IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIKE EVON, )
)
     Plaintiff, )
)     Case No: 20 CV 5682
v. )
)     [Formerly Circuit Court of
MENARD, INC, )     Cook County, Illinois Case
)     No. 20 L 9082]
     Defendant. )

## DEFENDANT MENARD, INC.'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGEMTN PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56.1(A)(3)

Now comes the Defendant, MENARD, INC., by their attorneys, FABRIZIO, HANSON, PEYLA & KAWINSKI, P.C., and for their Statement of Material Facts pursuant to FRCP 56.1(a)(3), states as follows:

1.     Plaintiff is 70 years old and resides in Monee, Illinois (Exhibit A, p. 5).

2.     The incident occurred on February 13, 2019 at the Menard store in Tinley Park, IL at approximately 9:00 a.m. (Exhibit A, p. 25-26).

3.     Plaintiff shopped at this Menard location regularly (Exhibit A, p. 26).

4.     The weather was cold. (Exhibit A, p. 26).

5.     The Plaintiff was wearing gym shoes on the date of the accident (Exhibit A, p. 27).

6.     Plaintiff entered the store through the IN door (Exhibit A, p. 27).

7.     Plaintiff stomped his feet on the runner in front of the IN door as he entered the store (Exhibit A, p. 28).

8.     Plaintiff went to get a shopping cart from the cart corral and slipped and fell directly in front of the carts (Exhibit A, p. 28).

1

9. Plaintiff slipped on clear liquid that he believed to be water (Exhibit A, p. 29).

10. The shopping carts where he slipped were wet from the outside (Exhibit A, p. 29).

11. Plaintiff has no idea how long the water he slipped on was on the floor (Exhibit A, p. 31).

12. He has no knowledge of whether Menard was aware of the water he slipped on prior to the fall (Exhibit A, p. 31).

13. Plaintiff cannot say that he saw the water he slipped on prior to his fall as he was not looking (Exhibit A, p. 33).

14. Plaintiff has reviewed the store surveillance produced in discovery by defendant and recognizes himself in said footage (Exhibit A, p. 11-12).

15. Cole Hickey was employed as a courtesy patrol member (also known as a carry out) with the Tinley Park Menards at the time of the accident (Exhibit B, p. 8).

16. Carry outs bring the carts from the parking lot into the store (Exhibit B, p. 23).

17. The Tinley Park store has a garage door next to the IN door for carts to be brought into the store from the parking lot (Exhibit B, p. 14).

18. Carts can be brought in through the garage door or the entrance door if you do not have a lot of carts (Exhibit B, p. 26).

19. There are 4 rows of carts located to the right as you enter the IN door (Exhibit B, p. 14-15).

20. Mats are put in front of the IN door when it rains or snows (Exhibit B, p. 14, Exhibit C, p. 12, Exhibit D, p. 16).

21. Mr. Hickey believes there was snow on the ground on the date of the incident (Exhibit B, p. 32).

22. The outside pavement was wet from either rain or snow on the date of the accident (Exhibit B, p. 36-37).

23. There was a runner in place in front of the IN door on the date of the accident (Exhibit B, p. 36).

24. Mr. Hickey did not witness the plaintiff's fall but he assisted him in getting up (Exhibit B, p. 29-30).

25. Wet floor signs are used for spills or when Menard becomes aware of some type of liquid on the floor (Exhibit B, p. 37).

26. Menard does not use wet floor signs when it is raining or snowing outside (Exhibit B, p. 37).

27. Spills or other liquid on the floor are mopped up as soon as Menard has notice of the condition (Exhibit B, p. 37).

28. If water from the shopping carts is seen on the floor, it is mopped up (Exhibit B, p. 38).

29. Pam Bamman was the assistant front-end manager on the date of the accident who took a report of the accident from the plaintiff (Exhibit D, p. 11, 31, 33).

30. Plaintiff reported to Ms. Bamman that he fell on water by the shopping carts (Exhibit D, p. 33).

31. Ms. Bamman went to the scene and saw a little water on the floor from the wheels of the shopping carts (Exhibit D, p. 33-34).

32. The water near the carts was an area not bigger than 1 by 1 feet (Exhibit D, p. 34).

33. The water near the shopping carts was from the wheels of the cart; "it had snowed, and it's from the wheels coming in" (Exhibit D, p. 34).

3

34. It had snowed the night prior and it was misting or light snow on the date of the accident (Exhibit D, p. 34-35).

35. Carts can be brought in through the main entrance door or the garage door (Exhibit C, p. 20, 39; Exhibit D, p. 16).

36. The main entrance floor is commercial grade vinyl tile (Exhibit D, p. 17).

37. The surveillance footage, attached hereto as Exhibit E and produced by the defendant in response to plaintiff's request for production is a true and accurate copy of surveillance footage recorded at the time of this accident.

38. The surveillance footage (Exhibit E) depicts wet conditions outside at the time of the accident, including snow.

FABRIZIO, HANSON, PEYLA & KAWINSKI, P.C.

By:    /s/ Marilynn Frangella

Marilynn Frangella # 6271920
FABRIZIO HANSON PEYLA & KAWINSKI, P.C.
Attorneys for Defendant
116 N. Chicago Street – Suite 200A
Joliet, Illinois 60432
(815) 727-5445, Ext. 1315
mfrangella.fhpk@gmail.com

4

Michael E. Evon

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIKE EVON,                          )
                                    )
                Plaintiff,          )
                                    )
    vs.                             )  No. 20 CV 05682
                                    )
MENARD, INC.,                       )
                                    )
                Defendant.          )

DEPOSITION VIA ZOOM OF:
MICHAEL E. EVON

The deposition via Zoom videoconferencing of MICHAEL E. EVON, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before SOPHIA KARNEZIS, CSR, RPR, a Notary Public in and for the County of Will, State of Illinois, at 60 West Randolph Street, Fourth Floor, Chicago, Illinois  60601, Illinois, on the 7th day of June, 2021, at 10:01 a.m.



EXHIBIT

A

Michael E. Evon

                    A P P E A R A N C E S

        (via Zoom:)
        KRALOVEC JAMBOIS & SCHWARTZ by
        MS. OLIVIA SCHWARTZ
        60 West Randolph Street, Fourth Floor
        Chicago, Illinois   60601

              on behalf of Plaintiff,

        (via Zoom:)
        FABRIZIO HANSON PEYLA AND KAWINSKI PC by
        MS. MARILYNN FRANGELLA
        116 North Chicago Street, Suite 200-A
        Joliet, Illinois   60432

              on behalf of Defendant.

-----------------------------------------------------------

                       I N D E X

EXAMINATIONS:                                        PAGE

MICHAEL E. EVON

        Direct By Ms. Frangella ..................3
        Examination By Ms. Schwartz .............72
        Further Examination By Ms. Frangella .....74

                NO EXHIBITS WERE MARKED

         George E. Rydman & Assoc., Joliet, IL   (815) 727-4363

THE COURT REPORTER:  Before I swear in the witness, I will ask Counsel to stipulate on the record that due to the current national emergency pandemic, the court reporter may swear in the deponent even though she is not in the physical presence of the deponent, and that there is no objection to that at this time, nor will there be an objection to it at a future date.

MS. SCHWARTZ:  Olivia Schwartz for the plaintiff, no objection.

MS. FRANGELLA:  The defendant stipulates.

(Witness sworn.)

MS. FRANGELLA:  Let the record reflect that this is the deposition of Mike Evon taken pursuant to notice and will be taken in accordance with all applicable rules.

MICHAEL E. EVON,

called as a witness herein on behalf of the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. FRANGELLA:

Q    Did I pronounce your last name correctly?

A    Yes.  Very good.

Michael E. Evon

Q    Okay, great.  Mr. Evon, my name is Marilynn Frangella, and I represent Menards in a lawsuit that you filed against them as a result of an incident that occurred on February 13th of 2019.  And I'm going to be asking you some questions today about your background, that incident, any injuries and treatment you may have had as a result.

Have you ever had to give a deposition before?

A    No.

Q    As you can see, there is a court reporter on the screen today.  She is going to be taking down everything that we're saying.  During the deposition, only one person could speak at a time to ensure that the court reporter is able to take everything down, so if you can please be sure to wait until I'm finished with my question before you give your answer.

If you answer my question, I'm going to assume that you understood it.  But if, at any point in the deposition, you don't understand my question, if you would please let me know, and I will rephrase it for you.  Does that sound fair?

A    Yes.

Michael E. Evon

Q    Okay.  All of your answers need to be out loud in spoken responses such as a "yes" or a "no." Avoid answers like "uh-huh" or "uh-uh" or nodding with your head or speaking with your hands.  It needs to be a verbal response so the court reporter can take it down.

And if you need to take a break at any point, please let me know.  Sound good?

A    Okay.

Q    All right, great.  If you can state your full name including any middle name you may have?

A    Michael Eugene Evon.

Q    And have you ever been known by any other name?

A    No.

Q    What is your date of birth?

A    3-28-49.

Q    And based on your answers to interrogatories, you reside at 7308 Burns Road in Monee, Illinois.  Is that correct?

A    Correct.

Q    And how long have you lived at that address?

A    Approximately 24 years.

Michael E. Evon

Q    And is that a house?

A    Yes.

Q    And do you reside at that address with anyone?

A    My wife.

Q    And what is your wife's name?

A    Ellen.

Q    I'm sorry, you said Helen?

A    Ellen, E-l-l-e-n.

Q    And Ellen has the same last name?

A    Correct.

Q    And do you and Ellen have any children together?

A    Yes.

Q    Can you tell me their names and ages?

A    Melissa, 49; Jerome, 46; and Jessica, 43.

Q    And Melissa's last name?

A    Wesphal.

Q    Can you spell that for me?

A    W-e-s-p-h-a-l, I believe.

Q    And Jerome's last name is Evon?

A    Correct.

Q    And Jessica's last name?

A    Evon.

Michael E. Evon

Q    And what town does Melissa live in?

A    Chesterton, Indiana.

Q    And Jerome, where does he live?

A    New Lenox, Illinois.

Q    And where does Jessica live?

A    She's in Virginia, and I'm not sure of the town. It might be a county, you know.

MS. FRANGELLA:  Thank you.  Off the record.

(Discussion off the record.)

BY MS. FRANGELLA:

Q    What is your highest level of education?

A    High school.  Graduated.

Q    And are you currently employed?

A    No.

Q    And when were you last employed?

A    Not positive.  About 10 years ago.

Q    And where were you last employed?

A    That would be with the U.S. government for the Census Bureau.

Q    And what did you do for the U.S. government?

A    Took the census.

Q    And how long were you in that position?

A    It was limited.  I don't think it was more

Michael E. Evon

than six months, if that.

Q    And prior to that, where were you employed?

A    I had my own business.

Q    And what was the name of your business?

A    Gambone's Restaurant.

Q    And can you spell that for me?

A    G-a-m-b-o-n-e-s.

Q    And what years did you have that business?

A    It started in about 1985, and I'm not sure when I sold it.  I can't remember, somewhere in the '90s maybe.

Q    So you think you had it roughly ten years?

A    Probably a little more than that.  I have to check my records.

Q    And where was that located?

A    Tinley Park, Illinois.

Q    And so assuming that was in the mid-'90s, did you have any jobs in between the Census Bureau and owning Gambone's Restaurant?

A    Let me see.  I owned the restaurant -- I retired, and I believe when I was sixty -- the earliest I could take it.  63, was it, when I was 63 years old?  So that would have been -- I'm 73 now, so ten years prior.  I'm not sure on my dates there.  I

George E. Rydman & Assoc., Joliet, IL  (815) 727-4363

Michael E. Evon

could look up on my records if you need.

Q    No.  That's okay.  I'm just trying to get an idea of your employment history.  And have you ever been convicted of a felony?

A    No.

Q    Have you ever been convicted of a misdemeanor involving fraud or dishonesty?

A    No.

Q    Are you taking any medication today that would affect your memory or ability to testify?

A    No.

Q    And were you taking any medication on the date of the accident we're here for today?

A    No.

Q    How would you describe your general state of health on the date of the accident?

A    Excellent.

Q    Did you have any health conditions for which you had to regularly see a doctor at the time of the Menard incident?

A    No.

Q    Do you have a primary care physician today?

A    No.  He retired.

Q    And when did your doctor retire?

Michael E. Evon

A    Approximately three years ago.

Q    You haven't seen a primary care physician since then?

A    Correct.

Q    And who was your primary care doctor that retired three years ago?

A    Dr. Kalamaris in Tinley Park.

Q    Okay.  And that's K-a-l-a-m-a-r-i-s at DuPage Medical Group?

A    I believe so, yes.

Q    And how long was Dr. Kalamaris your primary care doctor?

A    I'm going to have to guess.  Maybe 30 years, maybe more.

Q    And which location did you see Dr. Kalamaris at?

A    It was in Tinley Park.

Q    And did you have any other primary care physicians during that time besides Dr. Kalamaris?

A    No.  Not to my recollection.  I don't really see doctors very often.

Q    Okay.  And I see you're wearing glasses today?

A    Correct.

Michael E. Evon

Q    And for what condition do you wear glasses?

A    Whoa.

Q    Do you need them to read or for distance?

A    For distance, yes.

Q    Okay.  And were you wearing your glasses at the time of the Menards incident?

A    I believe I was, yes.  I need them.  I'd have to double-check.  I don't think I had contacts at that time.  I believe I was wearing glasses.

Q    And since the Menards incident, you sometimes wear contacts?

A    No, I do not.

Q    You do not, okay.  And did you review any documents to prepare for your deposition today?

A    Yes.

Q    And what documents did you review?

A    I looked at some notes I made, and I looked at some of the videotape, I believe, you guys sent out.

Q    You're talking about the store surveillance of your fall?

A    Correct.

Q    Okay.  And do you recognize yourself in the video footage?

Michael E. Evon

A    I do.

Q    And the notes that you're referring to, your attorney recently gave us some handwritten notes that were notes regarding the type of pain you had, treatment, and things you couldn't do.  Is that what you're referring to?

A    Correct.

Q    Okay.  And when did you make those notes?

A    I started them, I think, the day after or a couple days after my fall.

Q    Okay.  So on the notes it looks like it's four handwritten pages.  At the top it says emails to band mates with question marks.  What does that mean?

A    Well, after about -- I think after I played with the church on Easter, I was extremely in a lot of pain, and I couldn't play with the church band anymore.  And I had to notify them that I could no longer play with them.

Q    Okay.  And then there is a note under it, 10 o'clock, 60 West Randolph, Fourth Floor.  What is that?

A    Well, I met with my attorney on Friday.

Q    Okay.

A    And I wanted to make sure I knew where I

Michael E. Evon

was going and what time I was supposed to be there.

Q    Okay.  And underneath it has February 14th to February 28th, and then there are several entries of the type of pain you were having and things you were having difficulty doing.  Were those notes made sometime between the dates of February 14 to February 28th?

A    Correct.

Q    Okay.  And then I'm assuming underneath you had dates of March 1st to March 15th, and then you have some additional notes.  So were all of the notes made in between the dates that you have listed there?

A    Yes.

Q    Okay.  And why did you make these handwritten notes?

A    I wanted to memorialize what kind of pain I was having.

Q    For what purpose?

A    Well, the fall, I was hoping that the insurance would at least cover my medical bills.  And I just wanted to document that I had pain, and that was pretty much about it.

Q    And when you say you wanted the insurance to cover your medical bills, are you talking about

Michael E. Evon

your own health insurance or are you talking about you wanted Menards to pay your bills?

A    I don't think I really thought through it that much.

Q    Okay.

A    I was just documenting, you know, how my body was.

Q    And so were you making these notes for the purposes of a claim that you might make or a lawsuit that you might have filed later?

A    I had thought about it.

Q    Okay.  And based on your answers to interrogatories, you're claiming injuries to your neck, right knee, low back, and left hip; does that sound correct?

A    Correct.

Q    And in your answers, you indicate that your neck pain radiates to your right shoulder?

A    Correct.

Q    Do you get any numbness and tingling into your right shoulder or right arm or hand?

A    I do not.

Q    And prior to the Menard incident, had you ever had an injury to your neck?

Michael E. Evon

A    No.

Q    And prior to the Menard incident, had you ever had any symptoms of pain or stiffness or anything in your neck?

A    No.

Q    And had you ever sought any treatment for any symptoms in your neck prior to the Menard fall?

A    No.

Q    And your right knee, I understand from your medical records that you have a history of right knee issues.  Is that correct?

A    Going back about ten years ago.

Q    And your right knee injury was as a result or at least originally from a work-related incident?

A    Correct.  With the Census Bureau.

Q    Okay.  And what happened?  Did you have a fall?

A    I had an individual who I was trying to get information from, a big muscular man who came after me, and I was getting out of the way backing up.  And if it wasn't for his wife, he would have got me.

Q    So you fell trying to get away from somebody?

A    Right.  I missed a step.  I didn't want to

16

Michael E. Evon

turn my back to him.

Q    And that was approximately in 2010, does that sound correct?

A    It sounds correct approximately.

Q    And then based on some of the records that your attorney provided, you treated with Dr. Rhode for your right knee?

A    Correct.

Q    And did you see anybody else besides Dr. Rhode for your right knee before the Menards fall?

A    I do not believe so, no.

Q    And do you recall the last time you would have seen Dr. Rhode prior to the Menard fall?

A    I do not.

Q    Can you tell me approximately when you last saw him prior to the fall?

A    I'd have to check my records or you might have those records.  I don't know.

Q    Well, I have records, but I'm asking you for your recollection.

A    I don't recall.  I really don't.

Q    Do you think it had been more than a year since you had seen him for your right knee?

Michael E. Evon

A    I believe so, yes.

Q    Was it more than two years?

A    Again, I can't recall.  That would have been like four or five years ago, then, from today.

Q    No.  I'm asking you when you last saw him prior to the fall.

A    Yes.  For me it would be like four or five years from today.

Q    Okay.

A    I have to remember, and I don't remember.

Q    Okay.  So as you sit here today, you don't have any estimate as to the last time you would have seen Dr. Rhode prior to the Menard fall; true?

A    No.  I'd have to check my medical records.

Q    Okay.  You keep copies of your medical records?

A    Yes.

Q    Okay.  And at the time of the Menard fall, were you still having any issues with your right knee?

A    No.

     I want to rephrase that.  Earlier I know I was having a little bit of tightening of my knee, and that was probably a few years prior to the fall.

Michael E. Evon

Q    Okay.

A    I did get a -- I did get a few injections in my knee for tightening.  My knee would get a little stiff, and that would relieve the pain or the tightening of it.

Q    So when was the last time that you would have had the tightening or stiffness in the right knee prior to the Menard fall?

A    Again, don't recall.

Q    Do you have any estimate?

A    I don't.

Q    Did you have any symptoms in your right knee within six months prior to the fall?

A    I do not believe so, no.

Q    Did you have any symptoms in your knee within a year prior to the fall?

A    Again, it's pushing to the point where I really can't recall.

Q    Did you review any of your medical records to prepare for today?

A    I did not.

Q    And then whenever you last saw Dr. Rhode for your right knee, how did you leave it with him as far as future treatment?

A    He says I need surgery.

Q    What type of surgery did he tell you you needed?  And I'm talking about before the fall.

MS. SCHWARTZ:  Yes.  I was going to say, if you could just specify as to when we were talking about that.

BY MS. FRANGELLA:

Q    Did you understand my question?  So the last time you saw Dr. Rhode prior to the Menard fall, how did you leave it with him?

A    I don't recall.  I don't recall.

Q    Okay.  You mentioned that he told you you needed surgery.  Were you talking about before the fall or after the fall?

A    After the fall.

Q    Okay.  Did Dr. Rhode ever tell you that you needed future treatment when you last saw him prior to the fall?

A    No.

Q    And you had a surgery on your right knee prior to the fall, correct?

A    Correct.

Q    And that was sometime in 2011?  Does that sound correct?

Michael E. Evon

A    That sounds correct.

Q    All right.  And were there any other surgeries discussed on your right knee prior to the fall?

A    No.

Q    Okay.  And had you ever had any issues with your low back prior to the Menard fall?

A    No.

Q    Have you ever sought any treatment for any symptoms in your low back?

A    No.

Q    And then your left hip, any issues with your left hip prior to the Menard fall?

A    No.

Q    No treatment for any left hip issues prior to the fall?

A    Not to my recollection, no.

Q    Okay.  And have you been involved in any type of personal injury since the Menards incident, whether it be a fall at home or anywhere else or a car accident, anything like that?

A    Yes.

Q    And when were you involved in another injury?

Michael E. Evon

A     I'm going to -- I think it was maybe a couple months ago.

Q     And what happened a couple months ago?

A     I broke my right leg.

Q     And how did you do that?

A     I was walking through heavy, wet snow, and my bad knee, the right one, it was almost like cement. The snow was probably 16 to 18 inches deep from the drifting. And when I went in there, I stepped in with my right foot. I was pulling my left one to go forward. My right knee gave out or did a catch, and I rolled over, and my leg stayed in the snow. It was like cement. So my leg stayed in there, and I rolled over to my side, and it broke.

Q     Where did this occur?

A     At a friend's house.

Q     You said a couple months ago. So here in Illinois?

A     Oh, yeah, Illinois just down the block from me. It was my neighbor.

Q     And do you have any claim or anything against your neighbor for that fall?

A     No.

Q     And who did you treat with following this

22

Michael E. Evon

incident?

A    That would have been Dr. Rhode.

Q    Did you go to -- do you remember the day of the incident?

A    I do not.

Q    The month?

A    Wow.  It wasn't that long ago.  I'm trying to recall.  Might have been March maybe.

Q    March of 2021?

A    Correct.

Q    And then other than Dr. Rhode, did you see anyone else?

A    In what regard?

Q    For the injury that you had for the fracture in your leg.

A    Yes.

Q    Who else did you see?

A    I don't remember the name of them, but I went to an emergency like care place that took X-rays and did a splint on it the day after the incident.

Q    So I'm assuming that was somewhere near your home?

A    Relatively.  We live in a farming area, so everything is a distance.

Michael E. Evon

(Court reporter clarification.)

A    We live in a farming area, rural, so going anywhere is a drive.

BY MS. FRANGELLA:

Q    And did you reinjure your right knee in that incident in March of 2021?

A    No.

Q    And you don't know the name of the emergency facility?

A    I do not.

Q    Okay.

A    Something specialty.  I can't remember it.

Q    Okay.  Is there anything that you have that you would be able to look at and maybe provide that information to your attorney later as to where you were seen?

A    Yes.  I just got a bill from them.

Q    Okay.  And then I only have like one visit with Dr. Rhode regarding that incident, and it looks like he took X-rays of your right knee following that incident?  Does that sound correct?

A    Well, the right knee and the leg, it was all -- the break was by my knee, so it was a high break.

Michael E. Evon

Q    And did you see Dr. Rhode more than one time?

A    Yes.

Q    Okay.  Are you still under his care for this incident?

A    No.

Q    And who else did you see besides the emergency room facility and Dr. Rhode?

A    That's it.  Now, if I can clarify.

Q    Sure.

A    Okay.  I didn't see Dr. Rhode.  I saw his assistant Mark Brodick, I believe it is, or Broderick.

Q    Bordic, B-o-r-d-i-c?

A    That's it, yes.

Q    Okay.  And then he didn't send you for any therapy or anything?

A    No.

Q    And has your -- I'm assuming you're no longer wearing a boot on your leg, correct?

A    Oh, correct.

Q    How long did you have to wear a boot?

A    I believe it was six weeks.

Q    And has your leg recovered from the

Michael E. Evon

fracture?

A     Yes.

Q     And any ongoing issues due to that fall in March --

A     No.

Q     -- of 2021?

A     No.

Q     And any other subsequent personal injuries?

A     No.

Q     Have you been involved in any other personal injuries prior to the Menard fall?

A     Other than the Census Bureau?

Q     Correct.

A     Not to my recollection.

Q     Have you ever filed a lawsuit for personal injuries other than the lawsuit we're here for today?

A     I do not believe I ever have.

Q     Okay.  I'm just going to turn your attention to the accident we're here for today.  I referred to the date as February 13th of 2019.  Does that sound correct to you?

A     It does.

Q     And do you recall approximately what time you went to the store?

26

Michael E. Evon

A    Approximately 9 in the morning.

Q    And what location did you go to?

A    Tinley Park Menards.

Q    And was this the closest Menards to your home?

A    No.

Q    Was this a location that you shopped at regularly?

A    Yes.  It's the biggest one in, I believe, the United States.  It has everything.

Q    And was there a particular purpose for your visit to the store that day?

A    Yes.

Q    And what were you going to get?

A    Coffee.  It was on sale.

Q    Okay.  And did you go to the store with anyone that day?

A    No.  I want to rephrase that.  I went with my daughter.  I had her in the car.

Q    Okay.  And do you recall what the weather was like that day?

A    Somewhat cold.  Not bad, though.

Q    And when you say somewhat cold, do you remember whether it was above freezing or below?

Michael E. Evon

A     I do not.

Q     Was there any precipitation?

A     I do not believe there was, no.

Q     Was there any snow on the ground from a prior snowfall?

A     I can't recall that.

Q     You mentioned earlier that you reviewed the surveillance footage from the store?

A     Correct.

Q     Did you happen to see the footage of what the outside looked like on the date of your incident?

A     I did not.

Q     Do you recall whether there was any melting snow on the ground on the date of your incident?

A     I don't recall.

Q     Do you recall whether the parking lot was wet as you were entering the store?

A     Again, I do not recall.

Q     And what type of shoes were you wearing that day?

A     I believe I had gym shoes on.

Q     And which store did you go in, the "In" door or the "Out" door?

A     The "In" door.

Michael E. Evon

Q    And what happened after you walked in the "In" door?

A    I walked in, was going to get a cart, and right in front of the carts, that's where I slipped and fell.

Q    And when you walked in the door, did you notice whether there was a runner or some type of rug in front of the automatic --

A    Yes.

Q    -- door?

A    I'm sorry, I interrupted you.  I apologize.

Q    That's okay.  So did you notice a runner in front of the automatic door?

A    Yes, I did.  And I actually stomped my feet on it.

Q    And why did you stomp your feet on the runner?

A    I do it every time I go in every store regardless of weather.  It's a habit.

Q    And then you said you went to get a shopping cart, and you slipped in front of the carts?

A    Directly in front, correct.

Q    And do you know what you slipped on?

A    Was wet.

Michael E. Evon

Q    Do you know what it was that you slipped on?

A    I could only assume what it was.  I don't know exactly.

Q    Whatever you slipped on, was it clear?  Did it have a color to it?

A    It looked clear to me.

Q    Do you know whether it was water?

A    I think it was.

Q    Do you know, the shopping carts that were right there where you slipped, were the carts wet from the outside?

A    At the time -- I believe they were.

Q    And did you see like any puddle or anything of water or did you just know that the floor was wet because you slipped?

A    Well, when I was on my hands and knees from falling, the puddle was right underneath me.

Q    And can you tell me approximately the size of the puddle that you're talking about?

A    I really couldn't.  I wasn't really trying to measure it.

Q    And when you fell, how did you fall?  Did you fall backwards, forward, or to one side?

George E. Rydman & Assoc., Joliet, IL  (815) 727-4363

Michael E. Evon

A    I fell backwards and a little bit to my left side, and I hit my left hip.

Q    And when you fell backwards, did your arms like go down to break your fall or were your arms in front of you?

A    I would have to look at the video.  I really don't remember, but I think -- I believe my arms went forward.  I believe.  I am not positive.  I'd have to look at the video.  I'm sure that will say everything.

Q    And when you fell backwards, did you kind of go down on your bottom and then your hip?

A    Well, I went on my hip, and then I went flat on my back and was staring at the ceiling.

Q    And did you strike your head on the floor?

A    I don't recall.

Q    And do you know if anybody witnessed your fall?

A    I believe so, yes.

Q    And who was it that you believe witnessed your fall?

A    There was an employee who was, I think, just past me when I fell.  And there was another customer, I don't know who he is, but who talked to

Michael E. Evon

me after I got up and got by a shopping cart.

Q    And the employee that you're referring to, was that the gentleman that was bringing the shopping carts in?

A    Correct.

Q    Okay.  And do you know his name?

A    Do not.

Q    And do you know, as you were walking in, did you see any Menard employee bringing shopping carts in in front of you?

A    I did not immediately see that.

Q    And the water that you described on the floor where you fell, do you know how long that water was there?

A    Oh, I have no idea.

Q    Do you know if Menards was aware of the water that you described on the floor?

A    After I told them, yes.

Q    No.  Prior to your fall do you know --

A    Oh, I -- sorry.

Q    That's okay.  Prior to your fall, do you know whether Menards was aware of the water on the floor?

A    I would have no knowledge of that at all.

Michael E. Evon

Q    And the employee that you described, did he tell you that he saw your fall or did you just assume he saw it because he was there right after your fall?

A    Well, I don't know if he saw it.  I can't vouch for what he saw.  All I can say is I fell, and he was there pretty much right away.  And looking at the film, he was right there when I fell.

Q    Okay.  And what you're telling me here today, is this from your memory or your review of the video?

A    A little bit of both.

Q    Okay.  And did you have any conversation with the employee who was there right after your fall?

A    Yes.

Q    Okay.  And tell me about that conversation.

A    I was on my hands and knees, and he said "Can you get up?"  I said, "No."  And he helped me up, and that was the entire conversation.

Q    And the customer that you spoke with, you stated that you don't know this person's name?

A    No.

Q    And what was the conversation with the customer?

Michael E. Evon

A     Between a little bit of small talk, he asked me if I was okay.  And I said, "I don't know. I'm a little beat up."  I believe -- and I'm trying to remember.  I think he said that I should file a report just to document, and if I was injured to let them know, and they'd call an ambulance for me.

Q     And you're talking about this is the conversation with the customer?

A     Correct.

Q     Okay.

A     To the best of my recollection, right.

Q     And did you see any water on the floor prior to your fall?

A     I wasn't looking.

Q     And then I'm assuming you had a conversation with somebody else from Menards after your fall?

A     Correct.

Q     And who did you talk to next?

A     I don't know anyone's name.

Q     Was it a male or a female?

A     Female.

Q     And was the person African-American, Caucasian?

Michael E. Evon

A       Wow.  I don't recall.

Q       Okay.  Did you talk to more than one Menard employee after your fall?

A       Whoa.  Again, I do apologize.  I don't recall.

Q       Do you remember any of the conversations you had with any of the Menards employees other than the gentleman bringing in the carts that you told me about?

A       Maybe.  Hold on.  Let me think about that. I went to get -- like I said, I went in there to get coffee, and I had the cart and was having little difficulty going.  And I saw, I think, an employee in the back because I didn't see the coffee, and they said they didn't have any.

Q       Okay.  I was talking more conversations about your fall.

A       Oh, you mean like the desk people?

Q       Yeah.  Let's just back up for a minute.  So after your fall, the employee who was bringing in the carts helped you up; correct?

A       Correct.

Q       And then he asked you whether you were okay?

Michael E. Evon

A     No, no, no.  The employee didn't.  The employee didn't even ask me if I was okay.  He just asked if I could get up, and I said, "no."  And he picked me up, and that was the end of it, and then he walked away.

Q     Okay.  And then after he helped you up, what did you do?

A     I got a cart because I planned on getting the coffee my wife sent me for.

Q     Okay.  And then did you, then, proceed to go into the store to shop for your coffee?

A     I did.

Q     And immediately after the fall, were you having any symptoms anywhere in your body?

A     Oh, yeah.  My hip was killing me, and I was limping.

Q     And did you have any issues with limping prior to the fall?

A     No.

Q     And then did you go anywhere else in the store besides to the area where they have the coffee?

A     No.

Q     And before you left, I'm assuming you went to the desk and filled out a report; correct?

Michael E. Evon

A    Correct.

Q    And how long were you walking around the store shopping before you went back to the desk to fill out a report?

A    I'm going to say approximately maybe four minutes.

Q    And were you having any other symptoms other than your left hip was bothering you and you were limping?

A    I don't recall.

Q    And then when you went to the desk, do you know who you spoke with?

A    I do not.

Q    Can you tell me about the conversation you had with the person at the desk?

A    Yes.  To the best that I can remember, I told them I fell.  And she got, I think, something out to make a report or she was on the computer.  I don't really remember.  And I told her that I fell, and I wanted to make sure that she knew I was injured at that time and to make sure that they knew where the water was, the pool of water, so that they could take care of it so nobody else would fall.

And I believe I pointed out from the desk

Michael E. Evon

the pool of water that I saw in front of the carts. I think I showed her. I said, "You can see it from here," I believe. And I said, "You should get somebody to mop that up," and I think she got the guy who picked me up to mop up the floors there.

Q   And were you present when the employee mopped up the floor?

A   I was not. Well, I didn't see him. I might have been present, but I didn't see him.

Q   So as you were standing there at the desk, did you see anybody come out with a mop bucket?

A   I did not.

Q   Okay. And then did this employee that you spoke to, did they offer medical attention?

A   No.

Q   Did you tell them that you needed an ambulance?

A   I did not. I wanted to make -- first off, just to make it clear, I did not want an ambulance called. I had my puppy with me in the car. I did not to want end up going into a hospital. I wasn't bleeding. I didn't have anything broken to my knowledge, and I could walk. So I did not want an ambulance called, have to go to a hospital, and I had

38

Michael E. Evon

my puppy in the car.  Couldn't have that happen.

Q     So you had your puppy in the car.  Did you leave the car running or was the car off?

A     The car was off.

Q     So I'm assuming it wasn't that cold out if you left the dog in the car?

A     Well, I can't say.  Like I stated before, I don't know.  My dog is a Husky.  They love cold weather.  I can't get her in when it's cold out.  She rolls in the snow.  So the cold weather, if it was cold, wouldn't have mattered.  Actually, she would have enjoyed it more.

Q     And then did you speak with anyone else before you left the store?

A     Other than the desk?

Q     Correct.

A     Desk area, no.

Q     And then did you take any pictures of the area where you fell?

A     Did not.

Q     And then I'm assuming you left the store?

A     Correct.

Q     And where did you go when you left the store?

Michael E. Evon

A       When I left the store, I went to the Menards in Matteson.

Q       And I'm assuming you went for the coffee that was on sale?

A       That my wife sent me for.  You got it.

Q       All right.  And then were you able to get your coffee that day?

A       I was.

Q       And did you shop for anything else at the Matteson store?

A       No.

Q       And then after you left the Matteson store, did you go home?

A       Yes.

Q       And were you having any additional symptoms by that time besides your left hip pain?

A       When I got home, I laid down, and I didn't wake up again until my wife got home from work at about 3 o'clock.

Q       And then when you woke up at 3 o'clock, were you having any additional symptoms?

A       Yes.

Q       And what were those?

A       Well, I had -- my neck was starting to hurt

Michael E. Evon

a lot.  My hip was hurting a lot.  My knee was just starting to hurt.  And I don't want to say I had a headache, you know, like a headache, but I had a pain in my head.

Q    And then I'm assuming you told your wife of the incident?

A    I did.

Q    And did you seek any medical care that day?

A    Did not.

Q    And then when was the first time you sought medical care?

A    The next day.

Q    And who was that with?

A    I called Dr. Rhode's office.

Q    Okay.  And based on the records I have, it looks like you went to see him on the 18th of February, about five days later.  Does that sound correct?

A    Could be correct, yes.

Q    Okay.  And what were your complaints to Dr. Rhode when you saw him following the accident?

A    Well, it's over two years ago.  To the best of my recollection I was telling him about my hip, my neck and back, and my knee.  I also had a problem

with my arm and shoulder, and he gave me an injection in there, I think, right away if I remember correctly.

Q    Are we talking about your right shoulder?

A    Correct.

Q    So he gave you like a steroid injection in the shoulder?

A    I believe that's what it is, yeah.

Q    Okay.  And what else did Dr. Rhode do for you besides the injection?

A    They took X-rays.

Q    And did you have an understanding as to the results of the X-rays?

A    I'm not sure.  I know nothing was broken. That's all I know.

Q    And what was the recommendation, if any, for future care?

A    I don't recall what we did.  I know I had follow-up visits.

Q    Okay.  It looks like from your records that you had an MRI of your knee?

A    Correct.

Q    So I'm assuming Dr. Rhode ordered that, correct?

Michael E. Evon

A     Correct.

Q     And have you ever had an MRI of your knee before?

A     Yes.

Q     And when was the last time that you had one prior to the fall?

A     When I worked for the Census Bureau, which would have been about 12 years ago.

Q     Okay.  And after you had the MRI of your right knee following a fall, I'm assuming Dr. Rhode discussed the results with you?

A     He did.

Q     And did you have an understanding as to what the MRI showed?

A     It said I tore -- I think it's called a meniscus.

Q     And what did Dr. Rhode recommend for the torn meniscus?

A     That I should have surgery.

Q     And did you elect to have the surgery?

A     No.  Not at that time.

Q     And when you say not at that time, did you eventually have the surgery?

A     I did not.

Michael E. Evon

Q    And why was that?

A    Well, I wanted to push it off as long as possible.  I have 14 acres of land that has to be taken care of.  And if I had surgery during the spring or summer, my property would just -- I'd be devastated.  Nothing would get done.

Q    And the 14 acres of land that you have, do you grow things on it or what do you do with the property?

A    I -- first off, I manicure it.  It's an investment in my property.  I have manicured lawns.  I have flower gardens.  I have hanging baskets.  It's almost like a park.  It's so nice.  And it took me 20 years to -- a little over 20 years to accomplish what I've done there.  It's pretty much my retirement.

Q    So other than landscaping, you don't farm or grow anything on the property?

A    Oh, we -- we do -- I have apple orchards.  I have blackberries patches, large ones.  I do strawberries, blueberries.  I do corn, sweet corn, and I have my organic garden, and I have a small greenhouse that we prep everything with.

Q    And do you sell anything that you farm?

Michael E. Evon

A     No.  I give it away.

Q     And do you still maintain all of this today, everything you've just described as far as the farming?

A     To the best of my ability.  And just so you know, it's very difficult.  I work at about half the pace I used to.  And since I can't do as much as I used to do, my wife actually took off from a five day a week job to a four day a week job to help out because I just couldn't do it anymore with the pain.

Q     And what does your wife do for a living?

A     She works at a grocery store.

Q     What grocery store does she work at?

A     It's called Berkot's.

Q     And what does she do at Berkot's?

A     She verifies pricing.

Q     I'm sorry?

A     She's a verifier.  She verifies the prices of the products.

Q     And does she work at the location in Matteson?

A     No.  No, no, no.  She works at all the different stores.  She travels to all the different stores.

Michael E. Evon

Q    And so you decided not to have the surgery, so did Dr. Rhode recommend any other treatment for your knee?

A    Not to my recollection.  Oh, I take that back.  I did get injections, which helped.

Q    Dr. Rhode gave you an injection in the knee?

A    He doesn't.  Mark does.

Q    His P.A.?

A    Correct.  He's the one who does the work.

Q    And how many injections did you have in your right knee following the fall?

A    I don't recall.

Q    Did you have any swelling in your right knee following the fall?

A    Oh, yes.

Q    And at some point did that swelling subside?

A    I'm not sure.  It seems like it was always swollen.

Q    Always swollen meaning before the fall or after the fall?

A    After the fall.

Q    Is it still swollen today?

Michael E. Evon

A     Yes.  It has -- yes, it is.

Q     And how many injections did you get in your knee following the fall?

A     I don't recall.

Q     Did you have any relief from the injection that you received in your knee?

A     Yes.

Q     And how would you describe the relief?

A     I didn't have as much pain, and I had more mobility.

Q     And was this the same type of injection that you had received in the past?

A     Correct.

Q     So if you had to quantify how much relief you received from the injection, how would you quantify that?

A     I could function more.

Q     Meaning did you have 50 percent pain relief, 90?

A     It's difficult to come up with a number.  I don't think I can come up with a number.  There were times that it worked very well and times it didn't work as well.

Q     When you say work as well, are you talking

about your knee or with different injections?

A    With the injections.  And regardless of whether it worked or didn't, it never worked for long periods of time.

Q    In the past when you had received an injection in your knee prior to the fall, how long did the pain relief last from the injection?

A    Again, I can't qualify how long.  I don't remember.  It was always different.

Q    Okay.  And then what other treatment did Dr. Rhode recommend for the knee other than the injections?

A    Surgery.  Surgery to clean up the meniscus.

Q    Okay.  And you elected not to do that, so did he recommend anything else, any therapy?

A    No.

Q    Okay.  And then at some point it looks like he sent you for an MRI of your neck?

A    Correct.

Q    And did you have an understanding as to why he ordered an MRI of your neck?

A    Yes.  To see why I was in so much pain.

Q    Did you have an understanding as to the results on the MRI of your neck?

Michael E. Evon

A    Not really.  I know there was a problem. They called in a specialist, neck and spine specialist to look it over, and I met with him.

Q    And you're talking about somebody that Dr. Rhode referred you to or somebody in his office?

A    They had him come in as a specialist from time to time for specifically the neck and spine issues.

Q    And was that Dr. Sinha?

A    I believe so.

Q    And so your recollection is whoever the specialist was came to Dr. Rhode's office, correct?

A    Correct.

Q    And that was his Orland Park office?

A    Correct.

Q    And assuming it was Dr. Sinha, what did he tell you about your neck?

A    He told me that he would recommend surgery and having my neck fused.

MS. FRANGELLA:  Okay.

MS. SCHWARTZ:  Can we take a quick break?

MS. FRANGELLA:  Yes.  Sure.

(Recess taken.)

George E. Rydman & Assoc., Joliet, IL  (815) 727-4363

Michael E. Evon

BY MS. FRANGELLA:

Q    So it's your recollection that this spine specialist you saw at Dr. Rhode's office recommended a cervical fusion?

A    I don't know what it's called but, yeah, he wanted to go through my mouth and fuse some bones in the top.

Q    Okay.

A    I think that's what he said, yeah.

Q    Okay.  And the doctor that you saw at Rhode's office, did you ever go to his office to see him or did you only see him at Dr. Rhode's office? The spine specialist.

A    Only at Rhode's office.

Q    Okay.  And based on the records that I have, I show that you saw him on two occasions.  Does that sound correct to you?

A    Correct.  Yes.

Q    Okay.  And then did that spine specialist refer you for some type of injections in your neck?

A    I think he referred me because I didn't want to get the surgery.  I was kind of scared of it. I saw another specialist.  It was a spine and pain doctor who did treatments on my neck.

Michael E. Evon

Q    Okay.  And you're talking about Dr. Patel at Pain & Spine Institute?

A    That's the one.  Correct.

Q    Okay.  And then did you go to the location in Joliet?

A    Yes.

Q    And then did you see anyone other than Dr. Patel there?

A    No.  Not there, no.

Q    And it looks like Dr. Patel gave you some injections in your neck.  Does that sound correct?

A    Yes.

Q    And how many injections did you have in your neck?

A    I believe two, two different times.

Q    Okay.  And did you have any relief from the injections?

A    Very little.  It didn't last long.

Q    Did you have an understanding as to why Dr. Patel was recommending the injections in your neck?

A    He wanted to see whether that would relieve the pain on a long term basis, I believe.  I believe.

Q    And then did you bring the MRI that

Michael E. Evon

Dr. Rhode offered with you to Dr. Patel's office for him to look at?

A     I think I did.  I think I got a disk.

Q     Okay.

A     You know, CD thing.

Q     And did Dr. Patel indicate what the MRI of your neck showed?

A     I don't recall.  I don't know if he got specific.

Q     And did Dr. Patel recommend any treatment other than the injections he gave in your neck?

A     Oh.  Definitely, yes.

Q     And what other treatment did he recommend?

A     I don't know what it's called, but they -- you lay forward, and he sticks needles in your neck by the nerves to deaden them.  Then they stick some kind of big needle in there that's extremely painful, and it's supposed to destroy the nerves themselves to give relief.

Q     Okay.  And did you have that procedure that you're describing?

A     Twice.

Q     So it looks like you saw Dr. Patel in the fall of '19, and then you returned again in late

Michael E. Evon

December of 2020?

    A    Correct.

    Q    And then did you have that procedure again in 2020?

    A    Yes.

    Q    And the procedure that you're describing, did you have any relief from that?

    A    I did.

    Q    And how much relief did you have?

    A    Well, the first time it was almost a miracle.  After a few days it was better, and then within about a week I didn't even realize I was almost pain-free.

    Q    And this was the first set or the first procedure?

    A    Correct.

    Q    Okay.  And then did that neck pain return?

    A    Yes.  And it returned, just to throw a little in there.  I know I'm not supposed to say too much here, but it was gradual.  It's kind of like you don't realize it's starting to hurt again, and then it's hurting more and hurting more and hurting more and hurting more.

    Q    When you had the first procedure and you

Michael E. Evon

said in about week you were pain-free, how long did that period last where you had no pain in your neck?

A    I really can't say when I was totally pain-free how long it lasted.

Q    Okay.  Do you have any estimate?  Was it six months, three months?

A    It's difficult because I have so much work that I do on a tractor, on different equipment.  It's hard to say how long it really lasted.

Q    Okay.

A    I really can't tell.  I definitely remember in October it was getting real bad before I had the new injection or the new process.  My wife actually made me go to the doctor to get it done because I was complaining so much.

Q    And you're talking about October of 2020?

A    Correct.  That's when it was really bad. And I believe I had the procedure then in December again, the second one.

Q    Okay.  And then the last visit I show with Dr. Patel looked like just a tele-health visit in January of '21?

A    Correct.

Q    Have you seen Dr. Patel since?

George E. Rydman & Assoc., Joliet, IL  (815) 727-4363

54

Michael E. Evon

A    No.  I will be setting up another appointment, though.  My neck is starting to kill me again.

Q    And the last procedure that you had in December of '20, did you again get like full pain relief for a period of time?

A    For a period of time, a shorter period of time.  It wasn't all that long.

Q    And when did your neck pain roughly return after the December of '20 procedure or the second one?

A    Well, this is what?  This is June?  About a month before -- I'm sorry.  I'm trying to remember here.  Probably May of this year.

Q    In May of 2021 your neck --

A    Correct.  Yes.  It didn't last that long.

Q    Okay.  So in May of 2021, you believe your neck pain started to return?

A    Yes.  And it's back right now.

Q    And you never had any issues with neck pain prior to this Menard fall?

A    No.  Not that I recollect.  I don't remember ever having any.

Q    Okay.  And do you have an appointment with

George E. Rydman & Assoc., Joliet, IL  (815) 727-4363

Michael E. Evon

Dr. Patel or you have to schedule one?

A    I have to schedule it.  I'm delaying it. It's very painful.  And I do have -- I do do pain medicine, and that takes the pain away for, you know, the day almost.

Q    And what is the pain medication that you take?

A    Hydrocodone.

Q    And who prescribes that?

A    That would be Dr. Rhode's office.

Q    And did he prescribe the hydrocodone after the fall?

A    Correct.

Q    And had Dr. Rhode prescribed hydrocodone prior to the fall for you for your right knee?

A    Eleven years earlier when I had the fall working for the Census Bureau.

Q    So is that the last time that you had taken hydrocodone for your knee was 11 years prior to the fall?

A    Correct.  And I don't know how long it lasted that they prescribed it.  I can't recall that far back.

Q    And you didn't have a prescription for

Michael E. Evon

hydrocodone at the time of this fall, correct?

A    Oh.  No.  No.

Q    And so you're still receiving a regular prescription for hydrocodone from Dr. Rhode?

A    Not a regular prescription, no.

Q    So how often are you taking the hydrocodone?

A    As needed.

Q    So can you tell me how often you're taking it?

A    It depends on how much pain I'm in and what kind of work I have to do.

Q    So do you have any estimate as to are you taking it daily, weekly?

A    Oh, it's more than -- it's not daily because sometimes I don't do enough work.  I try to say what I have when I'm doing a lot of heavy work, so I can't say.  There was a period I was taking it almost every day.

MS. SCHWARTZ:  Can you estimate how many times per week that you think you took it on average?

THE WITNESS:  Oh, on average I would say probably six times a week.

BY MS. FRANGELLA:

Q    And it looks like Dr. Rhode also prescribed some physical therapy for your neck pain?

A    Correct.

Q    And it looks like you just attended a handful of visits at his office?

A    Correct.

Q    And did the physical therapy provide any relief?

A    Temporary.

Q    And had you had any issues with your right shoulder prior to the Menard fall?

A    Yes.

Q    And did you have a prior injury or what was the issue?

A    I don't know how it happened, but I had problems with my right shoulder about two years or so prior to the fall.

Q    And what happened two years prior to the fall?

A    I don't -- I don't recall.  It just -- I know I was in pain.

Q    Okay.  And who --

A    I work with a lot of -- I work with a lot

Michael E. Evon

of equipment, farm stuff, stuff like that.  It could have been anything.

Q     And who did you treat with two years prior to the fall when you had right shoulder pain?

A     Dr. Rhode.

Q     And what type of treatment did you have for your right shoulder prior?

A     If I remember correctly, an injection.

Q     And other than having an injection in your right shoulder with Dr. Rhode prior to the fall, did you have any other treatment?

A     On my shoulder?

Q     Correct.

A     Not to my knowledge, no.

Q     Dr. Rhode's records indicate that you received injections for your left shoulder prior to the fall, but you think it's your right?

A     I think it was my right, yeah.

Q     Okay.

A     I did see that -- I did see that also on one of my reports.  And when I looked at it I go, I thought it was my right one.  I think they mismarked it.

Q     Okay.  Yeah, it could be a typo.

59

Michael E. Evon

A    Yes.  I don't know.

Q    So you didn't have any issues with your left shoulder prior to the fall?

A    I don't believe so.  I think it was on my right.

Q    Okay.

A    I don't know.

MS. SCHWARTZ:  That's okay.

BY MS. FRANGELLA:

Q    And so were you still having any pain in that right shoulder at the time of the Menard fall?

A    No.

Q    And have we talked about all of the treatment that you've had following the fall?

A    I think so.

Q    Okay.  Did you have any visits with your primary care doctor, Dr. Kalamaris?

A    In what regard?

Q    For this fall.

A    I don't believe I did.  I could have, but I don't think so.

Q    So you believe we've discussed all of the treatment that you've had following the fall?

A    Well, I did get an injection in my shoulder

when I hurt after the fall.

Q    Correct.  I think you said that you got that right out of the gate when you went to see Dr. Rhode, correct?

A    Correct.  Yes.

Q    Okay.  So any other treatment that you've had following this fall that we haven't talked about?

A    Oh.  Yes.

Q    Okay.

A    I had an injection in my hip, my left hip.

Q    And who was that with?

A    Dr. Rhode.

Q    Okay.

A    Or Mark.  You know, he takes care of everything.

Q    The physician's assistant?

A    Correct.

Q    Okay.  And any other treatment that we haven't talked about, meaning any other providers?

A    That we haven't talked about?

Q    Correct.  That you're claiming are related to your fall.

A    Oh, no.  I can't recall that at all.  I don't think so.

Michael E. Evon

Q    Okay.  And did you have health insurance at the time of the fall?

A    Medicare.

Q    And to your knowledge, have your bills been paid?

A    Yes.

Q    And when is the last time that you received a prescription for hydrocodone from Dr. Rhode?

A    I believe about maybe three weeks ago.

Q    And what are you taking the hydrocodone for?

A    Pain.

Q    Pain where?

A    My knee and my neck.

Q    And has your left hip pain resolved?

A    It comes and goes.  It's not the same all the time.  There'll be stretches when it's fine, and then it just bothers me badly.

Q    And other than the injection, did you have any other treatment for the left hip?

A    No.

Q    And has your right shoulder pain resolved?

A    Yes.  Completely.

Q    And when did it resolve?

Michael E. Evon

A    Immediately after the shot.

Q    And how often are you having knee pain?

A    Every day.

Q    And have you had daily knee pain since the fall?

A    Yes.  Now, the injections do help, you know, so I don't know how to put that in perspective.

Q    So do the injections lessen the pain but you still have it or when you get an injection, does the pain go away for a period in your knee?

A    It usually goes away for a short period, and then it comes back.

Q    And when you say short period, are you able to tell me how long the pain is gone after the knee injection?

A    It's always different.  It's always different.

Q    And how often are you having pain in your neck?

A    Well, after the -- after the process I'm good for a period of time where I have almost no pain.  But like now, it's 24 hours a day.

Q    So after the procedure, you describe where they burn your nerves --

Michael E. Evon

A    Right.

Q    Do you recognize the term ablation?  If I say nerve ablation is that --

A    (Indicating.)

Q    No?  Okay.  I'll just call it burning --

A    I'm sorry, I did the hand thing there.  No. I'm sorry.  I apologize.

Q    No.  You're fine.  So after that procedure, after a period of time, the neck pain returns, and you have it daily?

A    Yes.

Q    And are there any physical activities that you absolutely can no longer do because of your knee or neck pain?

A    I can still move my knees.  I can still walk.  I still try to do everything I used to do, but now it's just with pain.

Q    Okay.  So are there any activities that you absolutely can no longer do because of your right knee or neck pain from this fall?

A    Well, I don't climb ladders anymore.

Q    Why can't you climb a ladder?

A    Because of my knee.  If I get up on a ladder and it catches or gives out, I will be in big

64

Michael E. Evon

trouble.

Q    And were you climbing ladders regularly before the fall?

A    Oh, yeah.  I have, yes.

Q    And for what purpose?

A    Cleaning gutters, doing roofs, cutting trees.  I have trees all over the place.  All the maintenance that needs to be done.

Q    Do you have anyone that helps you with the maintenance for your property?

A    My wife.

Q    Anyone else?

A    No.

Q    Any other activities that you can no longer do because of your knee or neck pain besides climbing ladders?

A    That I totally can't do?

Q    Correct.

A    No.  But limited is --

Q    No.  My question is limited to what you absolutely cannot do, so anything else besides climbing a ladder.

A    I don't believe so.

Q    Okay.  And you're still able to maintain

65

Michael E. Evon

your property, but you don't do it as quickly?

A    I can still -- I make a point of doing that.  Like I said, I do have my wife, who took another day off of work so that she could help.  Yes.

Q    And have you taken any vacations since this fall?

A    No.

Q    And do you have any hobbies or anything you regularly do outside of maintaining your property?

A    Yes.  I have a recording studio.  I play music.  I write it.  I played in the church band until I got injured, and then I couldn't play anymore.  I played with the New Lenox United Methodist Church, and I had to quit them.  And I couldn't record -- I couldn't even play guitar for about a year.  And when I record, I'm doing CDs and videos.

Q    And so did you ever return to playing guitar at the New Lenox Methodist Church after the fall?

A    No.

Q    Have you since started playing the guitar again since the fall?

A    Yes.

66

Michael E. Evon

Q    Okay.  So you said it was a period of one year following the fall that you couldn't play the guitar?

A    Correct.

Q    And was that due to your neck pain?

A    Correct.

Q    And prior to the fall, how often would you play guitar for the church?

A    Oh, for the church?

Q    Correct.

A    Well, we have rehearsal, and then we play at the church, I think it was, every other week.

Q    And do you play guitar anywhere outside of the church?

A    Just at my house and in my studio.

Q    And is your studio at your home or somewhere else?

A    At the house.

Q    So you don't go anywhere and perform for anyone, you would just do that at the church every other week?

A    Correct.  I had opportunity, but I just can't stand with a guitar strap around my neck and play.

Michael E. Evon

                    (Telephone interruption.)

     THE WITNESS:  Sorry.  My apologies.  I didn't
turn it off.

     MS. SCHWARTZ:  His phone just started ringing,
and he's turning it off right now.

     MS. FRANGELLA:  Okay.  No problem.

     THE WITNESS:  My apologies.  I'm sorry.

     MS. FRANGELLA:  No problem.

     Q    And so you don't play anywhere like
formally other than at the church every other week
prior to the fall?

     A    Correct.

     Q    Okay.  And then you mentioned something
about making CDs?

     A    Correct.

     Q    So this is something that you do in your
studio?

     A    Correct.

     Q    Okay.  And do you play something else
besides the guitar?

     A    Yes.

     Q    And what is that?

     A    Keyboard.  And I have a drum machine.  I
play bass, 12-string acoustic, 6-string electric, the

Michael E. Evon

keyboards, and I have a drum machine I use for drums.

Q    And are you still able to play all of those?

A    Yes.

Q    And the CDs that you make in your studio, what do you do with those?  Do you sell them somewhere?

A    No.  I give them away for free.  I only have one CD out right now.  I was working on a Christian CD before I got injured.

Q    And do you play music with like a band or a group of people?

A    No.  Since I can play all the instruments, I write the music, I write the songs.  And then I record them, and since I am not a vocalist, I get vocalists who do want to work with me.

Q    And any other hobbies outside of your music and taking care of your property?

A    No.

Q    Do you belong to a gym or a health club?

A    No.

Q    Do you have any grandchildren?

A    Yes.

Q    And how many do you have?

69

Michael E. Evon

A    Six.

Q    And who is it that has the children?  Which child?

A    Well, all three of them.

Q    All three of them, okay.  And Jessica, how many children does she have?

A    One.  A daughter.

Q    And then what about Jerome and Melissa?

A    Jerome has two daughters.  Melissa has two sons and one daughter.

Q    And do you watch any of your grandchildren on a regular basis?

A    No.  They're all older.

Q    Oh, they're all older.  Okay.

A    Let me see.  Two of them are in college, one works at a restaurant, and the other one is in -- a senior.

Q    Okay.  And then you mentioned you had dogs. Do you have more than just the Husky, the one Husky?

A    Just the one.

Q    And then are you able to walk your dog?

A    Limited.

Q    And did you ever use a cane or anything to help you walk prior to the Menard fall?

Michael E. Evon

A    No.

Q    And when you say limited, how are you limited in walking your dog?

A    I can't walk her very far.  I can't walk her very far.

Q    Did you walk her far previously before --

A    Oh, yes.  Almost every day.

Q    Well, tell me about the difference.

A    Well, the difference is now I walk her either down the driveway and back where before I used to walk her around the entire property, which was -- probably I walked a couple miles.

Q    And are you able to do things inside the home like cleaning and cooking?

A    Well, I can do them, but they're painful. Vacuuming, I'm surprised, is very painful.

Q    And are you able to do grocery shopping?

A    Yes.

Q    And you're able to drive?

A    Yes.

Q    And are you claiming an emotional injury as a result of the accident?

A    No.

Q    And do you still shop at the Menards in

Michael E. Evon

Tinley Park?

        A        I do.

        Q        Have you ever spoken to anyone at Menards since the day of your incident regarding your fall?

        A        No.

        Q        Did you ever return to take pictures of the area where you fell?

        A        I did some -- I think I took some videos.

        Q        And what did you take videos of?

        A        The area coming into the store and the area that I fell.

        Q        And what was the purpose of the videos?

        A        To see what it looked like and what could have happened.

        Q        And did you learn anything from returning to take the videos?

        A        I don't really recall if I learned anything because it wasn't the same day.

        Q        Okay.

        A        It was after the fact.

        Q        And have you ever given a statement regarding this incident other than to your attorney?

        A        I talked to the gentleman who called me from the insurance agency.  I talked to him a little

Michael E. Evon

bit.  I don't remember what the conversation really was other than he said they weren't liable.  I gave him some information but I don't think much.

MS. FRANGELLA:  I don't think I have any other questions.  Thank you.

THE WITNESS:  Thank you.

EXAMINATION

BY MS. SCHWARTZ:

Q   Just a few really quick.  The defense attorney had asked about if you were still able to play all of the instruments that you were playing prior to the fall.  Playing those instruments, do they still cause you pain?

A   Oh, yes, definitely.

Q   We briefly talked about some symptoms you were having in your knee prior to the fall and compared to the pain after the fall in that same knee.  Was it the same pain that you feel now that you were feeling prior to the fall?

A   Oh, no.  No.  It wasn't even pain before.  It was more of a stiffness in my knee.  After the fall it was, without question, pain.

Q   And you mentioned that your knee sometimes gives out.  Can you explain a little bit?

Michael E. Evon

A    They called it a catch.  I think the doctors called it a catch so that as you're walking, instead of returning to fully out, it just stays like bent, and it can almost bring you down to the ground so that you would fall.

Q    And did that ever occur prior to the fall at Menards?

A    No.  Other than immediately when -- 12 years ago.

Q    Defense counsel asked you a couple of questions about your doctor's appointments and complaints of pain on specific dates.  Would you defer to your medical records as opposed to your recollection today for those answers?

A    Oh, definitely to be accurate.

Q    Do you believe that the substance that you fell on at Menards was water?

A    Oh, yeah.  I would think so.

Q    Can you describe it a little bit more?

A    Well, when I was on my hands and knees trying to get up, I felt wet like water, you know. And it had like a gritty -- like came from like the parking lot type, you know, little granule things in it.

Michael E. Evon

Q    And you had described a pool of water by the shopping carts earlier.

A    Correct.

Q    Do you have any -- was that pool of water bigger than a foot by a foot?

A    That's like 12 inches by 12 -- oh, yeah.

Q    Do you think it was bigger than 2 feet by 2 feet?

A    Two feet by 2 feet.  I'm trying to picture it.  Probably 2 feet by 2 feet would be more accurate.

Q    Okay.  That's all I have.

A    And it's round, so it's not like -- you know, well, kind of round.

MS. SCHWARTZ:  That's all I have.

THE WITNESS:  Okay.

MS. FRANGELLA:  Just a couple more follow up.

FURTHER EXAMINATION

BY MS. FRANGELLA:

Q    Had you ever been diagnosed with rheumatoid arthritis?

A    I do not believe so.

Q    And do you have high blood pressure?

A    No.

George E. Rydman & Assoc., Joliet, IL   (815) 727-4363

Michael E. Evon

Q    So you had never been diagnosed or taking any or taken any medication for high blood pressure?

A    No.

Q    Earlier in the deposition I asked you the size of the puddle of water, and you were not able to tell me; correct?

A    Correct.  It was tough to tell.

Q    But now you have a recollection that it's 2 feet by 2 feet?

A    Well, when she put it in perspective of is it a foot by a foot, you know, I'm thinking 12 inches by 12 inches, it was bigger than that.

Q    Okay.

A    So probably about, you know, arm size, then (indicating).

MS. FRANGELLA:  Okay.  No further questions.

MS. SCHWARTZ:  All right.  That's it for me, too.

MS. FRANGELLA:  Okay.

(The deposition ended at 11:29 a.m., and the witness was excused.)

Michael E. Evon

STATE OF ILLINOIS    )
                     )  SS:
COUNTY OF W I L L     )

I, SOPHIA KARNEZIS, CSR, RPR, a Notary Public in and for the County of Will, State of Illinois, do hereby certify MICHAEL E. EVON was first duly sworn by me to testify the truth; that the above deposition, Page 1 through 76, was recorded stenographically and reduced to typewriting under my personal direction; and that the foregoing transcript of the said deposition is a true and correct transcript of the testimony given by the said witness at the time and place previously specified.

I further certify that I am not counsel for nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal this 17th day of June, 2021.

_____
Sophia Karnezis, CSR, RPR
IL CSR No. 084-003792

Michael E. Evon

**A**

a.m 1:19 75:20
ability 9:10 44:5
ablation 63:2,3
able 4:15 23:14
  39:6 62:13
  64:24 68:2
  69:21 70:13,17
  70:19 72:10
  75:5
absolutely 63:13
  63:19 64:21
accident 9:13,16
  20:21 25:19
  40:21 70:22
accomplish 43:14
accurate 73:15
  74:11
acoustic 67:24
acres 43:3,7
activities 63:12,18
  64:14
additional 13:11
  39:15,21
address 5:23 6:3
affect 9:10
affix 76:18
African-Americ...
  33:23
agency 71:24
ages 6:15
ago 7:16 10:1,6
  15:12 17:4 21:2
  21:3,17 22:7
  40:22 42:8 61:9
  73:9
ambulance 33:6
  37:17,19,24
answer 4:18,19
answers 5:1,3,18
  14:12,17 73:14
anybody 16:9
  30:17 37:11
anymore 12:17
  44:10 63:21
  65:13

anyone's 33:20
apologies 67:2,7
apologize 28:11
  34:4 63:7
apple 43:19
applicable 3:16
appointment 54:2
  54:24
appointments
  73:11
approximately
  5:24 10:1 16:2,4
  16:16 25:23
  26:1 29:19 36:5
area 22:23 23:2
  35:21 38:17,19
  71:7,10,10
arm 14:21 41:1
  75:14
arms 30:3,4,8
arthritis 74:21
asked 33:2 34:23
  35:3 72:10
  73:10 75:4
asking 4:5 16:20
  17:5
assistant 24:12
  60:16
assume 4:20 29:3
  32:2
assuming 8:17
  13:9 22:21
  24:19 33:15
  35:23 38:5,21
  39:3 40:5 41:23
  42:10 48:16
attended 57:5
attention 25:19
  37:14
attorney 12:3,22
  16:6 23:15
  71:22 72:10
automatic 28:8,13
average 56:21,22
Avoid 5:3
aware 31:16,22

**B**

B-o-r-d-i-c 24:14
back 14:14 15:12
  16:1 20:7,10
  30:14 34:14,19
  36:3 40:24 45:5
  54:19 55:23
  62:12 70:10
background 4:6
backing 15:20
backwards 29:24
  30:1,3,11
bad 21:7 26:22
  53:12,17
badly 61:18
band 12:13,16
  65:11 68:11
based 5:18 14:12
  16:5 40:15
  49:15
basis 50:23 69:12
baskets 43:12
bass 67:24
beat 33:3
behalf 2:5,9 3:18
believe 6:20 8:21
  10:10 11:7,9,18
  16:12 17:1
  18:14 24:12,23
  25:17 26:9 27:3
  27:21 29:13
  30:7,8,19,20
  33:3 36:24 37:3
  41:8 48:10
  50:15,23,23
  53:18 54:17
  59:4,20,22 61:9
  64:23 73:16
  74:22
belong 68:20
bent 73:4
Berkot's 44:14,15
best 33:11 36:16
  40:22 44:5
better 52:11
big 15:19 51:17

63:24
bigger 74:5,7
  75:12
biggest 26:9
bill 23:17
bills 13:20,24
  14:2 61:4
birth 5:16
bit 17:23 30:1
  32:11 33:1 72:1
  72:24 73:19
blackberries
  43:20
bleeding 37:22
block 21:19
blood 74:23 75:2
blueberries 43:21
body 14:7 35:14
bones 49:6
boot 24:20,22
Bordic 24:14
bothering 36:8
bothers 61:18
bottom 30:12
break 5:7 23:23
  23:24 30:4
  48:21
briefly 72:15
bring 50:24 73:4
bringing 31:3,9
  34:8,20
Broderick 24:13
Brodick 24:12
broke 21:4,14
broken 37:22
  41:14
bucket 37:11
Bureau 7:19 8:18
  15:15 25:12
  42:7 55:17
burn 62:24
burning 63:5
Burns 5:19
business 8:3,4,8

**C**

C 2:1
call 33:6 63:5
called 3:18 37:20
  37:24 40:14
  42:15 44:14
  48:2 49:5 51:14
  71:23 73:1,2
cane 69:23
car 20:21 26:19
  37:20 38:1,2,3,3
  38:4,6
care 9:22 10:2,5
  10:12,18 22:19
  24:4 36:23 40:8
  40:11 41:17
  43:4 59:17
  60:14 68:18
cart 28:3,21 31:1
  34:12 35:8
carts 28:4,21
  29:10,11 31:4
  31:10 34:8,21
  37:1 74:2
catch 21:12 73:1,2
catches 63:24
Caucasian 33:24
cause 72:13
CD 51:5 68:9,10
CDs 65:16 67:14
  68:5
ceiling 30:14
cement 21:8,13
census 7:19,22
  8:18 15:15
  25:12 42:7
  55:17
certify 76:5,13
cervical 49:4
check 8:14 16:18
  17:14
Chesterton 7:2
Chicago 1:18 2:4
  2:7
child 69:3
children 6:12
  69:2,6

Michael E. Evon

Christian 68:10
church 12:15,16
  65:11,14,19
  66:8,9,12,14,20
  67:10
Civil 1:13
claim 14:9 21:21
claiming 14:13
  60:21 70:21
clarification 23:1
clarify 24:9
clean 47:13
cleaning 64:6
  70:14
clear 29:5,7 37:19
climb 63:21,22
climbing 64:2,15
  64:22
closest 26:4
club 68:20
coffee 26:15 34:12
  34:14 35:9,11
  35:21 39:3,7
cold 26:22,23
  38:5,8,9,10,11
college 69:15
color 29:6
come 37:11 46:20
  46:21 48:6
comes 61:16
  62:12
coming 71:10
compared 72:17
complaining
  53:15
complaints 40:20
  73:12
Completely 61:23
computer 36:18
condition 11:1
conditions 9:18
contacts 11:8,11
conversation
  32:12,16,19,23
  33:8,16 36:14
  72:1

conversations
  34:6,16
convicted 9:4,6
cooking 70:14
copies 17:15
corn 43:21,21
correct 5:20,21
  6:11,22 10:4,24
  11:22 12:7 13:8
  14:15,16,19
  15:11,15 16:3,4
  16:8 19:21,22
  19:24 20:1
  22:10 23:21
  24:20,21 25:13
  25:21 27:9
  28:22 31:5 33:9
  33:18 34:21,22
  35:24 36:1
  38:16,22 40:18
  40:19 41:5,22
  41:24 42:1
  45:10 46:13
  47:19 48:12,13
  48:15 49:17,18
  50:3,11 52:2,16
  53:17,23 54:16
  55:13,21 56:1
  57:4,7 58:13
  60:2,4,5,17,21
  64:18 66:4,6,10
  66:22 67:12,15
  67:18 74:3 75:6
  75:7 76:10
correctly 3:23
  41:3 58:8
counsel 3:2 73:10
  76:13
county 1:16 7:7
  76:2,4
couple 12:10 21:2
  21:3,17 70:12
  73:10 74:17
court 1:1 3:1,4
  4:11,15 5:5 23:1
Courts 1:14

cover 13:20,24
CSR 1:16 76:3,21
  76:22
current 3:3
currently 7:13
customer 30:24
  32:20,24 33:8
cutting 64:6
CV 1:5

**D**

D 2:11
daily 56:14,15
  62:4 63:10
date 3:8 5:16 9:13
  9:16 25:20
  27:11,14
dates 8:24 13:6,10
  13:12 73:12
daughter 26:19
  69:7,10
daughters 69:9
day 1:19 12:9
  22:3,20 26:12
  26:17,21 27:20
  39:7 40:8,12
  44:8,9 55:5
  56:19 62:3,22
  65:4 70:7 71:4
  71:18 76:18
days 12:10 40:17
  52:11
deaden 51:16
December 52:1
  53:18 54:5,10
decided 45:1
deep 21:8
defendant 1:7 2:9
  3:11,19
defense 72:9
  73:10
defer 73:13
definitely 51:12
  53:11 72:14
  73:15
delaying 55:2

depends 56:11
deponent 3:5,6
deposition 1:9,11
  3:14 4:8,13,21
  11:14 75:4,20
  76:7,10
depositions 1:15
describe 9:15
  46:8 62:23
  73:19
described 31:12
  31:17 32:1 44:3
  74:1
describing 51:21
  52:6
desk 34:18 35:24
  36:3,11,15,24
  37:10 38:15,17
destroy 51:18
devastated 43:6
diagnosed 74:20
  75:1
difference 70:8,9
different 44:23,23
  47:1,9 50:15
  53:8 62:16,17
difficult 44:6
  46:20 53:7
difficulty 13:5
  34:13
Direct 2:13 3:21
direction 76:9
Directly 28:22
discussed 20:3
  42:11 59:22
Discussion 7:9
dishonesty 9:7
disk 51:3
distance 11:3,4
  22:24
District 1:1,1,14
DIVISION 1:2
doctor 9:19,24
  10:5,12 49:10
  49:24 53:14
  59:17

doctor's 73:11
doctors 10:21
  73:2
document 13:21
  33:5
documenting 14:6
documents 11:14
  11:16
dog 38:6,8 69:21
  70:3
dogs 69:18
doing 13:5 56:17
  64:6 65:2,16
door 27:23,23,24
  28:2,6,10,13
double-check
  11:8
Dr 10:7,11,16,19
  16:6,10,14
  17:13 18:22
  19:9,16 22:2,11
  23:19 24:1,8,11
  40:14,21 41:9
  41:23 42:10,17
  45:2,6 47:11
  48:5,9,12,16
  49:3,12 50:1,8
  50:10,20 51:1,1
  51:6,10,23
  53:21,24 55:1
  55:10,14 56:4
  57:2 58:5,10,15
  59:17 60:4,12
  61:8
drifting 21:9
drive 23:3 70:19
driveway 70:10
drum 67:23 68:1
drums 68:1
due 3:3 25:3 66:5
duly 3:19 76:6
DuPage 10:9

**E**

E 1:9,12 2:1,1,11
  2:13 3:17 76:5

Michael E. Evon

E-l-l-e-n 6:9
earlier 17:22 27:7
  55:16 74:2 75:4
earliest 8:22
Easter 12:15
EASTERN 1:2
education 7:11
either 70:10
elect 42:20
elected 47:14
electric 67:24
Eleven 55:16
Ellen 6:7,9,10,12
emails 12:12
emergency 3:3
  22:19 23:9 24:8
emotional 70:21
employed 7:13,15
  7:17 8:2
employee 30:22
  31:2,9 32:1,13
  34:3,13,20 35:1
  35:2 37:6,13
employees 34:7
employment 9:3
ended 75:20
enjoyed 38:12
ensure 4:14
entering 27:17
entire 32:19 70:11
entries 13:3
equipment 53:8
  58:1
estimate 17:12
  18:10 53:5
  56:13,20
Eugene 5:12
eventually 42:23
Evon 1:3,9,12
  2:13 3:14,17 4:1
  5:12 6:21,24
  76:5
exactly 29:4
Examination 2:14
  2:14 3:21 72:7
  74:18

EXAMINATIO...
  2:12
examined 3:19
Excellent 9:17
excused 75:21
EXHIBITS 2:16
explain 72:24
extremely 12:15
  51:17

F
FABRIZIO 2:6
facility 23:9 24:8
fact 71:20
fair 4:23
fall 11:21 12:10
  13:19 15:7,17
  16:11,14,17
  17:6,13,18,24
  18:8,13,16 19:3
  19:9,14,14,15
  19:18,21 20:4,7
  20:13,16,20
  21:22 25:3,11
  29:23,24 30:4
  30:18,21 31:19
  31:21 32:2,3,14
  33:13,17 34:3
  34:17,20 35:13
  35:18 36:23
  42:6,10 45:12
  45:15,21,22,23
  46:3 47:6 51:24
  54:21 55:12,15
  55:16,20 56:1
  57:12,18,20
  58:4,10,17 59:3
  59:11,14,19,23
  60:1,7,22 61:2
  62:5 63:20 64:3
  65:6,20,23 66:2
  66:7 67:11
  69:24 71:4
  72:12,16,17,19
  72:22 73:5,6
falling 29:18

far 18:24 44:3
  55:23 70:4,5,6
farm 43:17,24
  58:1
farming 22:23
  23:2 44:4
February 4:4
  13:2,3,6,7 25:20
  40:17
Federal 1:13
feel 72:18
feeling 72:19
feet 28:14,16 74:7
  74:8,9,9,10,10
  75:9,9
fell 15:22 28:5
  29:23 30:1,3,11
  30:23 31:13
  32:5,7 36:17,19
  38:19 71:7,11
  73:17
felony 9:4
felt 73:21
female 33:21,22
file 33:4
filed 4:3 14:10
  25:15
fill 36:4
filled 35:24
film 32:7
fine 61:17 63:8
finished 4:17
first 3:19 37:18
  40:10 43:10
  52:10,14,14,24
  76:5
five 17:4,7 40:17
  44:8
flat 30:14
floor 1:18 2:3
  12:20 29:15
  30:15 31:13,17
  31:23 33:12
  37:7
floors 37:5
flower 43:12

follow 74:17
follow-up 41:19
following 21:24
  23:20 40:21
  42:10 45:12,15
  46:3 59:14,23
  60:7 66:2
follows 3:20
foot 21:10 74:5,5
  75:11,11
footage 11:24
  27:8,10
foregoing 76:9
formally 67:10
forward 21:11
  29:24 30:8
  51:15
four 12:12 17:4,7
  36:5 44:9
Fourth 1:18 2:3
  12:20
fracture 22:15
  25:1
Frangella 2:7,13
  2:14 3:11,13,22
  4:2 7:8,10 19:7
  23:4 48:20,22
  49:1 57:1 59:9
  67:6,8 72:4
  74:17,19 75:16
  75:19
fraud 9:7
free 68:8
freezing 26:24
Friday 12:22
friend's 21:16
front 28:4,8,13,21
  28:22 30:5
  31:10 37:1
full 5:11 54:5
fully 73:3
function 46:17
further 2:14
  74:18 75:16
  76:13
fuse 49:6

fused 48:19
fusion 49:4
future 3:8 18:24
  19:17 41:17

G
G-a-m-b-o-n-e-s
  8:7
Gambone's 8:5
  8:19
garden 43:22
gardens 43:12
gate 60:3
general 9:15
gentleman 31:3
  34:8 71:23
getting 15:20 35:8
  53:12
give 4:8,17 44:1
  51:19 68:8
given 71:21 76:11
gives 63:24 72:24
glasses 10:22 11:1
  11:5,9
go 21:11 22:3
  26:2,16 27:22
  28:18 30:4,12
  35:11,20 37:24
  38:23 39:13
  49:6,11 50:4
  53:14 58:21
  62:10 66:19
goes 61:16 62:11
going 4:5,12,19
  10:13 13:1
  15:12 19:4 21:1
  23:2 25:18
  26:14 28:3
  34:13 36:5
  37:21
good 3:24 5:8
  62:21
government 7:18
  7:21
gradual 52:20
Graduated 7:12

Michael E. Evon

grandchildren 68:22 69:11
granule 73:23
great 4:1 5:10
greenhouse 43:23
gritty 73:22
grocery 44:12,13 70:17
ground 27:4,14 73:4
group 10:9 68:12
grow 43:8,18
guess 10:13
guitar 65:15,19 65:22 66:3,8,13 66:23 67:20
gutters 64:6
guy 37:4
guys 11:18
gym 27:21 68:20

**H**

habit 28:19
half 44:6
hand 14:21 63:6 76:18
handful 57:6
hands 5:4 29:17 32:17 73:20
handwritten 12:3 12:12 13:15
hanging 43:12
HANSON 2:6
happen 27:10 38:1
happened 15:16 21:3 28:1 57:16 57:19 71:14
hard 53:9
head 5:4 30:15 40:4
headache 40:3,3
health 9:16,18 14:1 61:1 68:20
heavy 21:6 56:17
Helen 6:8

help 44:9 62:6 65:4 69:24
helped 32:18 34:21 35:6 45:5
helps 64:9
hereunto 76:17
high 7:12 23:23 74:23 75:2
highest 7:11
hip 14:14 20:12 20:13,15 30:2 30:12,13 35:15 36:8 39:16 40:1 40:23 60:10,10 61:15,20
history 9:3 15:10
hit 30:2
hobbies 65:8 68:17
Hold 34:10
home 20:20 22:22 26:5 39:13,17 39:18 66:16 70:14
hoping 13:19
hospital 37:21,24
hours 62:22
house 6:1 21:16 66:15,18
hurt 39:24 40:2 52:21 60:1
hurting 40:1 52:22,22,22,23
Husky 38:8 69:19 69:19
hydrocodone 55:8,11,14,19 56:1,4,7 61:8,10

**I**

idea 9:3 31:15
IL 76:22
Illinois 1:1,17,18 1:18 2:4,8 5:20 7:4 8:16 21:18 21:19 76:1,5

immediately 31:11 35:13 62:1 73:8
inches 21:8 74:6 75:11,12
incident 4:3,6 9:20 11:6,10 14:23 15:2,14 20:19 22:1,4,20 23:6,19,21 24:5 27:11,14 40:6 71:4,22
including 5:11
Indiana 7:2
indicate 14:17 51:6 58:15
indicating 63:4 75:15
individual 15:18
information 15:19 23:15 72:3
injection 41:1,6 41:10 45:6 46:5 46:11,15 47:6,7 53:13 58:8,9 59:24 60:10 61:19 62:9,15
injections 18:2 45:5,11 46:2 47:1,2,12 49:20 50:11,13,17,20 51:11 58:16 62:6,8
injured 33:5 36:20 65:12 68:10
injuries 4:6 14:13 25:8,11,16
injury 14:24 15:13 20:19,24 22:14 57:14 70:21
inside 70:13
Institute 50:2
instruments

68:13 72:11,12
insurance 13:20 13:23 14:1 61:1 71:24
interested 76:15
interrogatories 5:19 14:13
interrupted 28:11
interruption 67:1
investment 43:11
involved 20:18,23 25:10
involving 9:7
issue 57:15
issues 15:11 17:19 20:6,12,15 25:3 35:17 48:8 54:20 57:11 59:2

**J**

JAMBOIS 2:2
January 53:22
Jerome 6:16 7:3 69:8,9
Jerome's 6:21
Jessica 6:16 7:5 69:5
Jessica's 6:23
job 44:9,9
jobs 8:18
Joliet 2:8 50:5
June 1:19 54:12 76:18

**K**

K-a-l-a-m-a-r-i-s 10:8
Kalamaris 10:7 10:11,16,19 59:17
Karnezis 1:15 76:3,21
KAWINSKI 2:6
keep 17:15
Keyboard 67:23

keyboards 68:1
kill 54:2
killing 35:15
kind 13:16 30:11 49:22 51:17 52:20 56:12 74:14
knee 14:14 15:9 15:10,13 16:7 16:10,24 17:20 17:23 18:3,3,8 18:13,15,23 19:20 20:3 21:7 21:11 23:5,20 23:22,23 40:1 40:24 41:21 42:2,10 45:3,7 45:12,15 46:3,6 47:1,6,11 55:15 55:19 61:14 62:2,4,10,14 63:13,20,23 64:15 72:16,18 72:21,23
knees 29:17 32:17 63:15 73:20
knew 12:24 36:20 36:21
know 4:22 5:8 7:7 14:6 16:19 17:22 23:8 28:23 29:1,4,8 29:10,15 30:17 30:24 31:6,8,13 31:16,19,22 32:4,21 33:2,6 33:20 36:12 38:8 40:3 41:14 41:15,18 44:6 48:1 49:5 51:5,8 51:14 52:19 55:4,21 57:16 57:22 59:1,7 60:14 62:7,7 73:21,23 74:14 75:11,14

Michael E. Evon

| | | | | |
|---|---|---|---|---|
| knowledge 31:24 37:23 58:14 61:4 | 64:20 69:22 70:2,3 | low 14:14 20:7,10 | memory 9:10 32:9 | move 63:15 |

knowledge 31:24
  37:23 58:14
  61:4
known 5:13
KRALOVEC 2:2

**L**

L 76:2,2
ladder 63:22,24
  64:22
ladders 63:21
  64:2,16
laid 39:17
land 43:3,7
landscaping
  43:17
large 43:20
lasted 53:4,9
  55:22
late 51:24
lawns 43:11
lawsuit 4:2 14:9
  25:15,16
lay 51:15
learn 71:15
learned 71:17
leave 18:23 19:10
  38:3
left 14:14 20:12
  20:13,15 21:10
  30:2,2 35:23
  36:8 38:6,14,21
  38:23 39:1,12
  39:16 58:16
  59:3 60:10
  61:15,20
leg 21:4,12,13
  22:15 23:22
  24:20,24
Lenox 7:4 65:13
  65:19
lessen 62:8
Let's 34:19
level 7:11
liable 72:2
limited 7:24 64:19

64:20 69:22
  70:2,3
limping 35:16,17
  36:9
listed 13:12
little 8:13 17:23
  18:4 30:1 32:11
  33:1,3 34:12
  43:14 50:18
  52:19 71:24
  72:24 73:19,23
live 7:1,3,5 22:23
  23:2
lived 5:22
living 44:11
located 8:15
location 10:15
  26:2,7 44:20
  50:4
long 5:22 7:23
  10:11 22:7
  24:22 31:13
  36:2 43:2 47:3,6
  47:8 50:18,23
  53:1,4,9 54:8,16
  55:21 62:14
longer 12:18
  24:20 63:13,19
  64:14
look 9:1 23:14
  30:6,9 48:3 51:2
looked 11:17,17
  27:11 29:7
  53:21 58:21
  71:13
looking 32:6
  33:14
looks 12:11 23:19
  40:16 41:20
  47:17 50:10
  51:23 57:2,5
lot 12:15 27:16
  40:1,1 56:17
  57:24,24 73:23
loud 5:2
love 38:8

low 14:14 20:7,10

**M**

machine 67:23
  68:1
maintain 44:2
  64:24
maintaining 65:9
maintenance 64:8
  64:10
making 14:8
  67:14
male 33:21
man 15:19
manicure 43:10
manicured 43:11
March 13:10,10
  22:8,9 23:6 25:4
Marilynn 2:7 4:1
Mark 24:12 45:8
  60:14
MARKED 2:16
marks 12:13
mates 12:13
mattered 38:11
Matteson 39:2,10
  39:12 44:21
mean 12:13 34:18
meaning 45:21
  46:18 60:19
measure 29:22
medical 10:9
  13:20,24 15:10
  17:14,15 18:19
  37:14 40:8,11
  73:13
Medicare 61:3
medication 9:9,12
  55:6 75:2
medicine 55:4
Melissa 6:16 7:1
  69:8,9
Melissa's 6:17
melting 27:13
memorialize
  13:16

memory 9:10 32:9
Menard 1:6 9:20
  14:23 15:2,7
  16:14 17:13,18
  18:8 19:9 20:7
  20:13 25:11
  31:9 34:2 54:21
  57:12 59:11
  69:24
Menards 4:2 11:6
  11:10 14:2
  16:10 20:19
  26:3,4 31:16,22
  33:16 34:7 39:2
  70:24 71:3 73:7
  73:17
meniscus 42:16
  42:18 47:13
mentioned 19:12
  27:7 67:13
  69:18 72:23
met 12:22 48:3
Methodist 65:14
  65:19
Michael 1:9,12
  2:13 3:17 5:12
  76:5
mid-'90s 8:17
middle 5:11
Mike 1:3 3:14
miles 70:12
minute 34:19
minutes 36:6
miracle 52:11
misdemeanor 9:7
mismarked 58:22
missed 15:24
mobility 46:10
Monee 5:20
month 22:6 54:13
months 8:1 18:13
  21:2,3,17 53:6,6
mop 37:4,5,11
mopped 37:7
morning 26:1
mouth 49:6

move 63:15
MRI 41:21 42:2,9
  42:14 47:18,21
  47:24 50:24
  51:6
muscular 15:19
music 65:11 68:11
  68:14,17

**N**

N 2:1,11
name 3:23 4:1
  5:11,11,14 6:6
  6:10,17,21,23
  8:4 22:18 23:8
  31:6 32:21
  33:20
names 6:15
national 3:3
near 22:21
neck 14:14,18,24
  15:4,7 39:24
  40:24 47:18,21
  47:24 48:2,7,17
  48:19 49:20,24
  50:11,14,21
  51:7,11,15
  52:17 53:2 54:2
  54:9,15,18,20
  57:3 61:14
  62:19 63:9,14
  63:20 64:15
  66:5,23
need 5:1,7 9:1
  11:3,7 19:1
needed 19:3,13,17
  37:16 56:8
needle 51:17
needles 51:15
needs 5:4 64:8
neighbor 21:20
  21:22
nerve 63:3
nerves 51:16,18
  62:24
never 47:3 54:20

Michael E. Evon

| | | | | |
|---|---|---|---|---|
| 75:1 | 13:14 14:5,12 | owned 8:20 | **PC** 2:6 | 18:17 45:17 |
| **new** 7:4 53:13,13 | 15:16 17:9,11 | **owning** 8:19 | **people** 34:18 | 47:17 65:2 |
| 65:13,19 | 17:15,18 18:1 | | 68:12 | **pointed** 36:24 |
| **nice** 43:13 | 19:12,16 20:6 | **P** | **percent** 46:18 | **pool** 36:22 37:1 |
| **nodding** 5:3 | 20:18 23:11,13 | **P** 2:1,1 | **perform** 66:19 | 74:1,4 |
| **North** 2:7 | 23:18 24:4,11 | **P.A** 45:9 | **period** 53:2 54:6 | **position** 7:23 |
| **NORTHERN** 1:1 | 24:16 25:18 | **pace** 44:7 | 54:7,7 56:18 | **positive** 7:16 30:8 |
| **Notary** 1:16 76:3 | 26:16,20 28:12 | **Page** 2:12 76:7 | 62:10,11,13,21 | **possible** 43:3 |
| **note** 12:19 | 31:6,21 32:8,12 | **pages** 12:12 | 63:9 66:1 | **precipitation** 27:2 |
| **notes** 11:17 12:2,3 | 32:16 33:2,10 | **paid** 61:5 | **periods** 47:4 | **prep** 43:23 |
| 12:4,8,11 13:5 | 34:2,16,24 35:2 | **pain** 12:4,16 13:4 | **person** 4:14 33:23 | **prepare** 11:14 |
| 13:11,11,15 | 35:6,10 37:13 | 13:16,21 14:18 | 36:15 | 18:20 |
| 14:8 | 40:15,20 41:9 | 15:3 18:4 39:16 | **person's** 32:21 | **prescribe** 55:11 |
| **notice** 1:12 3:15 | 41:20 42:9 | 40:3 44:10 46:9 | **personal** 20:19 | **prescribed** 55:14 |
| 28:7,12 | 47:10,14,17 | 46:18 47:7,22 | 25:8,11,15 76:9 | 55:22 57:2 |
| **notify** 12:17 | 48:20 49:8,10 | 49:23 50:2,23 | **perspective** 62:7 | **prescribes** 55:9 |
| **number** 46:20,21 | 49:15,19 50:1,4 | 52:17 53:2 54:5 | 75:10 | **prescription** |
| **numbness** 14:20 | 50:16 51:4,20 | 54:9,18,20 55:3 | **pertaining** 1:14 | 55:24 56:4,5 |
| | 52:17 53:5,10 | 55:4,6 56:11 | **PEYLA** 2:6 | 61:8 |
| **O** | 53:20 54:17,24 | 57:3,22 58:4 | **phone** 67:4 | **presence** 3:6 |
| **o'clock** 12:20 | 57:23 58:19,24 | 59:10 61:12,13 | **physical** 3:5 57:3 | **present** 37:6,9 |
| 39:19,20 | 59:6,8,16 60:6,9 | 61:15,22 62:2,4 | 57:8 63:12 | **pressure** 74:23 |
| **objection** 3:7,8,10 | 60:13,18 61:1 | 62:8,10,14,18 | **physician** 9:22 | 75:2 |
| **occasions** 49:16 | 63:5,18 64:24 | 62:22 63:9,14 | 10:2 | **pretty** 13:22 32:6 |
| **occur** 21:15 73:6 | 66:1 67:6,13,19 | 63:17,20 64:15 | **physician's** 60:16 | 43:15 |
| **occurred** 4:4 | 69:5,14,18 | 66:5 72:13,17 | **physicians** 10:19 | **previously** 70:6 |
| **October** 53:12,16 | 71:19 74:12,16 | 72:18,20,22 | **picked** 35:4 37:5 | 76:12 |
| **offer** 37:14 | 75:13,16,19 | 73:12 | **picture** 74:9 | **prices** 44:18 |
| **offered** 51:1 | **old** 8:23 | **pain-free** 52:13 | **pictures** 38:18 | **pricing** 44:16 |
| **office** 40:14 48:5 | **older** 69:13,14 | 53:1,4 | 71:6 | **primary** 9:22 |
| 48:12,14 49:3 | **Olivia** 2:3 3:9 | **painful** 51:17 | **place** 22:19 64:7 | 10:2,5,11,18 |
| 49:11,11,12,14 | **ones** 43:20 | 55:3 70:15,16 | 76:12 | 59:17 |
| 51:1 55:10 57:6 | **ongoing** 25:3 | **pandemic** 3:4 | **plaintiff** 1:4 2:5 | **prior** 8:2,24 14:23 |
| **oh** 21:19 24:21 | **opportunity** | **park** 8:16 10:7,17 | 3:10 | 15:2,7 16:14,17 |
| 31:15,20 34:18 | 66:22 | 26:3 43:13 | **planned** 35:8 | 17:6,13,24 18:8 |
| 35:15 43:19 | **opposed** 73:13 | 48:14 71:1 | **play** 12:16,18 | 18:13,16 19:9 |
| 45:4,16 51:12 | **orchards** 43:19 | **parking** 27:16 | 65:10,12,15 | 19:17,21 20:3,7 |
| 56:2,15,22 60:8 | **ordered** 41:23 | 73:23 | 66:2,8,11,13,24 | 20:13,15 25:11 |
| 60:23 64:4 66:9 | 47:21 | **particular** 26:11 | 67:9,19,24 68:2 | 27:5 31:19,21 |
| 69:14 70:7 | **organic** 43:22 | **parties** 76:14 | 68:11,13 72:11 | 33:13 35:18 |
| 72:14,20 73:15 | **originally** 15:14 | **patches** 43:20 | **played** 12:14 | 42:6 47:6 54:21 |
| 73:18 74:6 | **Orland** 48:14 | **Patel** 50:1,8,10,20 | 65:11,13 | 55:15,19 57:12 |
| **okay** 4:1 5:1,9 9:2 | **outcome** 76:15 | 51:6,10,23 | **playing** 65:18,22 | 57:14,18,19 |
| 10:8,22 11:5,13 | **outside** 27:11 | 53:21,24 55:1 | 72:11,12 | 58:3,7,10,16 |
| 11:23 12:8,11 | 29:12 65:9 | **Patel's** 51:1 | **please** 4:16,22 5:8 | 59:3 66:7 67:11 |
| 12:19,23 13:2,9 | 66:13 68:17 | **pay** 14:2 | **point** 4:20 5:8 | 69:24 72:12,16 |

Michael E. Evon

72:19 73:6
**probably** 8:13
  17:24 21:8
  54:14 56:23
  70:12 74:10
  75:14
**problem** 40:24
  48:1 67:6,8
**problems** 57:17
**procedure** 1:13
  51:20 52:3,6,15
  52:24 53:18
  54:4,10 62:23
  63:8
**proceed** 35:10
**process** 53:13
  62:20
**products** 44:19
**pronounce** 3:23
**property** 43:5,9
  43:11,18 64:10
  65:1,9 68:18
  70:11
**provide** 23:14
  57:8
**provided** 16:6
**providers** 60:19
**Public** 1:16 76:4
**puddle** 29:14,18
  29:20 75:5
**pulling** 21:10
**puppy** 37:20 38:1
  38:2
**purpose** 13:18
  26:11 64:5
  71:12
**purposes** 14:9
**pursuant** 1:12,12
  3:14
**push** 43:2
**pushing** 18:17
**put** 62:7 75:10

**Q**

**qualify** 47:8
**quantify** 46:14,16

**question** 4:17,19
  4:21 12:13 19:8
  64:20 72:22
**questions** 4:5 72:5
  73:11 75:16
**quick** 48:21 72:9
**quickly** 65:1
**quit** 65:14

**R**

**R** 2:1
**radiates** 14:18
**Randolph** 1:17
  2:3 12:20
**read** 11:3
**real** 53:12
**realize** 52:12,21
**really** 10:21 14:3
  16:22 18:18
  29:21,21 30:7
  36:19 48:1 53:3
  53:9,11,17
  71:17 72:1,9
**recall** 16:13,22
  17:3 18:9,18
  19:11,11 22:8
  25:23 26:20
  27:6,13,15,16
  27:18 30:16
  34:1,5 36:10
  41:18 45:13
  46:4 51:8 55:22
  57:21 60:23
  71:17
**received** 46:6,12
  46:15 47:5
  58:16 61:7
**receiving** 56:3
**Recess** 48:23
**recognize** 11:23
  63:2
**recollect** 54:22
**recollection** 10:20
  16:21 20:17
  25:14 33:11
  40:23 45:4

48:11 49:2
  73:14 75:8
**recommend** 42:17
  45:2 47:11,15
  48:18 51:10,13
**recommendation**
  41:16
**recommended**
  49:3
**recommending**
  50:20
**record** 3:3,13 7:8
  7:9 65:15,16
  68:15
**recorded** 76:7
**recording** 65:10
**records** 8:14 9:1
  15:10 16:5,18
  16:19,20 17:14
  17:16 18:19
  40:15 41:20
  49:15 58:15
  73:13
**recovered** 24:24
**reduced** 76:8
**refer** 49:20
**referred** 25:20
  48:5 49:21
**referring** 12:2,6
  31:2
**reflect** 3:13
**regard** 22:13
  59:18
**regarding** 12:4
  23:19 71:4,22
**regardless** 28:19
  47:2
**regular** 56:3,5
  69:12
**regularly** 9:19
  26:8 64:2 65:9
**rehearsal** 66:11
**reinjure** 23:5
**related** 60:21
  76:14
**Relatively** 22:23

**relief** 46:5,8,14,19
  47:7 50:16
  51:19 52:7,9
  54:6 57:9
**relieve** 18:4 50:22
**remember** 8:10
  17:10,10 22:3
  22:18 23:12
  26:24 30:7 33:4
  34:6 36:16,19
  41:2 47:9 53:11
  54:13,23 58:8
  72:1
**rephrase** 4:22
  17:22 26:18
**report** 33:5 35:24
  36:4,18
**reporter** 3:1,4
  4:11,15 5:5 23:1
**reports** 58:21
**represent** 4:2
**reside** 5:19 6:3
**resolve** 61:24
**resolved** 61:15,22
**response** 5:5
**responses** 5:2
**restaurant** 8:5,19
  8:20 69:16
**result** 4:3,7 15:13
  70:22
**results** 41:13
  42:11 47:24
**retire** 9:24
**retired** 8:21 9:23
  10:6
**retirement** 43:16
**return** 52:17 54:9
  54:18 65:18
  71:6
**returned** 51:24
  52:18
**returning** 71:15
  73:3
**returns** 63:9
**review** 11:13,16
  18:19 32:9

**reviewed** 27:7
**rheumatoid** 74:20
**Rhode** 16:6,10,14
  17:13 18:22
  19:9,16 22:2,11
  23:19 24:1,8,11
  40:21 41:9,23
  42:10,17 45:2,6
  47:11 48:5 51:1
  55:14 56:4 57:2
  58:5,10 60:4,12
  61:8
**Rhode's** 40:14
  48:12 49:3,11
  49:12,14 55:10
  58:15
**right** 5:10 14:14
  14:18,21,21
  15:9,10,13,24
  16:7,10,24
  17:19 18:7,12
  18:23 19:20
  20:2,3 21:4,7,10
  21:11 23:5,20
  23:22 28:4
  29:11,18 32:3,6
  32:7,13 33:11
  39:6 41:2,4
  42:10 45:12,14
  54:19 55:15
  57:11,17 58:4,7
  58:10,17,18,22
  59:5,11 60:3
  61:22 63:1,19
  67:5 68:9 75:17
**ringing** 67:4
**Road** 5:19
**rolled** 21:12,14
**rolls** 38:10
**roofs** 64:6
**room** 24:8
**roughly** 8:12 54:9
**round** 74:13,14
**RPR** 1:16 76:3,21
**rug** 28:7
**rules** 1:13 3:16

Michael E. Evon

runner 28:7,12,17
running 38:3
rural 23:2

___

**S**

S 2:1
sale 26:15 39:4
saw 16:17 17:5
  18:22 19:9,17
  24:11 32:2,3,4,5
  34:13 37:1
  40:21 49:3,10
  49:16,23 51:23
saying 4:13
says 12:12 19:1
scared 49:22
schedule 55:1,2
school 7:12
Schwartz 2:2,3,14
  3:9,9 19:4 48:21
  56:20 59:8 67:4
  72:8 74:15
  75:17
screen 4:12
seal 76:18
second 53:19
  54:10
see 4:11 8:20 9:19
  10:15,21,22
  16:9 22:11,17
  24:1,7,11 27:10
  29:14 31:9,11
  33:12 34:14
  37:2,8,9,11
  40:16 47:22
  49:11,12 50:7
  50:22 58:20,20
  60:3 69:15
  71:13
seek 40:8
seen 10:2 16:14
  16:24 17:13
  23:16 53:24
sell 43:24 68:6
send 24:16
senior 69:17

sent 11:18 35:9
  39:5 47:18
set 52:14 76:17
setting 54:1
shoes 27:19,21
shop 35:11 39:9
  70:24
shopped 26:7
shopping 28:21
  29:10 31:1,3,9
  36:3 70:17 74:2
short 62:11,13
shorter 54:7
shot 62:1
shoulder 14:18,21
  41:1,4,7 57:12
  57:17 58:4,7,10
  58:12,16 59:3
  59:11,24 61:22
show 49:16 53:20
showed 37:2
  42:14 51:7
side 21:14 29:24
  30:2
Sinha 48:9,16
sit 17:11
six 8:1 18:13
  24:23 53:6
  56:23 69:1
sixty 8:21
size 29:19 75:5,14
slipped 28:4,21
  28:23 29:1,5,11
  29:16
small 33:1 43:22
snow 21:6,8,13
  27:4,14 38:10
snowfall 27:5
sold 8:10
somebody 15:23
  33:16 37:4 48:4
  48:5
somewhat 26:22
  26:23
songs 68:14
sons 69:10

Sophia 1:15 76:3
  76:21
sorry 6:8 28:11
  31:20 44:17
  54:13 63:6,7
  67:2,7
sought 15:6 20:9
  40:10
sound 4:23 5:8
  14:15 16:3
  19:24 23:21
  25:21 40:17
  49:17 50:11
sounds 16:4 20:1
speak 4:14 38:13
speaking 5:4
specialist 48:2,3,6
  48:12 49:3,13
  49:19,23
specialty 23:12
specific 51:9
  73:12
specifically 48:7
specified 76:12
specify 19:5
spell 6:19 8:6
spine 48:2,7 49:2
  49:13,19,23
  50:2
splint 22:20
spoke 32:20 36:12
  37:14
spoken 5:2 71:3
spring 43:5
SS 76:1
stand 66:23
standing 37:10
staring 30:14
started 8:9 12:9
  54:18 65:22
  67:4
starting 39:24
  40:2 52:21 54:2
state 1:17 5:10
  9:15 76:1,4
stated 32:21 38:7

statement 71:21
States 1:1,14
  26:10
stayed 21:12,13
stays 73:3
stenographically
  76:8
step 15:24
stepped 21:10
steroid 41:6
stick 51:16
sticks 51:15
stiff 18:4
stiffness 15:3 18:7
  72:21
stipulate 3:2
stipulates 3:11
stomp 28:16
stomped 28:14
store 11:20 25:24
  26:12,16 27:8
  27:17,22 28:18
  35:11,21 36:3
  38:14,21,24
  39:1,10,12
  44:12,13 71:10
stores 44:23,24
strap 66:23
strawberries
  43:21
Street 1:17 2:3,7
stretches 61:17
strike 30:15
studio 65:10
  66:15,16 67:17
  68:5
stuff 58:1,1
subsequent 25:8
subside 45:18
substance 73:16
suit 76:15
Suite 2:7
summer 43:5
supposed 13:1
  51:18 52:19
sure 4:16 7:6 8:9

8:24 12:24
  24:10 30:9
  36:20,21 41:14
  45:19 48:22
surgeries 20:3
surgery 19:1,2,13
  19:20 42:19,20
  42:23 43:4 45:1
  47:13,13 48:18
  49:22
surprised 70:16
surveillance
  11:20 27:8
swear 3:1,4
sweet 43:21
swelling 45:14,17
swollen 45:20,21
  45:24
sworn 3:12,19
  76:6
symptoms 15:3,7
  18:12,15 20:10
  35:14 36:7
  39:15,21 72:15

___

**T**

take 4:15 5:6,7
  8:22 36:23
  38:18 45:4
  48:21 55:7 71:6
  71:9,16
taken 1:15 3:14
  3:15 43:4 48:23
  55:18 65:5 75:2
takes 55:4 60:14
talk 33:1,19 34:2
talked 30:24
  59:13 60:7,19
  60:20 71:23,24
  72:15
talking 11:20
  13:24 14:1 19:3
  19:5,13 29:20
  33:7 34:16 41:4
  46:24 48:4 50:1
  53:16

Michael E. Evon

| | | | | |
|---|---|---|---|---|
| tele-health 53:21 | 18:3,5,7 | 60:6,18 61:20 | vacations 65:5 | 37:21 38:5 54:8 |
| Telephone 67:1 | time 3:7 4:14 9:19 | treatments 49:24 | Vacuuming 70:16 | 71:18 72:20 |
| tell 6:15 16:16 | 10:19 11:6,9 | trees 64:7,7 | verbal 5:5 | watch 69:11 |
| 19:2,16 29:19 | 13:1 16:13 | trouble 64:1 | verifier 44:18 | water 29:8,15 |
| 32:2,16 36:14 | 17:12,18 18:6 | true 17:13 76:10 | verifies 44:16,18 | 31:12,13,17,22 |
| 37:16 48:17 | 19:9 24:2 25:23 | truth 76:6 | video 11:24 30:6 | 33:12 36:22,22 |
| 53:11 56:9 | 28:18 29:13 | try 56:16 63:16 | 30:9 32:10 | 37:1 73:17,21 |
| 62:14 70:8 75:6 | 36:21 39:16 | trying 9:2 15:18 | videoconferenci... | 74:1,4 75:5 |
| 75:7 | 40:10 42:5,21 | 15:22 22:7 | 1:11 | way 15:20 76:14 |
| telling 32:8 40:23 | 42:22 47:4 48:7 | 29:21 33:3 | videos 65:17 71:8 | 76:15 |
| Temporary 57:10 | 48:7 52:10 54:6 | 54:13 73:21 | 71:9,12,16 | we're 4:13 9:13 |
| ten 8:12,24 15:12 | 54:7,8 55:18 | 74:9 | videotape 11:18 | 25:16,19 |
| term 50:23 63:2 | 56:1 59:11 61:2 | turn 16:1 25:18 | Virginia 7:6 | we've 59:22 |
| testified 3:20 | 61:7,17 62:21 | 67:3 | visit 23:18 26:12 | wear 11:1,11 |
| testify 9:10 76:6 | 63:9 76:12 | turning 67:5 | 53:20,21 | 24:22 |
| testimony 76:11 | times 46:22,22 | Twice 51:22 | visits 41:19 57:6 | wearing 10:22 |
| Thank 7:8 72:5,6 | 50:15 56:20,23 | two 17:2 40:22 | 59:16 | 11:5,9 24:20 |
| therapy 24:17 | tingling 14:20 | 49:16 50:15,15 | vocalist 68:15 | 27:19 |
| 47:15 57:3,8 | Tinley 8:16 10:7 | 57:17,19 58:3 | vocalists 68:16 | weather 26:20 |
| thereof 76:16 | 10:17 26:3 71:1 | 69:9,9,15 74:9 | vouch 32:5 | 28:19 38:9,10 |
| they'd 33:6 | today 4:5,12 9:9 | type 12:4 13:4 | vs 1:5 | week 44:9,9 52:12 |
| thing 51:5 63:6 | 9:13,22 10:23 | 19:2 20:19 | | 53:1 56:21,23 |
| things 12:5 13:4 | 11:14 17:4,8,11 | 27:19 28:7 | **W** | 66:12,21 67:10 |
| 43:8 70:13 | 18:20 25:16,19 | 46:11 49:20 | W 76:2 | weekly 56:14 |
| 73:23 | 32:9 44:3 45:24 | 58:6 73:23 | W-e-s-p-h-a-l | weeks 24:23 61:9 |
| think 7:24 8:12 | 73:14 | typewriting 76:8 | 6:20 | went 21:9 22:19 |
| 11:8 12:9,14 | told 19:12 31:18 | typo 58:24 | wait 4:16 | 25:24 26:18 |
| 14:3 16:23 21:1 | 34:8 36:17,19 | | wake 39:18 | 28:20 30:8,13 |
| 29:9 30:7,22 | 40:5 48:18 | **U** | walk 37:23 63:16 | 30:13 34:11,11 |
| 33:4 34:10,13 | top 12:12 49:7 | U.S 7:18,20 | 69:21,24 70:4,4 | 35:23 36:3,11 |
| 36:17 37:2,4 | tore 42:15 | uh-huh 5:3 | 70:6,9,11 | 39:1,3 40:16 |
| 41:2 42:15 | torn 42:18 | uh-uh 5:3 | walked 28:1,3,6 | 60:3 |
| 46:21 49:9,21 | totally 53:3 64:17 | underneath 13:2 | 35:5 70:12 | weren't 72:2 |
| 51:3,3 56:21 | tough 75:7 | 13:9 29:18 | walking 21:6 31:8 | Wesphal 6:18 |
| 58:17,18,22 | town 7:1,7 | understand 4:21 | 36:2 70:3 73:2 | West 1:17 2:3 |
| 59:4,15,21 60:2 | tractor 53:8 | 15:9 19:8 | want 15:24 17:22 | 12:20 |
| 60:24 66:12 | transcript 76:9,11 | understanding | 26:18 37:19,21 | wet 21:6 27:17 |
| 71:8 72:3,4 73:1 | travels 44:23 | 41:12 42:13 | 37:23 40:2 | 28:24 29:11,15 |
| 73:18 74:7 | treat 21:24 58:3 | 47:20,23 50:19 | 49:22 68:16 | 73:21 |
| thinking 75:11 | treated 16:6 | understood 4:20 | wanted 12:24 | **WHEREOF** |
| thought 14:3,11 | treatment 4:7 | United 1:1,14 | 13:16,21,23 | 76:17 |
| 58:22 | 12:5 15:6 18:24 | 26:10 65:13 | 14:2 36:20 | Whoa 11:2 34:4 |
| three 10:1,6 53:6 | 19:17 20:9,15 | use 68:1 69:23 | 37:18 43:2 49:6 | wife 6:5 15:21 |
| 61:9 69:4,5 | 45:2 47:10 | usually 62:11 | 50:22 | 35:9 39:5,18 |
| throw 52:18 | 51:10,13 58:6 | | wasn't 15:21 22:7 | 40:5 44:8,11 |
| tightening 17:23 | 58:11 59:14,23 | **V** | 29:21 33:14 | 53:13 64:11 |

Michael E. Evon

65:3
wife's 6:6
witness 3:2,12,18
  56:22 67:2,7
  72:6 74:16
  75:21 76:11,17
witnessed 30:17
  30:20
woke 39:20
work 39:18 44:6
  44:13,20 45:10
  46:23,24 53:7
  56:12,16,17
  57:24,24 65:4
  68:16
work-related
  15:14
worked 42:7
  46:22 47:3,3
working 55:17
  68:9
works 44:12,22
  69:16
wouldn't 38:11
Wow 22:7 34:1
write 65:11 68:14
  68:14

**X**

X 2:11
X-rays 22:19
  23:20 41:11,13

**Y**

yeah 21:19 34:19
  35:15 41:8 49:5
  49:9 58:18,24
  64:4 73:18 74:6
year 16:23 18:16
  54:14 65:16
  66:2
years 5:24 7:16
  8:8,12,23,24
  10:1,6,14 15:12
  17:2,4,8,24
  40:22 42:8

43:14,14 55:16
55:19 57:17,19
58:3 73:9

**Z**

Zoom 1:9,11 2:2,6

**0**

05682 1:5
084-003792 76:22

**1**

1 76:7
10 7:16 12:20
10:01 1:19
11 55:19
11:29 75:20
116 2:7
12 42:8 73:9 74:6
  74:6 75:11,12
12-string 67:24
13th 4:4 25:20
14 13:6 43:3,7
14th 13:2
15th 13:10
16 21:8
17th 76:18
18 21:8
18th 40:16
19 51:24
1985 8:9
1st 13:10

**2**

2 74:7,8,9,10,10
  75:9,9
20 1:5 43:14,14
  54:5,10
200-A 2:7
2010 16:2
2011 19:23
2019 4:4 25:20
2020 52:1,4 53:16
2021 1:19 22:9
  23:6 25:6 54:15
  54:17 76:18

21 53:22
24 5:24 62:22
28th 13:3,7

**3**

3 2:13 39:19,20
3-28-49 5:17
30 10:14

**4**

43 6:16
46 6:16
49 6:16

**5**

50 46:18

**6**

6-string 67:24
60 1:17 2:3 12:20
60432 2:8
60601 1:18 2:4
63 8:22,22

**7**

72 2:14
73 8:23
7308 5:19
74 2:14
76 76:7
7th 1:19

**8**

**9**

9 26:1
90 46:19
90s 8:11

# DEPOSITION OF:

# **COLE HICKEY**

July 27, 2021

MIKE EVON

vs

MENARD, INC.

**MOSIER**
**REPORTING SERVICES**
Local Knowledge With National Reach
312.632.1116

**EXHIBIT**

B

MIKE EVON vs MENARD, INC.
COLE HICKEY 07/27/2021

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIKE EVON,                          )
                                    )
              Plaintiff,            ) Case No.
                                    ) 20 CV 5682
    vs.                             )
                                    ) Formerly
MENARD, INC.,                       ) Case No.
                                    ) 20 L 9082
              Defendant.            )

        The Zoom deposition of COLE THOMAS HICKEY, taken in the above-entitled cause before Gabrielle Pudlo, CSR, and Notary Public within and for the County of Cook and State of Illinois, taken pursuant to the Federal Code of Civil Procedure for the United States District Court, Northern District of Illinois, Eastern Division, on July 27, 2021, at the hour of 12:00 p.m.

A  P  P  E A  R  A  N  C  E  S:

KRALOVEC, JAMBOIS & SCHWARTZ
BY:   MS.  OLIVIA  SCHWARTZ
      60 West Randolph Street, 4th Floor
      Chicago, Illinois   60601
      (312)  782-2525
      oschwartz@kjs-law.com

            Appeared via  Zoom
            On behalf of the Plaintiff;


FABRIZIO, HANSON, PEYLA & KAWINSKI
BY:   MS.  MARILYNN  FRANGELLA
      116 North Chicago Street, Suite 200A
      Joliet, Illinois   60432
      (815)  727-5445
      mfrangella.fhpk@gmail.com

            Appeared via  Zoom
            On behalf of  the Defendant.

INDEX

| WITNESS EXAMINATION | DX | CX | RDX | RCX |
|---|---|---|---|---|
| COLE THOMAS HICKEY | | | | |
| By Ms. Schwartz | 4 | | 38 | |
| By Ms. Frangella | | 36 | | |

EXHIBITS

| DEPOSITION EXHIBITS | MARKED |
|---|---|
| Exhibit No. 1 | 12 |
| Exhibit No. 2 | 13 |

(Witness sworn.)

MS. SCHWARTZ: Can you please state your name for the record.

THE WITNESS: Cole Thomas Hickey.

MS. SCHWARTZ: Let the record reflect this is the deposition of Cole Hickey, taken via Zoom, proper notice to all parties, in accordance with federal and local rules.

COLE THOMAS HICKEY, called as a witness on behalf of the plaintiff, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SCHWARTZ:

Q   Mr. Hickey, have you ever given a deposition before?

A   No.

Q   Before we start, just a couple brief, kind of, rules here. So I'll be asking you questions. If you wouldn't mind waiting until I finish my question before you provide your answer, that will just -- because the court reporter is taking down everything that we say. With that, head nods, uh-huhs, uh-uhs aren't going to be able to be taken

down by the court reporter.  So make sure that you're answering out loud, verbal answers.

If you don't understand one of my questions, please let me know.  If you do answer it, I'm going to assume you understood the question. But if you tell me you don't understand, I'll try to rephrase it or ask a different question.  If you need to take a break, you're obviously more than welcome to do so.  You just can't take a break if a question is pending.  So make sure to answer my question, then ask to take a break, and we can go off the record.

Sound good?

A      Yep.

Q      Have you ever gone by any names other than Cole Hickey?

A      No.

Q      Did you review any materials before coming to the deposition today?

A      Yes.  I reviewed the video clips.

Q      And it's my understanding that you reviewed maybe three or four video clips from the morning of February 13, 2019; is that true?

A      Yes.

Q    Prior to your review of those -- Strike that.

About when did you review those videos?

A    Last week.

Q    Okay.  Prior to your review of those videos last week, had you reviewed any materials regarding this incident?

A    No.

Q    Were the video clips that you reviewed the security footage clips from Menard's on the morning of February 13, 2019?

A    Yes.

Q    And was it a few videos just at different angles, kind of showing the same front entrance of Menard's?

A    Yes.

Q    What is your current address?

A    16901 New England Avenue, Tinley Park, Illinois.

Q    Do you live there with anybody?

A    My parents.

Q    Do you yourself have any children?

A    No.

Q    What's your date of birth?

A    February 26, 1999.

Q    What's your current phone number?

A    I couldn't hear you.  Sorry.

Q    What is your current phone number?

A    1-708-603-9509.

Q    Are you a United States citizen?

A    Yes.

Q    Have you ever served in the military?

A    No.

Q    Have you ever been convicted of a felony?

A    No.

Q    Have you ever been convicted of a misdemeanor involving dishonesty?

A    No.

Q    What's your highest level of education?

A    One year of college.

Q    Where was that year of college?

A    Bradley University.

Q    When was that?

A    That would be 2017 to 2018.

Q    Where did you go to high school?

A    Tinley Park High School.

Q    What year did you graduate?

A    2017.

Q    It's my understanding that you are currently employed by Menard's; is that true?

A    Yes.

Q    When did you start working at Menard's?

A    That would be August of 2019.

Q    What was your position when you first started working at Menard's?

A    I was a Courtesy Patrol member.

Q    I'm sorry.  Did you state that you started working there in August of 2019?

A    2018.  I apologize.

Q    Thank you for that.

And you began working as a Courtesy Patrol member?

A    Yes.

Q    Are you still in that position?

A    No.  I am a head cashier.

Q    You are now a head cashier; true?

A    Yes.

Q    When you began working at Menard's in August of 2018, did you begin working at the Tinley Park location?

A    Yes.

Q    Have you ever worked a different Menard's

location?

A    No, I have not.

Q    So after -- Strike that.

You were hired as a carry-out in 2018. How long did you work as a carry-out?

A    I think it was about nine months.

Q    After nine months, what job did you transition into?

A    I went straight to head cashier.

Q    So am I correct in thinking that at Menard's you have held two different positions, the carry-out -- or Courtesy Patrol member -- and the head cashier?

A    Yes.

Q    Okay.  So was it sometime in the summer of 2019 that you then became a head cashier?  Does that sound right?

A    Yes.

Q    And were you a carry-out at Menard's in February of 2019?

A    Yes.

Q    Is there formal training that employees go through prior to starting their positions at Menard's?

A    Yes.

Q    Are there written training materials provided to the employees during those training sessions?

A    Yes.

Q    So prior to starting as a carry-out in August of 2018, were you provided written training materials?

A    Yes.

Q    Were those written training materials specific to the position of a carry-out?

A    Yes.

Q    Do you recall, you know, how many pages of written training materials there were?

A    I don't remember, no.

Q    Do you recall it to be less than ten pages of materials, or do you recall it to be more than that?

A    I would say less than that.

Q    Okay.  Are you familiar with the policies and procedures that are provided to employees during their training?

A    Yes.

Q    Are written policies and procedures

physically given to employees during their training?

A    Not all of them are.

Q    By that answer with "not all of them," do you mean that not all of the policies and procedures are provided to the employee or not all employees are provided policies and procedures?

A    Not all of the policies are printed out and given to employees.  They are on the computer system.

Q    Okay.  Do you recall which policies and procedures were provided to you prior to you starting as a carry-out?

A    I do not.

Q    Do you recall if the policies and procedures that were provided to you prior to starting as carry-out had anything to do specifically with the shopping carts?

A    I don't remember, no.

Q    Do you recall ever seeing any written policies and procedures, whether printed out or on the computer, regarding the shopping carts?

A    No, I don't remember.

Q    Are employees taught about what to do if a customer is injured on the premises?

A    Yes.  We notify our manager on duty.

Q    Are there formal incidents that are to be filled out if a customer is injured at Menard's?

A    Yes.

Q    Excuse me.  I meant are there formal incident reports.  Sorry if that was confusing.

Are the formal incident reports to be filled out only by the managers, or are other positions to fill out formal incident reports if a customer is injured on the premises?

A    As far I am aware, only managers fill out the incident reports.

Q    In the time that you've been working at Menard's, has the exterior of the building remained the same?

A    Yes.

MS. SCHWARTZ:  I'm going to pull up a picture here just to make this a little bit easier.

(Exhibit No. 1 previously marked for identification.)

BY MS. SCHWARTZ:

Q    Mr. Hickey, can you see this picture of

the outside of Menard's?

A     Yes.

Q     Does this picture appear to be an accurate photograph of what the outside of the Tinley Park Menard's has looked like since you've worked there?

A     Yes.

Q     The parking lot that we see depicted in this image, is that the main customer parking lot?

A     Yes.

Q     Okay.  And then if you see underneath the Menard's sign, there's a door marked "In" and a door marked "Out."  Do you see what I'm talking about?

A     Yes.

Q     Is that door marked "In," is that the main customer entrance into the building?

A     Yes, it is.

Q     Is that the entrance for employees to enter the building as well?

A     Yes.

        MS. SCHWARTZ:  I'll stop sharing and pull up a second image here, which is Exhibit 2.

                    (Exhibit No. 2

                        previously marked for

                        identification.)

BY MS. SCHWARTZ:

Q    Mr. Hickey, do you see this picture that I'm showing you, Exhibit 2?

A    Yes.

Q    To the right of the "In" door and the "Carpet" sign, there appears to be some garage doors. Correct?

A    Yes.

Q    Are those for the carts to be brought in from the parking lot?

A    Yes.

Q    When a customer walks into the main entrance of the store that we just saw shown in Exhibit 1, is there always a mat on the ground right there?

A    Only in conditions with rain and snow.

Q    Whose job is it to put out a mat when it's raining or snowing?

A    The carry-outs'.

Q    Does somebody specifically instruct the carry-outs to put out a mat?

A    Our managers do, yes.

Q    And then one a customer enters through that "In" door, there's like a metal turnstile over

to their right to walk through in order to get into the store; is that true?

A    Yes.

Q    And then that's where the shopping carts are?

A    Yes.

Q    Which side of the metal turnstile are the shopping carts on?  Are they before the customer were to reach the turnstile or after the customer goes through the turnstile?

A    After the turnstile.

Q    And then are there more than one row of shopping carts?

A    Yes.  There are four rows of shopping carts.

Q    Okay.  And those four rows of shopping carts are accessed through the garage door that we saw in Exhibit 2?

A    Yes.

Q    Is it typical for customers to walk in the "In" door towards the turnstile, through the turnstile, and then proceed into the store?

A    Yes.

Q    Is that the main path that customers take

to enter into this Menard's store?

A    Yes.

Q    Are you aware if Menard's contracts with a snow removal company to provide services at the Tinley Park location?

A    Yes.

Q    Do you know who that company is?

A    I don't remember.

Q    Does that company plow the parking lot?

A    Yes.

Q    Does that company also clear any snow off of the, kind of, sidewalk at the front of the Menard's store?

A    They do occasionally.  But right outside the door, the carry-outs usually use a shovel to clear it.

Q    Okay.  So it's the Menard's carry-outs that shovel the concrete area outside of the entrance?

A    Yes.

Q    Is there a specific schedule as to who is to shovel that area?

A    Usually just whatever carry-out is on duty.  We usually delegate them on ourselves.

Q     So is it a decision amongst the carry-outs as to who is going to be shoveling the concrete area?

A     It's either that or the managers tell one of us to do it.

Q     Outside of that concrete area -- Strike that.

Am I correct in thinking that the parking lot is asphalt and then there's a concrete area outside of the door before the main entrance at Menard's?

A     Yes.

Q     Okay.  So are the carry-outs to shovel only the concrete area?

A     Yes.

Q     So the carry-outs do not shovel the asphalt area?

A     No.

Q     The asphalt area is taken care of by the snow removal company?

A     Yes.

Q     You previously stated that there is a mat to be put inside the main entrance, I believe, during -- if it's snowing or raining; is that true?

A     Yes.

Q     Is it always the same size mat, or are there different sizes of mats to be placed in that area?

A     It's always the same size mat.

Q     And that mat does not reach all the way to the turnstile, correct?

A     No, it does not.

Q     Are there ever two mats placed in order to make a runway all the way to that turnstile, or no?

A     No.

Q     Whose job is it to change the mats?

A     I don't understand the question.

Q     Does somebody -- Strike that.

If throughout the day the mat becomes saturated with an amount of water, is it somebody's job to change the mat to then provide a dry mat in that area?

A     No.  We only have one mat for each entrance or exit.

Q     Have you ever had a situation where you've noticed that that mat became saturated with rainwater or snow or anything like that?

A     No.

Q    Do you know how often the mats are changed?

A    I don't know.

Q    Is it an outside company that changes the mats, or does someone at Menard's change the mats?

A    It's an outside company.

Q    Does Menard's have "Wet Floor" or "Caution" signs to put up if the floor is wet?

A    Yes.

Q    And who puts those "Wet Floor" signs out?

A    Either the managers or the carry-outs.

Q    How do you determine if the manager is going to put the "Wet Floor" sign out or if the carry-outs are going to put the "Wet Floor" sign out?

A    I'm unsure.  It's usually up to the manager or whoever notices that the floor is wet.

Q    So if there's a carry-out working and the carry-out notices the floor is wet, then the carry-out can put out the "Wet Floor" sign?

A    Yes.

Q    But, you know, the "Wet Floor" sign can also be instructed by a manager -- Strike that.

The carry-out can also be instructed by a

manager to go ahead and put the "Wet Floor" sign out?

A     Yes.

Q     Does the "Wet Floor" sign stay in the area until whatever is on the floor is cleaned up?

A     Yes.

Q     What is the protocol for when a customer falls down and gets hurt in the store?

A     **We notify our manager on duty and then fill out an incident report.**

Q     Does that protocol involve taking photos of the area?

A     **I'm unsure.  I believe that might be part of what the managers do in their incident report.**

Q     Have you been made aware of any fails that have occurred inside this Menard's store prior to February 13th of 2019?

MS. FRANGELLA:  Objection, relevance.

You could --

A     **No.**

MS. FRANGELLA:  -- answer, Mr. Hickey.

A     **(No response.)**

MS. FRANGELLA:  You can go ahead and state your answer again.

A       No.

BY MS. SCHWARTZ:

Q       Are you aware of any falls that have occurred in the entrance area of this Menard's since February 13th of 2019?

MS. FRANGELLA:  Objection, relevance.

You could answer.

A       No.

BY MS. SCHWARTZ:

Q       It appears that someone sustained a fall at this Menard's on February 26, 2017.  I understand that you were not working there at that time.

But do you have any knowledge of that incident?

MS. FRANGELLA:  Objection, relevance.

You could answer.

A       I do not.

BY MS. SCHWARTZ:

Q       Have you ever noticed any standing water in the entrance area of that Menard's on the floor?

A       No.

Q       And have you personally ever noticed any pooled liquid near the turnstile or near the shopping carts in front of the store?

A    Yes.

Q    How many times have you noticed pooled liquid in that area?  And you can estimate.

A    I'm not sure.

Q    Have you noticed pooled liquid in that area near the turnstile where the customers grab the shopping carts more than five times?

A    Yes.

Q    Have you personally noticed any pooled liquid in that area more than 20 times?

A    I'm not sure.  I don't believe so.

Q    Do you recall if the times that you noticed standing water in that area were prior to February of 2019?

        MS. FRANGELLA:  I'm just going to object.  He didn't say "standing water."

        MS. SCHWARTZ:  I'll rephrase.

BY MS. SCHWARTZ:

Q    Did you notice -- Of the instances where you noticed pooled water near the turnstile where customers grab the shopping carts, do you recall if those instances were prior to February of 2019?

A    I don't recall.

Q    Did you notice that pooled liquid when you

were working as a carry-out?

A     Yes.

Q     In the instances where you noticed pooled liquid near the turnstile and the shopping carts, is that something that you would have reported to a supervisor?

A     Yes.

Q     And, as a carry-out, who would that supervisor have been?

A     That would have been the front-end manager on duty.

Q     Are you aware of anybody -- Strike that.
      The carry-outs are tasked with bringing the carts in from the parking lot, right?

A     Yes.

Q     And the carry-outs, do they always wear reflective vests?

A     It's either a reflective vest or garments that are purchaseable.

Q     Say that again.

A     It's either the reflective vests or other reflective garments that are purchaseable.

Q     So what else are the reflective garments that you're referring to?

A       There is a sweatshirt and a T-shirt and a long-sleeved shirt.

Q       Okay.  Do you know how many carry-outs work at each time?

A       Can you rephrase the question.

Q       At any time that the Menard's in Tinley Park is open, is there at least one carry-out working?

A       Yes.

Q       Are there ever multiple carry-outs working?

A       Yes.

Q       Are there always multiple carry-outs working?

A       No.

Q       So is it true that there are times when only one carry-out is working and there are times when multiple carry-outs are working?

A       Yes.

Q       Are there ever more than two carry-outs working at a time?

A       Yes.

Q       How many carry-outs are working at a specific time?  That was a bad question.

A    It depends day to day.

Q    Okay.  It seems like there are either one, two, or multiple carry-outs working at a time; is that correct?

A    Yes.

Q    Up to how many carry-outs would be working at the same time?

A    I've seen up to, probably, around six at one time.

Q    Is it the job of the front-end manager to determine how many carry-outs to be working at each time?

A    Yes.

Q    Do you know how many carry-outs were working between -- Strike that.

Do you know how many carry-outs were working the morning shift on February 13th of 2019?

A    I don't remember.

Q    Do you know if there was only one carry-out working that morning?

A    I don't remember.

Q    I didn't hear the end of that.

A    I don't remember.

Q    Okay.  Are you aware if there are specific

written policies and procedures that apply to bringing the carts in from the parking lot?

A    **I couldn't hear the end of the question.**

Q    Are there specific written policies or procedures that apply to bringing the carts in from the parking lot?

A    **I don't remember.**

Q    Do you recall if there are written training materials that apply to bringing the carts in from the parking lot?

A    **I don't remember.**

Q    Are the carts supposed to be brought in through the cart corral?

A    **They can either be brought in through the garage doors or the entrance doors if you don't have a lot.**

Q    And do you know whether or not that is provided in any sort of written training materials or policies and procedures?

A    **I'm not sure.**

Q    Did somebody tell you that shopping carts can be brought in either through the garage door or through the main entrance?

A    **Yeah, when I was being trained.**

Q    Do you recall who it was that told you that?

A    I don't recall, no.

Q    So when are the times where carts are allowed to be brought in through the main entrance?

A    Through the main entrance, we usually -- our bigger rail carts or flatbed carts or if we only have a few of the small, silver shopping carts.

Q    So is there a number of shopping carts that would require you to use the garage door versus the main entrance?

A    Usually, like, six or more.

Q    And is that something that you were specifically trained on?

A    Not specifically.  It's just something that was told to me by the other carry-outs and managers.

Q    And do you recall who those other carry-outs or managers were that told you that?

A    No, I don't.

Q    There is a -- Strike that.

Are the garage doors used for anything other than bringing carts in?

A    No.

Q    So the sole purpose of the garage doors is for the carry-outs to bring in shopping carts from the parking lot, correct?

A    Yes.

Q    One of the store policies mentions a walk-off grate.  Do you know what a walk-off grate is?

A    No, I don't.

Q    What are the general duties of the carry-outs at Menard's on a day-to-day basis?

A    **Bringing in carts, assisting guests with bringing items out to their cars, sweeping up the parking lot, picking up trash.**

Q    Does Menard's open at 6:00 in the morning every day?

A    Yes.

Q    Did you ever work the 6:00 a.m. shift as a carry-out?

A    Yes.

Q    Do the carry-outs have any duties prior to the opening of the store at 6:00 a.m. that they need to carry out before 6:00 a.m.?

A    No.

Q    So the carry-outs are not tasked with

doing an inspection of the premises prior to opening or anything like that?

A     No.

Q     Do you know if any employee at Menard's is tasked with doing an inspection of the premises prior to Menard's opening at 6:00 a.m.?

A     I'm not sure.

Q     As you may be aware, the incident that we're here discussing today involves my client, Mike Evon, in a slip and fall that occurred on February 13, 2019, around 9:00 a.m. at the Menard's in Tinley Park.

Do you recall the incident that I'm talking about?

A     I vaguely recall it, yes.

Q     Were you working at Menard's when this incident happened?

A     Yes.

Q     Do you recall meeting Mr. Evon?

A     Yes.

Q     Do you recall if he was with anyone?

A     I don't remember.

Q     What do you remember from meeting him --
Strike that, actually.  Sorry.

What do you recall from your interaction with Mr. Evon?

A     I don't really recall much from outside of what was on the video.  I remember him coming through the turnstile, trying to get a cart, and then I turned around and he was on the floor.

Q     Did you physically see him fall?

A     I did not.  I believe I heard a noise behind me and then I turned around and he was on the ground.

Q     Are you aware of anyone that physically saw him fall?

A     No.

Q     Did you see what he fell on?

A     I did not.

Q     Did you have a conversation with Mr. Evon?

A     I don't remember.

Q     Did you help him up?

A     I believe I did, yes.

Q     Did you do anything after you helped him up -- Did you do anything after you helped Mr. Evon off the ground?

A     I don't remember.

Q     Do you recall telling a manager what had

happened?

A    I don't remember specifically.  But I believe I told my manager on duty, yes.

Q    Do you only remember that because that is what your typical custom and practice would be, or do you remember in this incident telling your manager?

A    Only because that's what the typical procedure is.

Q    Do you recall who your manager was that day?

A    I believe it was Pam Bamman.

Q    Do you recall any conversation you had with Pam Bamman on February 13th of 2019 regarding Mr. Evon or the fall?

A    No, I don't.

Q    Do you remember any conversations on the day of the incident regarding Mr. Evon's fall that you had?

A    No, I do not.

Q    After you found out that Mr. Evon had fallen, did you walk over and inspect the area where he had fallen?

A    I don't remember.

Q    Do you recall if you saw any water on the ground in the area that he fell that day?

A    I don't remember.

Q    Did Mr. Evon point out to you exactly where it was that he fell?

A    I don't remember, no.

Q    After the fall, the video of the incident shows that a "Caution" sign was put up.  Do you recall if you put that "Caution" sign up?

A    I don't remember, no.

Q    Do you recall what the weather was like on February 13, 2019?

A    I believe there was snow on the ground. I'm unsure if it was snowing at the time, though.

Q    Is that memory something that you only know because of the videos that you've reviewed?

A    Yes.

Q    And do you recall if there was any water pooled in the entranceway of Menard's on that day?

A    I don't remember.

Q    Did you have a conversation with a woman named Katrice Matthews about this incident?

A    I don't remember.

Q    Since the day of this incident, have you

had any other conversations with Pam Bamman about this incident?

A    No.

Q    Since February 13, 2019, have you had any conversations with any other employees at Menard's regarding this incident?

A    No.

Q    Did you yourself fill out any paperwork regarding this incident such as an incident report or something of that nature?

A    No.

Q    Do you recall mopping up any water near the area that Mr. Evon fell on the date of this incident?

A    I don't remember.

Q    So I've received a document called the Courtesy Patrol Orientation Guide, which I believe is what the carry-outs receive prior to starting their jobs as a carry-out.

Does that sound familiar to you?

A    Yes.

Q    Are you aware of any other training materials provided to the carry-outs other than the Welcome to (inaudible) Courtesy Patrol Orientation

Guide?

A      I don't remember.

Q      Within the Courtesy Patrol Orientation Guide it states that, The carry-outs are trained on the proper cart locations for different types of carts.

Are you familiar with that?

A      Yes.

Q      Is the proper cart location for a general shopping cart through the cart corral door and in those four rows of carts?

A      Yes.

Q      The document also states that, In stores with overhead garage park doors, the doors must always remain closed when not in use.  And this is necessary for expenses and security purposes.

Do you know what that's referring to?

A      I don't, no.

Q      The Menard's in Tinley Park has overhead garage doors for the cart corral, right?

A      Yeah.

Q      So when they're not in use, are those garage doors kept closed?

A      Yes.

Q     Throughout the day are the carts -- are the garage doors kept closed, or are they open while the store is open and then closed at night when the store closes?

A     They're supposed to be closed once the carry-outs are finished pushing carts through them.

Q     So is it the practice of the carry-outs to bring the carts over to the carry-out door, open the garage door, put the carts in, and then immediately shut the garage door following?

A     Yes.

Q     Do you know why?

A     I don't know why.

Q     Do you have an opinion -- Strike that.

Did you watch Mr. Evon come into the store on the morning of February 13, 2019?

A     I don't remember.

Q     Is the first time that you remember seeing Mr. Evon once he was already on the ground?

A     Yes.

Q     Have you had any conversations with Mr. Evon since February 13, 2019?

A     Not that I know of.

Q     Have you had any conversations regarding

Mr. Evon and the fall he sustained on February 13, 2019, other than what we've already discussed and other than your lawyer?

A     No.

Q     Do you have any knowledge of the injuries that Mr. Evon sustained from his fall on February 13, 2019?

A     No.

MS. SCHWARTZ:  That is all the questions I have for you.

MS. FRANGELLA:  Mr. Hickey, just a couple questions for you.

CROSS-EXAMINATION

BY MS. FRANGELLA:

Q     Customers coming to Menard's could enter through the "In" or the "Out" door, correct?

A     Yes.

Q     And on the date of this incident, after reviewing the surveillance footage, it's correct to say that there was one runner in place at the entrance door.  Correct?

A     Correct.

Q     And then earlier you stated that you believe the outside pavement and parking lot was wet

either from snow or maybe rain; is that correct?

A     Yes.

Q     And is that when Menard's would have a mat out, is only during weather that's either rain or snow?

A     Yes.

Q     And, generally, the "Wet Floor" signs are used for spills or when a team member becomes aware that the floor has some type of a liquid on it; is that correct?

A     Yes.

Q     So Menard's doesn't just put out "Wet Floor" signs when it's raining or snowing outside, correct?

A     Correct.

Q     And then when Menard's would become aware of a spill or water on the floor, that would be mopped up as soon as there was notice of it; is that correct?

A     Correct.

Q     Earlier you indicated that you have noticed water near the cart corral in the past, correct?

A     Yes.

Q And that water that you noticed near the cart corral was water that was coming from the shopping carts that was brought in from the outside, correct?

A Yes.

Q And if you would notice water that came from the shopping carts and was on the floor, you would mop that up or whoever the carry-out was would mop up that water; is that correct?

A Yes.

Q And then based on your memory and your review of the surveillance, it's your recollection that the plaintiff in this case fell near the cart corral, correct?

A Yes.

MS. FRANGELLA: Okay. I don't have anything further. Thank you, Mr. Hickey.

REDIRECT EXAMINATION

BY MS. SCHWARTZ:

Q And then, just very briefly, I'm going to show you a couple of these videos and just, kind of, still frames; and just, if you wouldn't mind, identifying -- letting me know if that is, in fact, you in the video. Okay?

A      Okay.

Q      Mr. Hickey, I am showing you 3086C01, I believe.  And I'm going to play this video briefly for you, and then just let me know if you identify this to be yourself.

A      Okay.

Q      Is that you in this video?

A      Yes.

Q      And it might be easier -- I'll identify it as on the date at 9:04 a.m.

Thank you, Mr. Hickey.  I have one more for you.  Mr. Hickey, can you see this?

A      I cannot.

Q      That's because I'm not sharing my screen.

Mr. Hickey, are you able to tell if this man in the reflective sweatshirt and vest is you?

A      Yes, that is me.

MS. SCHWARTZ:  Okay, that is it for me today.  Thank you.

MS. FRANGELLA:  Great.  Thank you so much for your time, Mr. Hickey.  You can sign off.

(WITNESS EXCUSED.)

MIKE EVON vs MENARD, INC.
COLE HICKEY 07/27/2021                                        40

STATE OF ILLINOIS           )
                            ) SS.
COUNTY OF COOK              )


          I, GABRIELLE PUDLO, Certified Shorthand Reporter No. 084-004173, and Notary Public within and for the County of Cook and State of Illinois, do hereby certify that on July 27, 2021, at 12:00 p.m., the deponent, COLE THOMAS HICKEY, appeared before me via Zoom.

          I further certify that COLE THOMAS HICKEY, was by me duly sworn to testify the truth and that the foregoing is a true record of the testimony given by COLE THOMAS HICKEY.

          I further certify that the deposition terminated at 12:46 p.m.

          I further certify that there were present, via Zoom, at the taking of the said deposition the persons and parties as indicated on the appearance page made a part of this deposition transcript.

          I further certify that I am not counsel for nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome thereof.

          IN TESTIMONY WHEREOF, I have hereunto set

my hand and affixed my notarial seal on this 10th day of August, 2021.

*Gabrielle Pudlo*

GABRIELLE PUDLO, CSR
Notary Public
CSR License No. 084-004173

MIKE EVON vs MENARD, INC.
COLE HICKEY 07/27/2021

Index: 1..corr

21,22 29:6

**1**

**1** 12:20 14:14
**1-708-603-9509**
7:5
**13** 5:23 6:11
29:11 32:12
33:4 35:16,22
36:1,7
**13th** 20:17
21:5 25:17
31:14
**16901** 6:18
**1999** 7:1

**2**

**2** 13:21,22
14:3 15:18
**20** 22:10
**2017** 7:20,24
21:11
**2018** 7:20
8:11,21 9:4
10:7
**2019** 5:23 6:11
8:5,10 9:16,20
20:17 21:5
22:14,22
25:17 29:11
31:14 32:12
33:4 35:16,22
36:2,7
**26** 7:1 21:11

**3**

**3086C01** 39:2

**6**

**6:00** 28:14,17,

**9**

**9:00** 29:11
**9:04** 39:10

**A**

**a.m.** 28:17,21,
22 29:6,11
39:10
**accessed**
15:17
**accordance**
4:8
**accurate** 13:3
**address** 6:17
**ahead** 20:1,23
**allowed** 27:5
**amount** 18:16
**angles** 6:14
**answering** 5:2
**answers** 5:2
**apologize** 8:11
**appears** 14:6
21:10
**apply** 26:1,5,9
**area** 16:18,22
17:3,6,9,14,
17,19 18:4,18
20:4,12 21:4,
20 22:3,6,10,
13 31:22 32:2
33:13
**asphalt** 17:9,
17,19
**assisting**
28:11
**assume** 5:5
**August** 8:5,10,
21 10:7

**Avenue** 6:18
**aware** 12:11
16:3 20:15
21:3 23:12
25:24 29:8
30:11 33:22
37:8,16

**B**

**bad** 24:24
**Bamman**
31:12,14 33:1
**based** 38:11
**basis** 28:10
**began** 8:13,20
**begin** 8:21
**behalf** 4:10
**bigger** 27:7
**birth** 6:24
**bit** 12:18
**Bradley** 7:18
**break** 5:8,9,11
**briefly** 38:20
39:3
**bring** 28:2
35:8
**bringing** 23:13
26:2,5,9 27:23
28:11,12
**brought** 14:9
26:12,14,22
27:5 38:3
**building** 12:14
13:15,18

**C**

**called** 4:10
33:16
**care** 17:19

**Carpet** 14:6
**carry** 28:22
**carry-out** 9:4,
5,12,19 10:6,
11 11:12,16
16:23 19:18,
19,20,24 23:1,
8 24:7,17
25:20 28:18
33:19 35:8
38:8
**carry-outs**
14:21 16:15,
17 17:1,13,16
19:11,14
23:13,16 24:3,
10,13,18,20,
23 25:3,6,11,
14,16 27:16,
19 28:2,10,20,
24 33:18,23
34:4 35:6,7
**carry-outs'**
14:19
**cars** 28:12
**cart** 26:13 30:5
34:5,9,10,20
37:22 38:2,13
**carts** 11:17,21
14:9 15:4,8,
13,15,17
21:24 22:7,21
23:4,14 26:2,
5,9,12,21
27:4,7,8,9,23
28:2,11 34:6,
11 35:1,6,8,9
38:3,7
**case** 38:13
**cashier** 8:17,
18 9:9,13,16
**Caution** 19:8
32:8,9

**change** 18:12,
17 19:5
**changed** 19:2
**children** 6:22
**citizen** 7:6
**cleaned** 20:5
**clear** 16:11,16
**client** 29:9
**clips** 5:20,22
6:9,10
**closed** 34:15,
23 35:2,3,5
**closes** 35:4
**Cole** 4:4,6,9
5:16
**college** 7:16,
17
**company** 16:4,
7,9,11 17:20
19:4,6
**computer**
11:8,21
**concrete**
16:18 17:2,6,
9,14
**conditions**
14:16
**confusing**
12:6
**contracts** 16:3
**conversation**
30:16 31:13
32:21
**conversations**
31:17 33:1,5
35:21,24
**convicted**
7:10,12
**corral** 26:13
34:10,20
37:22 38:2,14

correct 9:10 14:7 17:8 18:7 25:4 28:3 36:16,19,21,22 37:1,10,14,15,19,20,23 38:4,9,14

couple 4:18 36:11 38:21

court 4:22 5:1

Courtesy 8:8,13 9:12 33:17,24 34:3

CROSS-EXAMINATION 36:13

current 6:17 7:2,4

custom 31:5

customer 11:24 12:3,10 13:8,15 14:12,23 15:8,9 20:7

customers 15:20,24 22:6,21 36:15

**D**

date 6:24 33:13 36:18 39:10

day 18:15 25:1 28:15 31:11,18 32:2,19,24 35:1

day-to-day 28:10

decision 17:1

delegate 16:24

depends 25:1

depicted 13:7

deposition 4:6,16 5:19

determine 19:12 25:11

DIRECT 4:13

discussed 36:2

discussing 29:9

dishonesty 7:13

document 33:16 34:13

door 13:11,14 14:5,24 15:17,21 16:15 17:10 26:22 27:10 34:10 35:8,9,10 36:16,21

doors 14:7 26:15 27:22 28:1 34:14,20,23 35:2

dry 18:17

duly 4:11

duties 28:9,20

duty 12:1 16:24 20:9 23:11 31:3

**E**

earlier 36:23 37:21

easier 12:19 39:9

education 7:15

employed 8:2

employee 11:5 29:4

employees 9:22 10:3,21 11:1,5,8,23 13:17 33:5

end 25:22 26:3

England 6:18

enter 13:18 16:1 36:15

enters 14:23

entrance 6:14 13:15,17 14:13 16:19 17:10,23 18:20 21:4,20 26:15,23 27:5,6,11 36:21

entranceway 32:19

estimate 22:3

Evon 29:10,19 30:2,16,21 31:15,21 32:4 33:13 35:15,19,22 36:1,6

Evon's 31:18

EXAMINATION 4:13 38:18

examined 4:11

Excuse 12:5

EXCUSED 39:22

exhibit 12:20 13:21,22 14:3,14 15:18

exit 18:20

expenses 34:16

exterior 12:14

**F**

fact 38:23

fails 20:15

fall 21:10 29:10 30:7,12 31:15,18 32:7 36:1,6

fallen 31:22,23

falls 20:8 21:3

familiar 10:20 33:20 34:7

February 5:23 6:11 7:1 9:20 20:17 21:5,11 22:14,22 25:17 29:11 31:14 32:12 33:4 35:16,22 36:1,7

federal 4:8

fell 30:14 32:2,5 33:13 38:13

felony 7:10

fill 12:9,11 20:10 33:8

filled 12:3,8

finish 4:20

finished 35:6

flatbed 27:7

floor 19:7,8,10,13,14,17,19,20,22 20:1,4,5 21:20 30:6 37:7,9,13,17 38:7

footage 6:10 36:19

formal 9:22 12:2,5,7,9

found 31:21

frames 38:22

FRANGELLA 20:18,21,23 21:6,15 22:15

36:11,14 38:16 39:20

front 6:14 16:12 21:24

front-end 23:10 25:10

**G**

garage 14:6 15:17 26:15,22 27:10,22 28:1 34:14,20,23 35:2,9,10

garments 23:18,22,23

general 28:9 34:9

generally 37:7

good 5:13

grab 22:6,21

graduate 7:23

grate 28:6

Great 39:20

ground 14:14 30:10,22 32:2,13 35:19

guests 28:11

Guide 33:17 34:1,4

**H**

happened 29:17 31:1

head 4:23 8:17,18 9:9,13,16

hear 7:3 25:22 26:3

heard 30:8

**held** 9:11

**helped** 30:20, 21

**Hickey** 4:4,6,9, 15 5:16 12:24 14:2 20:21 36:11 38:17 39:2,11,12,15, 21

**high** 7:21,22

**highest** 7:15

**hired** 9:4

**hurt** 20:8

**I**

**identification** 12:22 13:24

**identify** 39:4,9

**identifying** 38:23

**Illinois** 6:19 40:1

**image** 13:8,21

**immediately** 35:9

**inaudible** 33:24

**incident** 6:7 12:6,7,9,12 20:10,14 21:14 29:8,13, 17 31:6,18 32:7,22,24 33:2,6,9,14 36:18

**incidents** 12:2

**injured** 11:24 12:3,10

**injuries** 36:5

**inside** 17:23 20:16

**inspect** 31:22

**inspection** 29:1,5

**instances** 22:19,22 23:3

**instruct** 14:20

**instructed** 19:23,24

**interaction** 30:1

**involve** 20:11

**involves** 29:9

**involving** 7:13

**items** 28:12

**J**

**job** 9:7 14:17 18:12,17 25:10

**jobs** 33:19

**K**

**Katrice** 32:22

**kind** 4:18 6:14 16:12 38:21

**knowledge** 21:13 36:5

**L**

**lawyer** 36:3

**letting** 38:23

**level** 7:15

**liquid** 21:23 22:3,5,10,24 23:4 37:9

**live** 6:20

**local** 4:8

**location** 8:22 9:1 16:5 34:9

**locations** 34:5

**long** 9:5

**long-sleeved** 24:2

**looked** 13:5

**lot** 13:7,8 14:10 16:9 17:9 23:14 26:2,6,10,16 28:3,13 36:24

**loud** 5:2

**M**

**made** 20:15

**main** 13:8,14 14:12 15:24 17:10,23 26:23 27:5,6, 11

**make** 5:1,10 12:18 18:10

**man** 39:16

**manager** 12:1 19:12,17,23 20:1,9 23:10 25:10 30:24 31:3,7,10

**managers** 12:8,11 14:22 17:4 19:11 20:14 27:17, 19

**marked** 12:21 13:11,12,14, 23

**mat** 14:14,17, 21 17:22 18:2, 5,6,15,17,19, 22 37:3

**materials** 5:18 6:6 10:2,8,10, 14,17 26:9,18

33:23

**mats** 18:3,9,12 19:1,5

**Matthews** 32:22

**meant** 12:5

**meeting** 29:19, 23

**member** 8:8, 14 9:12 37:8

**memory** 32:15 38:11

**Menard's** 6:10, 15 8:2,4,7,20, 24 9:11,19,24 12:3,14 13:1, 5,11 16:1,3, 13,17 17:11 19:5,7 20:16 21:4,11,20 24:6 28:10,14 29:4,6,11,16 32:19 33:5 34:19 36:15 37:3,12,16

**mentions** 28:5

**metal** 14:24 15:7

**Mike** 29:9

**military** 7:8

**mind** 4:20 38:22

**misdemeanor** 7:13

**months** 9:6,7

**mop** 38:8,9

**mopped** 37:18

**mopping** 33:12

**morning** 5:23 6:10 25:17,20 28:14 35:16

**multiple** 24:10, 13,18 25:3

**N**

**named** 32:22

**names** 5:15

**nature** 33:10

**night** 35:3

**nods** 4:23

**noise** 30:8

**notice** 4:7 22:19,24 37:18 38:6

**noticed** 18:22 21:19,22 22:2, 5,9,13,20 23:3 37:22 38:1

**notices** 19:17, 19

**notify** 12:1 20:9

**number** 7:2,4 27:9

**O**

**object** 22:15

**Objection** 20:18 21:6,15

**occasionally** 16:14

**occurred** 20:16 21:4 29:10

**open** 24:7 28:14 35:2,3,8

**opening** 28:21 29:1,6

**opinion** 35:14

**order** 15:1 18:9

**Orientation** 33:17,24 34:3

**overhead** 34:14,19

**P**

**pages** 10:13, 16

**Pam** 31:12,14 33:1

**paperwork** 33:8

**parents** 6:21

**park** 6:18 7:22 8:22 13:4 16:5 24:7 29:12 34:14,19

**parking** 13:7,8 14:10 16:9 17:8 23:14 26:2,6,10 28:3,13 36:24

**part** 20:13

**parties** 4:7

**past** 37:22

**path** 15:24

**Patrol** 8:8,13 9:12 33:17,24 34:3

**pavement** 36:24

**pending** 5:10

**personally** 21:22 22:9

**phone** 7:2,4

**photograph** 13:4

**photos** 20:11

**physically** 11:1 30:7,11

**picking** 28:13

**picture** 12:18, 24 13:3 14:2

**place** 36:20

**plaintiff** 4:10 38:13

**play** 39:3

**plow** 16:9

**point** 32:4

**policies** 10:20, 24 11:4,6,7, 10,14,20 26:1, 4,19 28:5

**pooled** 21:23 22:2,5,9,20,24 23:3 32:19

**position** 8:6, 16 10:11

**positions** 9:11,23 12:9

**practice** 31:5 35:7

**premises** 11:24 12:10 29:1,5

**previously** 12:21 13:23 17:22

**printed** 11:7, 20

**prior** 6:1,5 9:23 10:6 11:11,15 20:16 22:13, 22 28:20 29:1, 6 33:18

**procedure** 31:9

**procedures** 10:21,24 11:4, 6,11,15,20 26:1,5,19

**proceed** 15:22

**proper** 4:7 34:5,9

**protocol** 20:7, 11

**provide** 4:21 16:4 18:17

**provided** 10:3, 7,21 11:5,6, 11,15 26:18 33:23

**pull** 12:17 13:20

**purchaseable** 23:19,22

**purpose** 28:1

**purposes** 34:16

**pushing** 35:6

**put** 14:17,21 17:23 19:8,13, 14,20 20:1 32:8,9 35:9 37:12

**puts** 19:10

**Q**

**question** 4:21 5:5,7,10,11 18:13 24:5,24 26:3

**questions** 4:19 5:4 36:9, 12

**R**

**rail** 27:7

**rain** 14:16 37:1,4

**raining** 14:18

17:24 37:13

**rainwater** 18:23

**reach** 15:9 18:6

**recall** 10:13, 16,17 11:10, 14,19 22:12, 21,23 26:8 27:1,3,18 29:13,15,19, 21 30:1,3,24 31:10,13 32:1, 9,11,18 33:12

**receive** 33:18

**received** 33:16

**recollection** 38:12

**record** 4:3,5 5:12

**REDIRECT** 38:18

**referring** 23:24 34:17

**reflect** 4:5

**reflective** 23:17,18,21, 22,23 39:16

**relevance** 20:18 21:6,15

**remain** 34:15

**remained** 12:14

**remember** 10:15 11:18, 22 16:8 25:18, 21,23 26:7,11 29:22,23 30:4, 17,23 31:2,4, 6,17,24 32:3, 6,10,20,23 33:15 34:2

35:17,18

**removal** 16:4 17:20

**rephrase** 5:7 22:17 24:5

**report** 20:10, 14 33:9

**reported** 23:5

**reporter** 4:22 5:1

**reports** 12:6,7, 9,12

**require** 27:10

**response** 20:22

**review** 5:18 6:1,3,5 38:12

**reviewed** 5:20, 22 6:6,9 32:16

**reviewing** 36:19

**row** 15:12

**rows** 15:14,16 34:11

**rules** 4:8,19

**runner** 36:20

**runway** 18:10

**S**

**saturated** 18:16,22

**schedule** 16:21

**school** 7:21,22

**SCHWARTZ** 4:2,5,14 12:17,23 13:20 14:1 21:2,9,18 22:17,18 36:9 38:19 39:18

screen 39:14
security 6:10 34:16
served 7:8
services 16:4
sessions 10:4
sharing 13:20 39:14
shift 25:17 28:17
shirt 24:2
shopping 11:17,21 15:4, 8,13,14,16 21:24 22:7,21 23:4 26:21 27:8,9 28:2 34:10 38:3,7
shovel 16:15, 18,22 17:13, 16
shoveling 17:2
show 38:21
showing 6:14 14:3 39:2
shown 14:13
shows 32:8
shut 35:10
side 15:7
sidewalk 16:12
sign 13:11 14:6 19:13,14, 20,22 20:1,4 32:8,9 39:21
signs 19:8,10 37:7,13
silver 27:8
situation 18:21
size 18:2,5

sizes 18:3
slip 29:10
small 27:8
snow 14:16 16:4,11 17:20 18:23 32:13 37:1,5
snowing 14:18 17:24 32:14 37:13
sole 28:1
somebody's 18:16
sort 26:18
sound 5:13 9:17 33:20
specific 10:11 16:21 24:24 25:24 26:4
specifically 11:17 14:20 27:14,15 31:2
spill 37:17
spills 37:8
standing 21:19 22:13, 16
start 4:18 8:4
started 8:7,9
starting 9:23 10:6 11:12,16 33:18
state 4:2 8:9 20:23 40:1
stated 17:22 36:23
states 7:6 34:4,13
stay 20:4
stop 13:20
store 14:13 15:2,22 16:1,

13 20:8,16 21:24 28:5,21 35:3,4,15
stores 34:13
straight 9:9
Strike 6:1 9:3 17:6 18:14 19:23 23:12 25:15 27:21 29:24 35:14
summer 9:15
supervisor 23:6,9
supposed 26:12 35:5
surveillance 36:19 38:12
sustained 21:10 36:1,6
sweatshirt 24:1 39:16
sweeping 28:12
sworn 4:1,11
system 11:9

**T**

T-SHIRT 24:1
taking 4:22 20:11
talking 13:12 29:14
tasked 23:13 28:24 29:5
taught 11:23
team 37:8
telling 30:24 31:6
ten 10:16
testified 4:11

thinking 9:10 17:8
Thomas 4:4,9
time 12:13 21:12 24:4,6, 21,24 25:3,7, 9,12 32:14 35:18 39:21
times 22:2,7, 10,12 24:16, 17 27:4
Tinley 6:18 7:22 8:21 13:4 16:5 24:6 29:12 34:19
today 5:19 29:9 39:19
told 27:1,16,19 31:3
trained 26:24 27:14 34:4
training 9:22 10:2,3,7,10, 14,22 11:1 26:9,18 33:22
transition 9:8
trash 28:13
true 5:23 8:2, 18 15:2 17:24 24:16
turned 30:6,9
turnstile 14:24 15:7,9,10,11, 21,22 18:7,10 21:23 22:6,20 23:4 30:5
type 37:9
types 34:5
typical 15:20 31:5,8

**U**

uh-huhs 4:24
uh-uhs 4:24
underneath 13:10
understand 5:3,6 18:13 21:11
understanding 5:21 8:1
understood 5:5
United 7:6
University 7:18
unsure 19:16 20:13 32:14

**V**

vaguely 29:15
verbal 5:2
versus 27:10
vest 23:18 39:16
vests 23:17,21
video 5:20,22 6:9 30:4 32:7 38:24 39:3,7
videos 6:3,6, 13 32:16 38:21

**W**

waiting 4:20
walk 15:1,20 31:22
walk-off 28:6
walks 14:12

**watch** 35:15
**water** 18:16
 21:19 22:13,
 16,20 32:1,18
 33:12 37:17,
 22 38:1,2,6,9
**wear** 23:16
**weather** 32:11
 37:4
**week** 6:4,6
**wet** 19:7,8,10,
 13,14,17,19,
 20,22 20:1,4
 36:24 37:7,12
**woman** 32:21
**work** 9:5 24:4
 28:17
**worked** 8:24
 13:5
**working** 8:4,7,
 10,13,20,21
 12:13 19:18
 21:12 23:1
 24:8,11,14,17,
 18,21,23 25:3,
 6,11,15,17,20
 29:16
**written** 10:2,7,
 10,14,24
 11:19 26:1,4,
 8,18


      Y

**year** 7:16,17,
 23


      Z

**Zoom** 4:7

# DEPOSITION OF:

# **KATRICE MATTHEWS**

July 27, 2021

MIKE EVON

vs

MENARD, INC.

## MOSIER
## REPORTING SERVICES
Local Knowledge With National Reach

312.632.1116



EXHIBIT

C

MIKE EVON vs MENARD, INC.
KATRICE MATTHEWS 07/27/2021

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIKE EVON,                                )
                                          )
                    Plaintiff,            ) Case No.
                                          ) 20 CV 5682
        vs.                               )
                                          ) Formerly
MENARD, INC.,                             ) Case No.
                                          ) 20 L 9082
                    Defendant.            )

          The Zoom deposition of KATRICE MATTHEWS, taken in the above-entitled cause before Gabrielle Pudlo, CSR, and Notary Public within and for the County of Cook and State of Illinois, taken pursuant to the Federal Code of Civil Procedure for the United States District Court, Northern District of Illinois, Eastern Division, on July 27, 2021, at the hour of 10:37 a.m.

A  P  P  E  A  R  A  N  C  E  S:

KRALOVEC, JAMBOIS & SCHWARTZ
BY:   MS. OLIVIA SCHWARTZ
      60 West Randolph Street, 4th Floor
      Chicago, Illinois  60601
      (312) 782-2525
      oschwartz@kjs-law.com

            Appeared via Zoom
            On behalf of the Plaintiff;


FABRIZIO, HANSON, PEYLA & KAWINSKI
BY:   MS. MARILYNN FRANGELLA
      116 North Chicago Street, Suite 200A
      Joliet, Illinois  60432
      (815) 727-5445
      mfrangella.fhpk@gmail.com

            Appeared via Zoom
            On behalf of the Defendant.

MIKE EVON vs MENARD, INC.
KATRICE MATTHEWS 07/27/2021                    3

INDEX

| WITNESS EXAMINATION | DX | CX | RDX | RCX |
|---|---|---|---|---|
| KATRICE MATTHEWS | | | | |
| By Ms. Schwartz | 4 | | 41 | |
| By Ms. Frangella | | 38 | | |

EXHIBITS

| DEPOSITION EXHIBITS | MARKED |
|---|---|
| Matthews Exhibit No. 1 | 17 |
| Matthews Exhibit No. 2 | 19 |
| Matthews Exhibit No. 3 | 34 |

MIKE EVON vs MENARD, INC.
KATRICE MATTHEWS 07/27/2021                    4

(Witness sworn.)

MS. SCHWARTZ:  Good morning.  Would you please state your name for the record.

**THE WITNESS:  Katrice Matthews.**

MS. SCHWARTZ:  Let the record reflect that this is the discovery deposition of Katrice Matthews, taken via Zoom with proper notice to all parties in accordance with state and local rules.

KATRICE MATTHEWS,
called as a witness on behalf of the plaintiff, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SCHWARTZ:

Q    Before we start, Ms. Matthews, I'm just going to go through a couple deposition rules.  So if you would please wait for me to finish asking my question before you start to answer it, that way the court reporter can go ahead and get everything down. If you don't understand a question, please let me know and I can try to rephrase it or for you.

That being said, I know I talk quickly. So I apologize in advance.  And if you don't

understand it, just let me know and I'll try to repeat myself.

A     Okay.

Q     So if you answer the question, I'm going to assume that you did understand it.  And then if you need to take a break, you're obviously more than free to do so, just not while a question is pending. So answer the question, ask to take a break, and then we'll reconvene afterwards.

All right?

A     Okay.

Q     Have you ever given a deposition before?

A     Yes.

Q     Was it in your capacity as an employee of Menard's?

A     Yes.

Q     Has it been just one deposition, or have there been multiple?

A     Just one.

Q     Do you recall the reason for that deposition?

A     No, I don't.

Q     Do you recall if it was related to someone being injured at Menard's?

A    No, I don't.

Q    Do you recall about when that deposition was taken?

A    No.  I know it's been years ago.

Q    Okay.  So do you believe that it was more than five years ago?

A    Yeah, it's been more than five years ago.

Q    Okay.  Did you review any materials before coming to this deposition today?

A    Yes.  I saw the videos.

Q    Okay.  So when you said "the videos," do you recall how many videos?

A    I saw three clips.

Q    Okay.  Were they all three clips that were taken on February 13th of 2019?

A    I don't recall the date.  I didn't even look at the date.  I just looked at the clips.

Q    Okay.  In general, do you believe that they were surrounding this incident where the plaintiff, Mr. Evon, fell at Menard's?

A    Yes.

Q    Were you in any of the videos that you reviewed?

A    The third one.

Q    Okay, so you were in one of the three videos.  And in that video, were you standing behind a desk at the front of the store?

A    **Yes, the service desk.**

Q    Thank you.  Did you review any documents other than the videos?

A    **No.**

Q    Have you ever gone by any names other than Katrice Matthews?

A    **No.**

Q    What is your current address?

A    **14620 South Cleveland, C-l-e-v-e-l-a-n-d -- Katrice Bradley, yes.**

Q    What town is that in?

A    **Posen, Illinois.**

Q    And then I believe that you answered Katrice Bradley to my first question; is that true?

A    **Yes.**

Q    And was Bradley a maiden name?

A    **No.  That's my married name.**

Q    Do you go by Katrice Bradley now or Katrice Matthews now?

A    **I go by Katrice Matthews at work, yes.**

Q    Okay.  Is your name legally Katrice

Bradley?

A    No, Katrice Matthews.

Q    Okay.  When was it that you went by Katrice Bradley?

A    My name is hyphenated Katrice Matthews-Bradley.  But I never switched over anything, so I just go back to Katrice Matthews.

Q    Okay, thank you.  You stated your current address is in Posen, Illinois.  Do you live there with anybody?

A    Yes.

Q    Who do you live with?

A    My kids.

Q    How many, and what are their ages?

A    How many is two.

Q    Okay, two children.  What are their ages?

A    21 and 18.

Q    What is your current phone number?

A    (312) 662-8689.

Q    Are you a United States citizen?

A    Yes, I am.

Q    What is your date of birth?

A    12-12-79.

Q    Have you ever served in the military?

A    No.

Q    Have you ever been convicted of a felony?

A    No.

Q    Have you ever been convicted of a misdemeanor involving dishonesty?

A    No.

Q    What's your highest level of education?

A    Twelfth grade.

Q    Where did you go to high school?

A    Carl Schurz High School.

Q    What town is that in?

A    Chicago, Illinois.

Q    It's my understanding that you are currently employed by Menard's; is that true?

A    Yes.

Q    When did you start working at Menard's?

A    March the 1st, 2000.

Q    What position were you first hired to work in at Menard's?

A    I'm sorry?

Q    What was the position that you were first hired to be at Menard's?

A    Cashier.

Q    So hired as a cashier in 2000; is that

right?

A     Yes.

Q     And then what is your position at Menard's now?

A     **Cashier, customer service.**

Q     Have you been a cashier at Menard's since 2000?

A     **I've been a cashier.  I've also done accounts payable.**

Q     When did you do accounts payable?

A     **It's been years ago.  I can't even remember what year it was.**

Q     You broke up a little bit.  Can you just repeat that.

A     **It's been years.  I don't even remember what year that was.  That was -- I know they just stopped it maybe, like, four or five years ago; the position, they closed it out.  But I did accounts payable also.**

Q     So am I correct in thinking you were hired as a cashier; at some point you transferred roles into accounts payable; Menard's then shut down the job of accounts payable; so you returned to being a cashier?

MIKE EVON vs MENARD, INC.
KATRICE MATTHEWS 07/27/2021                    11

A     Yes.

Q     Okay.  In your career at Menard's, have you always worked at the Menard's in Tinley Park, located at 6851 West 159th?

A     No.

Q     Okay.  So when you were hired in 2000, which Menard's were you located at?

A     Melrose Park.

Q     Melrose Park.  How long were you at the Melrose Park location?

A     Oh, I came out here in 2000- -- I came out here in 2003.  I was maybe over there for, like, four or five years.

Q     Okay.  So after four or five years at Melrose Park, did you then begin at the Tinley Park location?

A     No.  I went to the Dolton location.

Q     The what location?

A     Dolton.

Q     Would you mind saying that again?

A     Dolton, D-o-l-t-o-n.

Q     So Melrose Park first, then Dolton.  Was there anywhere else?

A     No.

Q    Okay.

A    **Then Tinley Park.**

Q    Do you recall what year it was that you transferred from the Dolton location to the Tinley Park location?

A    **Oh, Lord.  No, I don't remember right now how many years I've been transferred from over there; no.**

Q    Have you been at the Tinley Park location for more than five years?

A    **It's been about close -- maybe close to five years.  Yeah, I want to say close to five years; yeah.**

Q    But you were working at the Tinley Park location in 2019, correct?

A    **Yes.**

Q    And you were working as a cashier at the Tinley Park location in February of 2019?

A    **Yes.**

Q    Is there a formal training that employees go through prior to becoming a cashier at Menard's?

A    **Yes.**

Q    Is that training something that you do just once before you start as a cashier, or are

there multiple times that you go through training?

A    We go through training before we were cashiers, and we have training all during our -- all during our being a cashier.  We have training all the time.

Q    Okay.  Can you estimate about how many times a year you have training?

A    Basically, like, every month we have different trainings that come up.

Q    Okay.  And when you say different trainings that come up, can you explain a little bit about what you mean?

A    We have, like, a new program that we might have, a new -- They just tell us new things, like a new program.  We might have a new update.  Yeah.

Q    Are there written training materials every time that there is a new training, or is it oral?

A    It's written.

Q    Do you recall when the last time you got new written training materials was?

A    We just got some new things.  I think it was, like, a week or two ago.

Q    Okay.  Are you familiar with the written policies and procedures of Menard's?

A    Some of them, yes.

Q    Have you ever been provided a physical copy of some of those written policies and procedures?

**A    Yes.  We always get a copy of our procedures.**

Q    Do you recall when the last time you got a copy of the written policies and procedures was?

**A    We got a -- Every time we have a training. So that was probably -- whatever we had last week or the week before that, we got something.  And every time we get a training, they print it out and give it to us so we can have a copy and we're able to read over it before we sign anything.**

Q    Okay.  Are employees taught about what to do if someone is injured on the premises?

**A    Are they told what to do?**

Q    Yeah.  Is there, you know, some training materials that discuss what to do if somebody falls and becomes injured at Menard's?

**A    We are to go to a -- tell the manager, let the manager know.**

Q    Okay.  Do you believe that that's in a written -- in written materials, or is that just an

oral rule that you would tell the manager?

A    It should be -- it's written.

Q    Are employees trained to do anything else if someone falls other than just telling the manager?

A    What do you mean, just fall out of nowhere or if it's...

Q    Yeah.

MS. FRANGELLA:  Can we specify that you're talking about a customer, as opposed to an employee?

MS. SCHWARTZ:  Yes.

BY MS. SCHWARTZ:

Q    So if a customer were to fall at Menard's, is there anything that's stated in the policies and procedures as to what the employee is supposed to do other than tell the manager?

A    I don't recall anything else.  Are you talking about a slip and fall, or are you talking about a -- I don't -- I'm quite not understanding what you're saying.

Q    I was talking about just a fall in general.  So if a customer were to fall or become injured at Menard's, am I correct in stating that

the employees are taught to tell the manager?

A    Yes.

Q    Okay.  Are employees taught to do anything beyond tell the manager if a customer were to fall at Menard's?

A    I don't recall, no.

Q    Are there formal incident reports that are to be filled out if someone is injured, if a customer is injured?

A    Yes.  That's filled out by the manager, yes.

Q    Okay.  So in all situations, a manager would -- Is a manager supposed to fill out an incident report in any situation where a customer falls at Menard's?

A    Yeah, if the customer -- Yeah.

Q    Are there any another positions who -- of employees who are supposed to fill out an incident report, or is it only a manager?

A    It's only the office manager, store manager.  The office manager normally does that.

Q    Okay.  So as a cashier, if a customer falls at Menard's, you are not supposed to -- Strike that.

As a cashier, if a customer were to fall at Menard's, is the cashier supposed to fill out an incident report?

A    No.

Q    If the cashier physically sees a customer fall at Menard's, are they supposed to fill out an incident report?

A    No.

MS. SCHWARTZ:  I am going to go ahead and show you a picture just of the outside of Menard's or what I believe the outside of this Menard's looks like.

Give me one second.

BY MS. SCHWARTZ:

Q    Katrice, can you see this picture?

A    Yes.

MS. SCHWARTZ:  We'll mark this as Exhibit 1.

                    (Matthews Exhibit No. 1

                    marked for identification.)

BY MS. SCHWARTZ:

Q    Does this picture appear to be an accurate photograph of the Tinley Park Menard's, as taken from the parking lot?

A    Yes.

Q    In the five or so years that you've worked at the Tinley Park Menard's, has this exterior of the Menard's changed at all?

A    The parking lot is -- Well, no.  It's the same exterior.  It's just that the parking lot -- I mean, the lot asphalt is fixed.

Q    Okay.  So other than potentially that, you know --

A    It looks the same.

Q    -- the asphalt looks newer, this looks the same?

A    Yeah.

Q    Is this -- Strike that.

Would you consider the parking lot that's shown in this photo to be the main customer parking lot at Menard's?

A    Yes.

Q    Is this where the employees at Menard's would park their cars as well?

A    No.  We park all the way at the end and on the blue.

Q    Do you park in the same parking lot, it's just not shown in this picture; or do you park in a

separate parking lot, as an employee?

A    It's in the same parking lot, but it's not in the picture.  We have blue lines where we park at.

Q    Okay.  How about as for the entrance, the "In" and the "Out" doors, do you see what I'm talking about in the picture?

A    Uh-huh.

Q    Okay.  Is that door marked "In" the main customer entrance?

A    Yes.  It's marked "In."

Q    Is that same entrance the entrance that employees would use, coming to work?

A    Yes.

(Matthews Exhibit No. 2 marked for identification.)

BY MS. SCHWARTZ:

Q    I'm going to show Exhibit 2.  So it's just the same photo, just a little bit more zoomed in.

Ms. Matthews, can you see what I'm showing you now?

A    Yes.

Q    Okay.  So to the right of the door marked "In" and underneath the "Carpet" sign, there appears

to be some doors there.  Correct?

A    Uh-huh, yes.

Q    Is that the cart corral doors?

A    Yes.

Q    Do they open like a garage type door, from the bottom to the top?

A    Yes.

Q    In this photo there appears to be a line of shopping carts outside of that door.  Do you see that?

A    Uh-huh, yes.

Q    So to your knowledge, are those the doors that are specifically to be used to bring the carts into the store?

A    Yes.

Q    So when a customer walks into the main entrance, is there a mat on the floor?

A    No.

Q    Is there other times when a mat is put down inside the main customer entrance?

A    Yes, when it's raining or snowing; when the weather is wet, yes.

Q    Whose decision is it to put out the mat if it's raining or snowing or when the weather is wet?

A    The managers and the carry-outs, they know they are supposed to put them down when it's wet.

Q    Okay. So is the carry-out supposed to put the mat down if it's wet?

A    Yes.

Q    Okay. And is there one size mat, or are there multiple size mats that can be put out?

A    I'm not sure.

Q    Are there ever multiple mats put out, or is it --

A    Yeah. It's multiple mats puts out, yes.

Q    So to my knowledge, once a customer walks in the front entrance -- the main entrance that we just saw in the photograph -- kind of over to the right there's a turnstile to continue walking through to get to the store; is that correct?

A    Uh-huh.

Q    You have to say --

A    Yes, I'm sorry.

Q    It's something funny to get used to.

Are there shopping carts for customers to grab inside of the store through that metal turnstile?

A    Once you go through the turnstile, the

carts are on the right-hand side.  They can grab them once they come -- go into the turnstile, yes; to the right, yes.

Q     Is that the main entrance path for customers to take as they come inside the store?

A     Yes.

Q     In February of 2019, do you know if Menard's contracted with a snow removal company to provide services at the Tinley Park location?

A     I don't know.

Q     In terms of the mat to be put out if there are certain weather conditions, do you know if it is the carry-out's decision to put the mat down or if it is the decision of a manager who then tells the carry-out to put the mat down?

A     The manager usually tells them to put the mat down as soon as it starts raining.  But the carry-outs usually just put them down.  But the managers still tell them to put it down.  So it's both ways.

Q     Do you know how often the mat is changed?

A     Never changed.

Q     Do you know how often the mat is cleaned?

A     I'm sorry?

Q    Do you know how often the mat is cleaned?

A    **We get new mats once a -- I think it's once a week.  I'm not sure.**

Q    Do you know whose job it is to clean the mat?

A    **They get them from the company, I know. But I don't know whose job it is to get them cleaned.**

Q    Is it a separate company that provides the mats?

A    **Yes.**

Q    Does Menard's have "Wet Floor" or "Caution" signs to put up if the floor inside the building is wet?

A    **Yes.**

Q    Are they the yellow folding signs?

A    **Yes.**

Q    Is there a specific position who is supposed to put out the "Caution" or the "Wet Floor" signs?

A    **No.**

Q    If any employee notices that there's a spill on the floor, is it the job of the employee who notices it to then put out the "Wet Floor" sign?

A     Yeah.  If we see a spill, we go get the yellow signs and put them out.

Q     What is the protocol for when a customer falls down and gets hurt?

A     When you fall down and get hurt?  Just -- I guess they just tell the manager.  I'm not -- I don't know what else they can really do.

Q     Do you know if an employee is supposed to take pictures of the area where the individual fell?

A     The manager usually does, yes.

Q     Have you been made aware of any falls that have occurred on the premises at Tinley Park prior to February 13th of 2019?

A     No.

MS. FRANGELLA:  Objection, relevance.

You could answer, Ms. Matthews.

A     No.

BY MS. SCHWARTZ:

Q     Are you aware of any customers falling in the entrance area at Menard's other than the incident that we're here for today?

MS. FRANGELLA:  Objection --

A     No.

MS. FRANGELLA:  -- relevance.

You could answer, Ms. Matthews.

A    No.

MS. FRANGELLA:  Ms. Matthews, when you hear me object, if you could wait until I tell you to answer, not before you give your answer, that would be great.

THE WITNESS:  Okay.

BY MS. SCHWARTZ:

Q    It's documented in some of the materials that I received that somebody sustained a fall on February 26th of 2017.

Do you have any knowledge of that incident?

A    No.

Q    Have you been made aware of anyone prior to February 13th of 2019 complaining that the entrance area to Menard's was slippery?

A    No.

Q    Are you aware of any complaints that there has been accumulations of liquid near the entrance of the Menard's store?

A    No.

Q    Have you personally ever noticed any accumulation of liquid at the entranceway of the

Menard's store?

A    No.

Q    How about near where the customers were to get a shopping cart, have you ever noticed any pooled liquid in that area?

A    No.

Q    Are you aware of anybody that's fallen in the area near the entranceway where the customers were to collect a cart since February 13th of 2019?

MS. FRANGELLA:  Objection, relevance.

You could answer, Ms. Matthews.

A    No.

BY MS. SCHWARTZ:

Q    Who has the job of bringing the carts in from the parking lot?

A    Carry-outs.

Q    Are the carry-outs also referred to as Courtesy Patrol team members?

A    Yes.

Q    And are the carry-outs the ones that wear the reflective vests?

A    Yes.

Q    Do you know how many carry-outs work per shift?

A    No.

Q    Do you know if it varies, the number of carry-outs that work per shift?

A    Yes.

Q    Is there ever just one carry-out working, or are there always multiple carry-outs?

A    **As far as I can see, it's always multiple carry-outs.**

Q    And are the carry-outs trained to bring the carts in from the parking lot into the separate cart corral door?

A    **Yes.**

Q    Are you aware if there are specific written policies or procedures that apply to bringing the carts in from the parking lot?

A    **I guess they -- No.  I'm guessing the carry-out has the same policies to training, but I don't know what their training is.**

Q    As a cashier, are you only familiar with the cashier training and policies?

A    **Yes.**

Q    So as a cashier, you are not aware of the policies and procedures, training materials for the carry-outs?

MIKE EVON vs MENARD, INC.
KATRICE MATTHEWS 07/27/2021                    28

A    No.

Q    Some of the store policies mention a walk-off grate. Are you familiar with what a walk-off grate is?

A    No.

Q    What are the general duties of a cashier at Menard's on a day-to-day basis?

A    **Cashier, we are to bring the guests in and out the store and call for a carry-out if they need help, greet the customers.**

Q    What is the position called that would be your direct supervisor?

A    **My direct supervisor?**

Q    Yes.

A    **Front-end manager.**

Q    Did you say front-end manager?

A    **Uh-huh, yes.**

Q    Are there any positions that report to you, as a cashier?

A    **No.**

Q    So am I correct in stating that the cashiers report to -- Strike that.

Am I correct in stating that the supervisor for the cashiers in the front-end

manager.

A    I'm sorry.  You said, "the supervisors."
Can you repeat that.

Q    Yeah.  So is the supervisor for the
position of a cashier, is that the front-end
manager?

A    Yes.

Q    And is the front-end manager also the
supervisor for the carry-outs?

A    Yes.

Q    So the carry-outs don't report to the
cashiers?

A    No.

Q    Is the front-end manager the supervisor of
any other positions in addition to the cashiers and
the carry-outs?

A    They're the managers of the head cashiers.

Q    Are you a head cashier?

A    No.

Q    So what is the difference, I guess,
between a head cashier and a cashier?

A    Head cashiers just basically stand over
the cashiers and watch them every now and then.  So
that's what the head cashier does.

Q    Do you, as a cashier --

A    **It's all the same as cashiers, maybe. They're all the same; cashiers.**

Q    Okay.  What time in the morning does your shift typically start?

A    **I'm sorry?**

Q    Is there a specific time in the morning that your shift starts?

A    **My shifts vary.**

Q    Okay.  Is there a morning shift?

A    **I have different shifts.**

Q    Okay.  Do you know what time the store opens in the morning?

A    **The store opens at 6:00 a.m.**

Q    Okay.  Does your shift ever start at 6:00 a.m.?

A    **Yes.**

Q    If your shift starts at 6:00 a.m., what time in the morning do you usually get to work?

A    **Do I get to work if my shift starts at 6:00 a.m.?**

Q    Yes.

A    **6:00 a.m.**

Q    So are you required to get to the store at

any -- Strike that.

If your shift starts at 6:00 a.m., are you required to be at the store prior to the store opening and before customer begin to arrive?

A    Yeah, as long as we there at 6:00 a.m.

Q    Okay.  As you may be aware, the incident that we're here discussing today involves my client, Mike Evon, in a slip and fall that occurred on February 13, 2019, at the Tinley Park Menard's.

Do you recall the incident that I'm talking about?

A    No.

Q    And I believe that you stated that you had reviewed some videos from this incident, correct?

A    Yes.

Q    So prior to seeing those videos, were you aware of this incident?

A    No.

Q    Were you working at Menard's when this incident happened?

A    Yes.

Q    Is the only way that you know that you were working at Menard's when this incident happened because of the videos?

A    Yes.

Q    So do you recall ever meeting Mr. Evon?

A    No.

Q    Do you recall if he was with anyone?

A    No.

Q    And did you physically see him fall?

A    No.

Q    When was the first time you learned about this incident?

A    Maybe, like -- maybe, like, a month ago.

Q    And who did you hear about this incident from?

A    From my office manager.

Q    Was that Pam Bamman?

A    Yes.

Q    Is the first conversation that you and Ms. Bamman had regarding this incident, did that occur about a month ago?

A    I don't recall if it was exactly a month ago, but it's -- I'm thinking maybe it was about a month ago they sent the email saying that the incident occurred and we had a deposition. That's all I know.

Q    Okay. After you received that email, did

you have a conversation with Ms. Bamman about this incident?

A    No -- Yes.  Basically, she just -- we were just talking about the dates and when it was done. As I said, I don't recall the incident at all.

Q    Did you have a conversation with Ms. Bamman about how the incident occurred?

A    No.

Q    Did you have a conversation with Ms. Bamman about who the individual that fell was, maybe besides his name?

A    No.

Q    Did you have a conversation with anybody else at Menard's about this incident other than what you just said about Ms. Bamman?

A    No.

Q    Do you agree that there's a video of you having a conversation with Mr. Evon on the date of the incident?

A    Yes.

Q    Prior to seeing that video, do you recall ever having a conversation with Mr. Evon on the date of the incident?

A    No.

MIKE EVON vs MENARD, INC.
KATRICE MATTHEWS 07/27/2021                    34

Q    Do you believe that Mr. Evon, on February 13th of 2019, told you that he fell near where the shopping carts are stored?

A    No.

Q    Did you ever see -- Strike that.

On the date of the incident, did you ever physically go over towards where Mr. Evon said he fell and inspect the area?

A    No.  I don't even recall the incident.

Q    Do you recall whether or not a "Caution" sign was put up after Mr. Evon fell?

A    No.

Q    Do you recall what the weather was like on February 13, 2019?

A    No.

Q    Are you aware if Mr. Evon filled out an incident report?

A    No.

MS. SCHWARTZ:  I am going to pull up just a picture of that -- just a still of that video.  Give me one second here.  This will be Exhibit 3.

(Matthews Exhibit No. 3 marked for identification.)

BY MS. SCHWARTZ:

Q    Ms. Matthews, can you see what's pulled up here on the screen in Exhibit 3?

A    Yes.

Q    Do you believe this individual behind the desk, is that you?

MS. FRANGELLA:  I think she may have froze.

(Brief pause due to technical difficulties.)

MS. SCHWARTZ:  Would you mind just reading that question again.

(Record read as requested.)

A    Yes.

BY MS. SCHWARTZ:

Q    Do you know who the other individual in the video is?

A    Pull it up closer.

Q    Would you say that again?

A    I was trying to pinch in on it.  I can't really see their face.  It's blurry.

Q    Okay.  If I play the video, maybe that will help here.  I'll try, if you can see.

It's still pretty blurry, but do you know

who that is?

A    No.  It's blurry.

Q    Okay.  Do you believe that that other individual was a carry-out?

A    Yes.

Q    Do you have an opinion as to whether or not Mike Evon fell on water or slush he tracked in himself?

A    No.

Q    Do you have an opinion as to whether or not Mr. Evon failed to wipe or dry his shoes when he entered the store?

A    No.

Q    Do you have an opinion as whether or not Mr. Evon was keeping a proper lookout at the time that he fell?

MS. FRANGELLA:  I'm just going to object that that calls for a legal conclusion and then also foundation, as she didn't testify she saw Mr. Evon enter the store.

You could answer, Ms. Matthews.

A    No.

BY MS. SCHWARTZ:

Q    Have you had any conversations with

Mr. Evon since February 13th of 2019?

A     No.

Q     Have you had any conversations regarding Mr. Evon since February 13th of 2019 other than with your lawyers and the previous discussion we talked about with Pam Bamman?

A     No.

Q     Do you have any knowledge of the injuries that Mr. Evon sustained from his fall on February 13th of 2019?

A     No.

Q     Okay.  And you yourself have never been in the carry-out position, right?

A     No.

Q     Have you yourself ever trained the carry-outs?

A     I'm sorry.  Can you repeat that.

Q     Have you yourself ever been involved in training the carry-outs?

A     No.

MS. SCHWARTZ:  That's it for me.  Thank you, Ms. Matthews.

THE WITNESS:  Give me one second.  It's kind of noisy.  I'm sorry, one second.

Okay, can you repeat that.

MS. SCHWARTZ: I just let you know that that was all the questions I had for you. So if your attorney has any...

MS. FRANGELLA: Yes. Ms. Matthews, just a couple clarification questions for you.

CROSS-EXAMINATION

BY MS. FRANGELLA:

Q   The incident reports or the insurance claim forms that are done by Menard's following a customer injury, those are normally completed by the front-end manager or a store manager; is that true?

A   Yes.

Q   Okay. And then in your experience at Menard's, customers could enter the store either through the "In" door or the "Out" door; true?

A   "In" door.

Q   Well, they could also go in through the "Out" door if they wanted to?

A   Yes. "Out" door, yes, yes.

Q   Okay. And the carts car that are brought into the store, those can be brought in through the cart door that Counsel showed you a picture of; and they could also be brought in through the "In" door.

True?

A    No, only the garage doors.

Q    Well, the carry-outs do bring carts through the entrance door if they're just bringing in a couple of carts, correct?

A    Yes; sometime, yes.

Q    Okay.  But primarily the cart door is used?

A    For the carts, yes.

Q    And at the time of this incident, the surveillance footage that you reviewed shows that there was one big runner in place in front of the entrance door; true?

A    Yes.

Q    And you told us earlier that Menard's policy is to place a runner or mat -- whatever you want to call it -- in front of the door when it's raining or snowing.  Correct?

A    Yes.

Q    And the surveillance footage that you showed -- you were shown reveals that there was snow outside in the parking lot and on the pavement on the date of this incident.  Correct?

A    I seen the -- Yeah.  It was wet outside,

so yeah.  I saw the video.

Q    Yeah.  The surveillance shows that there was, kind of, snow still in the parking lot, correct?

A    Uh-huh.

Q    All right.  And I understand that you have no independent recollection of this incident, but you have reviewed a number of surveillance clips from the dates of the incident.  Correct?

A    Yes.

Q    And you've identified yourself as being the person that was behind the desk, at least shortly after this incident when the plaintiff approached you.  Correct?

A    Yes.

Q    And one of the clips that you reviewed, the surveillance clips, you can hear a conversation between you and somebody reporting that they fell.
Correct?

A    Yes.

Q    And you did not see this person enter the store prior to their fall; is that true?

A    No.

Q    And you don't have any other independent

memory of this incident other than what you've told us today?

A    No.

MS. FRANGELLA:  Okay.  I don't have anything further for you, Ms. Matthews.  Thank you.

THE WITNESS:  Okay.

MS. SCHWARTZ:  And just a very quick follow-up.

REDIRECT EXAMINATION

BY MS. SCHWARTZ:

Q    The questions your attorney asked regarding the weather on the day of the incident and the mat configuration on the day of the incident, your answers were based on your review of the videos, not your personal recollection.

Correct?

A    On the videos, yes.

Q    And do you believe that the carry-outs are supposed to bring all of the carts in through the cart corral door?

A    Yes.  Sometime they may have a few that they bring through the front.  But it's the cart corral that's always used.

Q    The cart corral door is specifically for the carts to be brought into the building, correct?

**A    Yes.**

MS. SCHWARTZ:  That's it for me.  Thanks.

MS. FRANGELLA:  Okay, great.  So I guess we'll sign back on at 12:00 for Mr. Hickey.

THE COURT REPORTER:  Marilyn, before we go, what do you want to do about signature?

MS. FRANGELLA:  There is no signature. It's federal court.

(WITNESS EXCUSED.)

STATE OF ILLINOIS          )
                           ) SS.
COUNTY OF COOK             )


          I, GABRIELLE PUDLO, Certified Shorthand

Reporter No. 084-004173, and Notary Public within

and for the County of Cook and State of Illinois, do

hereby certify that on July 27, 2021, at 10:37 a.m.,

the deponent, KATRICE MATTHEWS, appeared before me

via Zoom.

          I further certify that KATRICE MATTHEWS,

was by me duly sworn to testify the truth and that

the foregoing is a true record of the testimony

given by KATRICE MATTHEWS.

          I further certify that the deposition

terminated at 11:29 a.m.

          I further certify that there were present,

via Zoom, at the taking of the said deposition the

persons and parties as indicated on the appearance

page made a part of this deposition transcript.

          I further certify that I am not counsel

for nor in any way related to any of the parties to

this suit, nor am I in any way interested in the

outcome thereof.

          IN TESTIMONY WHEREOF, I have hereunto set

my hand and affixed my notarial seal on this 10th day of August, 2021.

*Gabrielle Pudlo*

GABRIELLE PUDLO, CSR
Notary Public
CSR License No. 084-004173

**1**

1 17:18,19
12-12-79 8:23
12:00 42:6
13 31:9 34:14
13th 6:15
 24:13 25:16
 26:9 34:2
 37:1,4,10
14620 7:12
159th 11:4
18 8:17
1st 9:17

**2**

2 19:15,18
2000 9:17,24
 10:7 11:6
2000- 11:11
2003 11:12
2017 25:11
2019 6:15
 12:15,18 22:7
 24:13 25:16
 26:9 31:9
 34:2,14 37:1,
 4,10
21 8:17
26th 25:11

**3**

3 34:22,23
 35:3
312 662-8689
 8:19

**6**

6851 11:4
6:00 30:14,16,
 18,21,23 31:2,
 5

**A**

a.m. 30:14,16,
 18,21,23 31:2,
 5
accordance
 4:8
accounts 10:9,
 10,18,22,23
accumulation
 25:24
accumulations
 25:20
accurate 17:22
addition 29:15
address 7:11
 8:9
advance 4:24
ages 8:14,16
agree 33:17
ahead 4:20
 17:9
answers 41:15
apologize 4:24
appears 19:24
 20:8
apply 27:14
approached
 40:14
area 24:9,20
 25:17 26:5,8
 34:8
arrive 31:4

asphalt 18:7,
 11
assume 5:5
attorney 38:4,
 41:12
aware 24:11,
 19 25:15,19
 26:7 27:13,22
 31:6,17 34:16

**B**

back 8:7 42:6
Bamman
 32:14,17 33:1,
 7,10,15 37:6
based 41:15
basically 13:8
 29:22 33:3
basis 28:7
begin 11:15
 31:4
behalf 4:11
big 39:12
birth 8:22
bit 10:13 13:11
 19:19
blue 18:22
 19:3
blurry 35:21,
 24 36:2
bottom 20:6
Bradley 7:13,
 17,19,21 8:1,4
break 5:6,8
bring 20:13
 27:9 28:8 39:3
 41:20,23
bringing 26:14
 39:6
broke 10:13

brought 38:21,
 22,24 42:2
building 23:14
 42:2

**C**

C-L-E-V-E-L-A-
N-D 7:13
call 28:9 39:17
called 4:11
 28:11
calls 36:18
capacity 5:14
car 38:21
career 11:2
Carl 9:10
Carpet 19:24
carry-out 21:3
 22:15 27:5,17
 28:9 36:4
 37:13
carry-out's
 22:13
carry-outs
 21:1 22:18
 26:16,17,20,
 23 27:3,6,8,9,
 24 29:9,11,16
 37:16,19 39:3
 41:19
cars 18:20
cart 20:3 26:4,
 9 27:11 38:23
 39:7 41:21,23
 42:1
carts 20:9,13
 21:21 22:1
 26:14 27:10,
 15 34:3 38:21
 39:3,5,9 41:20
 42:2

cashier 9:23,
 24 10:5,6,8,
 21,24 12:17,
 21,24 13:4
 16:22 17:1,2,5
 27:19,20,22
 28:6,8,19
 29:5,18,21,24
 30:1
cashiers 13:3
 28:22,24
 29:12,15,17,
 22,23 30:2,3
Caution 23:13,
 19 34:10
changed 18:4
 22:21,22
Chicago 9:12
children 8:16
citizen 8:20
claim 38:10
clarification
 38:6
clean 23:4
cleaned 22:23
 23:1,8
Cleveland
 7:12
client 31:7
clips 6:13,14,
 17 40:8,16,17
close 12:11,12
closed 10:18
closer 35:18
collect 26:9
company 22:8
 23:6,9
complaining
 25:16
complaints
 25:19

Mosier Reporting Services
mosierreporting.com   (312) 632-1116

**completed** 38:11

**conclusion** 36:18

**conditions** 22:12

**configuration** 41:14

**continue** 21:15

**contracted** 22:8

**conversation** 32:16 33:1,6, 9,13,18,22 40:17

**conversations** 36:24 37:3

**convicted** 9:2, 4

**copy** 14:3,5,8, 13

**corral** 20:3 27:11 41:21, 24 42:1

**correct** 10:20 12:15 15:24 20:1 21:16 28:21,23 31:14 39:5,18, 23 40:4,9,14, 19 41:17 42:2

**Counsel** 38:23

**couple** 4:17 38:6 39:5

**court** 4:20 42:7,10

**Courtesy** 26:18

**CROSS-EXAMINATION** 38:7

**current** 7:11 8:8,18

**customer** 10:5 15:10,14,23 16:4,9,14,16, 22 17:1,5 18:16 19:10 20:16,20 21:12 24:3 31:4 38:11

**customers** 21:21 22:5 24:19 26:3,8 28:10 38:15

---

**D**

**D-O-L-T-O-N** 11:21

**date** 6:16,17 8:22 33:18,22 34:6 39:23

**dates** 33:4 40:9

**day** 41:13,14

**day-to-day** 28:7

**decision** 20:23 22:13,14

**deposition** 4:6,17 5:12, 17,21 6:2,9 32:22

**desk** 7:3,4 35:6 40:12

**difference** 29:20

**difficulties** 35:10

**direct** 4:14 28:12,13

**discovery** 4:6

**discuss** 14:19

**discussing** 31:7

**discussion** 37:5

**dishonesty** 9:5

**documented** 25:9

**documents** 7:5

**Dolton** 11:17, 19,21,22 12:4

**door** 19:9,23 20:5,9 27:11 38:16,17,19, 20,23,24 39:4, 7,13,17 41:21 42:1

**doors** 19:6 20:1,3,12 39:2

**dry** 36:11

**due** 35:9

**duly** 4:12

**duties** 28:6

---

**E**

**earlier** 39:15

**education** 9:7

**email** 32:21,24

**employed** 9:14

**employee** 5:14 15:11,16 19:1 23:22,23 24:8

**employees** 12:20 14:15 15:3 16:1,3,18 18:19 19:13 19:18:24

**enter** 36:20 38:15 40:21

**entered** 36:12

**entrance** 19:5, 10,12 20:17, 20 21:13 22:4 24:20 25:17, 20 39:4,13

**entranceway** 25:24 26:8

**estimate** 13:6

**Evon** 6:20 31:8 32:2 33:18,22 34:1,7,11,16 36:7,11,15,20 37:1,4,9

**EXAMINATION** 4:14 41:10

**examined** 4:12

**EXCUSED** 42:11

**Exhibit** 17:18, 19 19:15,18 34:22,23 35:3

**experience** 38:14

**explain** 13:11

**exterior** 18:3,6

---

**F**

**face** 35:21

**failed** 36:11

**fall** 15:6,14,19, 22,23 16:4 17:1,6 24:5 25:10 31:8 32:6 37:9 40:22

**fallen** 26:7

**falling** 24:19

**falls** 14:19 16:4 16:15,23 24:4,11

**familiar** 13:23 27:19 28:3

**February** 6:15 12:18 22:7 24:13 25:11, 16 26:9 31:9 34:2,14 37:1, 4,10

**federal** 42:10

**fell** 6:20 24:9 33:10 34:2,8, 11 36:7,16 40:18

**felony** 9:2

**fill** 16:13,18 17:2,6

**filled** 16:8,10 34:16

**finish** 4:18

**fixed** 18:7

**floor** 20:17 23:12,13,19, 23,24

**folding** 23:16

**follow-up** 41:9

**footage** 39:11, 20

**formal** 12:20 16:7

**forms** 38:10

**foundation** 36:19

**FRANGELLA** 15:9 24:15,22, 24 25:3 26:10 35:7 36:17 38:5,8 41:4 42:5,9

**free** 5:7

**front** 7:3 21:13 39:12,17 41:23

Mosier Reporting Services
mosierreporting.com   (312) 632-1116

**front-end** 28:15,16,24 29:5,8,14 38:12

**froze** 35:8

**funny** 21:20

---

**G**

**garage** 20:5 39:2

**general** 6:18 15:23 28:6

**give** 14:12 17:13 25:5 34:21 37:23

**Good** 4:2

**grab** 21:22 22:1

**grade** 9:8

**grate** 28:3,4

**great** 25:6 42:5

**greet** 28:10

**guess** 24:6 27:16 29:20 42:5

**guessing** 27:16

**guests** 28:8

---

**H**

**happened** 31:20,23

**head** 29:17,18, 21,22,24

**hear** 25:4 32:11 40:17

**Hickey** 42:6

**high** 9:9,10

**highest** 9:7

**hired** 9:18,22, 24 10:20 11:6

**hurt** 24:4,5

**hyphenated** 8:5

---

**I**

**identification** 17:20 19:16 34:24

**identified** 40:11

**Illinois** 7:15 8:9 9:12

**incident** 6:19 16:7,14,18 17:3,7 24:21 25:13 31:6,10, 14,17,20,23 32:9,11,17,22 33:2,5,7,14, 19,23 34:6,9, 17 38:9 39:10, 23 40:7,9,13 41:1,13,14

**independent** 40:7,24

**individual** 24:9 33:10 35:5,16 36:4

**injured** 5:24 14:16,20 15:24 16:8,9

**injuries** 37:8

**injury** 38:11

**inside** 20:20 21:22 22:5 23:13

**inspect** 34:8

**insurance** 38:9

**involved** 37:18

**involves** 31:7

**involving** 9:5

---

**J**

**job** 10:23 23:4, 7,23 26:14

---

**K**

**Katrice** 4:4,6, 10 7:9,13,17, 21,22,23,24 8:2,4,5,7 17:15

**keeping** 36:15

**kids** 8:13

**kind** 21:14 37:24 40:3

**knowledge** 20:12 21:12 25:12 37:8

---

**L**

**lawyers** 37:5

**learned** 32:8

**legal** 36:18

**legally** 7:24

**level** 9:7

**lines** 19:3

**liquid** 25:20,24 26:5

**live** 8:9,12

**local** 4:8

**located** 11:4,7

**location** 11:10, 16,17,18 12:4, 5,9,15,18 22:9 23:2,6

**long** 11:9 31:5

**looked** 6:17

**lookout** 36:15

**Lord** 12:6

**lot** 17:24 18:5, 6,7,15,17,23 19:1,2 26:15 27:10,15 39:22 40:3

---

**M**

**made** 24:11 25:15

**maiden** 7:19

**main** 18:16 19:9 20:16,20 21:13 22:4

**manager** 14:21,22 15:1, 5,17 16:1,4, 10,12,13,19, 20,21 22:14, 16 24:6,10 28:15,16 29:1, 6,8,14 32:13 38:12

**managers** 21:1 22:19 29:17

**March** 9:17

**Marilyn** 42:7

**mark** 17:17

**marked** 17:20 19:9,11,16,23 34:24

**married** 7:20

**mat** 20:17,19, 23 21:4,6 22:11,13,15, 17,21,23 23:1, 5 39:16 41:14

**materials** 6:8

13:16,20 14:19,24 25:9 27:23

**mats** 21:7,9,11 23:2,10

**matthews** 4:4, 7,10,16 7:9, 22,23 8:2,7 17:19 19:15, 20 24:16 25:1, 3 26:11 34:23 35:2 36:21 37:22 38:5 41:5

**Matthews-bradley** 8:6

**meeting** 32:2

**Melrose** 11:8, 9,10,15,22

**members** 26:18

**memory** 41:1

**Menard's** 5:15, 24 6:20 9:14, 16,19,22 10:3, 6,22 11:2,3,7 12:21 13:24 14:20 15:14, 24 16:5,15,23 17:2,6,11,12, 23 18:3,4,17, 19 22:8 23:12 24:20 25:17, 21 26:1 28:7 31:9,19,23 33:14 38:10, 15 39:15

**mention** 28:2

**metal** 21:22

**Mike** 31:8 36:7

**military** 8:24

**mind** 11:20 35:11

**misdemeanor** 9:5

**month** 13:8 32:10,18,19, 21

**morning** 4:2 30:4,7,10,13, 19

**multiple** 5:18 13:1 21:7,9,11 27:6,7

**N**

**names** 7:8

**newer** 18:11

**noisy** 37:24

**notice** 4:7

**noticed** 25:23 26:4

**notices** 23:22, 24

**number** 8:18 27:2 40:8

**O**

**object** 25:4 36:17

**Objection** 24:15,22 26:10

**occur** 32:18

**occurred** 24:12 31:8 32:22 33:7

**office** 16:20,21 32:13

**open** 20:5

**opening** 31:4

**opens** 30:13, 14

**opinion** 36:6, 10,14

**opposed** 15:10

**oral** 13:17 15:1

**P**

**Pam** 32:14 37:6

**park** 11:3,8,9, 10,15,22 12:2, 5,9,14,18 17:23 18:3,20, 21,23,24 19:3 22:9 24:12 31:9

**parking** 17:24 18:5,6,15,16, 23 19:1,2 26:15 27:10, 15 39:22 40:3

**parties** 4:8

**path** 22:4

**Patrol** 26:18

**pause** 35:9

**pavement** 39:22

**payable** 10:9, 10,19,22,23

**pending** 5:7

**person** 40:12, 21

**personal** 41:16

**personally** 25:23

**phone** 8:18

**photo** 18:16 19:19 20:8

**photograph** 17:23 21:14

**physical** 14:2

**physically** 17:5 32:6 34:7

**picture** 13:17 15:22 18:24 19:3,7 34:20 38:23

**pictures** 24:9

**pinch** 35:20

**place** 39:12,16

**plaintiff** 4:11 6:20 40:13

**play** 35:22

**point** 10:21

**policies** 13:24 14:3,8 15:15 27:14,17,20, 23 28:2

**policy** 39:16

**pooled** 26:5

**Posen** 7:15 8:9

**position** 9:18, 21 10:3,18 23:18 28:11 29:5 37:13

**positions** 16:17 28:18 29:15

**potentially** 18:8

**premises** 14:16 24:12

**pretty** 35:24

**previous** 37:5

**primarily** 39:7

**print** 14:12

**prior** 12:21 24:12 25:15 31:3,16 33:21 40:22

**procedures** 13:24 14:4,6,8

15:16 27:14, 23

**program** 13:13,15

**proper** 4:7 36:15

**protocol** 24:3

**provide** 22:9

**provided** 14:2

**pull** 34:19 35:18

**pulled** 35:2

**put** 20:19,23 21:2,3,7,9 22:11,13,15, 16,18,19 23:13,19,24 24:2 34:11

**puts** 21:11

**Q**

**question** 4:19, 21 5:4,7,8 7:17 35:12

**questions** 38:3,6 41:12

**quick** 41:8

**quickly** 4:23

**R**

**raining** 20:21, 24 22:17 39:18

**read** 14:14 35:13

**reading** 35:11

**reason** 5:20

**recall** 5:20,23 6:2,12,16 12:3 13:19 14:7

15:18 16:6 31:10 32:2,4, 19 33:5,21 34:9,10,13

**received** 25:10 32:24

**recollection** 40:7 41:16

**reconvene** 5:9

**record** 4:3,5 35:13

**REDIRECT** 41:10

**referred** 26:17

**reflect** 4:5

**reflective** 26:21

**related** 5:23

**relevance** 24:15,24 26:10

**remember** 10:12,15 12:6

**removal** 22:8

**repeat** 5:2 10:14 29:3 37:17 38:1

**rephrase** 4:22

**report** 16:14, 19 17:3,7 28:18,22 29:11 34:17

**reporter** 4:20 42:7

**reporting** 40:18

**reports** 16:7 38:9

**requested** 35:13

**required** 30:24 31:3

MIKE EVON vs MENARD, INC.
KATRICE MATTHEWS 07/27/2021

Index: retu..Unit

returned 10:23

reveals 39:21

review 6:8 7:5 41:15

reviewed 6:23 31:14 39:11 40:8,16

right-hand 22:1

roles 10:21

rule 15:1

rules 4:9,17

runner 39:12, 16

**S**

school 9:9,10

Schurz 9:10

SCHWARTZ 4:2,5,15 15:12,13 17:9, 14,17,21 19:17 24:18 25:8 26:13 34:19 35:1,11, 15 36:23 37:21 38:2 41:8,11 42:4

screen 35:3

sees 17:5

separate 19:1 23:9 27:10

served 8:24

service 7:4 10:5

services 22:9

shift 26:24 27:3 30:5,8, 10,15,18,20 31:2

shifts 30:9,11

shoes 36:11

shopping 20:9 21:21 26:4 34:3

shortly 40:13

show 17:10 19:18

showed 38:23 39:21

showing 19:20

shown 18:16, 24 39:21

shows 39:11 40:2

shut 10:22

side 22:1

sign 14:14 19:24 23:24 34:11 42:6

signature 42:8,9

signs 23:13, 16,20 24:2

situation 16:14

situations 16:12

size 21:6,7

slip 15:19 31:8

slippery 25:17

slush 36:7

snow 22:8 39:21 40:3

snowing 20:21,24 39:18

South 7:12

specific 23:18 27:13 30:7

specifically 6:19

20:13 42:1

spill 23:23 24:1

stand 26:22

standing 7:2

start 4:16,19 9:16 12:24 30:5,15

starts 22:17 30:8,18,20 31:2

state 4:3,8

stated 8:8 15:15 31:13

States 8:20

stating 15:24 28:21,23

stopped 10:17

store 7:3 16:20 20:14 21:16, 22 22:5 25:21 26:1 28:2,9 30:12,14,24 31:3 36:12,20 38:12,15,22 40:22

stored 34:3

Strike 16:23 18:14 28:22 31:1 34:5

supervisor 28:12,13,24 29:4,9,14

supervisors 29:2

supposed 15:16 16:13, 18,23 17:2,6 21:2,3 23:19 24:8 41:20

surrounding 6:19

surveillance 39:11,20 40:2, 8,17

sustained 25:10 37:9

switched 8:6

sworn 4:1,12

**T**

talk 4:23

talked 37:5

talking 15:10, 19,22 19:7 31:11 33:4

taught 14:15 16:1,3

team 26:18

technical 35:9

telling 15:4

tells 22:14,16

terms 22:11

testified 4:12

testify 36:19

things 13:14, 21

thinking 10:20 32:20

time 13:5,17, 19 14:7,9,12 30:4,7,12,19 32:8 36:15 39:10

times 13:1,7 20:19

Tinley 11:3,15 12:2,4,9,14,18 17:23 18:3 22:9 24:12 31:9

today 6:9 24:21 31:7

41:2

told 14:17 34:2 39:15 41:1

top 20:6

town 7:14 9:11

tracked 36:7

trained 15:3 27:9 37:15

training 12:20, 23 13:1,2,3,4, 7,16,17,20 14:9,12,18 27:17,18,20, 23 37:19

trainings 13:9, 11

transferred 10:21 12:4,7

true 7:17 9:14 38:12,16 39:1, 13 40:22

turnstile 21:15,23,24 22:2

Twelfth 9:8

type 20:5

typically 30:5

**U**

Uh-huh 19:8 20:2,11 21:17 28:17 40:5

underneath 19:24

understand 4:21 5:1,5 40:6

understanding 9:13 15:20

United 8:20

**update** 13:15

**V**

**varies** 27:2
**vary** 30:9
**vests** 26:21
**video** 7:2
33:17,21
34:21 35:17,
22 40:1
**videos** 6:10,
11,12,22 7:2,6
31:14,16,24
41:16,18

**W**

**wait** 4:18 25:4
**walk-off** 28:3,4
**walking** 21:15
**walks** 20:16
21:12
**wanted** 38:19
**watch** 29:23
**water** 36:7
**ways** 22:20
**wear** 26:20
**weather** 20:22,
24 22:12
34:13 41:13
**week** 13:22
14:10,11 23:3
**West** 11:4
**wet** 20:22,24
21:2,4 23:12,
14,19,24
39:24
**wipe** 36:11
**work** 7:23 9:18
19:13 26:23
27:3 30:19,20

**worked** 11:3
18:2
**working** 9:16
12:14,17 27:5
31:19,23
**written** 13:16,
18,20,23 14:3,
8,24 15:2
27:14

**Y**

**year** 10:12,16
12:3 13:7
**years** 6:4,6,7
10:11,15,17
11:13,14 12:7,
10,12,13 18:2
**yellow** 23:16
24:2

**Z**

**Zoom** 4:7
**zoomed** 19:19

MIKE EVON vs MENARD, INC.
KATRICE MATTHEWS 07/27/2021

Pamela Bamman

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIKE EVON,                          )
                                    )
            Plaintiff,              )
                                    )
    vs.                             )  No. 20 CV 05682
                                    )
MENARD, INC.,                       )
                                    )
            Defendant.              )


DEPOSITION VIA ZOOM OF:
PAMELA BAMMAN

        The deposition via Zoom videoconferencing of PAMELA BAMMAN, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before SOPHIA KARNEZIS, CSR, RPR, a Notary Public in and for the County of Will, State of Illinois, on the 7th day of June, 2021, at 11:59 a.m.



**EXHIBIT**

D

George E. Rydman & Assoc., Joliet, IL  (8

A P P E A R A N C E S

(via Zoom:)
KRALOVEC JAMBOIS & SCHWARTZ by
MS. OLIVIA SCHWARTZ
60 West Randolph Street, Fourth Floor
Chicago, Illinois   60601

        on behalf of Plaintiff,

(via Zoom:)
FABRIZIO HANSON PEYLA AND KAWINSKI PC by
MS. MARILYNN FRANGELLA
116 North Chicago Street, Suite 200-A
Joliet, Illinois   60432

        on behalf of Defendant.

-------------------------------------------------------------

I N D E X

EXAMINATIONS:                                          PAGE

PAMELA BAMMAN
        Direct By Ms. Schwartz ....................3
        Cross By Ms. Frangella ...................39
        Redirect By Ms. Schwartz .................39
        Recross By Ms. Frangella .................40
        Further Redirect By Ms. Schwartz ........41


                EXHIBITS PREVIOUSLY MARKED

                                              FIRST
EXHIBIT                                     REFERENCED

        Exhibit A and B ..........................14


                EXHIBITS RETAINED BY MS. SCHWARTZ

3

Pamela Bamman

THE COURT REPORTER: Before I swear in the witness, I will ask Counsel to stipulate on the record that due to the current national emergency pandemic, the court reporter may swear in the deponent even though she is not in the physical presence of the deponent, and that there is no objection to that at this time, nor will there be an objection to it at a future date.

MS. SCHWARTZ: Olivia Schwartz for the plaintiff, so stipulated.

MS. FRANGELLA: Defendant stipulates.

PAMELA BAMMAN,

called as a witness herein on behalf of the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SCHWARTZ:

Q    Good afternoon.  Is it Ms. Bamman?

A    Mrs.

Q    Mrs. Bamman?

A    Yes.

Q    The name on your call is a different name, so I just wanted to make sure that that's who you are.

Pamela Bamman

A    I used another member's phone because I was unsure how to set it all up.

Q    I completely understand.  My name is Olivia Schwartz.  I represent an individual named Michael Evon, who fell at the Menards in Tinley Park on February 3rd of 2019.  Can you please state your name for the record?

A    Pamela Bamman.

MS. SCHWARTZ:  Let the record reflect that this is the discovery deposition of Pamela Bamman, taken via Zoom with proper notice to all parties, in accordance with all state and local rules.

Q    Mrs. Bamman, have you ever given a deposition before?

A    Yes.

Q    Was it in your capacity as an employee of Menards?

A    Yes.

Q    Was there only one other deposition or have there been multiple?

A    Two that I remember.

Q    Okay.  Can you briefly just explain what type of incident it was that you were then having to give your deposition?

Pamela Bamman

MS. FRANGELLA: Objection, relevance. You can answer.

THE WITNESS: I --

MS. FRANGELLA: You can answer. Yes.

A    Actually, I don't . . .

BY MS. SCHWARTZ:

Q    Were either of the instances where you gave your deposition, did either of them involve a fall inside the store?

MS. FRANGELLA: Objection, relevance. You can answer.

A    I don't remember.

BY MS. SCHWARTZ:

Q    Have you ever testified at trial in your capacity as an employee of Menard?

MS. FRANGELLA: Objection, relevance. You can answer.

A    No, that I remember.

BY MS. SCHWARTZ:

Q    Before we start, just briefly a couple deposition rules. If you could make sure you wait until I'm done asking my question before you answer. All of your answers have to be out loud, no "uh-huhs," "uh-uhs," shaking your head, that type of

Pamela Bamman

thing because the court reporter is trying to take down everything that we say.

If you need to take a break, you're obviously more than welcome to do so, just not while a question is pending. So go ahead and answer the question and then ask to take a break.

Did you review any materials before coming to this deposition today?

A    The accident report, yes.

Q    Is that accident report -- was that filled out by yourself?

A    Yes.

Q    Did you review anything that was filled out by the plaintiff, Mr. Evon?

A    No.

Q    Have you ever gone by any other names other than Pamela Bamman?

A    No.

Q    I believe that you corrected my "Ms." to a "Mrs." What's your maiden name?

A    Pamela Nett.

Q    Can you spell that?

A    N-e-t-t.

Q    What is your current address?

Pamela Bamman

A    20505 Grand Prairie, Frankfort, Illinois, 60423.

Q    And who do you live at that address with?

A    My husband.

Q    Do you have any children?

A    Yes.

Q    How many and what are their ages?

A    Two, 34 and 37.

Q    What's your date of birth?

A    8-17-59.

Q    Have you ever served in the military --

A    No.

Q    -- or armed forces?

A    No.

Q    Have you ever been convicted of a felony?

A    No.

Q    Have you ever been convicted of a misdemeanor involving dishonesty?

A    No.

Q    What is your highest level of education?

A    Two years of college.

Q    And when did you have those two years of college?

A    '80 to '85, 1985.  It's been awhile.

Pamela Bamman

Q   And where did you take those or where did you go to college?

A   Oklahoma, Kansas, Pennsylvania, and Chicago.  Well, not Chicago.  I decided to go to work.

Q   It's my understanding that you're currently employed by Menard?

A   Yes.

Q   When did you start working at Menards?

A   1984 -- no.  1994.  Twenty-seven years ago, 28.

Q   What was your position when you first started working at Menard?

A   Cashier.

Q   And then it's my understanding that you're currently a front end manager, is that true?

A   Yes.  The assistant.

Q   Okay.  So you are currently an assistant front end manager?

A   Yes.

Q   Okay.  So you were a cashier when you started.  And then what was the next position that you had held?

A   Payroll.

Pamela Bamman

Q    Okay.  And then is there another position before front end manager?

A    Yes.  Head cashier.

Q    Okay.

A    Do you want all of them?

Q    Yes.

A    And then assistant front end, and then the front end manager, and then the last four years I've been assistant front end.

Q    Okay.  So you were an assistant front end manager, and then you became a front end manager, and now you're an assistant front end manager again?

A    Yes.

Q    What was the year that you became the front end manager from the assistant front end manager?  If you recall.

A    That was 20 years of that, so take away the last four years from now, four or five years from now, and then put 20 years on that.

Q    And then when did you become an assistant front end manager again?

A    The last couple years, two years ago, three years ago.

Q    Do you recall which year it was?

Pamela Bamman

A     No.

Q     Was there a specific reason that you went from being a front end manager to an assistant front end manager?

A     Yes.  They closed down the store to remodel it, and they transferred us all out.  So I just transferred to a store that was closer, and they didn't have the front end manager position open.

Q     Okay.  So when did you begin working at the Menards in Tinley Park?

A     I want to say four years ago.  The years blend together.

Q     Okay.  Well, am I correct in thinking that you had previously worked at a different Menards than the Menards in Tinley Park?

A     Right.

Q     Okay.  And then roughly four years ago you left that Menards -- or you started working at the Menards in Tinley Park, and you started there as an assistant front end manager?

A     No.  I started as -- I transferred over as a cashier.  And then the assistant front end manager came open, so they promoted me back up to the front end manager or assistant front end manager.

Pamela Bamman

Q    What was the location of the Menards that you were working at prior to the Tinley Park Menards?

A    I was over in Joliet, Illinois, and then the one that they closed down was Homewood, Illinois.

Q    Were you the assistant front end manager of the Menards in Tinley Park on February 13th of 2019?

A    Yes.

Q    Is there a formal training program that employees go through prior to beginning work at Menard?

A    Prior to working at Menards?

Q    Yes.

A    No.

Q    Is there a formal training that employees go through when they are promoted to a new position within Menard?

A    Yes.

Q    Are there only specific roles that require a formal training prior to beginning?

A    I don't understand that question.

Q    Okay.  If you don't need to undergo a formal training prior to starting at Menards but you do have to undergo formal training prior to starting a specific position at Menards, what are those

12

Pamela Bamman

positions?

A    Okay.  I don't understand the formal training of starting at Menards because you get hired from a new job.  There's always training to a new job, so it's formal training?

Q    Yes.  And then my apologies if that was a confusing question.  Before you start working at Menards, you undergo a training?

A    Right.

Q    Correct?

A    In any position, yes.

Q    Okay.  And then when you change positions, do you undergo a different training program?

A    Yes.  If you're getting promoted.

Q    Okay.  Are there written training materials that are provided to employees when they get promoted and start a different position?

A    Yes.

Q    Okay.  So when you became an assistant front end manager, were you provided written training materials?

A    Yes.

Q    And then when you became a front end manager, were you provided additional training

Pamela Bamman

materials?

A    Yes.

Q    Okay.  Are you provided with written policies and procedures when you begin a new position at Menards?

A    No.  They are on the computer.  They're not -- they're written on the computer, but you cannot print them out.

Q    So during that training process, do you review, learn the policies and procedures, but they're not physically printed?

A    Yes.

Q    All right.  In the time that you had been working at the Menards in Tinley Park, so for the last four years or so, has the exterior of the building always looked the same?

A    Yes.

Q    I'm going to just share my screen here and show you just a picture of the outside of Menards here if you give me one second.  Can you see that picture, Mrs. Bamman?

A    Yes.

Q    Does that picture appear to be an accurate photograph of the Tinley Park Menards as taken from

14

Pamela Bamman

the parking lot?

A    Yes.

Q    Is this the only parking lot for customers at this Menards location?

A    Well, there's one further down at the garden center.

Q    Okay.  So if you were not planning on going to the garden center but planning on going into the Menards building, into the front entrance of the building, is this the only parking lot that a customer would park in?

A    Yes.

Q    Okay.  To the best of your knowledge, is this what you recall the exterior of the building looking like in February of 2019?

A    Yes.

Q    Okay.  I'm going to switch to -- I guess we can mark this as Exhibit A, and then Exhibit B will just be a zoomed in -- a little bit further zoomed in here.  Mrs. Bamman, can you see what we're looking at here?

A    The "In" door and the sidewalk.

Q    Yes.  So those front doors marked "In," is that the main customer entrance into this Menards?

15

Pamela Bamman

A    Yes.

Q    Is this the only customer entrance into Menards?

A    No.  There's the garden center, and then there's the exit door that they can come in the exit door, too.  Or there is a special order receiving area they can -- once they get in the yard, they can come in that way.

Q    To the right of the "In" door, there looks to be some doors underneath the word "Carpet."  Do you see those?

A    Those are the cart corral doors.

Q    Okay.  So those are the cart corral doors. Is that where the employees bring carts in from the parking lot?

A    Yes.

Q    And do those -- they look to be closed in this picture, but do those open up like garage doors would?

A    Yes.

Q    And it's my understanding that the employees bringing the carts in are supposed to go through these cart corral doors; is that true?

A    Yes.

16

Pamela Bamman

Q    Are employees from the parking lot supposed to bring the carts in through the main entrance as well or are they only supposed to use the cart corral doors?

A    They are to use the cart corral doors, but they can bring them through the entrance, too.

Q    Okay.  When a customer walks into the main entrance, there is a mat there on the ground; right?

A    Not always.  When it's raining, snowing, when it's needed.

Q    Okay.  Who determines when the mat is placed in the inside of the door?

A    The front end managers, even the carry outs, if they see it's starting to rain a little bit, they can go get -- they know to put them down, cashiers.

Q    Okay.  So that job is not specific to one position?

A    No.

Q    There are multiple individuals -- multiple employees can make the decision to put a mat out?

A    Yes.

Q    So when you walk in the front entrance, there is -- is there ever multiple mats put out or

17

Pamela Bamman

would there only be one mat?

A    One.

Q    So the option is either no mat or one mat? There is not another option for a mat?

A    No.  We have other mats.  Well, no.  We only have two mats in the store, one for exit, one for in.

Q    And both of those mats are on -- are just inside the main doors, just one on the "In" door and one on the "Out" door?

A    Yes.

Q    And do you know what the floor is made of in that entrance area?

A    Commercial vinyl tile, those squares.

Q    And then when a customer enters into that -- if a customer were to enter in the door marked "In," there is a type of metal gate to the right that they are to walk through; is that true?

A    A turnstile, yes.

Q    Okay.  Is that the path that customers typically take into the store?

A    Yes.

Q    And then just through the turnstile is where the carts are corralled, is that true?

George E. Rydman & Assoc., Joliet, IL  (815) 727-4363

18

Pamela Bamman

A    Yes.

Q    Is this the route that all customers take as they go into the store or is there another way to go?

A    No.  Some come in through the exit doors, then go through the registers.  Some come through the -- if they're in the receiving, they come through the receiving and walk through the store.  Some go through the garden center and walk through the garden center door.

Q    Do you believe that the majority of customers walk in the door marked "In" and go through the turnstile and grab a cart or no?

A    I never thought about how many.  Yes.  I mean, it's the "In" door.

Q    That's what I would have assumed as well, but you said that people come in the exit door as well.

A    But they do.  The exit doors, they come in through the garden center doors.

Q    Does Menards have wet floor or caution signs to put up when there's a spill on the floor?

A    Yes.

Q    Do you know what they say?

Pamela Bamman

A    Wet floor or slippery when wet.

Q    And they are those yellow folding signs, right?

A    Right.

Q    Is there a specific employee that's tasked with putting those wet floor signs out or does that happen by multiple employees?

A    It happens by multiple employees.

Q    Does Menards have a system where if any employee were to see a spill on the ground, then that employee is supposed to put the sign out?

A    No.  If they see a spill on the ground, they are to stay by the spill and then get ahold of another person to go get a wet floor sign plus the mop or rags or whatever is needed.

Q    Is there a specific protocol for when somebody were to -- strike that.

Is there a specific protocol that applies if somebody falls at the store?

A    I don't know how you call it a set protocol.  The person that probably went -- that fell would go over there and -- as human nature would go over there and find out if they're all right.  But they also, once they make sure the guest is, you

Pamela Bamman

know, taken care of and need an ambulance, they also call the front end to come finish up like any reports or anything.

Q    Okay.  If an employee that's not the front end manager were to see somebody fall, is it Menards' policy that that employee is supposed to notify the front end manager?

A    Yes.  Or if they have to stay with them, they would tell somebody else to come get us or the store managers.

Q    If an individual is hurt inside of the Menards, is an incident report supposed to be filled out?

A    Yes.

Q    Who is supposed to fill out the incident report?

A    The front end managers or the store managers.

Q    What's the difference between a front end manager and a store manager?

A    The front end manager runs the front, the registers, the cashiers, the carry outs, the parking lot.  The store manager runs the whole store of all the departments.

Pamela Bamman

Q    You said carry outs a couple times.  Can you explain what you're referring to?

A    Carry outs are the gentlemen that get the carts.

Q    Okay.  Is there anybody else that works in the parking lot at Menards or is anyone that's out in the parking lot, are those the carry outs?

A    99 percent of the time it's the carry outs out there.  There is some team members that get assigned to help pick up the trash, so there is other team members out there.

Q    Okay.  Since you've been at the Menards location in Tinley Park, have you been made aware of any falls that occurred on the premises prior to February 13th of 2019?

MS. FRANGELLA:  Objection, relevance.  You can answer.

A    No.

BY MS. SCHWARTZ:

Q    Do you recall if you were working at this Menards on February 26th of 2017?

A    No.  I do not know.

Q    It appears that somebody sustained a fall on February 26th of 2017 at the Tinley Park Menards.

Pamela Bamman

Do you have any knowledge of that?

    MS. FRANGELLA:  Objection, relevance.  You can answer.

    A    No.

BY MS. SCHWARTZ:

    Q    Previously I had asked you if you had ever been deposed before as an employee of Menards.  Were those other situations before you started working at the Tinley Park Menards?

    A    What do you mean, deposed?

    Q    Had to give your deposition.

    A    Yes.

    Q    Okay.  So those instances were at a different location than the one that we're talking about today?

    A    Yes.

    Q    Have you been made aware of anybody that has fallen at the Menards since February 13th of 2019?

    MS. FRANGELLA:  Objection, relevance.  You can answer.

    A    No.

BY MS. SCHWARTZ:

    Q    Since you've been at the Tinley Park

23

Pamela Bamman

Menards, do you know of any complaints that have been made about accumulations of liquid in the front of the store?

A     No.

Q     Have you ever personally noticed any pooled liquid at the front of the store near the shopping carts?

A     On a snowy day if some snow comes in with it.  We get it wiped up.  I don't know what -- you're saying pooling.  That's not -- on a snowy day when carts bring it in off the wheels, that's not a pooling of liquid.  Like it's coming from -- I don't understand the question that well.

Q     Okay.  Have you ever noticed liquid on the ground near where the shopping carts are at the front entrance of the Menards?

A     Yes.

Q     Can you estimate about how many times you've noticed that?

A     No.  I cannot estimate.  I can say --

Q     I believe you cut out a little bit.  What did you say?

A     I can say one.  I know that I had them wipe it up.

George E. Rydman & Assoc., Joliet, IL  (815) 727-4363

24

Pamela Bamman

Q    Okay.  That one instance, are you referring to the February 13th, 2019 incident or are you referring to something else?

A    Something else.  A snow day.

Q    So there has been a separate time where you've noticed water on the ground in this front entrance at Menards?

A    Not the front entrance.  By the cart wheels where the snow rolls in.

Q    You said where the snow rolls in.  Can you explain what you mean by that?

A    The wheels roll in.  If they went through the snow, it brings in a little snow with it.

Q    And do you know if that's when individuals bring the shopping carts through the front door or if they're coming in through the cart corral?

A    Well, either way it's going to bring them in.  If a customer brings in a cart from the snow, it's going to bring snow with the wheels on both areas.

Q    Well, you said if a customer were to bring it in through both areas.  But a customer wouldn't be bringing in a cart through the cart corral, would they?

Pamela Bamman

A    No.   You said if a person brought it through or a guest brought it through the front entrance.   Yes.   They could bring in snow.   The cart guys would bring in through the cart corral.   They can bring in snow off wheels, too.

Q    Okay.   Do you know about or if there is a specific number, do you know about how many carts are lined up in the cart corral?

(Court reporter clarification.)

A    I do not know the number.   I know there is a number of carts that we do have, but I don't know exactly how many we have.

BY MS. SCHWARTZ:

Q    When one of the carry outs were to bring carts in through the separate cart corral door, they put the wet carts at the back of the line of carts; right?

A    Yes.

Q    And then as they bring more carts in, each cart then gets pushed up to the front; is that correct?

A    Yes.

Q    The carry outs are the individuals responsible for bringing the carts in from the

26

Pamela Bamman

parking lot, right?

A     Yes.

Q     Do carry outs have other jobs as well?

A     Yeah.  They help the guests load their product in the vehicles.  They sometimes, if it's slow, take back returns.  I mean, but their main job is to keep the parking lot clear of carts and help the guest.

Q     Do the carry outs have a different uniform than the rest of the Menard employees?

A     Yes.  They have neon shirts they can wear, and they have vests that say -- with that neon coloring reflecting stuff on it.

Q     Is there a specific number of carry outs that are working each shift or does that change?

A     It changes.

Q     Okay.  Why does it change?

A     Seasons.  Sometimes it's slow.  At different times it's busy.  You know, we go by the sales of how many people that we really need.

Q     Do you know how many carry outs were working on the morning of February 13, 2019?

A     No.

Q     Are you aware if there is any specific

Pamela Bamman

written policies or procedures that apply to bringing the carts in from the parking lot?

A    No.

Q    Do you know if -- when an individual starts as a carry out, are they given specific training materials for that job?

A    Yes.

Q    Do you know if those training materials include information as to how the carts are supposed to be brought into the building?

A    I don't think there's written ones there, but that's -- when you train them, that's where you train them, just bring them in.

Q    Are they trained to bring the carts in through the cart corral or are they trained to bring the carts in through the "In" marked entrance?

A    No.  They're trained to bring them through the cart corral.

Q    Are you aware of if the Tinley Park Menards has a walk-off grate?

A    Do you mean by the cart corral?  Where do you mean?

Q    I meant in general if there is a walk-off grate at the entrance of the Menards in Tinley Park.

Pamela Bamman

A    No.

Q    Is there a walk-off grate at the entrance for the cart corral?

A    No.

Q    And there's not one at the door that we previously saw marked "In," right?

A    No.

Q    Do you know what the purpose of a walk-off grate is?

A    What I'm thinking, if it's the same thing I'm thinking is any excess water, excess stuff that you bring in would drip down in the grates before you pass it.

Q    Do you remember if the previous Menards that you worked at, if either of those had a walk-off grate?

A    No.

Q    What are the general duties of the front end manager at Menards on a day-to-day basis?

A    Making sure the front end is running right, the cashiers are in order, the carry outs are getting done what they need to get done, making sure the money is being picked up.  There's a bunch.  How many do you want?

29

Pamela Bamman

Q    That's fine.  What time does the Tinley Park Menards open in the morning?

A    6 a.m.

Q    And is there a front end manager that starts at 6 a.m.?

A    Yes.

Q    Is there a specific shift that the front end manager works, you know, from 6 a.m. until what time?

A    No.  It's usually eight to ten hours, sometimes it's two, sometimes it's three depending on the day, if we have three people or if we have two.

Q    Okay.  If the front end manager was there at 6 a.m., would that individual still be there at 9 a.m.?

A    Yes.

Q    Okay.  Is that the same for an assistant front end manager?

A    Yes.    .

Q    And is there an assistant front end manager working every day?

A    Yes.

Q    If the front end manager were to notice pooled water, is that something that the front end

George E. Rydman & Assoc., Joliet, IL  (815) 727-4363

Pamela Bamman

manager would clean up themselves?

A    Yes.  Or if they can't walk away, they'd radio somebody else to bring some stuff over to get it cleaned up.

Q    If the assistant front end manager noticed a pool of water, it would be the assistant front end manager that would either clean it up or stay by the water until somebody came to clean it up?

A    Yes.

Q    Does the front end manager do an inspection of the premises before the store opens?

A    No.

Q    Does the assistant front end manager do an inspection of the premises before the store opens?

A    No.

Q    Does anybody do an inspection of the premises before the store opens?

A    I do not know.

Q    As you may be aware, the incident that we're here discussing involves my client in a slip and fall that occurred on October 13, 2019 around 9 a.m. at the Tinley Park Menards.  Do you recall the incident that I'm talking about?

A    Vaguely.

Pamela Bamman

Q    Do you recall if you were working there that day?

A    Yes.

Q    Do you recall ever meeting Mr. Evon?

A    Yes.

Q    Do you recall if he was with anyone?

A    Do not know.

Q    Did you physically see him fall?

A    No.

Q    Are you aware if anybody physically saw him fall?

A    No.

Q    When was the first time that you learned about that incident?

A    The carry out told the cashier, the cashier told me.

Q    So did you learn about the incident on February 13, 2019?

A    Yes.

Q    And did you learn about the incident when Mr. Evon was still in the store or had he already left?

A    No.  He was in the store.

Q    You said that the carry out told who?

Pamela Bamman

A     Told the cashier that was at the service desk.  The cashier told me.

Q     Do you recall what the cashier said when she or he told you about the incident?

A     That a gentleman had fallen.

Q     Okay.  Did she say what he had fallen on or what caused him to fall?

A     No.

Q     Do you recall who the cashier was on this day?

A     Katrice.

Q     And that's Katrice Matthews, correct?

A     Yes.

Q     Do you recall anything else about the conversation with Katrice Matthews?

A     No.

Q     Do you recall where you were when you had that conversation with Ms. Matthews?

A     In the front office by my computer.

Q     So when you had that conversation, you were in the front office?  You weren't at that front desk right as you walk in the entrance, is that correct?

A     No.  It's actually next to it.

Q     Okay.  Did you have a conversation with

33

Pamela Bamman

Mr. Evon?

A     Other than taking his statement of what happened.

Q     Okay.  So you did take his statement about what happened on that day?

A     Yes.

Q     Do you recall what that statement entailed?

A     He stated that he fell on some water by the carts.

Q     Did he say anything else about how he fell or what happened when he fell?

A     No.

Q     After you had the conversation with Mr. Evon, did you go over to the area by the carts where he stated he had fallen?

A     No.  I went over to the carts before I had the conversation where he was at.

Q     Oh, okay.  Then excuse me.  I'll ask a different question.  So after you had figured out -- strike that.

After you had learned that Mr. Evon fell, you went over to the area by the shopping carts?

A     Yes.

Q     Did you notice there to be anything on the

Pamela Bamman

ground?

A    A little bit of water from the wheels of the cart.

Q    Do you know about -- can you estimate about how big the bit of water was that you had noticed?

A    No.  I don't know.

Q    Was the wet area by the shopping carts, was it bigger than a foot by a foot?

A    No.

Q    Can you estimate about how big it was?

A    No.  I don't know how to estimate.

Q    That's okay.  Do you believe that the water was from the shopping carts?

A    From -- yeah.  It had snowed, and it's from the wheels coming in.

Q    Okay.  Did you put up a warning sign near that water, the one with the yellow warning hazard signs?

A    Yes.  I had somebody get the wet floor signs and then make sure somebody mopped it up and put the signs up.

Q    Do you recall what the weather was like on February 13th, 2019?

A    Other than it may have snowed that night

Pamela Bamman

and it was misty or it was still light snowing, not a hundred percent, no.

Q    Okay.  Did you have any knowledge of the water having been pooled by the shopping carts prior to Mr. Evon falling?

A    No.

Q    And did you fill out an incident report that day?

A    Yes.

Q    Let me pull that up as well.  Mrs. Bamman, can you see this?

A    I can -- yeah.

Q    Let me zoom in a little bit.  Does this help?

A    Yes.

Q    Is this the incident report that you had filled out on February 13, 2019 regarding Mr. Evon?

A    I can see that it's February 13th at 9 a.m. I can't see the name on the - the name of the person.

MS. SCHWARTZ:  Oh.  Here we go.

MS. FRANGELLA:  I think you're on a cell phone, correct?

THE WITNESS:  Yes, I am.

MS. FRANGELLA:  That's probably why.

Pamela Bamman

BY MS. SCHWARTZ:

Q    It states here injured property/damage, Michael G. Evon?

A    Okay.  Then yes.

Q    Is this likely what you believe to be the incident report that you filled out that day?

A    Yes.

Q    Okay.  And then you did not fill out any other documentation regarding this incident, is that true?

A    I should have filled out a first incident report going up to our general office.  That report that you just showed goes to our insurance company.

Q    Okay.

A    And then the first incident report, that goes to our general office.

Q    Okay.  And do you believe that you would have filled out both of those that day?

A    I can't remember if I did, but I should have.

Q    I'm sorry, we're going back here, back to Exhibit C, I guess this incident report for the insurance company.  There's a witness listed as Cole Hickey.  Do you see that?

Pamela Bamman

A     Yes.

Q     Is that one of the carry outs that works at Menards?

A     Yes.

Q     And do you know who Cole Hickey is?

A     Yes.

Q     Does he still work there?

A     Yes.

Q     Have you had a conversation with Mr. Hickey about this incident?

A     Other than he has to give a deposition on it because we got the report, and I had to inform him.

Q     Okay.  At that time did you have a conversation about how the incident had occurred?

A     Other than it was the gentleman that fell.

Q     Okay.

A     That he had fell, and he's got to remember what he can remember.

Q     No.  So, I mean, during that conversation, did Mr. Hickey explain to you how he felt that this man fell or what had caused him to fall or any of those details?

A     Oh, you mean the day of?

Pamela Bamman

Q    Yes.

A    No.  He just stated that the gentleman fell.

Q    Okay.  How about recently when he got the deposition, did you have a conversation then where Mr. Hickey told you what he had seen, if he saw him fall, any of those details?

A    No.

Q    Have you had any conversations with Mr. Evon since February 13, 2019?

A    No.

Q    Have you had any conversations with anybody else other than your lawyers, which I don't want to hear about, regarding the incident where Mr. Evon fell on February 13, 2019 that we have not already talked about?

A    No.

Q    Do you have any knowledge of the injuries that Mr. Evon sustained from his fall on February 13th?

A    No.

MS. SCHWARTZ:  That's all for me.

MS. FRANGELLA:  Just a couple of follow-up questions.

Pamela Bamman

CROSS-EXAMINATION

BY MS. FRANGELLA:

Q    Mrs. Bamman, with regard to the weather on the date of the incident, I know you said you weren't a hundred percent, but are you aware whether there was some type of snow or slush or something on the pavement outside of Menard that day?

A    I want to say yes, but I'm not a hundred percent.

Q    Okay.  And with regard to the report that you filled out, one of those reports goes to the corporate office, and then one goes to Gallagher Bassett; correct?

A    Yes.

Q    And it's the same insurance claim form, correct, the same information?  It's not a different report, true?

A    True.

MS. FRANGELLA:  Okay.  I don't have anything further.

REDIRECT EXAMINATION

BY MS. SCHWARTZ:

Q    Just do you have any knowledge as to why the carry outs are supposed to use the cart corral

Pamela Bamman

doors as opposed to the main entrance?

A    Because the main entrance is for the guests to walk through, and the cart corrals are mainly -- because you're bringing in a bunch of carts, you want them to come in through the cart corral, and you don't want to bring them through the main entrance so the guests can't walk in.

Q    So the cart corrals are specifically for the carts coming in from the parking lot, right?

A    Yes.

MS. SCHWARTZ:  That's all.

RECROSS-EXAMINATION

BY MS. FRANGELLA:

Q    Just for clarification, you had stated earlier that the carry outs can bring carts through the front door, though; correct?

A    Yes, they can.

Q    Okay.  They just wouldn't bring, you know, 10 or 15 carts at a time through the front door, they would use the specific cart corral door for that; correct?

A    Yes.

MS. FRANGELLA:  All right.  Thank you.  Any follow up, Olivia?

41

Pamela Bamman

MS. SCHWARTZ:  Yes.

FURTHER REDIRECT EXAMINATION

BY MS. SCHWARTZ:

Q    I believe you had stated earlier that the carry outs are trained to bring the carts in through the cart corral; correct?

MS. FRANGELLA:  I'm just going to object that that misstates her prior testimony.  You can answer.

A    Yes.

BY MS. SCHWARTZ:

Q    And the carry outs are trained that even if they only have one cart, they're still supposed to bring it through the cart corral; right?

A    Yes.

MS. SCHWARTZ:  That's all, then.

MS. FRANGELLA:  Okay.  Thank you.

(The deposition ended at 12:46 p.m., and the witness was excused.)

42

Pamela Bamman

STATE OF ILLINOIS    )
                     )   SS:
COUNTY OF W I L L     )

I, SOPHIA KARNEZIS, CSR, RPR, a Notary Public in and for the County of Will, State of Illinois, do hereby certify PAMELA BAMMAN was first duly sworn by me to testify the truth; that the above deposition, Page 1 through 41, was recorded stenographically and reduced to typewriting under my personal direction; and that the foregoing transcript of the said deposition is a true and correct transcript of the testimony given by the said witness at the time and place previously specified.

I further certify that I am not counsel for nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal this 17th day of June, 2021.

_____
Sophia Karnezis, CSR, RPR
IL CSR No. 084-003792

George E. Rydman & Assoc., Joliet, IL   (815) 727-4363

Pamela Bamman

**A**

a.m 1:18 29:3,5,8 29:14,15 30:22 35:18
accident 6:9,10
accumulations 23:2
accurate 13:23
additional 12:24
address 6:24 7:3
affix 42:18
afternoon 3:18
ages 7:7
ago 8:10 9:22,23 10:11,17
ahead 6:5
ahold 19:13
ambulance 20:1
answer 5:2,4,11 5:17,22 6:5 21:17 22:3,21 41:8
answers 5:23
anybody 21:5 22:17 30:16 31:10 38:12
apologies 12:6
appear 13:23
appears 21:23
applies 19:18
apply 27:1
area 15:7 17:13 33:14,22 34:7
areas 24:20,22
armed 7:13
asked 22:6
asking 5:22
assigned 21:10
assistant 8:17,18 9:7,9,10,12,15 9:20 10:3,20,22 10:24 11:5 12:19 29:17,20 30:5,6,13
assumed 18:16
aware 21:13

22:17 26:24 27:19 30:19 31:10 39:5
awhile 7:24

**B**

B 2:20 14:18
back 10:23 25:16 26:6 36:21,21
Bamman 1:9,12 2:14 3:12,18,20 4:8,10,13 6:17 13:21 14:20 35:10 39:3 42:5
basis 28:19
Bassett 39:13
beginning 11:9,19
behalf 2:5,9 3:13
believe 6:19 18:11 23:21 34:12 36:5,17 41:4
best 14:13
big 34:5,10
bigger 34:8
birth 7:9
bit 14:19 16:14 23:21 34:2,5 35:13
blend 10:12
break 6:3,6
briefly 4:22 5:20
bring 15:14 16:2 16:6 23:11 24:15,17,19,21 25:3,4,5,14,19 27:13,14,15,17 28:12 30:3 40:6 40:15,18 41:5 41:13
bringing 15:22 24:23 25:24 27:1 40:4
brings 24:13,18
brought 25:1,2 27:10
building 13:16

14:9,10,14 27:10
bunch 28:23 40:4
busy 26:19

**C**

C 2:1 36:22
call 3:22 19:20 20:2
called 3:13
capacity 4:16 5:15
care 20:1
Carpet 15:10
carry 16:13 20:22 21:1,3,7,8 25:14 25:23 26:3,9,14 26:21 27:5 28:21 31:15,24 37:2 39:24 40:15 41:5,11
cart 15:12,13,23 16:3,5 18:13 24:8,16,18,23 24:23 25:3,4,8 25:15,20 27:15 27:18,21 28:3 34:3 39:24 40:3 40:5,8,20 41:6 41:12,13
carts 15:14,22 16:2 17:24 21:4 23:7,11,15 24:15 25:7,11 25:15,16,16,19 25:24 26:7 27:2 27:9,14,16 33:9 33:14,16,22 34:7,13 35:4 40:4,9,15,19 41:5
cashier 8:14,21 9:3 10:22 31:15 31:15 32:1,2,3,9
cashiers 16:16 20:22 28:21

caused 32:7 37:22
caution 18:21
cell 35:21
center 14:6,8 15:4 18:9,10,20
certify 42:5,13
change 12:12 26:15,17
changes 26:16
Chicago 2:4,7 8:4 8:4
children 7:5
Civil 1:13
claim 39:15
clarification 25:9 40:14
clean 30:1,7,8
cleaned 30:4
clear 26:7
client 30:20
closed 10:5 11:4 15:17
closer 10:7
Cole 36:23 37:5
college 7:21,23 8:2
coloring 26:13
come 15:5,8 18:5 18:6,7,17,19 20:2,9 40:5
comes 23:8
coming 6:7 23:12 24:16 34:15 40:9
Commercial 17:14
company 36:13 36:23
complaints 23:1
completely 4:3
computer 13:6,7 32:19
confusing 12:7
conversation 32:15,18,20,24 33:13,17 37:9

37:15,20 38:5
conversations 38:9,12
convicted 7:15,17
corporate 39:12
corral 15:12,13 15:23 16:3,5 24:16,23 25:4,8 25:15 27:15,18 27:21 28:3 39:24 40:5,20 41:6,13
corralled 17:24
corrals 40:3,8
correct 10:13 12:10 25:21 32:12,22 35:22 39:13,16 40:16 40:21 41:6 42:10
corrected 6:19
counsel 3:2 42:13
County 1:16 42:2 42:4
couple 5:20 9:22 21:1 38:23
court 1:1 3:1,4 6:1 25:9
Courts 1:14
Cross 2:15
CROSS-EXAM... 39:1
CSR 1:15 42:3,21 42:22
current 3:3 6:24
currently 8:6,16 8:18
customer 14:11 14:24 15:2 16:7 17:15,16 24:18 24:21,22
customers 14:3 17:20 18:2,12
cut 23:21
CV 1:5

Pamela Bamman

**D**

D 2:12
date 3:8 7:9 39:4
day 1:17 23:8,10
  24:4 29:12,21
  31:2 32:10 33:5
  35:8 36:6,18
  37:24 39:7
  42:18
day-to-day 28:19
decided 8:4
decision 16:21
Defendant 1:7 2:9
  3:11,14
departments
  20:24
depending 29:11
deponent 3:5,6
deposed 22:7,10
deposition 1:9,11
  4:10,14,19,24
  5:8,21 6:8 22:11
  37:11 38:5
  41:17 42:7,10
depositions 1:15
desk 32:2,21
details 37:23 38:7
determines 16:11
difference 20:19
different 3:22
  10:14 12:13,17
  22:14 26:9,19
  33:19 39:16
Direct 2:14 3:16
direction 42:9
discovery 4:10
discussing 30:20
dishonesty 7:18
District 1:1,1,14
DIVISION 1:2
documentation
  36:9
door 14:22 15:5,6
  15:9 16:12 17:9
  17:10,16 18:10
  18:12,15,17

24:15 25:15
28:5 40:16,19
40:20
doors 14:23 15:10
  15:12,13,18,23
  16:4,5 17:9 18:5
  18:19,20 40:1
drip 28:12
due 3:3
duly 3:14 42:6
duties 28:18

**E**

E 2:1,1,12
earlier 40:15 41:4
EASTERN 1:2
education 7:20
eight 29:10
either 5:7,8 17:3
  24:17 28:15
  30:7
emergency 3:3
employed 8:7
employee 4:16
  5:15 19:5,10,11
  20:4,6 22:7
employees 11:9
  11:14 12:16
  15:14,22 16:1
  16:21 19:7,8
  26:10
ended 41:17
entailed 33:7
enter 17:16
enters 17:15
entrance 14:9,24
  15:2 16:2,6,8,23
  17:13 23:16
  24:7,8 25:3
  27:16,24 28:2
  32:22 40:1,2,6
estimate 23:18,20
  34:4,10,11
Evon 1:3 4:5 6:14
  31:4,21 33:1,14
  33:21 35:5,17

36:3 38:10,14
38:19
exactly 25:12
EXAMINATION
  3:16 39:21 41:2
EXAMINATIO...
  2:13
examined 3:14
excess 28:11,11
excuse 33:18
excused 41:18
Exhibit 2:19,20
  14:18,18 36:22
EXHIBITS 2:18
  2:22
exit 15:5,5 17:6
  18:5,17,19
explain 4:22 21:2
  24:11 37:21
exterior 13:15
  14:14

**F**

FABRIZIO 2:6
fall 5:8 20:5 21:23
  30:21 31:8,11
  32:7 37:22 38:7
  38:19
fallen 22:18 32:5
  32:6 33:15
falling 35:5
falls 19:19 21:14
February 4:6
  11:6 14:15
  21:15,21,24
  22:18 24:2
  26:22 31:18
  34:23 35:17,18
  38:10,15,20
Federal 1:13
fell 4:5 19:21 33:8
  33:10,11,21
  37:16,18,22
  38:3,15
felony 7:15
felt 37:21

figured 33:19
fill 20:15 35:7
  36:8
filled 6:10,13
  20:12 35:17
  36:6,11,18
  39:11
find 19:23
fine 29:1
finish 20:2
first 2:19 3:14
  8:12 31:13
  36:11,15 42:5
five 9:18
floor 2:3 17:12
  18:21,22 19:1,6
  19:14 34:19
folding 19:2
follow 40:24
follow-up 38:23
follows 3:15
foot 34:8,8
forces 7:13
foregoing 42:9
form 39:15
formal 11:8,14,19
  11:22,23 12:2,5
four 9:8,18,18
  10:11,17 13:15
Fourth 2:3
Frangella 2:7,15
  2:16 3:11 5:1,4
  5:10,16 21:16
  22:2,20 35:21
  35:24 38:23
  39:2,19 40:13
  40:23 41:7,16
Frankfort 7:1
front 8:16,19 9:2
  9:7,8,9,10,11,12
  9:14,15,21 10:3
  10:3,8,20,22,23
  10:24 11:5
  12:20,23 14:9
  14:23 16:13,23
  20:2,4,7,17,19

20:21,21 23:2,6
23:15 24:6,8,15
25:2,20 28:18
28:20 29:4,7,13
29:18,20,23,24
30:5,6,10,13
32:19,21,21
40:16,19
further 2:16 14:5
  14:19 39:20
  41:2 42:13
future 3:8

**G**

G 36:3
Gallagher 39:12
garage 15:18
garden 14:6,8
  15:4 18:9,9,20
gate 17:17
general 27:23
  28:18 36:12,16
gentleman 32:5
  37:16 38:2
gentlemen 21:3
getting 12:14
  28:21
give 4:24 13:20
  22:11 37:11
given 4:13 27:5
  42:11
go 6:5 8:2,4 11:9
  11:15 15:22
  16:15 18:3,4,6,8
  18:12 19:14,22
  19:22 26:19
  33:14 35:20
goes 36:13,16
  39:11,12
going 13:18 14:7
  14:8,17 24:17
  24:19 36:12,21
  41:7
Good 3:18
grab 18:13
Grand 7:1

Pamela Bamman

grate 27:20,24 28:2,9,16
grates 28:12
ground 16:8 19:10,12 23:15 24:6 34:1
guess 14:17 36:22
guest 19:24 25:2 26:8
guests 26:4 40:2,7
guys 25:4

**H**
hand 42:18
HANSON 2:6
happen 19:7
happened 33:3,5 33:11
happens 19:8
hazard 34:17
head 5:24 9:3
hear 38:14
held 8:23
help 21:10 26:4,7 35:14
hereunto 42:17
Hickey 36:24 37:5 37:9,21 38:6
highest 7:20
hired 12:3
Homewood 11:4
hours 29:10
human 19:22
hundred 35:2 39:5,8
hurt 20:11
husband 7:4

**I**
IL 42:22
Illinois 1:1,17 2:4 2:8 7:1 11:3,4 42:1,5
incident 4:23 20:12,15 24:2 30:19,23 31:14

31:17,20 32:4 35:7,16 36:6,9 36:11,15,22 37:10,15 38:14 39:4
include 27:9
individual 4:4 20:11 27:4 29:14
individuals 16:20 24:14 25:23
inform 37:12
information 27:9 39:16
injured 36:2
injuries 38:18
inside 5:9 16:12 17:9 20:11
inspection 30:10 30:14,16
instance 24:1
instances 5:7 22:13
insurance 36:13 36:23 39:15
interested 42:15
involve 5:8
involves 30:20
involving 7:18

**J**
JAMBOIS 2:2
job 12:4,5 16:17 26:6 27:6
jobs 26:3
Joliet 2:8 11:3
June 1:17 42:18

**K**
Kansas 8:3
Karnezis 1:15 42:3,21
Katrice 32:11,12 32:15
KAWINSKI 2:6
keep 26:7

know 16:15 17:12 18:24 19:20 20:1 21:22 23:1 23:9,23 24:14 25:6,7,10,10,11 26:19,21 27:4,8 28:8 29:8 30:18 31:7 34:4,6,11 37:5 39:4 40:18
knowledge 14:13 22:1 35:3 38:18 39:23
KRALOVEC 2:2

**L**
L 42:2,2
lawyers 38:13
learn 13:10 31:17 31:20
learned 31:13 33:21
left 10:18 31:22
level 7:20
light 35:1
line 25:16
lined 25:8
liquid 23:2,6,12 23:14
listed 36:23
little 14:19 16:14 23:21 24:13 34:2 35:13
live 7:3
load 26:4
local 4:12
location 11:1 14:4 21:13 22:14
look 15:17
looked 13:16
looking 14:15,20
looks 15:9
lot 14:1,3,10 15:15 16:1 20:23 21:6,7 26:1,7 27:2 40:9
loud 5:23

**M**
maiden 6:20
main 14:24 16:2,7 17:9 26:6 40:1,2 40:6
majority 18:11
making 28:20,22
man 37:22
manager 8:16,19 9:2,8,11,11,12 9:15,15,21 10:3 10:4,8,20,22,24 10:24 11:5 12:20,24 20:5,7 20:20,20,21,23 28:19 29:4,8,13 29:18,20,23 30:1,5,7,10,13
managers 16:13 20:10,17,18
MARILYNN 2:7
mark 14:18
marked 2:18 14:23 17:17 18:12 27:16 28:6
mat 16:8,11,21 17:1,3,3,4
materials 6:7 12:15,21 13:1 27:6,8
mats 16:24 17:5,6 17:8
Matthews 32:12 32:15,18
mean 18:15 22:10 24:11 26:6 27:21,22 37:20 37:24
meant 27:23
meeting 31:4
member's 4:1
members 21:9,11
Menard 1:6 5:15 8:7,13 11:10,16 26:10 39:7

Menards 4:5,17 8:9 10:10,14,15 10:18,19 11:1,2 11:6,11,22,24 12:3,8 13:5,14 13:19,24 14:4,9 14:24 15:3 18:21 19:9 20:12 21:6,12 21:21,24 22:7,9 22:18 23:1,16 24:7 27:19,24 28:14,19 29:2 30:22 37:3
Menards' 20:5
metal 17:17
Michael 4:4 36:3
MIKE 1:3
military 7:11
misdemeanor 7:18
misstates 41:8
misty 35:1
money 28:23
mop 19:15
mopped 34:20
morning 26:22 29:2
multiple 4:20 16:20,20,24 19:7,8

**N**
N 2:1,12
N-e-t-t 6:23
name 3:22,22 4:3 4:6 6:20 35:19 35:19
named 4:4
names 6:16
national 3:3
nature 19:22
near 23:6,15 34:16
need 6:3 11:21 20:1 26:20

Pamela Bamman

28:22
**needed** 16:10
  19:15
**neon** 26:11,12
**Nett** 6:21
**never** 18:14
**new** 11:15 12:4,4
  13:4
**night** 34:24
**North** 2:7
**NORTHERN** 1:1
**Notary** 1:16 42:3
**notice** 1:12 4:11
  29:23 33:24
**noticed** 23:5,14
  23:19 24:6 30:5
  34:5
**notify** 20:6
**number** 25:7,10
  25:11 26:14

**O**

**object** 41:7
**objection** 3:7,8
  5:1,10,16 21:16
  22:2,20
**obviously** 6:4
**occurred** 21:14
  30:21 37:15
**October** 30:21
**office** 32:19,21
  36:12,16 39:12
**Oh** 33:18 35:20
  37:24
**okay** 4:22 8:18,21
  9:1,4,10 10:9,13
  10:17 11:21
  12:2,12,15,19
  13:3 14:7,13,17
  15:13 16:7,11
  16:17 17:20
  20:4 21:5,12
  22:13 23:14
  24:1 25:6 26:17
  29:13,17 32:6
  32:24 33:4,18

34:12,16 35:3
  36:4,8,14,17
  37:14,17 38:4
  39:10,19 40:18
  41:16
**Oklahoma** 8:3
**Olivia** 2:3 3:9 4:3
  40:24
**once** 15:7 19:24
**ones** 27:11
**open** 10:8,23
  15:18 29:2
**opens** 30:11,14,17
**opposed** 40:1
**option** 17:3,4
**order** 15:6 28:21
**outcome** 42:15
**outs** 16:14 20:22
  21:1,3,7,8 25:14
  25:23 26:3,9,14
  26:21 28:21
  37:2 39:24
  40:15 41:5,11
**outside** 13:19
  39:7

**P**

**P** 2:1,1
**p.m** 41:17
**Page** 2:13 42:7
**Pamela** 1:9,12
  2:14 3:12 4:8,10
  6:17,21 42:5
**pandemic** 3:4
**park** 4:5 10:10,15
  10:19 11:2,6
  13:14,24 14:11
  21:13,24 22:9
  22:24 27:19,24
  29:2 30:22
**parking** 14:1,3,10
  15:15 16:1
  20:22 21:6,7
  26:1,7 27:2 40:9
**parties** 4:11 42:14
**pass** 28:13

**path** 17:20
**pavement** 39:7
**Payroll** 8:24
**PC** 2:6
**pending** 6:5
**Pennsylvania** 8:3
**people** 18:17
  26:20 29:12
**percent** 21:8 35:2
  39:5,9
**person** 19:14,21
  25:1 35:19
**personal** 42:9
**personally** 23:5
**pertaining** 1:14
**PEYLA** 2:6
**phone** 4:1 35:21
**photograph** 13:24
**physical** 3:5
**physically** 13:11
  31:8,10
**pick** 21:10
**picked** 28:23
**picture** 13:19,21
  13:23 15:18
**place** 42:12
**placed** 16:12
**plaintiff** 1:4 2:5
  3:10 6:14
**planning** 14:7,8
**please** 4:6
**plus** 19:14
**policies** 13:4,10
  27:1
**policy** 20:6
**pool** 30:6
**pooled** 23:5 29:24
  35:4
**pooling** 23:10,12
**position** 8:12,22
  9:1 10:8 11:15
  11:24 12:11,17
  13:4 16:18
**positions** 12:1,12
**Prairie** 7:1
**premises** 21:14

30:11,14,17
**presence** 3:6
**previous** 28:14
**previously** 2:18
  10:14 22:6 28:6
  42:12
**print** 13:8
**printed** 13:11
**prior** 11:2,9,11,19
  11:22,23 21:14
  35:4 41:8
**probably** 19:21
  35:24
**Procedure** 1:13
**procedures** 13:4
  13:10 27:1
**process** 13:9
**product** 26:5
**program** 11:8
  12:13
**promoted** 10:23
  11:15 12:14,16
**proper** 4:11
**property/damage**
  36:2
**protocol** 19:16,18
  19:21
**provided** 12:16
  12:20,24 13:3
**Public** 1:16 42:4
**pull** 35:10
**purpose** 28:8
**pursuant** 1:12,12
**pushed** 25:20
**put** 9:19 16:15,21
  16:24 18:22
  19:11 25:16
  34:16,21
**putting** 19:6

**Q**

**question** 5:22 6:5
  6:6 11:20 12:7
  23:13 33:19
**questions** 38:24

**R**

**R** 2:1
**radio** 30:3
**rags** 19:15
**rain** 16:14
**raining** 16:9
**Randolph** 2:3
**really** 26:20
**reason** 10:2
**recall** 9:16,24
  14:14 21:20
  30:22 31:1,4,6
  32:3,9,14,17
  33:7 34:22
**receiving** 15:6
  18:7,8
**record** 3:3 4:7,9
**recorded** 42:7
**Recross** 2:16
**RECROSS-EX...**
  40:12
**Redirect** 2:15,16
  39:21 41:2
**reduced** 42:8
**REFERENCED**
  2:19
**referring** 21:2
  24:1,3
**reflect** 4:9
**reflecting** 26:13
**regard** 39:3,10
**regarding** 35:17
  36:9 38:14
**registers** 18:6
  20:22
**related** 42:14
**relevance** 5:1,10
  5:16 21:16 22:2
  22:20
**remember** 4:21
  5:12,18 28:14
  36:19 37:18,19
**remodel** 10:5
**report** 6:9,10
  20:12,16 35:7
  35:16 36:6,12

Pamela Bamman

36:12,15,22
37:12 39:10,17
**reporter** 3:1,4 6:1
  25:9
**reports** 20:2
  39:11
**represent** 4:4
**require** 11:18
**responsible** 25:24
**rest** 26:10
**RETAINED** 2:22
**returns** 26:6
**review** 6:7,13
  13:10
**right** 10:16 12:9
  13:13 15:9 16:8
  17:18 19:3,4,23
  25:17 26:1 28:6
  28:20 32:22
  40:9,23 41:13
**roles** 11:18
**roll** 24:12
**rolls** 24:9,10
**roughly** 10:17
**route** 18:2
**RPR** 1:15 42:3,21
**rules** 1:13 4:12
  5:21
**running** 28:20
**runs** 20:21,23

**S**

**S** 2:1
**sales** 26:20
**saw** 28:6 31:10
  38:6
**saying** 23:10
**Schwartz** 2:2,3,14
  2:15,16,22 3:9,9
  3:17 4:4,9 5:6
  5:13,19 21:19
  22:5,23 25:13
  35:20 36:1
  38:22 39:22
  40:11 41:1,3,10
  41:15

**screen** 13:18
**seal** 42:18
**Seasons** 26:18
**second** 13:20
**see** 13:20 14:20
  15:11 16:14
  19:10,12 20:5
  31:8 35:11,18
  35:19 36:24
**seen** 38:6
**separate** 24:5
  25:15
**served** 7:11
**service** 32:1
**set** 4:2 19:20
  42:17
**shaking** 5:24
**share** 13:18
**shift** 26:15 29:7
**shirts** 26:11
**shopping** 23:6,15
  24:15 33:22
  34:7,13 35:4
**show** 13:19
**showed** 36:13
**sidewalk** 14:22
**sign** 19:11,14
  34:16
**signs** 18:22 19:2,6
  34:18,20,21
**situations** 22:8
**slip** 30:20
**slippery** 19:1
**slow** 26:6,18
**slush** 39:6
**snow** 23:8 24:4,9
  24:10,13,13,18
  24:19 25:3,5
  39:6
**snowed** 34:14,24
**snowing** 16:9 35:1
**snowy** 23:8,10
**somebody** 19:17
  19:19 20:5,9
  21:23 30:3,8
  34:19,20

**Sophia** 1:15 42:3
  42:21
**sorry** 36:21
**special** 15:6
**specific** 10:2
  11:18,24 16:17
  19:5,16,18 25:7
  26:14,24 27:5
  29:7 40:20
**specifically** 40:8
**specified** 42:12
**spell** 6:22
**spill** 18:22 19:10
  19:12,13
**squares** 17:14
**SS** 42:1
**start** 5:20 8:9 12:7
  12:17
**started** 8:13,22
  10:18,19,21
  22:8
**starting** 11:22,23
  12:3 16:14
**starts** 27:4 29:5
**state** 1:16 4:6,12
  42:1,4
**stated** 33:8,15
  38:2 40:14 41:4
**statement** 33:2,4
  33:7
**states** 1:1,14 36:2
**stay** 19:13 20:8
  30:7
**stenographically**
  42:8
**stipulate** 3:2
**stipulated** 3:10
**stipulates** 3:11
**store** 5:9 10:5,7
  17:6,21 18:3,8
  19:19 20:10,17
  20:20,23,23
  23:3,6 30:11,14
  30:17 31:21,23
**Street** 2:3,7
**strike** 19:17 33:20

**stuff** 26:13 28:11
  30:3
**suit** 42:15
**Suite** 2:7
**supposed** 15:22
  16:1,3 19:11
  20:6,12,15 27:9
  39:24 41:12
**sure** 3:23 5:21
  19:24 28:20,22
  34:20
**sustained** 21:23
  38:19
**swear** 3:1,4
**switch** 14:17
**sworn** 3:14 42:6
**system** 19:9

**T**

**take** 6:1,3,6 8:1
  9:17 17:21 18:2
  26:6 33:4
**taken** 1:15 4:10
  13:24 20:1
**talked** 38:16
**talking** 22:14
  30:23
**tasked** 19:5
**team** 21:9,11
**tell** 20:9
**ten** 29:10
**testified** 3:15 5:14
**testify** 42:6
**testimony** 41:8
  42:11
**Thank** 40:23
  41:16
**thereof** 42:16
**they'd** 30:2
**thing** 6:1 28:10
**think** 27:11 35:21
**thinking** 10:13
  28:10,11
**thought** 18:14
**three** 9:22 29:11
  29:12

**tile** 17:14
**time** 3:7 13:13
  21:8 24:5 29:1,9
  31:13 37:14
  40:19 42:12
**times** 21:1 23:18
  26:19
**Tinley** 4:5 10:10
  10:15,19 11:2,6
  13:14,24 21:13
  21:24 22:9,24
  27:19,24 29:1
  30:22
**today** 6:8 22:15
**told** 31:15,16,24
  32:1,2,4 38:6
**train** 27:12,13
**trained** 27:14,15
  27:17 41:5,11
**training** 11:8,14
  11:19,22,23
  12:3,4,5,8,13,15
  12:20,24 13:9
  27:5,8
**transcript** 42:9,11
**transferred** 10:6
  10:7,21
**trash** 21:10
**trial** 5:14
**true** 8:16 15:23
  17:18,24 36:10
  39:17,18 42:10
**truth** 42:6
**trying** 6:1
**turnstile** 17:19,23
  18:13
**Twenty-seven**
  8:10
**two** 4:21 7:8,21
  7:22 9:22 17:6
  29:11,12
**type** 4:23 5:24
  17:17 39:6
**typewriting** 42:8
**typically** 17:21

Page 48

Pamela Bamman

**U**

uh-huhs 5:24
uh-uhs 5:24
undergo 11:21,23
 12:8,13
underneath 15:10
understand 4:3
 11:20 12:2
 23:13
understanding
 8:6,15 15:21
uniform 26:9
United 1:1,13
unsure 4:2
use 16:3,5 39:24
 40:20
usually 29:10

**V**

Vaguely 30:24
vehicles 26:5
vests 26:12
videoconferenci...
 1:11
vinyl 17:14
vs 1:5

**W**

W 42:2
wait 5:21
walk 16:23 17:18
 18:8,9,12 30:2
 32:22 40:3,7
walk-off 27:20,23
 28:2,8,15
walks 16:7
want 9:5 10:11
 28:24 38:13
 39:8 40:4,6
wanted 3:23
warning 34:16,17
water 24:6 28:11
 29:24 30:6,8
 33:8 34:2,5,12
 34:17 35:4
way 15:8 18:3

24:17 42:14,15
we're 14:20 22:14
 30:20 36:21
wear 26:11
weather 34:22
 39:3
welcome 6:4
went 10:2 19:21
 24:12 33:16,22
weren't 32:21
 39:4
West 2:3
wet 18:21 19:1,1,6
 19:14 25:16
 34:7,19
wheels 23:11 24:8
 24:12,19 25:5
 34:2,15
WHEREOF
 42:17
wipe 23:23
wiped 23:9
witness 3:2,13 5:3
 35:23 36:23
 41:18 42:11,17
word 15:10
work 8:5 11:9
 37:7
worked 10:14
 28:15
working 8:9,13
 10:9,18 11:2,11
 12:7 13:14
 21:20 22:8
 26:15,22 29:21
 31:1
works 21:5 29:8
 37:2
wouldn't 24:22
 40:18
written 12:15,20
 13:3,7 27:1,11

**X**

X 2:12

**Y**

yard 15:7
yeah 26:4 34:14
 35:12
year 9:14,24
years 7:21,22 8:10
 9:8,17,18,18,19
 9:22,22,23
 10:11,11,17
 13:15
yellow 19:2 34:17

**Z**

zoom 1:9,11 2:2,6
 4:11 35:13
zoomed 14:19,19

**0**

05682 1:5
084-003792 42:22

**1**

1 42:7
10 40:19
11:59 1:18
116 2:7
12:46 41:17
13 26:22 30:21
 31:18 35:17
 38:10,15
13th 11:6 21:15
 22:18 24:2
 34:23 35:18
 38:20
14 2:20
15 40:19
17th 42:18
1984 8:10
1985 7:24
1994 8:10

**2**

20 1:5 9:17,19
200-A 2:7
2017 21:21,24
2019 4:6 11:6

14:15 21:15
 22:19 24:2
 26:22 30:21
 31:18 34:23
 35:17 38:10,15
2021 1:17 42:18
20505 7:1
26th 21:21,24
28 8:11

**3**

3 2:14
34 7:8
37 7:8
39 2:15,15
3rd 4:6

**4**

40 2:16
41 2:16 42:7

**5**

**6**

6 29:3,5,8,14
60 2:3
60423 7:2
60432 2:8
60601 2:4

**7**

7th 1:17

**8**

8-17-59 7:10
80 7:24
85 7:24

**9**

9 29:15 30:22
 35:18
99 21:8

George E. Rydman & Assoc., Joliet, IL  (815) 727-4363

IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIKE EVON,                          )
                                    )
        Plaintiff,                  )
                                    )        Case No: 20 CV 5682
v.                                  )
                                    )        [Formerly Circuit Court of
MENARD, INC,                        )        Cook County, Illinois Case
                                    )        No. 20 L 9082]
        Defendant.                  )

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## EXHIBIT E

*Surveillance Footage*
*will be produced electronically*
*with courtesy copies*



EXHIBIT

E