# DEPOSITION OF:

# **COLE HICKEY**

July 27, 2021

MIKE EVON

vs

MENARD, INC.

**MOSIER**
**REPORTING SERVICES**
Local Knowledge With National Reach

312.632.1116

MIKE EVON vs MENARD, INC.
COLE  HICKEY 07/27/2021

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIKE EVON,                            )
                                      )
            Plaintiff,                ) Case No.
                                      ) 20 CV 5682
     vs.                              )
                                      ) Formerly
MENARD, INC.,                         ) Case No.
                                      ) 20 L 9082
            Defendant.                )

            The Zoom deposition of COLE THOMAS HICKEY,

taken in the above-entitled cause before Gabrielle

Pudlo, CSR, and Notary Public within and for the

County of Cook and State of Illinois, taken pursuant

to the Federal Code of Civil Procedure for the

United States District Court, Northern District of

Illinois, Eastern Division, on July 27, 2021, at the

hour of 12:00 p.m.

Page 2

A P P E A R A N C E S :

KRALOVEC, JAMBOIS & SCHWARTZ
BY:  MS. OLIVIA SCHWARTZ
     60 West Randolph Street, 4th Floor
     Chicago, Illinois  60601
     (312) 782-2525
     oschwartz@kjs-law.com

          Appeared via Zoom
          On behalf of the Plaintiff;

FABRIZIO, HANSON, PEYLA & KAWINSKI
BY:  MS. MARILYNN FRANGELLA
     116 North Chicago Street, Suite 200A
     Joliet, Illinois  60432
     (815) 727-5445
     mfrangella.fhpk@gmail.com
          Appeared via Zoom
          On behalf of the Defendant.

Page 3

I N D E X

WITNESS EXAMINATION        DX     CX    RDX    RCX

COLE THOMAS HICKEY

By Ms. Schwartz               4          38

By Ms. Frangella                   36

E X H I B I T S

DEPOSITION EXHIBITS                    MARKED

Exhibit No. 1                           12

Exhibit No. 2                           13

Page 4

(Witness sworn.)

MS. SCHWARTZ:  Can you please state your name for the record.

THE WITNESS:  Cole Thomas Hickey.

MS. SCHWARTZ:  Let the record reflect this is the deposition of Cole Hickey, taken via Zoom, proper notice to all parties, in accordance with federal and local rules.

COLE THOMAS HICKEY, called as a witness on behalf of the plaintiff, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SCHWARTZ:

Q   Mr. Hickey, have you ever given a deposition before?

A   No.

Q   Before we start, just a couple brief, kind of, rules here.  So I'll be asking you questions. If you wouldn't mind waiting until I finish my question before you provide your answer, that will just -- because the court reporter is taking down everything that we say.  With that, head nods, uh-huhs, uh-uhs aren't going to be able to be taken

Page 5

down by the court reporter.  So make sure that you're answering out loud, verbal answers.

If you don't understand one of my questions, please let me know.  If you do answer it, I'm going to assume you understood the question. But if you tell me you don't understand, I'll try to rephrase it or ask a different question.  If you need to take a break, you're obviously more than welcome to do so.  You just can't take a break if a question is pending.  So make sure to answer my question, then ask to take a break, and we can go off the record.

Sound good?

A   Yep.

Q   Have you ever gone by any names other than Cole Hickey?

A   No.

Q   Did you review any materials before coming to the deposition today?

A   Yes.  I reviewed the video clips.

Q   And it's my understanding that you reviewed maybe three or four video clips from the morning of February 13, 2019; is that true?

A   Yes.

Page 6

Q   Prior to your review of those -- Strike that.

About when did you review those videos?

A   Last week.

Q   Okay.  Prior to your review of those videos last week, had you reviewed any materials regarding this incident?

A   No.

Q   Were the video clips that you reviewed the security footage clips from Menard's on the morning of February 13, 2019?

A   Yes.

Q   And was it a few videos just at different angles, kind of showing the same front entrance of Menard's?

A   Yes.

Q   What is your current address?

A   16901 New England Avenue, Tinley Park, Illinois.

Q   Do you live there with anybody?

A   My parents.

Q   Do you yourself have any children?

A   No.

Q   What's your date of birth?

Page 7

A   February 26, 1999.

Q   What's your current phone number?

A   I couldn't hear you.  Sorry.

Q   What is your current phone number?

A   1-708-603-9509.

Q   Are you a United States citizen?

A   Yes.

Q   Have you ever served in the military?

A   No.

Q   Have you ever been convicted of a felony?

A   No.

Q   Have you ever been convicted of a misdemeanor involving dishonesty?

A   No.

Q   What's your highest level of education?

A   One year of college.

Q   Where was that year of college?

A   Bradley University.

Q   When was that?

A   That would be 2017 to 2018.

Q   Where did you go to high school?

A   Tinley Park High School.

Q   What year did you graduate?

A   2017.

Page 8

Q   It's my understanding that you are currently employed by Menard's; is that true?

A   Yes.

Q   When did you start working at Menard's?

A   That would be August of 2019.

Q   What was your position when you first started working at Menard's?

A   I was a Courtesy Patrol member.

Q   I'm sorry.  Did you state that you started working there in August of 2019?

A   2018.  I apologize.

Q   Thank you for that.

And you began working as a Courtesy Patrol member?

A   Yes.

Q   Are you still in that position?

A   No.  I am a head cashier.

Q   You are now a head cashier; true?

A   Yes.

Q   When you began working at Menard's in August of 2018, did you begin working at the Tinley Park location?

A   Yes.

Q   Have you ever worked a different Menard's

Page 9

location?

A   No, I have not.

Q   So after -- Strike that.

You were hired as a carry-out in 2018. How long did you work as a carry-out?

A   I think it was about nine months.

Q   After nine months, what job did you transition into?

A   I went straight to head cashier.

Q   So am I correct in thinking that at Menard's you have held two different positions, the carry-out -- or Courtesy Patrol member -- and the head cashier?

A   Yes.

Q   Okay.  So was it sometime in the summer of 2019 that you then became a head cashier?  Does that sound right?

A   Yes.

Q   And were you a carry-out at Menard's in February of 2019?

A   Yes.

Q   Is there formal training that employees go through prior to starting their positions at Menard's?

Page 10

A   Yes.

Q   Are there written training materials provided to the employees during those training sessions?

A   Yes.

Q   So prior to starting as a carry-out in August of 2018, were you provided written training materials?

A   Yes.

Q   Were those written training materials specific to the position of a carry-out?

A   Yes.

Q   Do you recall, you know, how many pages of written training materials there were?

A   I don't remember, no.

Q   Do you recall it to be less than ten pages of materials, or do you recall it to be more than that?

A   I would say less than that.

Q   Okay.  Are you familiar with the policies and procedures that are provided to employees during their training?

A   Yes.

Q   Are written policies and procedures

Page 11

physically given to employees during their training?

A   Not all of them are.

Q   By that answer with "not all of them," do you mean that not all of the policies and procedures are provided to the employee or not all employees are provided policies and procedures?

A   Not all of the policies are printed out and given to employees.  They are on the computer system.

Q   Okay.  Do you recall which policies and procedures were provided to you prior to you starting as a carry-out?

A   I do not.

Q   Do you recall if the policies and procedures that were provided to you prior to starting as carry-out had anything to do specifically with the shopping carts?

A   I don't remember, no.

Q   Do you recall ever seeing any written policies and procedures, whether printed out or on the computer, regarding the shopping carts?

A   No, I don't remember.

Q   Are employees taught about what to do if a customer is injured on the premises?

Page 12

A   Yes.  We notify our manager on duty.

Q   Are there formal incidents that are to be filled out if a customer is injured at Menard's?

A   Yes.

Q   Excuse me.  I meant are there formal incident reports.  Sorry if that was confusing.
Are the formal incident reports to be filled out only by the managers, or are other positions to fill out formal incident reports if a customer is injured on the premises?

A   As far I am aware, only managers fill out the incident reports.

Q   In the time that you've been working at Menard's, has the exterior of the building remained the same?

A   Yes.

MS. SCHWARTZ:  I'm going to pull up a picture here just to make this a little bit easier.
(Exhibit No. 1 previously marked for identification.)

BY MS. SCHWARTZ:

Q   Mr. Hickey, can you see this picture of

Page 13

the outside of Menard's?

A   Yes.

Q   Does this picture appear to be an accurate photograph of what the outside of the Tinley Park Menard's has looked like since you've worked there?

A   Yes.

Q   The parking lot that we see depicted in this image, is that the main customer parking lot?

A   Yes.

Q   Okay.  And then if you see underneath the Menard's sign, there's a door marked "In" and a door marked "Out."  Do you see what I'm talking about?

A   Yes.

Q   Is that door marked "In," is that the main customer entrance into the building?

A   Yes, it is.

Q   Is that the entrance for employees to enter the building as well?

A   Yes.

MS. SCHWARTZ:  I'll stop sharing and pull up a second image here, which is Exhibit 2.
(Exhibit No. 2 previously marked for identification.)

MIKE EVON vs MENARD, INC.
COLE HICKEY 07/27/2021                                    14–17

Page 14

BY MS. SCHWARTZ:

Q   Mr. Hickey, do you see this picture that I'm showing you, Exhibit 2?

A   Yes.

Q   To the right of the "In" door and the "Carpet" sign, there appears to be some garage doors.  Correct?

A   Yes.

Q   Are those for the carts to be brought in from the parking lot?

A   Yes.

Q   When a customer walks into the main entrance of the store that we just saw shown in Exhibit 1, is there always a mat on the ground right there?

A   Only in conditions with rain and snow.

Q   Whose job is it to put out a mat when it's raining or snowing?

A   The carry-outs'.

Q   Does somebody specifically instruct the carry-outs to put out a mat?

A   Our managers do, yes.

Q   And then one a customer enters through that "In" door, there's like a metal turnstile over

Page 15

to their right to walk through in order to get into the store; is that true?

A   Yes.

Q   And then that's where the shopping carts are?

A   Yes.

Q   Which side of the metal turnstile are the shopping carts on?  Are they before the customer were to reach the turnstile or after the customer goes through the turnstile?

A   After the turnstile.

Q   And then are there more than one row of shopping carts?

A   Yes.  There are four rows of shopping carts.

Q   Okay.  And those four rows of shopping carts are accessed through the garage door that we saw in Exhibit 2?

A   Yes.

Q   Is it typical for customers to walk in the "In" door towards the turnstile, through the turnstile, and then proceed into the store?

A   Yes.

Q   Is that the main path that customers take

Page 16

to enter into this Menard's store?

A   Yes.

Q   Are you aware if Menard's contracts with a snow removal company to provide services at the Tinley Park location?

A   Yes.

Q   Do you know who that company is?

A   I don't remember.

Q   Does that company plow the parking lot?

A   Yes.

Q   Does that company also clear any snow off of the, kind of, sidewalk at the front of the Menard's store?

A   They do occasionally.  But right outside the door, the carry-outs usually use a shovel to clear it.

Q   Okay.  So it's the Menard's carry-outs that shovel the concrete area outside of the entrance?

A   Yes.

Q   Is there a specific schedule as to who is to shovel that area?

A   Usually just whatever carry-out is on duty.  We usually delegate them on ourselves.

Page 17

Q   So is it a decision amongst the carry-outs as to who is going to be shoveling the concrete area?

A   It's either that or the managers tell one of us to do it.

Q   Outside of that concrete area -- Strike that.

Am I correct in thinking that the parking lot is asphalt and then there's a concrete area outside of the door before the main entrance at Menard's?

A   Yes.

Q   Okay.  So are the carry-outs to shovel only the concrete area?

A   Yes.

Q   So the carry-outs do not shovel the asphalt area?

A   No.

Q   The asphalt area is taken care of by the snow removal company?

A   Yes.

Q   You previously stated that there is a mat to be put inside the main entrance, I believe, during -- if it's snowing or raining; is that true?

MIKE EVON vs MENARD, INC.
COLE HICKEY 07/27/2021                                    18–21

Page 18

A   Yes.

Q   Is it always the same size mat, or are there different sizes of mats to be placed in that area?

A   It's always the same size mat.

Q   And that mat does not reach all the way to the turnstile, correct?

A   No, it does not.

Q   Are there ever two mats placed in order to make a runway all the way to that turnstile, or no?

A   No.

Q   Whose job is it to change the mats?

A   I don't understand the question.

Q   Does somebody -- Strike that.
If throughout the day the mat becomes saturated with an amount of water, is it somebody's job to change the mat to then provide a dry mat in that area?

A   No.  We only have one mat for each entrance or exit.

Q   Have you ever had a situation where you've noticed that that mat became saturated with rainwater or snow or anything like that?

A   No.

Page 19

Q   Do you know how often the mats are changed?

A   I don't know.

Q   Is it an outside company that changes the mats, or does someone at Menard's change the mats?

A   It's an outside company.

Q   Does Menard's have "Wet Floor" or "Caution" signs to put up if the floor is wet?

A   Yes.

Q   And who puts those "Wet Floor" signs out?

A   Either the managers or the carry-outs.

Q   How do you determine if the manager is going to put the "Wet Floor" sign out or if the carry-outs are going to put the "Wet Floor" sign out?

A   I'm unsure.  It's usually up to the manager or whoever notices that the floor is wet.

Q   So if there's a carry-out working and the carry-out notices the floor is wet, then the carry-out can put out the "Wet Floor" sign?

A   Yes.

Q   But, you know, the "Wet Floor" sign can also be instructed by a manager -- Strike that.
The carry-out can also be instructed by a

Page 20

manager to go ahead and put the "Wet Floor" sign out?

A   Yes.

Q   Does the "Wet Floor" sign stay in the area until whatever is on the floor is cleaned up?

A   Yes.

Q   What is the protocol for when a customer falls down and gets hurt in the store?

A   We notify our manager on duty and then fill out an incident report.

Q   Does that protocol involve taking photos of the area?

A   I'm unsure.  I believe that might be part of what the managers do in their incident report.

Q   Have you been made aware of any fails that have occurred inside this Menard's store prior to February 13th of 2019?

MS. FRANGELLA:  Objection, relevance. You could --

A   No.

MS. FRANGELLA:  -- answer, Mr. Hickey.

A   (No response.)

MS. FRANGELLA:  You can go ahead and state your answer again.

Page 21

A   No.

BY MS. SCHWARTZ:

Q   Are you aware of any falls that have occurred in the entrance area of this Menard's since February 13th of 2019?

MS. FRANGELLA:  Objection, relevance. You could answer.

A   No.

BY MS. SCHWARTZ:

Q   It appears that someone sustained a fall at this Menard's on February 26, 2017.  I understand that you were not working there at that time.
But do you have any knowledge of that incident?

MS. FRANGELLA:  Objection, relevance. You could answer.

A   I do not.

BY MS. SCHWARTZ:

Q   Have you ever noticed any standing water in the entrance area of that Menard's on the floor?

A   No.

Q   And have you personally ever noticed any pooled liquid near the turnstile or near the shopping carts in front of the store?

Page 22

A   Yes.

Q   How many times have you noticed pooled liquid in that area?  And you can estimate.

A   I'm not sure.

Q   Have you noticed pooled liquid in that area near the turnstile where the customers grab the shopping carts more than five times?

A   Yes.

Q   Have you personally noticed any pooled liquid in that area more than 20 times?

A   I'm not sure.  I don't believe so.

Q   Do you recall if the times that you noticed standing water in that area were prior to February of 2019?

MS. FRANGELLA:  I'm just going to object.  He didn't say "standing water."

MS. SCHWARTZ:  I'll rephrase.

BY MS. SCHWARTZ:

Q   Did you notice -- Of the instances where you noticed pooled water near the turnstile where customers grab the shopping carts, do you recall if those instances were prior to February of 2019?

A   I don't recall.

Q   Did you notice that pooled liquid when you

Page 23

were working as a carry-out?

A   Yes.

Q   In the instances where you noticed pooled liquid near the turnstile and the shopping carts, is that something that you would have reported to a supervisor?

A   Yes.

Q   And, as a carry-out, who would that supervisor have been?

A   That would have been the front-end manager on duty.

Q   Are you aware of anybody -- Strike that.
The carry-outs are tasked with bringing the carts in from the parking lot, right?

A   Yes.

Q   And the carry-outs, do they always wear reflective vests?

A   It's either a reflective vest or garments that are purchaseable.

Q   Say that again.

A   It's either the reflective vests or other reflective garments that are purchaseable.

Q   So what else are the reflective garments that you're referring to?

Page 24

A   There is a sweatshirt and a T-shirt and a long-sleeved shirt.

Q   Okay.  Do you know how many carry-outs work at each time?

A   Can you rephrase the question.

Q   At any time that the Menard's in Tinley Park is open, is there at least one carry-out working?

A   Yes.

Q   Are there ever multiple carry-outs working?

A   Yes.

Q   Are there always multiple carry-outs working?

A   No.

Q   So is it true that there are times when only one carry-out is working and there are times when multiple carry-outs are working?

A   Yes.

Q   Are there ever more than two carry-outs working at a time?

A   Yes.

Q   How many carry-outs are working at a specific time?  That was a bad question.

Page 25

A   It depends day to day.

Q   Okay.  It seems like there are either one, two, or multiple carry-outs working at a time; is that correct?

A   Yes.

Q   Up to how many carry-outs would be working at the same time?

A   I've seen up to, probably, around six at one time.

Q   Is it the job of the front-end manager to determine how many carry-outs to be working at each time?

A   Yes.

Q   Do you know how many carry-outs were working between -- Strike that.
Do you know how many carry-outs were working the morning shift on February 13th of 2019?

A   I don't remember.

Q   Do you know if there was only one carry-out working that morning?

A   I don't remember.

Q   I didn't hear the end of that.

A   I don't remember.

Q   Okay.  Are you aware if there are specific

MIKE EVON vs MENARD, INC.
COLE HICKEY 07/27/2021                                    26–29

Page 26

written policies and procedures that apply to bringing the carts in from the parking lot?

A  I couldn't hear the end of the question.

Q  Are there specific written policies or procedures that apply to bringing the carts in from the parking lot?

A  I don't remember.

Q  Do you recall if there are written training materials that apply to bringing the carts in from the parking lot?

A  I don't remember.

Q  Are the carts supposed to be brought in through the cart corral?

A  They can either be brought in through the garage doors or the entrance doors if you don't have a lot.

Q  And do you know whether or not that is provided in any sort of written training materials or policies and procedures?

A  I'm not sure.

Q  Did somebody tell you that shopping carts can be brought in either through the garage door or through the main entrance?

A  Yeah, when I was being trained.

Page 27

Q  Do you recall who it was that told you that?

A  I don't recall, no.

Q  So when are the times where carts are allowed to be brought in through the main entrance?

A  Through the main entrance, we usually -- our bigger rail carts or flatbed carts or if we only have a few of the small, silver shopping carts.

Q  So is there a number of shopping carts that would require you to use the garage door versus the main entrance?

A  Usually, like, six or more.

Q  And is that something that you were specifically trained on?

A  Not specifically.  It's just something that was told to me by the other carry-outs and managers.

Q  And do you recall who those other carry-outs or managers were that told you that?

A  No, I don't.

Q  There is a -- Strike that.

Are the garage doors used for anything other than bringing carts in?

A  No.

Page 28

Q  So the sole purpose of the garage doors is for the carry-outs to bring in shopping carts from the parking lot, correct?

A  Yes.

Q  One of the store policies mentions a walk-off grate.  Do you know what a walk-off grate is?

A  No, I don't.

Q  What are the general duties of the carry-outs at Menard's on a day-to-day basis?

A  Bringing in carts, assisting guests with bringing items out to their cars, sweeping up the parking lot, picking up trash.

Q  Does Menard's open at 6:00 in the morning every day?

A  Yes.

Q  Did you ever work the 6:00 a.m. shift as a carry-out?

A  Yes.

Q  Do the carry-outs have any duties prior to the opening of the store at 6:00 a.m. that they need to carry out before 6:00 a.m.?

A  No.

Q  So the carry-outs are not tasked with

Page 29

doing an inspection of the premises prior to opening or anything like that?

A  No.

Q  Do you know if any employee at Menard's is tasked with doing an inspection of the premises prior to Menard's opening at 6:00 a.m.?

A  I'm not sure.

Q  As you may be aware, the incident that we're here discussing today involves my client, Mike Evon, in a slip and fall that occurred on February 13, 2019, around 9:00 a.m. at the Menard's in Tinley Park.

Do you recall the incident that I'm talking about?

A  I vaguely recall it, yes.

Q  Were you working at Menard's when this incident happened?

A  Yes.

Q  Do you recall meeting Mr. Evon?

A  Yes.

Q  Do you recall if he was with anyone?

A  I don't remember.

Q  What do you remember from meeting him -- Strike that, actually.  Sorry.

MIKE EVON vs MENARD, INC.
COLE  HICKEY 07/27/2021                          30–33

Page 30

What do you recall from your interaction with Mr. Evon?

A   I don't really recall much from outside of what was on the video.  I remember him coming through the turnstile, trying to get a cart, and then I turned around and he was on the floor.

Q   Did you physically see him fall?

A   I did not.  I believe I heard a noise behind me and then I turned around and he was on the ground.

Q   Are you aware of anyone that physically saw him fall?

A   No.

Q   Did you see what he fell on?

A   I did not.

Q   Did you have a conversation with Mr. Evon?

A   I don't remember.

Q   Did you help him up?

A   I believe I did, yes.

Q   Did you do anything after you helped him up -- Did you do anything after you helped Mr. Evon off the ground?

A   I don't remember.

Q   Do you recall telling a manager what had

Page 31

happened?

A   I don't remember specifically.  But I believe I told my manager on duty, yes.

Q   Do you only remember that because that is what your typical custom and practice would be, or do you remember in this incident telling your manager?

A   Only because that's what the typical procedure is.

Q   Do you recall who your manager was that day?

A   I believe it was Pam Bamman.

Q   Do you recall any conversation you had with Pam Bamman on February 13th of 2019 regarding Mr. Evon or the fall?

A   No, I don't.

Q   Do you remember any conversations on the day of the incident regarding Mr. Evon's fall that you had?

A   No, I do not.

Q   After you found out that Mr. Evon had fallen, did you walk over and inspect the area where he had fallen?

A   I don't remember.

Page 32

Q   Do you recall if you saw any water on the ground in the area that he fell that day?

A   I don't remember.

Q   Did Mr. Evon point out to you exactly where it was that he fell?

A   I don't remember, no.

Q   After the fall, the video of the incident shows that a "Caution" sign was put up.  Do you recall if you put that "Caution" sign up?

A   I don't remember, no.

Q   Do you recall what the weather was like on February 13, 2019?

A   I believe there was snow on the ground.  I'm unsure if it was snowing at the time, though.

Q   Is that memory something that you only know because of the videos that you've reviewed?

A   Yes.

Q   And do you recall if there was any water pooled in the entranceway of Menard's on that day?

A   I don't remember.

Q   Did you have a conversation with a woman named Katrice Matthews about this incident?

A   I don't remember.

Q   Since the day of this incident, have you

Page 33

had any other conversations with Pam Bamman about this incident?

A   No.

Q   Since February 13, 2019, have you had any conversations with any other employees at Menard's regarding this incident?

A   No.

Q   Did you yourself fill out any paperwork regarding this incident such as an incident report or something of that nature?

A   No.

Q   Do you recall mopping up any water near the area that Mr. Evon fell on the date of this incident?

A   I don't remember.

Q   So I've received a document called the Courtesy Patrol Orientation Guide, which I believe is what the carry-outs receive prior to starting their jobs as a carry-out.

Does that sound familiar to you?

A   Yes.

Q   Are you aware of any other training materials provided to the carry-outs other than the Welcome to (inaudible) Courtesy Patrol Orientation

MIKE EVON vs MENARD, INC.
COLE HICKEY 07/27/2021                                    34–37

Page 34

Guide?

A   I don't remember.

Q   Within the Courtesy Patrol Orientation Guide it states that, The carry-outs are trained on the proper cart locations for different types of carts.

Are you familiar with that?

A   Yes.

Q   Is the proper cart location for a general shopping cart through the cart corral door and in those four rows of carts?

A   Yes.

Q   The document also states that, In stores with overhead garage park doors, the doors must always remain closed when not in use.  And this is necessary for expenses and security purposes.

Do you know what that's referring to?

A   I don't, no.

Q   The Menard's in Tinley Park has overhead garage doors for the cart corral, right?

A   Yeah.

Q   So when they're not in use, are those garage doors kept closed?

A   Yes.

Page 35

Q   Throughout the day are the carts -- are the garage doors kept closed, or are they open while the store is open and then closed at night when the store closes?

A   They're supposed to be closed once the carry-outs are finished pushing carts through them.

Q   So is it the practice of the carry-outs to bring the carts over to the carry-out door, open the garage door, put the carts in, and then immediately shut the garage door following?

A   Yes.

Q   Do you know why?

A   I don't know why.

Q   Do you have an opinion -- Strike that.

Did you watch Mr. Evon come into the store on the morning of February 13, 2019?

A   I don't remember.

Q   Is the first time that you remember seeing Mr. Evon once he was already on the ground?

A   Yes.

Q   Have you had any conversations with Mr. Evon since February 13, 2019?

A   Not that I know of.

Q   Have you had any conversations regarding

Page 36

Mr. Evon and the fall he sustained on February 13, 2019, other than what we've already discussed and other than your lawyer?

A   No.

Q   Do you have any knowledge of the injuries that Mr. Evon sustained from his fall on February 13, 2019?

A   No.

MS. SCHWARTZ:  That is all the questions I have for you.

MS. FRANGELLA:  Mr. Hickey, just a couple questions for you.

CROSS-EXAMINATION

BY MS. FRANGELLA:

Q   Customers coming to Menard's could enter through the "In" or the "Out" door, correct?

A   Yes.

Q   And on the date of this incident, after reviewing the surveillance footage, it's correct to say that there was one runner in place at the entrance door.  Correct?

A   Correct.

Q   And then earlier you stated that you believe the outside pavement and parking lot was wet

Page 37

either from snow or maybe rain; is that correct?

A   Yes.

Q   And is that when Menard's would have a mat out, is only during weather that's either rain or snow?

A   Yes.

Q   And, generally, the "Wet Floor" signs are used for spills or when a team member becomes aware that the floor has some type of a liquid on it; is that correct?

A   Yes.

Q   So Menard's doesn't just put out "Wet Floor" signs when it's raining or snowing outside, correct?

A   Correct.

Q   And then when Menard's would become aware of a spill or water on the floor, that would be mopped up as soon as there was notice of it; is that correct?

A   Correct.

Q   Earlier you indicated that you have noticed water near the cart corral in the past, correct?

A   Yes.

Page 38

Q   And that water that you noticed near the cart corral was water that was coming from the shopping carts that was brought in from the outside, correct?

A   Yes.

Q   And if you would notice water that came from the shopping carts and was on the floor, you would mop that up or whoever the carry-out was would mop up that water; is that correct?

A   Yes.

Q   And then based on your memory and your review of the surveillance, it's your recollection that the plaintiff in this case fell near the cart corral, correct?

A   Yes.

MS. FRANGELLA:  Okay.  I don't have anything further.  Thank you, Mr. Hickey.

REDIRECT EXAMINATION

BY MS. SCHWARTZ:

Q   And then, just very briefly, I'm going to show you a couple of these videos and just, kind of, still frames; and just, if you wouldn't mind, identifying -- letting me know if that is, in fact, you in the video.  Okay?

Page 39

A   Okay.

Q   Mr. Hickey, I am showing you 3086C01, I believe.  And I'm going to play this video briefly for you, and then just let me know if you identify this to be yourself.

A   Okay.

Q   Is that you in this video?

A   Yes.

Q   And it might be easier -- I'll identify it as on the date at 9:04 a.m.

Thank you, Mr. Hickey.  I have one more for you.  Mr. Hickey, can you see this?

A   I cannot.

Q   That's because I'm not sharing my screen.

Mr. Hickey, are you able to tell if this man in the reflective sweatshirt and vest is you?

A   Yes, that is me.

MS. SCHWARTZ:  Okay, that is it for me today.  Thank you.

MS. FRANGELLA:  Great.  Thank you so much for your time, Mr. Hickey.  You can sign off.

(WITNESS EXCUSED.)

Page 40

STATE OF ILLINOIS      )
                       ) SS.
COUNTY OF COOK         )

I, GABRIELLE PUDLO, Certified Shorthand Reporter No. 084-004173, and Notary Public within and for the County of Cook and State of Illinois, do hereby certify that on July 27, 2021, at 12:00 p.m., the deponent, COLE THOMAS HICKEY, appeared before me via Zoom.

I further certify that COLE THOMAS HICKEY, was by me duly sworn to testify the truth and that the foregoing is a true record of the testimony given by COLE THOMAS HICKEY.

I further certify that the deposition terminated at 12:46 p.m.

I further certify that there were present, via Zoom, at the taking of the said deposition the persons and parties as indicated on the appearance page made a part of this deposition transcript.

I further certify that I am not counsel for nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF, I have hereunto set

Page 41

my hand and affixed my notarial seal on this 10th day of August, 2021.

*Gabrielle Pudlo*

GABRIELLE PUDLO, CSR
Notary Public
CSR License No. 084-004173

**1**

**1** 12:20 14:14
**1-708-603-9509** 7:5
**13** 5:23 6:11 29:11 32:12 33:4 35:16,22 36:1,7
**13th** 20:17 21:5 25:17 31:14
**16901** 6:18
**1999** 7:1

**2**

**2** 13:21,22 14:3 15:18
**20** 22:10
**2017** 7:20,24 21:11
**2018** 7:20 8:11, 21 9:4 10:7
**2019** 5:23 6:11 8:5,10 9:16,20 20:17 21:5 22:14,22 25:17 29:11 31:14 32:12 33:4 35:16,22 36:2, 7
**26** 7:1 21:11

**3**

**3086C01** 39:2

**6**

**6:00** 28:14,17, 21,22 29:6

**9**

**9:00** 29:11
**9:04** 39:10

**A**

**a.m.** 28:17,21, 22 29:6,11 39:10
**accessed** 15:17
**accordance** 4:8
**accurate** 13:3
**address** 6:17
**ahead** 20:1,23
**allowed** 27:5
**amount** 18:16
**angles** 6:14
**answering** 5:2
**answers** 5:2
**apologize** 8:11
**appears** 14:6 21:10
**apply** 26:1,5,9
**area** 16:18,22 17:3,6,9,14,17, 19 18:4,18 20:4,12 21:4, 20 22:3,6,10, 13 31:22 32:2 33:13

**asphalt** 17:9, 17,19
**assisting** 28:11
**assume** 5:5
**August** 8:5,10, 21 10:7
**Avenue** 6:18
**aware** 12:11 16:3 20:15 21:3 23:12 25:24 29:8 30:11 33:22 37:8,16

**B**

**bad** 24:24
**Bamman** 31:12,14 33:1
**based** 38:11
**basis** 28:10
**began** 8:13,20
**begin** 8:21
**behalf** 4:10
**bigger** 27:7
**birth** 6:24
**bit** 12:18
**Bradley** 7:18
**break** 5:8,9,11
**briefly** 38:20 39:3
**bring** 28:2 35:8
**bringing** 23:13 26:2,5,9 27:23 28:11,12
**brought** 14:9 26:12,14,22 27:5 38:3
**building** 12:14 13:15,18

**C**

**called** 4:10 33:16
**care** 17:19
**Carpet** 14:6
**carry** 28:22
**carry-out** 9:4,5, 12,19 10:6,11 11:12,16 16:23 19:18,19,20,24 23:1,8 24:7,17 25:20 28:18 33:19 35:8 38:8
**carry-outs** 14:21 16:15,17 17:1,13,16 19:11,14 23:13,16 24:3, 10,13,18,20,23 25:3,6,11,14, 16 27:16,19 28:2,10,20,24 33:18,23 34:4 35:6,7
**carry-outs'** 14:19
**cars** 28:12
**cart** 26:13 30:5 34:5,9,10,20 37:22 38:2,13
**carts** 11:17,21 14:9 15:4,8,13, 15,17 21:24 22:7,21 23:4, 14 26:2,5,9,12, 21 27:4,7,8,9, 23 28:2,11 34:6,11 35:1,6,

8,9 38:3,7
**case** 38:13
**cashier** 8:17,18 9:9,13,16
**Caution** 19:8 32:8,9
**change** 18:12, 17 19:5
**changed** 19:2
**children** 6:22
**citizen** 7:6
**cleaned** 20:5
**clear** 16:11,16
**client** 29:9
**clips** 5:20,22 6:9,10
**closed** 34:15, 23 35:2,3,5
**closes** 35:4
**Cole** 4:4,6,9 5:16
**college** 7:16,17
**company** 16:4, 7,9,11 17:20 19:4,6
**computer** 11:8, 21
**concrete** 16:18 17:2,6,9,14
**conditions** 14:16
**confusing** 12:6
**contracts** 16:3
**conversation** 30:16 31:13 32:21
**conversations** 31:17 33:1,5 35:21,24

**convicted** 7:10, 12

**corral** 26:13 34:10,20 37:22 38:2,14

**correct** 9:10 14:7 17:8 18:7 25:4 28:3 36:16,19,21,22 37:1,10,14,15, 19,20,23 38:4, 9,14

**couple** 4:18 36:11 38:21

**court** 4:22 5:1

**Courtesy** 8:8, 13 9:12 33:17, 24 34:3

**CROSS-EXAMINATION** 36:13

**current** 6:17 7:2,4

**custom** 31:5

**customer** 11:24 12:3,10 13:8,15 14:12, 23 15:8,9 20:7

**customers** 15:20,24 22:6, 21 36:15

— D —

**date** 6:24 33:13 36:18 39:10

**day** 18:15 25:1 28:15 31:11,18 32:2,19,24 35:1

**day-to-day** 28:10

**decision** 17:1

**delegate** 16:24

**depends** 25:1

**depicted** 13:7

**deposition** 4:6, 16 5:19

**determine** 19:12 25:11

**DIRECT** 4:13

**discussed** 36:2

**discussing** 29:9

**dishonesty** 7:13

**document** 33:16 34:13

**door** 13:11,14 14:5,24 15:17, 21 16:15 17:10 26:22 27:10 34:10 35:8,9, 10 36:16,21

**doors** 14:7 26:15 27:22 28:1 34:14,20, 23 35:2

**dry** 18:17

**duly** 4:11

**duties** 28:9,20

**duty** 12:1 16:24 20:9 23:11 31:3

— E —

**earlier** 36:23 37:21

**easier** 12:19 39:9

**education** 7:15

**employed** 8:2

**employee** 11:5 29:4

**employees** 9:22 10:3,21 11:1,5,8,23 13:17 33:5

**end** 25:22 26:3

**England** 6:18

**enter** 13:18 16:1 36:15

**enters** 14:23

**entrance** 6:14 13:15,17 14:13 16:19 17:10,23 18:20 21:4,20 26:15,23 27:5, 6,11 36:21

**entranceway** 32:19

**estimate** 22:3

**Evon** 29:10,19 30:2,16,21 31:15,21 32:4 33:13 35:15, 19,22 36:1,6

**Evon's** 31:18

**EXAMINATION** 4:13 38:18

**examined** 4:11

**Excuse** 12:5

**EXCUSED** 39:22

**exhibit** 12:20 13:21,22 14:3, 14 15:18

**exit** 18:20

**expenses** 34:16

**exterior** 12:14

— F —

**fact** 38:23

**fails** 20:15

**fall** 21:10 29:10 30:7,12 31:15, 18 32:7 36:1,6

**fallen** 31:22,23

**falls** 20:8 21:3

**familiar** 10:20 33:20 34:7

**February** 5:23 6:11 7:1 9:20 20:17 21:5,11 22:14,22 25:17 29:11 31:14 32:12 33:4 35:16,22 36:1, 7

**federal** 4:8

**fell** 30:14 32:2, 5 33:13 38:13

**felony** 7:10

**fill** 12:9,11 20:10 33:8

**filled** 12:3,8

**finish** 4:20

**finished** 35:6

**flatbed** 27:7

**floor** 19:7,8,10, 13,14,17,19, 20,22 20:1,4,5 21:20 30:6 37:7,9,13,17 38:7

**footage** 6:10 36:19

**formal** 9:22 12:2,5,7,9

**found** 31:21

**frames** 38:22

**FRANGELLA** 20:18,21,23 21:6,15 22:15 36:11,14 38:16 39:20

**front** 6:14 16:12 21:24

**front-end** 23:10 25:10

— G —

**garage** 14:6 15:17 26:15,22 27:10,22 28:1 34:14,20,23 35:2,9,10

**garments** 23:18,22,23

**general** 28:9 34:9

**generally** 37:7

**good** 5:13

**grab** 22:6,21

**graduate** 7:23

**grate** 28:6

**Great** 39:20

**ground** 14:14 30:10,22 32:2, 13 35:19

**guests** 28:11

**Guide** 33:17 34:1,4

## H

happened 29:17 31:1
head 4:23 8:17, 18 9:9,13,16
hear 7:3 25:22 26:3
heard 30:8
held 9:11
helped 30:20, 21
Hickey 4:4,6,9, 15 5:16 12:24 14:2 20:21 36:11 38:17 39:2,11,12,15, 21
high 7:21,22
highest 7:15
hired 9:4
hurt 20:8

## I

identification 12:22 13:24
identify 39:4,9
identifying 38:23
Illinois 6:19 40:1
image 13:8,21
immediately 35:9
inaudible 33:24
incident 6:7 12:6,7,9,12 20:10,14 21:14

29:8,13,17 31:6,18 32:7, 22,24 33:2,6,9, 14 36:18
incidents 12:2
injured 11:24 12:3,10
injuries 36:5
inside 17:23 20:16
inspect 31:22
inspection 29:1,5
instances 22:19,22 23:3
instruct 14:20
instructed 19:23,24
interaction 30:1
involve 20:11
involves 29:9
involving 7:13
items 28:12

## J

job 9:7 14:17 18:12,17 25:10
jobs 33:19

## K

Katrice 32:22
kind 4:18 6:14 16:12 38:21
knowledge 21:13 36:5

## L

lawyer 36:3
letting 38:23
level 7:15
liquid 21:23 22:3,5,10,24 23:4 37:9
live 6:20
local 4:8
location 8:22 9:1 16:5 34:9
locations 34:5
long 9:5
long-sleeved 24:2
looked 13:5
lot 13:7,8 14:10 16:9 17:9 23:14 26:2,6, 10,16 28:3,13 36:24
loud 5:2

## M

made 20:15
main 13:8,14 14:12 15:24 17:10,23 26:23 27:5,6,11
make 5:1,10 12:18 18:10
man 39:16
manager 12:1 19:12,17,23 20:1,9 23:10 25:10 30:24 31:3,7,10

managers 12:8,11 14:22 17:4 19:11 20:14 27:17,19
marked 12:21 13:11,12,14,23
mat 14:14,17, 21 17:22 18:2, 5,6,15,17,19, 22 37:3
materials 5:18 6:6 10:2,8,10, 14,17 26:9,18 33:23
mats 18:3,9,12 19:1,5
Matthews 32:22
meant 12:5
meeting 29:19, 23
member 8:8,14 9:12 37:8
memory 32:15 38:11
Menard's 6:10, 15 8:2,4,7,20, 24 9:11,19,24 12:3,14 13:1,5, 11 16:1,3,13, 17 17:11 19:5, 7 20:16 21:4, 11,20 24:6 28:10,14 29:4, 6,11,16 32:19 33:5 34:19 36:15 37:3,12, 16
mentions 28:5
metal 14:24

15:7
Mike 29:9
military 7:8
mind 4:20 38:22
misdemeanor 7:13
months 9:6,7
mop 38:8,9
mopped 37:18
mopping 33:12
morning 5:23 6:10 25:17,20 28:14 35:16
multiple 24:10, 13,18 25:3

## N

named 32:22
names 5:15
nature 33:10
night 35:3
nods 4:23
noise 30:8
notice 4:7 22:19,24 37:18 38:6
noticed 18:22 21:19,22 22:2, 5,9,13,20 23:3 37:22 38:1
notices 19:17, 19
notify 12:1 20:9
number 7:2,4 27:9

**O**

**object** 22:15
**Objection** 20:18 21:6,15
**occasionally** 16:14
**occurred** 20:16 21:4 29:10
**open** 24:7 28:14 35:2,3,8
**opening** 28:21 29:1,6
**opinion** 35:14
**order** 15:1 18:9
**Orientation** 33:17,24 34:3
**overhead** 34:14,19

**P**

**pages** 10:13,16
**Pam** 31:12,14 33:1
**paperwork** 33:8
**parents** 6:21
**park** 6:18 7:22 8:22 13:4 16:5 24:7 29:12 34:14,19
**parking** 13:7,8 14:10 16:9 17:8 23:14 26:2,6,10 28:3, 13 36:24
**part** 20:13

**parties** 4:7
**past** 37:22
**path** 15:24
**Patrol** 8:8,13 9:12 33:17,24 34:3
**pavement** 36:24
**pending** 5:10
**personally** 21:22 22:9
**phone** 7:2,4
**photograph** 13:4
**photos** 20:11
**physically** 11:1 30:7,11
**picking** 28:13
**picture** 12:18, 24 13:3 14:2
**place** 36:20
**plaintiff** 4:10 38:13
**play** 39:3
**plow** 16:9
**point** 32:4
**policies** 10:20, 24 11:4,6,7,10, 14,20 26:1,4, 19 28:5
**pooled** 21:23 22:2,5,9,20,24 23:3 32:19
**position** 8:6,16 10:11
**positions** 9:11, 23 12:9
**practice** 31:5 35:7

**premises** 11:24 12:10 29:1,5
**previously** 12:21 13:23 17:22
**printed** 11:7,20
**prior** 6:1,5 9:23 10:6 11:11,15 20:16 22:13,22 28:20 29:1,6 33:18
**procedure** 31:9
**procedures** 10:21,24 11:4, 6,11,15,20 26:1,5,19
**proceed** 15:22
**proper** 4:7 34:5,9
**protocol** 20:7, 11
**provide** 4:21 16:4 18:17
**provided** 10:3, 7,21 11:5,6,11, 15 26:18 33:23
**pull** 12:17 13:20
**purchaseable** 23:19,22
**purpose** 28:1
**purposes** 34:16
**pushing** 35:6
**put** 14:17,21 17:23 19:8,13, 14,20 20:1 32:8,9 35:9 37:12

**puts** 19:10

**Q**

**question** 4:21 5:5,7,10,11 18:13 24:5,24 26:3
**questions** 4:19 5:4 36:9,12

**R**

**rail** 27:7
**rain** 14:16 37:1, 4
**raining** 14:18 17:24 37:13
**rainwater** 18:23
**reach** 15:9 18:6
**recall** 10:13,16, 17 11:10,14,19 22:12,21,23 26:8 27:1,3,18 29:13,15,19,21 30:1,3,24 31:10,13 32:1, 9,11,18 33:12
**receive** 33:18
**received** 33:16
**recollection** 38:12
**record** 4:3,5 5:12
**REDIRECT** 38:18
**referring** 23:24 34:17
**reflect** 4:5

**reflective** 23:17,18,21, 22,23 39:16
**relevance** 20:18 21:6,15
**remain** 34:15
**remained** 12:14
**remember** 10:15 11:18,22 16:8 25:18,21, 23 26:7,11 29:22,23 30:4, 17,23 31:2,4,6, 17,24 32:3,6, 10,20,23 33:15 34:2 35:17,18
**removal** 16:4 17:20
**rephrase** 5:7 22:17 24:5
**report** 20:10,14 33:9
**reported** 23:5
**reporter** 4:22 5:1
**reports** 12:6,7, 9,12
**require** 27:10
**response** 20:22
**review** 5:18 6:1,3,5 38:12
**reviewed** 5:20, 22 6:6,9 32:16
**reviewing** 36:19
**row** 15:12
**rows** 15:14,16 34:11

MIKE EVON vs MENARD, INC.
COLE  HICKEY 07/27/2021

Index: rule..vagu

**rules** 4:8,19
**runner** 36:20
**runway** 18:10

**S**

**saturated** 18:16,22
**schedule** 16:21
**school** 7:21,22
**SCHWARTZ** 4:2,5,14 12:17, 23 13:20 14:1 21:2,9,18 22:17,18 36:9 38:19 39:18
**screen** 39:14
**security** 6:10 34:16
**served** 7:8
**services** 16:4
**sessions** 10:4
**sharing** 13:20 39:14
**shift** 25:17 28:17
**shirt** 24:2
**shopping** 11:17,21 15:4, 8,13,14,16 21:24 22:7,21 23:4 26:21 27:8,9 28:2 34:10 38:3,7
**shovel** 16:15, 18,22 17:13,16
**shoveling** 17:2
**show** 38:21
**showing** 6:14 14:3 39:2

**shown** 14:13
**shows** 32:8
**shut** 35:10
**side** 15:7
**sidewalk** 16:12
**sign** 13:11 14:6 19:13,14,20,22 20:1,4 32:8,9 39:21
**signs** 19:8,10 37:7,13
**silver** 27:8
**situation** 18:21
**size** 18:2,5
**sizes** 18:3
**slip** 29:10
**small** 27:8
**snow** 14:16 16:4,11 17:20 18:23 32:13 37:1,5
**snowing** 14:18 17:24 32:14 37:13
**sole** 28:1
**somebody's** 18:16
**sort** 26:18
**sound** 5:13 9:17 33:20
**specific** 10:11 16:21 24:24 25:24 26:4
**specifically** 11:17 14:20 27:14,15 31:2
**spill** 37:17
**spills** 37:8
**standing** 21:19

22:13,16
**start** 4:18 8:4
**started** 8:7,9
**starting** 9:23 10:6 11:12,16 33:18
**state** 4:2 8:9 20:23 40:1
**stated** 17:22 36:23
**states** 7:6 34:4, 13
**stay** 20:4
**stop** 13:20
**store** 14:13 15:2,22 16:1, 13 20:8,16 21:24 28:5,21 35:3,4,15
**stores** 34:13
**straight** 9:9
**Strike** 6:1 9:3 17:6 18:14 19:23 23:12 25:15 27:21 29:24 35:14
**summer** 9:15
**supervisor** 23:6,9
**supposed** 26:12 35:5
**surveillance** 36:19 38:12
**sustained** 21:10 36:1,6
**sweatshirt** 24:1 39:16
**sweeping** 28:12

**sworn** 4:1,11
**system** 11:9

**T**

**T-SHIRT** 24:1
**taking** 4:22 20:11
**talking** 13:12 29:14
**tasked** 23:13 28:24 29:5
**taught** 11:23
**team** 37:8
**telling** 30:24 31:6
**ten** 10:16
**testified** 4:11
**thinking** 9:10 17:8
**Thomas** 4:4,9
**time** 12:13 21:12 24:4,6, 21,24 25:3,7,9, 12 32:14 35:18 39:21
**times** 22:2,7, 10,12 24:16,17 27:4
**Tinley** 6:18 7:22 8:21 13:4 16:5 24:6 29:12 34:19
**today** 5:19 29:9 39:19
**told** 27:1,16,19 31:3
**trained** 26:24 27:14 34:4

**training** 9:22 10:2,3,7,10,14, 22 11:1 26:9, 18 33:22
**transition** 9:8
**trash** 28:13
**true** 5:23 8:2,18 15:2 17:24 24:16
**turned** 30:6,9
**turnstile** 14:24 15:7,9,10,11, 21,22 18:7,10 21:23 22:6,20 23:4 30:5
**type** 37:9
**types** 34:5
**typical** 15:20 31:5,8

**U**

**uh-huhs** 4:24
**uh-uhs** 4:24
**underneath** 13:10
**understand** 5:3,6 18:13 21:11
**understanding** 5:21 8:1
**understood** 5:5
**United** 7:6
**University** 7:18
**unsure** 19:16 20:13 32:14

**V**

**vaguely** 29:15

**verbal** 5:2
**versus** 27:10
**vest** 23:18
 39:16
**vests** 23:17,21
**video** 5:20,22
 6:9 30:4 32:7
 38:24 39:3,7
**videos** 6:3,6,13
 32:16 38:21

---

### W

**waiting** 4:20
**walk** 15:1,20
 31:22
**walk-off** 28:6
**walks** 14:12
**watch** 35:15
**water** 18:16
 21:19 22:13,
 16,20 32:1,18
 33:12 37:17,22
 38:1,2,6,9
**wear** 23:16
**weather** 32:11
 37:4
**week** 6:4,6
**wet** 19:7,8,10,
 13,14,17,19,
 20,22 20:1,4
 36:24 37:7,12
**woman** 32:21
**work** 9:5 24:4
 28:17
**worked** 8:24
 13:5
**working** 8:4,7,
 10,13,20,21
 12:13 19:18

21:12 23:1
24:8,11,14,17,
18,21,23 25:3,
6,11,15,17,20
29:16
**written** 10:2,7,
 10,14,24 11:19
 26:1,4,8,18

---

### Y

**year** 7:16,17,23

---

### Z

**Zoom** 4:7