# DEPOSITION OF:

# KATRICE MATTHEWS

July 27, 2021

MIKE EVON

vs

MENARD, INC.

**MOSIER
REPORTING SERVICES**
Local Knowledge With National Reach

312.632.1116

MIKE EVON vs MENARD, INC.
KATRICE MATTHEWS 07/27/2021

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIKE EVON,                              )
                                        )
            Plaintiff,                  ) Case No.
                                        ) 20 CV 5682
      vs.                               )
                                        ) Formerly
MENARD, INC.,                           ) Case No.
                                        ) 20 L 9082
            Defendant.                  )

          The Zoom deposition of KATRICE MATTHEWS,

taken in the above-entitled cause before Gabrielle

Pudlo, CSR, and Notary Public within and for the

County of Cook and State of Illinois, taken pursuant

to the Federal Code of Civil Procedure for the

United States District Court, Northern District of

Illinois, Eastern Division, on July 27, 2021, at the

hour of 10:37 a.m.

Page 2

A P P E A R A N C E S:

KRALOVEC, JAMBOIS & SCHWARTZ
BY:  MS. OLIVIA SCHWARTZ
     60 West Randolph Street, 4th Floor
     Chicago, Illinois  60601
     (312) 782-2525
     oschwartz@kjs-law.com

          Appeared via Zoom
          On behalf of the Plaintiff;

FABRIZIO, HANSON, PEYLA & KAWINSKI
BY:  MS. MARILYNN FRANGELLA
     116 North Chicago Street, Suite 200A
     Joliet, Illinois  60432
     (815) 727-5445
     mfrangella.fhpk@gmail.com
          Appeared via Zoom
          On behalf of the Defendant.

Page 3

I N D E X

| WITNESS EXAMINATION | DX | CX | RDX | RCX |
| --- | --- | --- | --- | --- |
| KATRICE MATTHEWS | | | | |
| By Ms. Schwartz | 4 | | 41 | |
| By Ms. Frangella | | 38 | | |

E X H I B I T S

| DEPOSITION EXHIBITS | MARKED |
| --- | --- |
| Matthews Exhibit No. 1 | 17 |
| Matthews Exhibit No. 2 | 19 |
| Matthews Exhibit No. 3 | 34 |

Page 4

(Witness sworn.)

MS. SCHWARTZ:  Good morning.  Would you please state your name for the record.

THE WITNESS:  Katrice Matthews.

MS. SCHWARTZ:  Let the record reflect that this is the discovery deposition of Katrice Matthews, taken via Zoom with proper notice to all parties in accordance with state and local rules.

KATRICE MATTHEWS, called as a witness on behalf of the plaintiff, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SCHWARTZ:

Q   Before we start, Ms. Matthews, I'm just going to go through a couple deposition rules.  So if you would please wait for me to finish asking my question before you start to answer it, that way the court reporter can go ahead and get everything down. If you don't understand a question, please let me know and I can try to rephrase it or for you.

That being said, I know I talk quickly. So I apologize in advance.  And if you don't

Page 5

understand it, just let me know and I'll try to repeat myself.

A   Okay.

Q   So if you answer the question, I'm going to assume that you did understand it.  And then if you need to take a break, you're obviously more than free to do so, just not while a question is pending. So answer the question, ask to take a break, and then we'll reconvene afterwards.

All right?

A   Okay.

Q   Have you ever given a deposition before?

A   Yes.

Q   Was it in your capacity as an employee of Menard's?

A   Yes.

Q   Has it been just one deposition, or have there been multiple?

A   Just one.

Q   Do you recall the reason for that deposition?

A   No, I don't.

Q   Do you recall if it was related to someone being injured at Menard's?

MIKE EVON vs MENARD, INC.
KATRICE MATTHEWS 07/27/2021                6–9

Page 6

A   No, I don't.

Q   Do you recall about when that deposition was taken?

A   No.  I know it's been years ago.

Q   Okay.  So do you believe that it was more than five years ago?

A   Yeah, it's been more than five years ago.

Q   Okay.  Did you review any materials before coming to this deposition today?

A   Yes.  I saw the videos.

Q   Okay.  So when you said "the videos," do you recall how many videos?

A   I saw three clips.

Q   Okay.  Were they all three clips that were taken on February 13th of 2019?

A   I don't recall the date.  I didn't even look at the date.  I just looked at the clips.

Q   Okay.  In general, do you believe that they were surrounding this incident where the plaintiff, Mr. Evon, fell at Menard's?

A   Yes.

Q   Were you in any of the videos that you reviewed?

A   The third one.

Page 7

Q   Okay, so you were in one of the three videos.  And in that video, were you standing behind a desk at the front of the store?

A   Yes, the service desk.

Q   Thank you.  Did you review any documents other than the videos?

A   No.

Q   Have you ever gone by any names other than Katrice Matthews?

A   No.

Q   What is your current address?

A   14620 South Cleveland, C-l-e-v-e-l-a-n-d -- Katrice Bradley, yes.

Q   What town is that in?

A   Posen, Illinois.

Q   And then I believe that you answered Katrice Bradley to my first question; is that true?

A   Yes.

Q   And was Bradley a maiden name?

A   No.  That's my married name.

Q   Do you go by Katrice Bradley now or Katrice Matthews now?

A   I go by Katrice Matthews at work, yes.

Q   Okay.  Is your name legally Katrice

Page 8

Bradley?

A   No, Katrice Matthews.

Q   Okay.  When was it that you went by Katrice Bradley?

A   My name is hyphenated Katrice Matthews-Bradley.  But I never switched over anything, so I just go back to Katrice Matthews.

Q   Okay, thank you.  You stated your current address is in Posen, Illinois.  Do you live there with anybody?

A   Yes.

Q   Who do you live with?

A   My kids.

Q   How many, and what are their ages?

A   How many is two.

Q   Okay, two children.  What are their ages?

A   21 and 18.

Q   What is your current phone number?

A   (312)662-8689.

Q   Are you a United States citizen?

A   Yes, I am.

Q   What is your date of birth?

A   12-12-79.

Q   Have you ever served in the military?

Page 9

A   No.

Q   Have you ever been convicted of a felony?

A   No.

Q   Have you ever been convicted of a misdemeanor involving dishonesty?

A   No.

Q   What's your highest level of education?

A   Twelfth grade.

Q   Where did you go to high school?

A   Carl Schurz High School.

Q   What town is that in?

A   Chicago, Illinois.

Q   It's my understanding that you are currently employed by Menard's; is that true?

A   Yes.

Q   When did you start working at Menard's?

A   March the 1st, 2000.

Q   What position were you first hired to work in at Menard's?

A   I'm sorry?

Q   What was the position that you were first hired to be at Menard's?

A   Cashier.

Q   So hired as a cashier in 2000; is that

Page 10

right?

A   Yes.

Q   And then what is your position at Menard's now?

A   Cashier, customer service.

Q   Have you been a cashier at Menard's since 2000?

A   I've been a cashier. I've also done accounts payable.

Q   When did you do accounts payable?

A   It's been years ago. I can't even remember what year it was.

Q   You broke up a little bit. Can you just repeat that.

A   It's been years. I don't even remember what year that was. That was -- I know they just stopped it maybe, like, four or five years ago; the position, they closed it out. But I did accounts payable also.

Q   So am I correct in thinking you were hired as a cashier; at some point you transferred roles into accounts payable; Menard's then shut down the job of accounts payable; so you returned to being a cashier?

Page 11

A   Yes.

Q   Okay. In your career at Menard's, have you always worked at the Menard's in Tinley Park, located at 6851 West 159th?

A   No.

Q   Okay. So when you were hired in 2000, which Menard's were you located at?

A   Melrose Park.

Q   Melrose Park. How long were you at the Melrose Park location?

A   Oh, I came out here in 2000- -- I came out here in 2003. I was maybe over there for, like, four or five years.

Q   Okay. So after four or five years at Melrose Park, did you then begin at the Tinley Park location?

A   No. I went to the Dolton location.

Q   The what location?

A   Dolton.

Q   Would you mind saying that again?

A   Dolton, D-o-l-t-o-n.

Q   So Melrose Park first, then Dolton. Was there anywhere else?

A   No.

Page 12

Q   Okay.

A   Then Tinley Park.

Q   Do you recall what year it was that you transferred from the Dolton location to the Tinley Park location?

A   Oh, Lord. No, I don't remember right now how many years I've been transferred from over there; no.

Q   Have you been at the Tinley Park location for more than five years?

A   It's been about close -- maybe close to five years. Yeah, I want to say close to five years; yeah.

Q   But you were working at the Tinley Park location in 2019, correct?

A   Yes.

Q   And you were working as a cashier at the Tinley Park location in February of 2019?

A   Yes.

Q   Is there a formal training that employees go through prior to becoming a cashier at Menard's?

A   Yes.

Q   Is that training something that you do just once before you start as a cashier, or are

Page 13

there multiple times that you go through training?

A   We go through training before we were cashiers, and we have training all during our -- all during our being a cashier. We have training all the time.

Q   Okay. Can you estimate about how many times a year you have training?

A   Basically, like, every month we have different trainings that come up.

Q   Okay. And when you say different trainings that come up, can you explain a little bit about what you mean?

A   We have, like, a new program that we might have, a new -- They just tell us new things, like a new program. We might have a new update. Yeah.

Q   Are there written training materials every time that there is a new training, or is it oral?

A   It's written.

Q   Do you recall when the last time you got new written training materials was?

A   We just got some new things. I think it was, like, a week or two ago.

Q   Okay. Are you familiar with the written policies and procedures of Menard's?

Page 14

A   Some of them, yes.

Q   Have you ever been provided a physical copy of some of those written policies and procedures?

A   Yes.  We always get a copy of our procedures.

Q   Do you recall when the last time you got a copy of the written policies and procedures was?

A   We got a -- Every time we have a training. So that was probably -- whatever we had last week or the week before that, we got something.  And every time we get a training, they print it out and give it to us so we can have a copy and we're able to read over it before we sign anything.

Q   Okay.  Are employees taught about what to do if someone is injured on the premises?

A   Are they told what to do?

Q   Yeah.  Is there, you know, some training materials that discuss what to do if somebody falls and becomes injured at Menard's?

A   We are to go to a -- tell the manager, let the manager know.

Q   Okay.  Do you believe that that's in a written -- in written materials, or is that just an

Page 15

oral rule that you would tell the manager?

A   It should be -- it's written.

Q   Are employees trained to do anything else if someone falls other than just telling the manager?

A   What do you mean, just fall out of nowhere or if it's...

Q   Yeah.

MS. FRANGELLA:  Can we specify that you're talking about a customer, as opposed to an employee?

MS. SCHWARTZ:  Yes.

BY MS. SCHWARTZ:

Q   So if a customer were to fall at Menard's, is there anything that's stated in the policies and procedures as to what the employee is supposed to do other than tell the manager?

A   I don't recall anything else.  Are you talking about a slip and fall, or are you talking about a -- I don't -- I'm quite not understanding what you're saying.

Q   I was talking about just a fall in general.  So if a customer were to fall or become injured at Menard's, am I correct in stating that

Page 16

the employees are taught to tell the manager?

A   Yes.

Q   Okay.  Are employees taught to do anything beyond tell the manager if a customer were to fall at Menard's?

A   I don't recall, no.

Q   Are there formal incident reports that are to be filled out if someone is injured, if a customer is injured?

A   Yes.  That's filled out by the manager, yes.

Q   Okay.  So in all situations, a manager would -- Is a manager supposed to fill out an incident report in any situation where a customer falls at Menard's?

A   Yeah, if the customer -- Yeah.

Q   Are there any another positions who -- of employees who are supposed to fill out an incident report, or is it only a manager?

A   It's only the office manager, store manager.  The office manager normally does that.

Q   Okay.  So as a cashier, if a customer falls at Menard's, you are not supposed to -- Strike that.

Page 17

As a cashier, if a customer were to fall at Menard's, is the cashier supposed to fill out an incident report?

A   No.

Q   If the cashier physically sees a customer fall at Menard's, are they supposed to fill out an incident report?

A   No.

MS. SCHWARTZ:  I am going to go ahead and show you a picture just of the outside of Menard's or what I believe the outside of this Menard's looks like.

Give me one second.

BY MS. SCHWARTZ:

Q   Katrice, can you see this picture?

A   Yes.

MS. SCHWARTZ:  We'll mark this as Exhibit 1.

(Matthews Exhibit No. 1 marked for identification.)

BY MS. SCHWARTZ:

Q   Does this picture appear to be an accurate photograph of the Tinley Park Menard's, as taken from the parking lot?

MIKE EVON vs MENARD, INC.
KATRICE MATTHEWS 07/27/2021                    18–21

Page 18

A    Yes.

Q    In the five or so years that you've worked at the Tinley Park Menard's, has this exterior of the Menard's changed at all?

A    The parking lot is -- Well, no.  It's the same exterior.  It's just that the parking lot -- I mean, the lot asphalt is fixed.

Q    Okay.  So other than potentially that, you know --

A    It looks the same.

Q    -- the asphalt looks newer, this looks the same?

A    Yeah.

Q    Is this -- Strike that.
Would you consider the parking lot that's shown in this photo to be the main customer parking lot at Menard's?

A    Yes.

Q    Is this where the employees at Menard's would park their cars as well?

A    No.  We park all the way at the end and on the blue.

Q    Do you park in the same parking lot, it's just not shown in this picture; or do you park in a

Page 19

separate parking lot, as an employee?

A    It's in the same parking lot, but it's not in the picture.  We have blue lines where we park at.

Q    Okay.  How about as for the entrance, the "In" and the "Out" doors, do you see what I'm talking about in the picture?

A    Uh-huh.

Q    Okay.  Is that door marked "In" the main customer entrance?

A    Yes.  It's marked "In."

Q    Is that same entrance the entrance that employees would use, coming to work?

A    Yes.

(Matthews Exhibit No. 2 marked for identification.)

BY MS. SCHWARTZ:

Q    I'm going to show Exhibit 2.  So it's just the same photo, just a little bit more zoomed in.
Ms. Matthews, can you see what I'm showing you now?

A    Yes.

Q    Okay.  So to the right of the door marked "In" and underneath the "Carpet" sign, there appears

Page 20

to be some doors there.  Correct?

A    Uh-huh, yes.

Q    Is that the cart corral doors?

A    Yes.

Q    Do they open like a garage type door, from the bottom to the top?

A    Yes.

Q    In this photo there appears to be a line of shopping carts outside of that door.  Do you see that?

A    Uh-huh, yes.

Q    So to your knowledge, are those the doors that are specifically to be used to bring the carts into the store?

A    Yes.

Q    So when a customer walks into the main entrance, is there a mat on the floor?

A    No.

Q    Is there other times when a mat is put down inside the main customer entrance?

A    Yes, when it's raining or snowing; when the weather is wet, yes.

Q    Whose decision is it to put out the mat if it's raining or snowing or when the weather is wet?

Page 21

A    The managers and the carry-outs, they know they are supposed to put them down when it's wet.

Q    Okay.  So is the carry-out supposed to put the mat down if it's wet?

A    Yes.

Q    Okay.  And is there one size mat, or are there multiple size mats that can be put out?

A    I'm not sure.

Q    Are there ever multiple mats put out, or is it --

A    Yeah.  It's multiple mats puts out, yes.

Q    So to my knowledge, once a customer walks in the front entrance -- the main entrance that we just saw in the photograph -- kind of over to the right there's a turnstile to continue walking through to get to the store; is that correct?

A    Uh-huh.

Q    You have to say --

A    Yes, I'm sorry.

Q    It's something funny to get used to.
Are there shopping carts for customers to grab inside of the store through that metal turnstile?

A    Once you go through the turnstile, the

Page 22

carts are on the right-hand side. They can grab them once they come -- go into the turnstile, yes; to the right, yes.

Q   Is that the main entrance path for customers to take as they come inside the store?

A   Yes.

Q   In February of 2019, do you know if Menard's contracted with a snow removal company to provide services at the Tinley Park location?

A   I don't know.

Q   In terms of the mat to be put out if there are certain weather conditions, do you know if it is the carry-out's decision to put the mat down or if it is the decision of a manager who then tells the carry-out to put the mat down?

A   The manager usually tells them to put the mat down as soon as it starts raining. But the carry-outs usually just put them down. But the managers still tell them to put it down. So it's both ways.

Q   Do you know how often the mat is changed?

A   Never changed.

Q   Do you know how often the mat is cleaned?

A   I'm sorry?

Page 23

Q   Do you know how often the mat is cleaned?

A   We get new mats once a -- I think it's once a week. I'm not sure.

Q   Do you know whose job it is to clean the mat?

A   They get them from the company, I know. But I don't know whose job it is to get them cleaned.

Q   Is it a separate company that provides the mats?

A   Yes.

Q   Does Menard's have "Wet Floor" or "Caution" signs to put up if the floor inside the building is wet?

A   Yes.

Q   Are they the yellow folding signs?

A   Yes.

Q   Is there a specific position who is supposed to put out the "Caution" or the "Wet Floor" signs?

A   No.

Q   If any employee notices that there's a spill on the floor, is it the job of the employee who notices it to then put out the "Wet Floor" sign?

Page 24

A   Yeah. If we see a spill, we go get the yellow signs and put them out.

Q   What is the protocol for when a customer falls down and gets hurt?

A   When you fall down and get hurt? Just -- I guess they just tell the manager. I'm not -- I don't know what else they can really do.

Q   Do you know if an employee is supposed to take pictures of the area where the individual fell?

A   The manager usually does, yes.

Q   Have you been made aware of any falls that have occurred on the premises at Tinley Park prior to February 13th of 2019?

A   No.

MS. FRANGELLA:  Objection, relevance.

You could answer, Ms. Matthews.

A   No.

BY MS. SCHWARTZ:

Q   Are you aware of any customers falling in the entrance area at Menard's other than the incident that we're here for today?

MS. FRANGELLA:  Objection --

A   No.

MS. FRANGELLA:  -- relevance.

Page 25

You could answer, Ms. Matthews.

A   No.

MS. FRANGELLA:  Ms. Matthews, when you hear me object, if you could wait until I tell you to answer, not before you give your answer, that would be great.

THE WITNESS:  Okay.

BY MS. SCHWARTZ:

Q   It's documented in some of the materials that I received that somebody sustained a fall on February 26th of 2017.

Do you have any knowledge of that incident?

A   No.

Q   Have you been made aware of anyone prior to February 13th of 2019 complaining that the entrance area to Menard's was slippery?

A   No.

Q   Are you aware of any complaints that there has been accumulations of liquid near the entrance of the Menard's store?

A   No.

Q   Have you personally ever noticed any accumulation of liquid at the entranceway of the

MIKE EVON vs MENARD, INC.
KATRICE MATTHEWS 07/27/2021

Page 26

Menard's store?

A  No.

Q  How about near where the customers were to get a shopping cart, have you ever noticed any pooled liquid in that area?

A  No.

Q  Are you aware of anybody that's fallen in the area near the entranceway where the customers were to collect a cart since February 13th of 2019?

MS. FRANGELLA:  Objection, relevance.

You could answer, Ms. Matthews.

A  No.

BY MS. SCHWARTZ:

Q  Who has the job of bringing the carts in from the parking lot?

A  Carry-outs.

Q  Are the carry-outs also referred to as Courtesy Patrol team members?

A  Yes.

Q  And are the carry-outs the ones that wear the reflective vests?

A  Yes.

Q  Do you know how many carry-outs work per shift?

Page 27

A  No.

Q  Do you know if it varies, the number of carry-outs that work per shift?

A  Yes.

Q  Is there ever just one carry-out working, or are there always multiple carry-outs?

A  As far as I can see, it's always multiple carry-outs.

Q  And are the carry-outs trained to bring the carts in from the parking lot into the separate cart corral door?

A  Yes.

Q  Are you aware if there are specific written policies or procedures that apply to bringing the carts in from the parking lot?

A  I guess they -- No.  I'm guessing the carry-out has the same policies to training, but I don't know what their training is.

Q  As a cashier, are you only familiar with the cashier training and policies?

A  Yes.

Q  So as a cashier, you are not aware of the policies and procedures, training materials for the carry-outs?

Page 28

A  No.

Q  Some of the store policies mention a walk-off grate.  Are you familiar with what a walk-off grate is?

A  No.

Q  What are the general duties of a cashier at Menard's on a day-to-day basis?

A  Cashier, we are to bring the guests in and out the store and call for a carry-out if they need help, greet the customers.

Q  What is the position called that would be your direct supervisor?

A  My direct supervisor?

Q  Yes.

A  Front-end manager.

Q  Did you say front-end manager?

A  Uh-huh, yes.

Q  Are there any positions that report to you, as a cashier?

A  No.

Q  So am I correct in stating that the cashiers report to -- Strike that.

Am I correct in stating that the supervisor for the cashiers in the front-end

Page 29

manager.

A  I'm sorry.  You said, "the supervisors." Can you repeat that.

Q  Yeah.  So is the supervisor for the position of a cashier, is that the front-end manager?

A  Yes.

Q  And is the front-end manager also the supervisor for the carry-outs?

A  Yes.

Q  So the carry-outs don't report to the cashiers?

A  No.

Q  Is the front-end manager the supervisor of any other positions in addition to the cashiers and the carry-outs?

A  They're the managers of the head cashiers.

Q  Are you a head cashier?

A  No.

Q  So what is the difference, I guess, between a head cashier and a cashier?

A  Head cashiers just basically stand over the cashiers and watch them every now and then.  So that's what the head cashier does.

MIKE EVON vs MENARD, INC.
KATRICE MATTHEWS 07/27/2021                    30–33

Page 30

Q  Do you, as a cashier --

A  **It's all the same as cashiers, maybe. They're all the same; cashiers.**

Q  Okay.  What time in the morning does your shift typically start?

A  **I'm sorry?**

Q  Is there a specific time in the morning that your shift starts?

A  **My shifts vary.**

Q  Okay.  Is there a morning shift?

A  **I have different shifts.**

Q  Okay.  Do you know what time the store opens in the morning?

A  **The store opens at 6:00 a.m.**

Q  Okay.  Does your shift ever start at 6:00 a.m.?

A  **Yes.**

Q  If your shift starts at 6:00 a.m., what time in the morning do you usually get to work?

A  **Do I get to work if my shift starts at 6:00 a.m.?**

Q  Yes.

A  **6:00 a.m.**

Q  So are you required to get to the store at

Page 31

any -- Strike that.

If your shift starts at 6:00 a.m., are you required to be at the store prior to the store opening and before customer begin to arrive?

A  **Yeah, as long as we there at 6:00 a.m.**

Q  Okay.  As you may be aware, the incident that we're here discussing today involves my client, Mike Evon, in a slip and fall that occurred on February 13, 2019, at the Tinley Park Menard's.

Do you recall the incident that I'm talking about?

A  **No.**

Q  And I believe that you stated that you had reviewed some videos from this incident, correct?

A  **Yes.**

Q  So prior to seeing those videos, were you aware of this incident?

A  **No.**

Q  Were you working at Menard's when this incident happened?

A  **Yes.**

Q  Is the only way that you know that you were working at Menard's when this incident happened because of the videos?

Page 32

A  **Yes.**

Q  So do you recall ever meeting Mr. Evon?

A  **No.**

Q  Do you recall if he was with anyone?

A  **No.**

Q  And did you physically see him fall?

A  **No.**

Q  When was the first time you learned about this incident?

A  **Maybe, like -- maybe, like, a month ago.**

Q  And who did you hear about this incident from?

A  **From my office manager.**

Q  Was that Pam Bamman?

A  **Yes.**

Q  Is the first conversation that you and Ms. Bamman had regarding this incident, did that occur about a month ago?

A  **I don't recall if it was exactly a month ago, but it's -- I'm thinking maybe it was about a month ago they sent the email saying that the incident occurred and we had a deposition.  That's all I know.**

Q  Okay.  After you received that email, did

Page 33

you have a conversation with Ms. Bamman about this incident?

A  **No -- Yes.  Basically, she just -- we were just talking about the dates and when it was done. As I said, I don't recall the incident at all.**

Q  Did you have a conversation with Ms. Bamman about how the incident occurred?

A  **No.**

Q  Did you have a conversation with Ms. Bamman about who the individual that fell was, maybe besides his name?

A  **No.**

Q  Did you have a conversation with anybody else at Menard's about this incident other than what you just said about Ms. Bamman?

A  **No.**

Q  Do you agree that there's a video of you having a conversation with Mr. Evon on the date of the incident?

A  **Yes.**

Q  Prior to seeing that video, do you recall ever having a conversation with Mr. Evon on the date of the incident?

A  **No.**

MIKE EVON vs MENARD, INC.
KATRICE MATTHEWS 07/27/2021                            34–37

Page 34

Q   Do you believe that Mr. Evon, on February 13th of 2019, told you that he fell near where the shopping carts are stored?

A   No.

Q   Did you ever see -- Strike that.

On the date of the incident, did you ever physically go over towards where Mr. Evon said he fell and inspect the area?

A   No. I don't even recall the incident.

Q   Do you recall whether or not a "Caution" sign was put up after Mr. Evon fell?

A   No.

Q   Do you recall what the weather was like on February 13, 2019?

A   No.

Q   Are you aware if Mr. Evon filled out an incident report?

A   No.

MS. SCHWARTZ:  I am going to pull up just a picture of that -- just a still of that video.  Give me one second here.  This will be Exhibit 3.

(Matthews Exhibit No. 3 marked for identification.)

Page 35

BY MS. SCHWARTZ:

Q   Ms. Matthews, can you see what's pulled up here on the screen in Exhibit 3?

A   Yes.

Q   Do you believe this individual behind the desk, is that you?

MS. FRANGELLA:  I think she may have froze.

(Brief pause due to technical difficulties.)

MS. SCHWARTZ:  Would you mind just reading that question again.

(Record read as requested.)

A   Yes.

BY MS. SCHWARTZ:

Q   Do you know who the other individual in the video is?

A   Pull it up closer.

Q   Would you say that again?

A   I was trying to pinch in on it. I can't really see their face. It's blurry.

Q   Okay.  If I play the video, maybe that will help here.  I'll try, if you can see.

It's still pretty blurry, but do you know

Page 36

who that is?

A   No. It's blurry.

Q   Okay.  Do you believe that that other individual was a carry-out?

A   Yes.

Q   Do you have an opinion as to whether or not Mike Evon fell on water or slush he tracked in himself?

A   No.

Q   Do you have an opinion as to whether or not Mr. Evon failed to wipe or dry his shoes when he entered the store?

A   No.

Q   Do you have an opinion as whether or not Mr. Evon was keeping a proper lookout at the time that he fell?

MS. FRANGELLA:  I'm just going to object that that calls for a legal conclusion and then also foundation, as she didn't testify she saw Mr. Evon enter the store.

You could answer, Ms. Matthews.

A   No.

BY MS. SCHWARTZ:

Q   Have you had any conversations with

Page 37

Mr. Evon since February 13th of 2019?

A   No.

Q   Have you had any conversations regarding Mr. Evon since February 13th of 2019 other than with your lawyers and the previous discussion we talked about with Pam Bamman?

A   No.

Q   Do you have any knowledge of the injuries that Mr. Evon sustained from his fall on February 13th of 2019?

A   No.

Q   Okay.  And you yourself have never been in the carry-out position, right?

A   No.

Q   Have you yourself ever trained the carry-outs?

A   I'm sorry. Can you repeat that.

Q   Have you yourself ever been involved in training the carry-outs?

A   No.

MS. SCHWARTZ:  That's it for me.  Thank you, Ms. Matthews.

THE WITNESS:  Give me one second. It's kind of noisy. I'm sorry, one second.

MIKE EVON vs MENARD, INC.
KATRICE MATTHEWS 07/27/2021                                    38–41

Page 38

Okay, can you repeat that.

MS. SCHWARTZ: I just let you know that that was all the questions I had for you. So if your attorney has any...

MS. FRANGELLA: Yes. Ms. Matthews, just a couple clarification questions for you.

CROSS-EXAMINATION
BY MS. FRANGELLA:

Q   The incident reports or the insurance claim forms that are done by Menard's following a customer injury, those are normally completed by the front-end manager or a store manager; is that true?

A   Yes.

Q   Okay. And then in your experience at Menard's, customers could enter the store either through the "In" door or the "Out" door; true?

A   "In" door.

Q   Well, they could also go in through the "Out" door if they wanted to?

A   Yes. "Out" door, yes, yes.

Q   Okay. And the carts car that are brought into the store, those can be brought in through the cart door that Counsel showed you a picture of; and they could also be brought in through the "In" door.

Page 39

True?

A   No, only the garage doors.

Q   Well, the carry-outs do bring carts through the entrance door if they're just bringing in a couple of carts, correct?

A   Yes; sometime, yes.

Q   Okay. But primarily the cart door is used?

A   For the carts, yes.

Q   And at the time of this incident, the surveillance footage that you reviewed shows that there was one big runner in place in front of the entrance door; true?

A   Yes.

Q   And you told us earlier that Menard's policy is to place a runner or mat -- whatever you want to call it -- in front of the door when it's raining or snowing. Correct?

A   Yes.

Q   And the surveillance footage that you showed -- you were shown reveals that there was snow outside in the parking lot and on the pavement on the date of this incident. Correct?

A   I seen the -- Yeah. It was wet outside,

Page 40

so yeah. I saw the video.

Q   Yeah. The surveillance shows that there was, kind of, snow still in the parking lot, correct?

A   Uh-huh.

Q   All right. And I understand that you have no independent recollection of this incident, but you have reviewed a number of surveillance clips from the dates of the incident. Correct?

A   Yes.

Q   And you've identified yourself as being the person that was behind the desk, at least shortly after this incident when the plaintiff approached you. Correct?

A   Yes.

Q   And one of the clips that you reviewed, the surveillance clips, you can hear a conversation between you and somebody reporting that they fell. Correct?

A   Yes.

Q   And you did not see this person enter the store prior to their fall; is that true?

A   No.

Q   And you don't have any other independent

Page 41

memory of this incident other than what you've told us today?

A   No.

MS. FRANGELLA: Okay. I don't have anything further for you, Ms. Matthews. Thank you.

THE WITNESS: Okay.

MS. SCHWARTZ: And just a very quick follow-up.

REDIRECT EXAMINATION
BY MS. SCHWARTZ:

Q   The questions your attorney asked regarding the weather on the day of the incident and the mat configuration on the day of the incident, your answers were based on your review of the videos, not your personal recollection. Correct?

A   On the videos, yes.

Q   And do you believe that the carry-outs are supposed to bring all of the carts in through the cart corral door?

A   Yes. Sometime they may have a few that they bring through the front. But it's the cart corral that's always used.

Page 42

Q   The cart corral door is specifically for the carts to be brought into the building, correct?

A   Yes.

MS. SCHWARTZ:  That's it for me.  Thanks.

MS. FRANGELLA:  Okay, great.  So I guess we'll sign back on at 12:00 for Mr. Hickey.

THE COURT REPORTER:  Marilyn, before we go, what do you want to do about signature?

MS. FRANGELLA:  There is no signature. It's federal court.

(WITNESS EXCUSED.)

Page 44

my hand and affixed my notarial seal on this 10th day of August, 2021.

*Gabrielle Pudlo*

GABRIELLE PUDLO, CSR
Notary Public
CSR License No. 084-004173

Page 43

STATE OF ILLINOIS        )
                         ) SS.
COUNTY OF COOK           )

I, GABRIELLE PUDLO, Certified Shorthand Reporter No. 084-004173, and Notary Public within and for the County of Cook and State of Illinois, do hereby certify that on July 27, 2021, at 10:37 a.m., the deponent, KATRICE MATTHEWS, appeared before me via Zoom.

I further certify that KATRICE MATTHEWS, was by me duly sworn to testify the truth and that the foregoing is a true record of the testimony given by KATRICE MATTHEWS.

I further certify that the deposition terminated at 11:29 a.m.

I further certify that there were present, via Zoom, at the taking of the said deposition the persons and parties as indicated on the appearance page made a part of this deposition transcript.

I further certify that I am not counsel for nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF, I have hereunto set

**1**

**1** 17:18,19
**12-12-79** 8:23
**12:00** 42:6
**13** 31:9 34:14
**13th** 6:15 24:13 25:16 26:9 34:2 37:1,4,10
**14620** 7:12
**159th** 11:4
**18** 8:17
**1st** 9:17

**2**

**2** 19:15,18
**2000** 9:17,24 10:7 11:6
**2000-** 11:11
**2003** 11:12
**2017** 25:11
**2019** 6:15 12:15,18 22:7 24:13 25:16 26:9 31:9 34:2, 14 37:1,4,10
**21** 8:17
**26th** 25:11

**3**

**3** 34:22,23 35:3
**312 662-8689** 8:19

**6**

**6851** 11:4

**6:00** 30:14,16, 18,21,23 31:2, 5

**A**

**a.m.** 30:14,16, 18,21,23 31:2, 5
**accordance** 4:8
**accounts** 10:9, 10,18,22,23
**accumulation** 25:24
**accumulations** 25:20
**accurate** 17:22
**addition** 29:15
**address** 7:11 8:9
**advance** 4:24
**ages** 8:14,16
**agree** 33:17
**ahead** 4:20 17:9
**answers** 41:15
**apologize** 4:24
**appears** 19:24 20:8
**apply** 27:14
**approached** 40:14
**area** 24:9,20 25:17 26:5,8 34:8
**arrive** 31:4
**asphalt** 18:7,11
**assume** 5:5

**attorney** 38:4 41:12
**aware** 24:11,19 25:15,19 26:7 27:13,22 31:6, 17 34:16

**B**

**back** 8:7 42:6
**Bamman** 32:14,17 33:1, 7,10,15 37:6
**based** 41:15
**basically** 13:8 29:22 33:3
**basis** 28:7
**begin** 11:15 31:4
**behalf** 4:11
**big** 39:12
**birth** 8:22
**bit** 10:13 13:11 19:19
**blue** 18:22 19:3
**blurry** 35:21,24 36:2
**bottom** 20:6
**Bradley** 7:13, 17,19,21 8:1,4
**break** 5:6,8
**bring** 20:13 27:9 28:8 39:3 41:20,23
**bringing** 26:14 27:15 39:4
**broke** 10:13
**brought** 38:21, 22,24 42:2

**building** 23:14 42:2

**C**

**C-L-E-V-E-L-A-N-D** 7:13
**call** 28:9 39:17
**called** 4:11 28:11
**calls** 36:18
**capacity** 5:14
**car** 38:21
**career** 11:2
**Carl** 9:10
**Carpet** 19:24
**carry-out** 21:3 22:15 27:5,17 28:9 36:4 37:13
**carry-out's** 22:13
**carry-outs** 21:1 22:18 26:16, 17,20,23 27:3, 6,8,9,24 29:9, 11,16 37:16,19 39:3 41:19
**cars** 18:20
**cart** 20:3 26:4,9 27:11 38:23 39:7 41:21,23 42:1
**carts** 20:9,13 21:21 22:1 26:14 27:10,15 34:3 38:21 39:3,5,9 41:20 42:2

**cashier** 9:23,24 10:5,6,8,21,24 12:17,21,24 13:4 16:22 17:1,2,5 27:19, 20,22 28:6,8, 19 29:5,18,21, 24 30:1
**cashiers** 13:3 28:22,24 29:12,15,17, 22,23 30:2,3
**Caution** 23:13, 19 34:10
**changed** 18:4 22:21,22
**Chicago** 9:12
**children** 8:16
**citizen** 8:20
**claim** 38:10
**clarification** 38:6
**clean** 23:4
**cleaned** 22:23 23:1,8
**Cleveland** 7:12
**client** 31:7
**clips** 6:13,14, 17 40:8,16,17
**close** 12:11,12
**closed** 10:18
**closer** 35:18
**collect** 26:9
**company** 22:8 23:6,9
**complaining** 25:16
**complaints** 25:19

**completed** 38:11

**conclusion** 36:18

**conditions** 22:12

**configuration** 41:14

**continue** 21:15

**contracted** 22:8

**conversation** 32:16 33:1,6,9, 13,18,22 40:17

**conversations** 36:24 37:3

**convicted** 9:2,4

**copy** 14:3,5,8, 13

**corral** 20:3 27:11 41:21,24 42:1

**correct** 10:20 12:15 15:24 20:1 21:16 28:21,23 31:14 39:5,18,23 40:4,9,14,19 41:17 42:2

**Counsel** 38:23

**couple** 4:17 38:6 39:5

**court** 4:20 42:7,10

**Courtesy** 26:18

**CROSS-EXAMINATION** 38:7

**current** 7:11 8:8,18

**customer** 10:5 15:10,14,23 16:4,9,14,16, 22 17:1,5 18:16 19:10 20:16,20 21:12 24:3 31:4 38:11

**customers** 21:21 22:5 24:19 26:3,8 28:10 38:15

**D**

**D-O-L-T-O-N** 11:21

**date** 6:16,17 8:22 33:18,22 34:6 39:23

**dates** 33:4 40:9

**day** 41:13,14

**day-to-day** 28:7

**decision** 20:23 22:13,14

**deposition** 4:6, 17 5:12,17,21 6:2,9 32:22

**desk** 7:3,4 35:6 40:12

**difference** 29:20

**difficulties** 35:10

**direct** 4:14 28:12,13

**discovery** 4:6

**discuss** 14:19

**discussing** 31:7

**discussion** 37:5

**dishonesty** 9:5

**documented** 25:9

**documents** 7:5

**Dolton** 11:17, 19,21,22 12:4

**door** 19:9,23 20:5,9 27:11 38:16,17,19, 20,23,24 39:4, 7,13,17 41:21 42:1

**doors** 19:6 20:1,3,12 39:2

**dry** 36:11

**due** 35:9

**duly** 4:12

**duties** 28:6

**E**

**earlier** 39:15

**education** 9:7

**email** 32:21,24

**employed** 9:14

**employee** 5:14 15:11,16 19:1 23:22,23 24:8

**employees** 12:20 14:15 15:3 16:1,3,18 18:19 19:13

**end** 18:21

**enter** 36:20 38:15 40:21

**entered** 36:12

**entrance** 19:5, 10,12 20:17,20 21:13 22:4 24:20 25:17,20 39:4,13

**entranceway** 25:24 26:8

**estimate** 13:6

**Evon** 6:20 31:8 32:2 33:18,22 34:1,7,11,16 36:7,11,15,20 37:1,4,9

**EXAMINATION** 4:14 41:10

**examined** 4:12

**EXCUSED** 42:11

**Exhibit** 17:18, 19 19:15,18 34:22,23 35:3

**experience** 38:14

**explain** 13:11

**exterior** 18:3,6

**F**

**face** 35:21

**failed** 36:11

**fall** 15:6,14,19, 22,23 16:4 17:1,6 24:5 25:10 31:8 32:6 37:9 40:22

**fallen** 26:7

**falling** 24:19

**falls** 14:19 15:4 16:15,23 24:4, 11

**familiar** 13:23 27:19 28:3

**February** 6:15 12:18 22:7 24:13 25:11,16 26:9 31:9 34:2, 14 37:1,4,10

**federal** 42:10

**fell** 6:20 24:9 33:10 34:2,8, 11 36:7,16 40:18

**felony** 9:2

**fill** 16:13,18 17:2,6

**filled** 16:8,10 34:16

**finish** 4:18

**fixed** 18:7

**floor** 20:17 23:12,13,19, 23,24

**folding** 23:16

**follow-up** 41:9

**footage** 39:11, 20

**formal** 12:20 16:7

**forms** 38:10

**foundation** 36:19

**FRANGELLA** 15:9 24:15,22, 24 25:3 26:10 35:7 36:17 38:5,8 41:4 42:5,9

**free** 5:7
**front** 7:3 21:13 39:12,17 41:23
**front-end** 28:15,16,24 29:5,8,14 38:12
**froze** 35:8
**funny** 21:20

---

**G**

**garage** 20:5 39:2
**general** 6:18 15:23 28:6
**give** 14:12 17:13 25:5 34:21 37:23
**Good** 4:2
**grab** 21:22 22:1
**grade** 9:8
**grate** 28:3,4
**great** 25:6 42:5
**greet** 28:10
**guess** 24:6 27:16 29:20 42:5
**guessing** 27:16
**guests** 28:8

---

**H**

**happened** 31:20,23
**head** 29:17,18, 21,22,24
**hear** 25:4 32:11 40:17

**Hickey** 42:6
**high** 9:9,10
**highest** 9:7
**hired** 9:18,22, 24 10:20 11:6
**hurt** 24:4,5
**hyphenated** 8:5

---

**I**

**identification** 17:20 19:16 34:24
**identified** 40:11
**Illinois** 7:15 8:9 9:12
**incident** 6:19 16:7,14,18 17:3,7 24:21 25:13 31:6,10, 14,17,20,23 32:9,11,17,22 33:2,5,7,14,19, 23 34:6,9,17 38:9 39:10,23 40:7,9,13 41:1, 13,14
**independent** 40:7,24
**individual** 24:9 33:10 35:5,16 36:4
**injured** 5:24 14:16,20 15:24 16:8,9
**injuries** 37:8
**injury** 38:11

**inside** 20:20 21:22 22:5 23:13
**inspect** 34:8
**insurance** 38:9
**involved** 37:18
**involves** 31:7
**involving** 9:5

---

**J**

**job** 10:23 23:4, 7,23 26:14

---

**K**

**Katrice** 4:4,6, 10 7:9,13,17, 21,22,23,24 8:2,4,5,7 17:15
**keeping** 36:15
**kids** 8:13
**kind** 21:14 37:24 40:3
**knowledge** 20:12 21:12 25:12 37:8

---

**L**

**lawyers** 37:5
**learned** 32:8
**legal** 36:18
**legally** 7:24
**level** 9:7
**lines** 19:3
**liquid** 25:20,24 26:5
**live** 8:9,12

**local** 4:8
**located** 11:4,7
**location** 11:10, 16,17,18 12:4, 5,9,15,18 22:9
**long** 11:9 31:5
**looked** 6:17
**lookout** 36:15
**Lord** 12:6
**lot** 17:24 18:5, 6,7,15,17,23 19:1,2 26:15 27:10,15 39:22 40:3

---

**M**

**made** 24:11 25:15
**maiden** 7:19
**main** 18:16 19:9 20:16,20 21:13 22:4
**manager** 14:21,22 15:1, 5,17 16:1,4,10, 12,13,19,20,21 22:14,16 24:6, 10 28:15,16 29:1,6,8,14 32:13 38:12
**managers** 21:1 22:19 29:17
**March** 9:17
**Marilyn** 42:7
**mark** 17:17
**marked** 17:20 19:9,11,16,23 34:24

**married** 7:20
**mat** 20:17,19, 23 21:4,6 22:11,13,15, 17,21,23 23:1, 5 39:16 41:14
**materials** 6:8 13:16,20 14:19,24 25:9 27:23
**mats** 21:7,9,11 23:2,10
**matthews** 4:4, 7,10,16 7:9,22, 23 8:2,7 17:19 19:15,20 24:16 25:1,3 26:11 34:23 35:2 36:21 37:22 38:5 41:5
**Matthews-bradley** 8:6
**meeting** 32:2
**Melrose** 11:8,9, 10,15,22
**members** 26:18
**memory** 41:1
**Menard's** 5:15, 24 6:20 9:14, 16,19,22 10:3, 6,22 11:2,3,7 12:21 13:24 14:20 15:14,24 16:5,15,23 17:2,6,11,12, 23 18:3,4,17, 19 22:8 23:12 24:20 25:17,21 26:1 28:7 31:9, 19,23 33:14

38:10,15 39:15

**mention** 28:2

**metal** 21:22

**Mike** 31:8 36:7

**military** 8:24

**mind** 11:20 35:11

**misdemeanor** 9:5

**month** 13:8 32:10,18,19,21

**morning** 4:2 30:4,7,10,13, 19

**multiple** 5:18 13:1 21:7,9,11 27:6,7

### N

**names** 7:8

**newer** 18:11

**noisy** 37:24

**notice** 4:7

**noticed** 25:23 26:4

**notices** 23:22, 24

**number** 8:18 27:2 40:8

### O

**object** 25:4 36:17

**Objection** 24:15,22 26:10

**occur** 32:18

**occurred** 24:12 31:8 32:22

33:7

**office** 16:20,21 32:13

**open** 20:5

**opening** 31:4

**opens** 30:13,14

**opinion** 36:6, 10,14

**opposed** 15:10

**oral** 13:17 15:1

### P

**Pam** 32:14 37:6

**park** 11:3,8,9, 10,15,22 12:2, 5,9,14,18 17:23 18:3,20, 21,23,24 19:3 22:9 24:12 31:9

**parking** 17:24 18:5,6,15,16, 23 19:1,2 26:15 27:10,15 39:22 40:3

**parties** 4:8

**path** 22:4

**Patrol** 26:18

**pause** 35:9

**pavement** 39:22

**payable** 10:9, 10,19,22,23

**pending** 5:7

**person** 40:12, 21

**personal** 41:16

**personally** 25:23

**phone** 8:18

**photo** 18:16 19:19 20:8

**photograph** 17:23 21:14

**physical** 14:2

**physically** 17:5 32:6 34:7

**picture** 17:10, 15,22 18:24 19:3,7 34:20 38:23

**pictures** 24:9

**pinch** 35:20

**place** 39:12,16

**plaintiff** 4:11 6:20 40:13

**play** 35:22

**point** 10:21

**policies** 13:24 14:3,8 15:15 27:14,17,20,23 28:2

**policy** 39:16

**pooled** 26:5

**Posen** 7:15 8:9

**position** 9:18, 21 10:3,18 23:18 28:11 29:5 37:13

**positions** 16:17 28:18 29:15

**potentially** 18:8

**premises** 14:16 24:12

**pretty** 35:24

**previous** 37:5

**primarily** 39:7

**print** 14:12

**prior** 12:21 24:12 25:15 31:3,16 33:21 40:22

**procedures** 13:24 14:4,6,8 15:16 27:14,23

**program** 13:13, 15

**proper** 4:7 36:15

**protocol** 24:3

**provide** 22:9

**provided** 14:2

**pull** 34:19 35:18

**pulled** 35:2

**put** 20:19,23 21:2,3,7,9 22:11,13,15, 16,18,19 23:13,19,24 24:2 34:11

**puts** 21:11

### Q

**question** 4:19, 21 5:4,7,8 7:17 35:12

**questions** 38:3,6 41:12

**quick** 41:8

**quickly** 4:23

### R

**raining** 20:21,

24 22:17 39:18

**read** 14:14 35:13

**reading** 35:11

**reason** 5:20

**recall** 5:20,23 6:2,12,16 12:3 13:19 14:7 15:18 16:6 31:10 32:2,4, 19 33:5,21 34:9,10,13

**received** 25:10 32:24

**recollection** 40:7 41:16

**reconvene** 5:9

**record** 4:3,5 35:13

**REDIRECT** 41:10

**referred** 26:17

**reflect** 4:5

**reflective** 26:21

**related** 5:23

**relevance** 24:15,24 26:10

**remember** 10:12,15 12:6

**removal** 22:8

**repeat** 5:2 10:14 29:3 37:17 38:1

**rephrase** 4:22

**report** 16:14,19 17:3,7 28:18, 22 29:11 34:17

**reporter** 4:20 42:7

**reporting** 40:18
**reports** 16:7 38:9
**requested** 35:13
**required** 30:24 31:3
**returned** 10:23
**reveals** 39:21
**review** 6:8 7:5 41:15
**reviewed** 6:23 31:14 39:11 40:8,16
**right-hand** 22:1
**roles** 10:21
**rule** 15:1
**rules** 4:9,17
**runner** 39:12, 16

**S**

**school** 9:9,10
**Schurz** 9:10
**SCHWARTZ** 4:2,5,15 15:12, 13 17:9,14,17, 21 19:17 24:18 25:8 26:13 34:19 35:1,11, 15 36:23 37:21 38:2 41:8,11 42:4
**screen** 35:3
**sees** 17:5
**separate** 19:1 23:9 27:10
**served** 8:24

**service** 7:4 10:5
**services** 22:9
**shift** 26:24 27:3 30:5,8,10,15, 18,20 31:2
**shifts** 30:9,11
**shoes** 36:11
**shopping** 20:9 21:21 26:4 34:3
**shortly** 40:13
**show** 17:10 19:18
**showed** 38:23 39:21
**showing** 19:20
**shown** 18:16, 24 39:21
**shows** 39:11 40:2
**shut** 10:22
**side** 22:1
**sign** 14:14 19:24 23:24 34:11 42:6
**signature** 42:8, 9
**signs** 23:13,16, 20 24:2
**situation** 16:14
**situations** 16:12
**size** 21:6,7
**slip** 15:19 31:8
**slippery** 25:17
**slush** 36:7
**snow** 22:8 39:21 40:3

**snowing** 20:21, 24 39:18
**South** 7:12
**specific** 23:18 27:13 30:7
**specifically** 20:13 42:1
**spill** 23:23 24:1
**stand** 29:22
**standing** 7:2
**start** 4:16,19 9:16 12:24 30:5,15
**starts** 22:17 30:8,18,20 31:2
**state** 4:3,8
**stated** 8:8 15:15 31:13
**States** 8:20
**stating** 15:24 28:21,23
**stopped** 10:17
**store** 7:3 16:20 20:14 21:16,22 22:5 25:21 26:1 28:2,9 30:12,14,24 31:3 36:12,20 38:12,15,22 40:22
**stored** 34:3
**Strike** 16:23 18:14 28:22 31:1 34:5
**supervisor** 28:12,13,24 29:4,9,14
**supervisors** 29:2

**supposed** 15:16 16:13, 18,23 17:2,6 21:2,3 23:19 24:8 41:20
**surrounding** 6:19
**surveillance** 39:11,20 40:2, 8,17
**sustained** 25:10 37:9
**switched** 8:6
**sworn** 4:1,12

**T**

**talk** 4:23
**talked** 37:5
**talking** 15:10, 19,22 19:7 31:11 33:4
**taught** 14:15 16:1,3
**team** 26:18
**technical** 35:9
**telling** 15:4
**tells** 22:14,16
**terms** 22:11
**testified** 4:12
**testify** 36:19
**things** 13:14,21
**thinking** 10:20 32:20
**time** 13:5,17,19 14:7,9,12 30:4, 7,12,19 32:8 36:15 39:10
**times** 13:1,7 20:19

**Tinley** 11:3,15 12:2,4,9,14,18 17:23 18:3 22:9 24:12 31:9
**today** 6:9 24:21 31:7 41:2
**told** 14:17 34:2 39:15 41:1
**top** 20:6
**town** 7:14 9:11
**tracked** 36:7
**trained** 15:3 27:9 37:15
**training** 12:20, 23 13:1,2,3,4, 7,16,17,20 14:9,12,18 27:17,18,20,23 37:19
**trainings** 13:9, 11
**transferred** 10:21 12:4,7
**true** 7:17 9:14 38:12,16 39:1, 13 40:22
**turnstile** 21:15, 23,24 22:2
**Twelfth** 9:8
**type** 20:5
**typically** 30:5

**U**

**Uh-huh** 19:8 20:2,11 21:17 28:17 40:5
**underneath** 19:24

**understand**
 4:21 5:1,5 40:6
**understanding**
 9:13 15:20
**United** 8:20
**update** 13:15

---

**V**

---

**varies** 27:2
**vary** 30:9
**vests** 26:21
**video** 7:2
 33:17,21 34:21
 35:17,22 40:1
**videos** 6:10,11,
 12,22 7:2,6
 31:14,16,24
 41:16,18

---

**W**

---

**wait** 4:18 25:4
**walk-off** 28:3,4
**walking** 21:15
**walks** 20:16
 21:12
**wanted** 38:19
**watch** 29:23
**water** 36:7
**ways** 22:20
**wear** 26:20
**weather** 20:22,
 24 22:12 34:13
 41:13
**week** 13:22
 14:10,11 23:3
**West** 11:4
**wet** 20:22,24
 21:2,4 23:12,

14,19,24 39:24
**wipe** 36:11
**work** 7:23 9:18
 19:13 26:23
 27:3 30:19,20
**worked** 11:3
 18:2
**working** 9:16
 12:14,17 27:5
 31:19,23
**written** 13:16,
 18,20,23 14:3,
 8,24 15:2
 27:14

---

**Y**

---

**year** 10:12,16
 12:3 13:7
**years** 6:4,6,7
 10:11,15,17
 11:13,14 12:7,
 10,12,13 18:2
**yellow** 23:16
 24:2

---

**Z**

---

**Zoom** 4:7
**zoomed** 19:19