Pamela Bamman

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIKE EVON,                                    )
                                              )
                Plaintiff,                    )
                                              )
        vs.                                   )   No. 20 CV 05682
                                              )
MENARD, INC.,                                 )
                                              )
                Defendant.                    )

DEPOSITION VIA ZOOM OF:
PAMELA BAMMAN

The deposition via Zoom videoconferencing of PAMELA BAMMAN, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before SOPHIA KARNEZIS, CSR, RPR, a Notary Public in and for the County of Will, State of Illinois, on the 7th day of June, 2021, at 11:59 a.m.

Pamela Bamman

Page 2

APPEARANCES

(via Zoom:)
KRALOVEC JAMBOIS & SCHWARTZ by
MS. OLIVIA SCHWARTZ
60 West Randolph Street, Fourth Floor
Chicago, Illinois 60601
    on behalf of Plaintiff,
(via Zoom:)
FABRIZIO HANSON PEYLA AND KAWINSKI PC by
MS. MARILYNN FRANGELLA
116 North Chicago Street, Suite 200-A
Joliet, Illinois 60432
    on behalf of Defendant.

-------------------------------------------------

INDEX
EXAMINATIONS:                       PAGE
PAMELA BAMMAN
    Direct By Ms. Schwartz ....................3
    Cross By Ms. Frangella ...................39
    Redirect By Ms. Schwartz .................39
    Recross By Ms. Frangella ................40
    Further Redirect By Ms. Schwartz ........41

EXHIBITS PREVIOUSLY MARKED
                      FIRST
EXHIBIT                  REFERENCED

    Exhibit A and B ..........................14

EXHIBITS RETAINED BY MS. SCHWARTZ

Page 3

THE COURT REPORTER: Before I swear in the witness, I will ask Counsel to stipulate on the record that due to the current national emergency pandemic, the court reporter may swear in the deponent even though she is not in the physical presence of the deponent, and that there is no objection to that at this time, nor will there be an objection to it at a future date.

MS. SCHWARTZ: Olivia Schwartz for the plaintiff, so stipulated.

MS. FRANGELLA: Defendant stipulates.

PAMELA BAMMAN, called as a witness herein on behalf of the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SCHWARTZ:

Q  Good afternoon. Is it Ms. Bamman?

A  Mrs.

Q  Mrs. Bamman?

A  Yes.

Q  The name on your call is a different name, so I just wanted to make sure that that's who you are.

Page 4

A  I used another member's phone because I was unsure how to set it all up.

Q  I completely understand. My name is Olivia Schwartz. I represent an individual named Michael Evon, who fell at the Menards in Tinley Park on February 3rd of 2019. Can you please state your name for the record?

A  Pamela Bamman.

MS. SCHWARTZ: Let the record reflect that this is the discovery deposition of Pamela Bamman, taken via Zoom with proper notice to all parties, in accordance with all state and local rules.

Q  Mrs. Bamman, have you ever given a deposition before?

A  Yes.

Q  Was it in your capacity as an employee of Menards?

A  Yes.

Q  Was there only one other deposition or have there been multiple?

A  Two that I remember.

Q  Okay. Can you briefly just explain what type of incident it was that you were then having to give your deposition?

Page 5

MS. FRANGELLA: Objection, relevance. You can answer.

THE WITNESS: I --

MS. FRANGELLA: You can answer. Yes.

A  Actually, I don't . . .

BY MS. SCHWARTZ:

Q  Were either of the instances where you gave your deposition, did either of them involve a fall inside the store?

MS. FRANGELLA: Objection, relevance. You can answer.

A  I don't remember.

BY MS. SCHWARTZ:

Q  Have you ever testified at trial in your capacity as an employee of Menard?

MS. FRANGELLA: Objection, relevance. You can answer.

A  No, that I remember.

BY MS. SCHWARTZ:

Q  Before we start, just briefly a couple deposition rules. If you could make sure you wait until I'm done asking my question before you answer. All of your answers have to be out loud, no "uh-huhs," "uh-uhs," shaking your head, that type of

Pamela Bamman

Page 6

thing because the court reporter is trying to take down everything that we say.

If you need to take a break, you're obviously more than welcome to do so, just not while a question is pending. So go ahead and answer the question and then ask to take a break.

Did you review any materials before coming to this deposition today?

A   The accident report, yes.

Q   Is that accident report -- was that filled out by yourself?

A   Yes.

Q   Did you review anything that was filled out by the plaintiff, Mr. Evon?

A   No.

Q   Have you ever gone by any other names other than Pamela Bamman?

A   No.

Q   I believe that you corrected my "Ms." to a "Mrs." What's your maiden name?

A   Pamela Nett.

Q   Can you spell that?

A   N-e-t-t.

Q   What is your current address?

Page 7

A   20505 Grand Prairie, Frankfort, Illinois, 60423.

Q   And who do you live at that address with?

A   My husband.

Q   Do you have any children?

A   Yes.

Q   How many and what are their ages?

A   Two, 34 and 37.

Q   What's your date of birth?

A   8-17-59.

Q   Have you ever served in the military --

A   No.

Q   -- or armed forces?

A   No.

Q   Have you ever been convicted of a felony?

A   No.

Q   Have you ever been convicted of a misdemeanor involving dishonesty?

A   No.

Q   What is your highest level of education?

A   Two years of college.

Q   And when did you have those two years of college?

A   '80 to '85, 1985. It's been awhile.

Page 8

Q   And where did you take those or where did you go to college?

A   Oklahoma, Kansas, Pennsylvania, and Chicago. Well, not Chicago. I decided to go to work.

Q   It's my understanding that you're currently employed by Menard?

A   Yes.

Q   When did you start working at Menards?

A   1984 -- no. 1994. Twenty-seven years ago, 28.

Q   What was your position when you first started working at Menard?

A   Cashier.

Q   And then it's my understanding that you're currently a front end manager, is that true?

A   Yes. The assistant.

Q   Okay. So you are currently an assistant front end manager?

A   Yes.

Q   Okay. So you were a cashier when you started. And then what was the next position that you had held?

A   Payroll.

Page 9

Q   Okay. And then is there another position before front end manager?

A   Yes. Head cashier.

Q   Okay.

A   Do you want all of them?

Q   Yes.

A   And then assistant front end, and then the front end manager, and then the last four years I've been assistant front end.

Q   Okay. So you were an assistant front end manager, and then you became a front end manager, and now you're an assistant front end manager again?

A   Yes.

Q   What was the year that you became the front end manager from the assistant front end manager? If you recall.

A   That was 20 years of that, so take away the last four years from now, four or five years from now, and then put 20 years on that.

Q   And then when did you become an assistant front end manager again?

A   The last couple years, two years ago, three years ago.

Q   Do you recall which year it was?

Pamela Bamman

Page 10

A   No.

Q   Was there a specific reason that you went from being a front end manager to an assistant front end manager?

A   Yes.  They closed down the store to remodel it, and they transferred us all out.  So I just transferred to a store that was closer, and they didn't have the front end manager position open.

Q   Okay.  So when did you begin working at the Menards in Tinley Park?

A   I want to say four years ago.  The years blend together.

Q   Okay.  Well, am I correct in thinking that you had previously worked at a different Menards than the Menards in Tinley Park?

A   Right.

Q   Okay.  And then roughly four years ago you left that Menards -- or you started working at the Menards in Tinley Park, and you started there as an assistant front end manager?

A   No.  I started as -- I transferred over as a cashier.  And then the assistant front end manager came open, so they promoted me back up to the front end manager or assistant front end manager.

Page 11

Q   What was the location of the Menards that you were working at prior to the Tinley Park Menards?

A   I was over in Joliet, Illinois, and then the one that they closed down was Homewood, Illinois.

Q   Were you the assistant front end manager of the Menards in Tinley Park on February 13th of 2019?

A   Yes.

Q   Is there a formal training program that employees go through prior to beginning work at Menard?

A   Prior to working at Menards?

Q   Yes.

A   No.

Q   Is there a formal training that employees go through when they are promoted to a new position within Menard?

A   Yes.

Q   Are there only specific roles that require a formal training prior to beginning?

A   I don't understand that question.

Q   Okay.  If you don't need to undergo a formal training prior to starting at Menards but you do have to undergo formal training prior to starting a specific position at Menards, what are those

Page 12

positions?

A   Okay.  I don't understand the formal training of starting at Menards because you get hired from a new job.  There's always training to a new job, so it's formal training?

Q   Yes.  And then my apologies if that was a confusing question.  Before you start working at Menards, you undergo a training?

A   Right.

Q   Correct?

A   In any position, yes.

Q   Okay.  And then when you change positions, do you undergo a different training program?

A   Yes.  If you're getting promoted.

Q   Okay.  Are there written training materials that are provided to employees when they get promoted and start a different position?

A   Yes.

Q   Okay.  So when you became an assistant front end manager, were you provided written training materials?

A   Yes.

Q   And then when you became a front end manager, were you provided additional training

Page 13

materials?

A   Yes.

Q   Okay.  Are you provided with written policies and procedures when you begin a new position at Menards?

A   No.  They are on the computer.  They're not -- they're written on the computer, but you cannot print them out.

Q   So during that training process, do you review, learn the policies and procedures, but they're not physically printed?

A   Yes.

Q   All right.  In the time that you had been working at the Menards in Tinley Park, so for the last four years or so, has the exterior of the building always looked the same?

A   Yes.

Q   I'm going to just share my screen here and show you just a picture of the outside of Menards here if you give me one second.  Can you see that picture, Mrs. Bamman?

A   Yes.

Q   Does that picture appear to be an accurate photograph of the Tinley Park Menards as taken from

Pamela Bamman

Page 14

the parking lot?

A   Yes.

Q   Is this the only parking lot for customers at this Menards location?

A   Well, there's one further down at the garden center.

Q   Okay. So if you were not planning on going to the garden center but planning on going into the Menards building, into the front entrance of the building, is this the only parking lot that a customer would park in?

A   Yes.

Q   Okay. To the best of your knowledge, is this what you recall the exterior of the building looking like in February of 2019?

A   Yes.

Q   Okay. I'm going to switch to -- I guess we can mark this as Exhibit A, and then Exhibit B will just be a zoomed in -- a little bit further zoomed in here. Mrs. Bamman, can you see what we're looking at here?

A   The "In" door and the sidewalk.

Q   Yes. So those front doors marked "In," is that the main customer entrance into this Menards?

Page 15

A   Yes.

Q   Is this the only customer entrance into Menards?

A   No. There's the garden center, and then there's the exit door that they can come in the exit door, too. Or there is a special order receiving area they can -- once they get in the yard, they can come in that way.

Q   To the right of the "In" door, there looks to be some doors underneath the word "Carpet." Do you see those?

A   Those are the cart corral doors.

Q   Okay. So those are the cart corral doors. Is that where the employees bring carts in from the parking lot?

A   Yes.

Q   And do those -- they look to be closed in this picture, but do those open up like garage doors would?

A   Yes.

Q   And it's my understanding that the employees bringing the carts in are supposed to go through these cart corral doors; is that true?

A   Yes.

Page 16

Q   Are employees from the parking lot supposed to bring the carts in through the main entrance as well or are they only supposed to use the cart corral doors?

A   They are to use the cart corral doors, but they can bring them through the entrance, too.

Q   Okay. When a customer walks into the main entrance, there is a mat there on the ground; right?

A   Not always. When it's raining, snowing, when it's needed.

Q   Okay. Who determines when the mat is placed in the inside of the door?

A   The front end managers, even the carry outs, if they see it's starting to rain a little bit, they can go get -- they know to put them down, cashiers.

Q   Okay. So that job is not specific to one position?

A   No.

Q   There are multiple individuals -- multiple employees can make the decision to put a mat out?

A   Yes.

Q   So when you walk in the front entrance, there is -- is there ever multiple mats put out or

Page 17

would there only be one mat?

A   One.

Q   So the option is either no mat or one mat? There is not another option for a mat?

A   No. We have other mats. Well, no. We only have two mats in the store, one for exit, one for in.

Q   And both of those mats are on -- are just inside the main doors, just one on the "In" door and one on the "Out" door?

A   Yes.

Q   And do you know what the floor is made of in that entrance area?

A   Commercial vinyl tile, those squares.

Q   And then when a customer enters into that -- if a customer were to enter in the door marked "In," there is a type of metal gate to the right that they are to walk through; is that true?

A   A turnstile, yes.

Q   Okay. Is that the path that customers typically take into the store?

A   Yes.

Q   And then just through the turnstile is where the carts are corralled, is that true?

Pamela Bamman

## Page 18

A   Yes.

Q   Is this the route that all customers take as they go into the store or is there another way to go?

A   No.  Some come in through the exit doors, then go through the registers.  Some come through the -- if they're in the receiving, they come through the receiving and walk through the store.  Some go through the garden center and walk through the garden center door.

Q   Do you believe that the majority of customers walk in the door marked "In" and go through the turnstile and grab a cart or no?

A   I never thought about how many.  Yes.  I mean, it's the "In" door.

Q   That's what I would have assumed as well, but you said that people come in the exit door as well.

A   But they do.  The exit doors, they come in through the garden center doors.

Q   Does Menards have wet floor or caution signs to put up when there's a spill on the floor?

A   Yes.

Q   Do you know what they say?

## Page 19

A   Wet floor or slippery when wet.

Q   And they are those yellow folding signs, right?

A   Right.

Q   Is there a specific employee that's tasked with putting those wet floor signs out or does that happen by multiple employees?

A   It happens by multiple employees.

Q   Does Menards have a system where if any employee were to see a spill on the ground, then that employee is supposed to put the sign out?

A   No.  If they see a spill on the ground, they are to stay by the spill and then get ahold of another person to go get a wet floor sign plus the mop or rags or whatever is needed.

Q   Is there a specific protocol for when somebody were to -- strike that.

Is there a specific protocol that applies if somebody falls at the store?

A   I don't know how you call it a set protocol.  The person that probably went -- that fell would go over there and -- as human nature would go over there and find out if they're all right.  But they also, once they make sure the guest is, you

## Page 20

know, taken care of and need an ambulance, they also call the front end to come finish up like any reports or anything.

Q   Okay.  If an employee that's not the front end manager were to see somebody fall, is it Menards' policy that that employee is supposed to notify the front end manager?

A   Yes.  Or if they have to stay with them, they would tell somebody else to come get us or the store managers.

Q   If an individual is hurt inside of the Menards, is an incident report supposed to be filled out?

A   Yes.

Q   Who is supposed to fill out the incident report?

A   The front end managers or the store managers.

Q   What's the difference between a front end manager and a store manager?

A   The front end manager runs the front, the registers, the cashiers, the carry outs, the parking lot.  The store manager runs the whole store of all the departments.

## Page 21

Q   You said carry outs a couple times.  Can you explain what you're referring to?

A   Carry outs are the gentlemen that get the carts.

Q   Okay.  Is there anybody else that works in the parking lot at Menards or is anyone that's out in the parking lot, are those the carry outs?

A   99 percent of the time it's the carry outs out there.  There is some team members that get assigned to help pick up the trash, so there is other team members out there.

Q   Okay.  Since you've been at the Menards location in Tinley Park, have you been made aware of any falls that occurred on the premises prior to February 13th of 2019?

MS. FRANGELLA:  Objection, relevance.  You can answer.

A   No.

BY MS. SCHWARTZ:

Q   Do you recall if you were working at this Menards on February 26th of 2017?

A   No.  I do not know.

Q   It appears that somebody sustained a fall on February 26th of 2017 at the Tinley Park Menards.

Pamela Bamman

Page 22

Do you have any knowledge of that?

MS. FRANGELLA: Objection, relevance. You can answer.

A No.

BY MS. SCHWARTZ:

Q Previously I had asked you if you had ever been deposed before as an employee of Menards. Were those other situations before you started working at the Tinley Park Menards?

A What do you mean, deposed?

Q Had to give your deposition.

A Yes.

Q Okay. So those instances were at a different location than the one that we're talking about today?

A Yes.

Q Have you been made aware of anybody that has fallen at the Menards since February 13th of 2019?

MS. FRANGELLA: Objection, relevance. You can answer.

A No.

BY MS. SCHWARTZ:

Q Since you've been at the Tinley Park

Page 23

Menards, do you know of any complaints that have been made about accumulations of liquid in the front of the store?

A No.

Q Have you ever personally noticed any pooled liquid at the front of the store near the shopping carts?

A On a snowy day if some snow comes in with it. We get it wiped up. I don't know what -- you're saying pooling. That's not -- on a snowy day when carts bring it in off the wheels, that's not a pooling of liquid. Like it's coming from -- I don't understand the question that well.

Q Okay. Have you ever noticed liquid on the ground near where the shopping carts are at the front entrance of the Menards?

A Yes.

Q Can you estimate about how many times you've noticed that?

A No. I cannot estimate. I can say --

Q I believe you cut out a little bit. What did you say?

A I can say one. I know that I had them wipe it up.

Page 24

Q Okay. That one instance, are you referring to the February 13th, 2019 incident or are you referring to something else?

A Something else. A snow day.

Q So there has been a separate time where you've noticed water on the ground in this front entrance at Menards?

A Not the front entrance. By the cart wheels where the snow rolls in.

Q You said where the snow rolls in. Can you explain what you mean by that?

A The wheels roll in. If they went through the snow, it brings in a little snow with it.

Q And do you know if that's when individuals bring the shopping carts through the front door or if they're coming in through the cart corral?

A Well, either way it's going to bring them in. If a customer brings in a cart from the snow, it's going to bring snow with the wheels on both areas.

Q Well, you said if a customer were to bring it in through both areas. But a customer wouldn't be bringing in a cart through the cart corral, would they?

Page 25

A No. You said if a person brought it through or a guest brought it through the front entrance. Yes. They could bring in snow. The cart guys would bring in through the cart corral. They can bring in snow off wheels, too.

Q Okay. Do you know about or if there is a specific number, do you know about how many carts are lined up in the cart corral?

(Court reporter clarification.)

A I do not know the number. I know there is a number of carts that we do have, but I don't know exactly how many we have.

BY MS. SCHWARTZ:

Q When one of the carry outs were to bring carts in through the separate cart corral door, they put the wet carts at the back of the line of carts; right?

A Yes.

Q And then as they bring more carts in, each cart then gets pushed up to the front; is that correct?

A Yes.

Q The carry outs are the individuals responsible for bringing the carts in from the

Pamela Bamman

## Page 26

parking lot, right?

A    Yes.

Q    Do carry outs have other jobs as well?

A    Yeah.  They help the guests load their product in the vehicles.  They sometimes, if it's slow, take back returns.  I mean, but their main job is to keep the parking lot clear of carts and help the guest.

Q    Do the carry outs have a different uniform than the rest of the Menard employees?

A    Yes.  They have neon shirts they can wear, and they have vests that say -- with that neon coloring reflecting stuff on it.

Q    Is there a specific number of carry outs that are working each shift or does that change?

A    It changes.

Q    Okay.  Why does it change?

A    Seasons.  Sometimes it's slow.  At different times it's busy.  You know, we go by the sales of how many people that we really need.

Q    Do you know how many carry outs were working on the morning of February 13, 2019?

A    No.

Q    Are you aware if there is any specific

## Page 27

written policies or procedures that apply to bringing the carts in from the parking lot?

A    No.

Q    Do you know if -- when an individual starts as a carry out, are they given specific training materials for that job?

A    Yes.

Q    Do you know if those training materials include information as to how the carts are supposed to be brought into the building?

A    I don't think there's written ones there, but that's -- when you train them, that's where you train them, just bring them in.

Q    Are they trained to bring the carts in through the cart corral or are they trained to bring the carts in through the "In" marked entrance?

A    No.  They're trained to bring them through the cart corral.

Q    Are you aware of if the Tinley Park Menards has a walk-off grate?

A    Do you mean by the cart corral?  Where do you mean?

Q    I meant in general if there is a walk-off grate at the entrance of the Menards in Tinley Park.

## Page 28

A    No.

Q    Is there a walk-off grate at the entrance for the cart corral?

A    No.

Q    And there's not one at the door that we previously saw marked "In," right?

A    No.

Q    Do you know what the purpose of a walk-off grate is?

A    What I'm thinking, if it's the same thing I'm thinking is any excess water, excess stuff that you bring in would drip down in the grates before you pass it.

Q    Do you remember if the previous Menards that you worked at, if either of those had a walk-off grate?

A    No.

Q    What are the general duties of the front end manager at Menards on a day-to-day basis?

A    Making sure the front end is running right, the cashiers are in order, the carry outs are getting done what they need to get done, making sure the money is being picked up.  There's a bunch.  How many do you want?

## Page 29

Q    That's fine.  What time does the Tinley Park Menards open in the morning?

A    6 a.m.

Q    And is there a front end manager that starts at 6 a.m.?

A    Yes.

Q    Is there a specific shift that the front end manager works, you know, from 6 a.m. until what time?

A    No.  It's usually eight to ten hours, sometimes it's two, sometimes it's three depending on the day, if we have three people or if we have two.

Q    Okay.  If the front end manager was there at 6 a.m., would that individual still be there at 9 a.m.?

A    Yes.

Q    Okay.  Is that the same for an assistant front end manager?

A    Yes.

Q    And is there an assistant front end manager working every day?

A    Yes.

Q    If the front end manager were to notice pooled water, is that something that the front end

Pamela Bamman

## Page 30

manager would clean up themselves?

A    Yes. Or if they can't walk away, they'd radio somebody else to bring some stuff over to get it cleaned up.

Q    If the assistant front end manager noticed a pool of water, it would be the assistant front end manager that would either clean it up or stay by the water until somebody came to clean it up?

A    Yes.

Q    Does the front end manager do an inspection of the premises before the store opens?

A    No.

Q    Does the assistant front end manager do an inspection of the premises before the store opens?

A    No.

Q    Does anybody do an inspection of the premises before the store opens?

A    I do not know.

Q    As you may be aware, the incident that we're here discussing involves my client in a slip and fall that occurred on October 13, 2019 around 9 a.m. at the Tinley Park Menards.  Do you recall the incident that I'm talking about?

A    Vaguely.

## Page 31

Q    Do you recall if you were working there that day?

A    Yes.

Q    Do you recall ever meeting Mr. Evon?

A    Yes.

Q    Do you recall if he was with anyone?

A    Do not know.

Q    Did you physically see him fall?

A    No.

Q    Are you aware if anybody physically saw him fall?

A    No.

Q    When was the first time that you learned about that incident?

A    The carry out told the cashier, the cashier told me.

Q    So did you learn about the incident on February 13, 2019?

A    Yes.

Q    And did you learn about the incident when Mr. Evon was still in the store or had he already left?

A    No.  He was in the store.

Q    You said that the carry out told who?

## Page 32

A    Told the cashier that was at the service desk.  The cashier told me.

Q    Do you recall what the cashier said when she or he told you about the incident?

A    That a gentleman had fallen.

Q    Okay.  Did she say what he had fallen on or what caused him to fall?

A    No.

Q    Do you recall who the cashier was on this day?

A    Katrice.

Q    And that's Katrice Matthews, correct?

A    Yes.

Q    Do you recall anything else about the conversation with Katrice Matthews?

A    No.

Q    Do you recall where you were when you had that conversation with Ms. Matthews?

A    In the front office by my computer.

Q    So when you had that conversation, you were in the front office?  You weren't at that front desk right as you walk in the entrance, is that correct?

A    No.  It's actually next to it.

Q    Okay.  Did you have a conversation with

## Page 33

Mr. Evon?

A    Other than taking his statement of what happened.

Q    Okay.  So you did take his statement about what happened on that day?

A    Yes.

Q    Do you recall what that statement entailed?

A    He stated that he fell on some water by the carts.

Q    Did he say anything else about how he fell or what happened when he fell?

A    No.

Q    After you had the conversation with Mr. Evon, did you go over to the area by the carts where he stated he had fallen?

A    No.  I went over to the carts before I had the conversation where he was at.

Q    Oh, okay.  Then excuse me.  I'll ask a different question.  So after you had figured out -- strike that.

After you had learned that Mr. Evon fell, you went over to the area by the shopping carts?

A    Yes.

Q    Did you notice there to be anything on the

Pages 34 to 37

Pamela Bamman

Page 34

ground?

A   A little bit of water from the wheels of the cart.

Q   Do you know about -- can you estimate about how big the bit of water was that you had noticed?

A   No. I don't know.

Q   Was the wet area by the shopping carts, was it bigger than a foot by a foot?

A   No.

Q   Can you estimate about how big it was?

A   No. I don't know how to estimate.

Q   That's okay. Do you believe that the water was from the shopping carts?

A   From -- yeah. It had snowed, and it's from the wheels coming in.

Q   Okay. Did you put up a warning sign near that water, the one with the yellow warning hazard signs?

A   Yes. I had somebody get the wet floor signs and then make sure somebody mopped it up and put the signs up.

Q   Do you recall what the weather was like on February 13th, 2019?

A   Other than it may have snowed that night

Page 35

and it was misty or it was still light snowing, not a hundred percent, no.

Q   Okay. Did you have any knowledge of the water having been pooled by the shopping carts prior to Mr. Evon falling?

A   No.

Q   And did you fill out an incident report that day?

A   Yes.

Q   Let me pull that up as well. Mrs. Bamman, can you see this?

A   I can -- yeah.

Q   Let me zoom in a little bit. Does this help?

A   Yes.

Q   Is this the incident report that you had filled out on February 13, 2019 regarding Mr. Evon?

A   I can see that it's February 13th at 9 a.m. I can't see the name on the - the name of the person.

MS. SCHWARTZ: Oh. Here we go.

MS. FRANGELLA: I think you're on a cell phone, correct?

THE WITNESS: Yes, I am.

MS. FRANGELLA: That's probably why.

Page 36

BY MS. SCHWARTZ:

Q   It states here injured property/damage, Michael G. Evon?

A   Okay. Then yes.

Q   Is this likely what you believe to be the incident report that you filled out that day?

A   Yes.

Q   Okay. And then you did not fill out any other documentation regarding this incident, is that true?

A   I should have filled out a first incident report going up to our general office. That report that you just showed goes to our insurance company.

Q   Okay.

A   And then the first incident report, that goes to our general office.

Q   Okay. And do you believe that you would have filled out both of those that day?

A   I can't remember if I did, but I should have.

Q   I'm sorry, we're going back here, back to Exhibit C, I guess this incident report for the insurance company. There's a witness listed as Cole Hickey. Do you see that?

Page 37

A   Yes.

Q   Is that one of the carry outs that works at Menards?

A   Yes.

Q   And do you know who Cole Hickey is?

A   Yes.

Q   Does he still work there?

A   Yes.

Q   Have you had a conversation with Mr. Hickey about this incident?

A   Other than he has to give a deposition on it because we got the report, and I had to inform him.

Q   Okay. At that time did you have a conversation about how the incident had occurred?

A   Other than it was the gentleman that fell.

Q   Okay.

A   That he had fell, and he's got to remember what he can remember.

Q   No. So, I mean, during that conversation, did Mr. Hickey explain to you how he felt that this man fell or what had caused him to fall or any of those details?

A   Oh, you mean the day of?

Pamela Bamman

Page 38

Q   Yes.
A   No.  He just stated that the gentleman fell.
Q   Okay.  How about recently when he got the deposition, did you have a conversation then where Mr. Hickey told you what he had seen, if he saw him fall, any of those details?
A   No.
Q   Have you had any conversations with Mr. Evon since February 13, 2019?
A   No.
Q   Have you had any conversations with anybody else other than your lawyers, which I don't want to hear about, regarding the incident where Mr. Evon fell on February 13, 2019 that we have not already talked about?
A   No.
Q   Do you have any knowledge of the injuries that Mr. Evon sustained from his fall on February 13th?
A   No.
MS. SCHWARTZ:  That's all for me.
MS. FRANGELLA:  Just a couple of follow-up questions.

Page 39

CROSS-EXAMINATION
BY MS. FRANGELLA:
Q   Mrs. Bamman, with regard to the weather on the date of the incident, I know you said you weren't a hundred percent, but are you aware whether there was some type of snow or slush or something on the pavement outside of Menard that day?
A   I want to say yes, but I'm not a hundred percent.
Q   Okay.  And with regard to the report that you filled out, one of those reports goes to the corporate office, and then one goes to Gallagher Bassett; correct?
A   Yes.
Q   And it's the same insurance claim form, correct, the same information?  It's not a different report, true?
A   True.
MS. FRANGELLA:  Okay.  I don't have anything further.
REDIRECT EXAMINATION
BY MS. SCHWARTZ:
Q   Just do you have any knowledge as to why the carry outs are supposed to use the cart corral

Page 40

doors as opposed to the main entrance?
A   Because the main entrance is for the guests to walk through, and the cart corrals are mainly -- because you're bringing in a bunch of carts, you want them to come in through the cart corral, and you don't want to bring them through the main entrance so the guests can't walk in.
Q   So the cart corrals are specifically for the carts coming in from the parking lot, right?
A   Yes.
MS. SCHWARTZ:  That's all.
RECROSS-EXAMINATION
BY MS. FRANGELLA:
Q   Just for clarification, you had stated earlier that the carry outs can bring carts through the front door, though; correct?
A   Yes, they can.
Q   Okay.  They just wouldn't bring, you know, 10 or 15 carts at a time through the front door, they would use the specific cart corral door for that; correct?
A   Yes.
MS. FRANGELLA:  All right.  Thank you.  Any follow up, Olivia?

Page 41

MS. SCHWARTZ:  Yes.
FURTHER REDIRECT EXAMINATION
BY MS. SCHWARTZ:
Q   I believe you had stated earlier that the carry outs are trained to bring the carts in through the cart corral; correct?
MS. FRANGELLA:  I'm just going to object that that misstates her prior testimony.  You can answer.
A   Yes.
BY MS. SCHWARTZ:
Q   And the carry outs are trained that even if they only have one cart, they're still supposed to bring it through the cart corral; right?
A   Yes.
MS. SCHWARTZ:  That's all, then.
MS. FRANGELLA:  Okay.  Thank you.
(The deposition ended at 12:46 p.m., and the witness was excused.)

George E. Rydman & Assoc., Joliet, IL  (815) 727-4363

Pamela Bamman

Page 42

STATE OF ILLINOIS )
                   ) SS:
COUNTY OF W I L L )

I, SOPHIA KARNEZIS, CSR, RPR, a Notary Public in and for the County of Will, State of Illinois, do hereby certify PAMELA BAMMAN was first duly sworn by me to testify the truth; that the above deposition, Page 1 through 41, was recorded stenographically and reduced to typewriting under my personal direction; and that the foregoing transcript of the said deposition is a true and correct transcript of the testimony given by the said witness at the time and place previously specified.

I further certify that I am not counsel for nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal this 17th day of June, 2021.



_____
Sophia Karnezis, CSR, RPR
IL CSR No. 084-003792

Page 43

Pamela Bamman

**A**

a.m 1:18 29:3,5,8 29:14,15 30:22 35:18
accident 6:9,10
accumulations 23:2
accurate 13:23
additional 12:24
address 6:24 7:3
affix 42:18
afternoon 3:18
ages 7:7
ago 8:10 9:22,23 10:11,17
ahead 6:5
ahold 19:13
ambulance 20:1
answer 5:2,4,11 5:17,22 6:5 21:17 22:3,21 41:8
answers 5:23
anybody 21:5 22:17 30:16 31:10 38:12
apologies 12:6
appear 13:23
appears 21:23
applies 19:18
apply 27:1
area 15:7 17:13 33:14,22 34:7
areas 24:20,22
armed 7:13
asked 22:6
asking 5:22
assigned 21:10
assistant 8:17,18 9:7,9,10,12,15 9:20 10:3,20,22 10:24 11:5 12:19 29:17,20 30:5,6,13
assumed 18:16
aware 21:13

22:17 26:24 27:19 30:19 31:10 39:5
awhile 7:24

**B**

B 2:20 14:18
back 10:23 25:16 26:6 36:21,21
Bamman 1:9,12 2:14 3:12,18,20 4:8,10,13 6:17 13:21 14:20 35:10 39:3 42:5
basis 28:19
Bassett 39:13
beginning 11:9,19
behalf 2:5,9 3:13
believe 6:19 18:11 23:21 34:12 36:5,17 41:4
best 14:13
big 34:5,10
bigger 34:8
birth 7:9
bit 14:19 16:14 23:21 34:2,5 35:13
blend 10:12
break 6:3,6
briefly 4:22 5:20
bring 15:14 16:2 16:6 23:11 24:15,17,19,21 25:3,4,5,14,19 27:13,14,15,17 28:12 30:3 40:6 40:15,18 41:5 41:13
bringing 15:22 24:23 25:24 27:1 40:4
brings 24:13,18
brought 25:1,2 27:10
building 13:16

14:9,10,14 27:10
bunch 28:23 40:4
busy 26:19

**C**

C 2:1 36:22
call 3:22 19:20 20:2
called 3:13
capacity 4:16 5:15
care 20:1
Carpet 15:10
carry 16:13 20:22 21:1,3,7,8 25:14 25:23 26:3,9,14 26:21 27:5 28:21 31:15,24 37:2 39:24 40:15 41:5,11
cart 15:12,13,23 16:3,5 18:13 24:8,16,18,23 24:23 25:3,4,8 25:15,20 27:15 27:18,21 28:3 34:3 39:24 40:3 40:5,8,20 41:6 41:12,13
carts 15:14,22 16:2 17:24 21:4 23:7,11,15 24:15 25:7,11 25:15,16,16,19 25:24 26:7 27:2 27:9,14,16 33:9 33:14,16,22 34:7,13 35:4 40:4,9,15,19 41:5
cashier 8:14,21 9:3 10:22 31:15 31:15 32:1,2,3,9
cashiers 16:16 20:22 28:21

caused 32:7 37:22
caution 18:21
cell 35:21
center 14:6,8 15:4 18:9,10,20
certify 42:5,13
change 12:12 26:15,17
changes 26:16
Chicago 2:4,7 8:4 8:4
children 7:5
Civil 1:13
claim 39:15
clarification 25:9 40:14
clean 30:1,7,8
cleaned 30:4
clear 26:7
client 30:20
closed 10:5 11:4 15:17
closer 10:7
Cole 36:23 37:5
college 7:21,23 8:2
coloring 26:13
come 15:5,8 18:5 18:6,7,17,19 20:2,9 40:5
comes 23:8
coming 6:7 23:12 24:16 34:15 40:9
Commercial 17:14
company 36:13 36:23
complaints 23:1
completely 4:3
computer 13:6,7 32:19
confusing 12:7
conversation 32:15,18,20,24 33:13,17 37:9

37:15,20 38:5
conversations 38:9,12
convicted 7:15,17
corporate 39:12
corral 15:12,13 15:23 16:3,5 24:16,23 25:4,8 25:15 27:15,18 27:21 28:3 39:24 40:5,20 41:6,13
corralled 17:24
corrals 40:3,8
correct 10:13 12:10 25:21 32:12,22 35:22 39:13,16 40:16 40:21 41:6 42:10
corrected 6:19
counsel 3:2 42:13
County 1:16 42:2 42:4
couple 5:20 9:22 21:1 38:23
court 1:1 3:1,4 6:1 25:9
Courts 1:14
Cross 2:15
CROSS-EXAM... 39:1
CSR 1:15 42:3,21 42:22
current 3:3 6:24
currently 8:6,16 8:18
customer 14:11 14:24 15:2 16:7 17:15,16 24:18 24:21,22
customers 14:3 17:20 18:2,12
cut 23:21
CV 1:5

Pamela Bamman

**D**

D 2:12
date 3:8 7:9 39:4
day 1:17 23:8,10
  24:4 29:12,21
  31:2 32:10 33:5
  35:8 36:6,18
  37:24 39:7
  42:18
day-to-day 28:19
decided 8:4
decision 16:21
Defendant 1:7 2:9
  3:11,14
departments
  20:24
depending 29:11
deponent 3:5,6
deposed 22:7,10
deposition 1:9,11
  4:10,14,19,24
  5:8,21 6:8 22:11
  37:11 38:5
  41:17 42:7,10
depositions 1:15
desk 32:2,21
details 37:23 38:7
determines 16:11
difference 20:19
different 3:22
  10:14 12:13,17
  22:14 26:9,19
  33:19 39:16
Direct 2:14 3:16
direction 42:9
discovery 4:10
discussing 30:20
dishonesty 7:18
District 1:1,1,14
DIVISION 1:2
documentation
  36:9
door 14:22 15:5,6
  15:9 16:12 17:9
  17:10,16 18:10
  18:12,15,17

24:15 25:15
28:5 40:16,19
40:20
doors 14:23 15:10
  15:12,13,18,23
  16:4,5 17:9 18:5
  18:19,20 40:1
drip 28:12
due 3:3
duly 3:14 42:6
duties 28:18

**E**

E 2:1,1,12
earlier 40:15 41:4
EASTERN 1:2
education 7:20
eight 29:10
either 5:7,8 17:3
  24:17 28:15
  30:7
emergency 3:3
employed 8:7
employee 4:16
  5:15 19:5,10,11
  20:4,6 22:7
employees 11:9
  11:14 12:16
  15:14,22 16:1
  16:21 19:7,8
  26:10
ended 41:17
entailed 33:7
enter 17:16
enters 17:15
entrance 14:9,24
  15:2 16:2,6,8,23
  17:13 23:16
  24:7,8 25:3
  27:16,24 28:2
  32:22 40:1,2,6
estimate 23:18,20
  34:4,10,11
Evon 1:3 4:5 6:14
  31:4,21 33:1,14
  33:21 35:5,17

36:3 38:10,14
38:19
exactly 25:12
EXAMINATION
  3:16 39:21 41:2
EXAMINATIO...
  2:13
examined 3:14
excess 28:11,11
excuse 33:18
excused 41:18
Exhibit 2:19,20
  14:18,18 36:22
EXHIBITS 2:18
  2:22
exit 15:5,5 17:6
  18:5,17,19
explain 4:22 21:2
  24:11 37:21
exterior 13:15
  14:14

**F**

FABRIZIO 2:6
fall 5:8 20:5 21:23
  30:21 31:8,11
  32:7 37:22 38:7
  38:19
fallen 22:18 32:5
  32:6 33:15
falling 35:5
falls 19:19 21:14
February 4:6
  11:6 14:15
  21:15,21,24
  22:18 24:2
  26:22 31:18
  34:23 35:17,18
  38:10,15,20
Federal 1:13
fell 4:5 19:21 33:8
  33:10,11,21
  37:16,18,22
  38:3,15
felony 7:15
felt 37:21

figured 33:19
fill 20:15 35:7
  36:8
filled 6:10,13
  20:12 35:17
  36:6,11,18
  39:11
find 19:23
fine 29:1
finish 20:2
first 2:19 3:14
  8:12 31:13
  36:11,15 42:5
five 9:18
floor 2:3 17:12
  18:21,22 19:1,6
  19:14 34:19
folding 19:2
follow 40:24
follow-up 38:23
follows 3:15
foot 34:8,8
forces 7:13
foregoing 42:9
form 39:15
formal 11:8,14,19
  11:22,23 12:2,5
four 9:8,18,18
  10:11,17 13:15
Fourth 2:3
Frangella 2:7,15
  2:16 3:11 5:1,4
  5:10,16 21:16
  22:2,20 35:21
  35:24 38:23
  39:2,19 40:13
  40:23 41:7,16
Frankfort 7:1
front 8:16,19 9:2
  9:7,8,9,10,11,12
  9:14,15,21 10:3
  10:3,8,20,22,23
  10:24 11:5
  12:20,23 14:9
  14:23 16:13,23
  20:2,4,7,17,19

20:21,21 23:2,6
23:15 24:6,8,15
25:2,20 28:18
28:20 29:4,7,13
29:18,20,23,24
30:5,6,10,13
32:19,21,21
40:16,19
further 2:16 14:5
  14:19 39:20
  41:2 42:13
future 3:8

**G**

G 36:3
Gallagher 39:12
garage 15:18
garden 14:6,8
  15:4 18:9,9,20
gate 17:17
general 27:23
  28:18 36:12,16
gentleman 32:5
  37:16 38:2
gentlemen 21:3
getting 12:14
  28:21
give 4:24 13:20
  22:11 37:11
given 4:13 27:5
  42:11
go 6:5 8:2,4 11:9
  11:15 15:22
  16:15 18:3,4,6,8
  18:12 19:14,22
  19:22 26:19
  33:14 35:20
goes 36:13,16
  39:11,12
going 13:18 14:7
  14:8,17 24:17
  24:19 36:12,21
  41:7
Good 3:18
grab 18:13
Grand 7:1

Pamela Bamman

grate 27:20,24 28:2,9,16
grates 28:12
ground 16:8 19:10,12 23:15 24:6 34:1
guess 14:17 36:22
guest 19:24 25:2 26:8
guests 26:4 40:2,7
guys 25:4

**H**
hand 42:18
HANSON 2:6
happen 19:7
happened 33:3,5 33:11
happens 19:8
hazard 34:17
head 5:24 9:3
hear 38:14
held 8:23
help 21:10 26:4,7 35:14
hereunto 42:17
Hickey 36:24 37:5 37:9,21 38:6
highest 7:20
hired 12:3
Homewood 11:4
hours 29:10
human 19:22
hundred 35:2 39:5,8
hurt 20:11
husband 7:4

**I**
IL 42:22
Illinois 1:1,17 2:4 2:8 7:1 11:3,4 42:1,5
incident 4:23 20:12,15 24:2 30:19,23 31:14

31:17,20 32:4 35:7,16 36:6,9 36:11,15,22 37:10,15 38:14 39:4
include 27:9
individual 4:4 20:11 27:4 29:14
individuals 16:20 24:14 25:23
inform 37:12
information 27:9 39:16
injured 36:2
injuries 38:18
inside 5:9 16:12 17:9 20:11
inspection 30:10 30:14,16
instance 24:1
instances 5:7 22:13
insurance 36:13 36:23 39:15
interested 42:15
involve 5:8
involves 30:20
involving 7:18

**J**
JAMBOIS 2:2
job 12:4,5 16:17 26:6 27:6
jobs 26:3
Joliet 2:8 11:3
June 1:17 42:18

**K**
Kansas 8:3
Karnezis 1:15 42:3,21
Katrice 32:11,12 32:15
KAWINSKI 2:6
keep 26:7

know 16:15 17:12 18:24 19:20 20:1 21:22 23:1 23:9,23 24:14 25:6,7,10,10,11 26:19,21 27:4,8 28:8 29:8 30:18 31:7 34:4,6,11 37:5 39:4 40:18
knowledge 14:13 22:1 35:3 38:18 39:23
KRALOVEC 2:2

**L**
L 42:2,2
lawyers 38:13
learn 13:10 31:17 31:20
learned 31:13 33:21
left 10:18 31:22
level 7:20
light 35:1
line 25:16
lined 25:8
liquid 23:2,6,12 23:14
listed 36:23
little 14:19 16:14 23:21 24:13 34:2 35:13
live 7:3
load 26:4
local 4:12
location 11:1 14:4 21:13 22:14
look 15:17
looked 13:16
looking 14:15,20
looks 15:9
lot 14:1,3,10 15:15 16:1 20:23 21:6,7 26:1,7 27:2 40:9
loud 5:23

**M**
maiden 6:20
main 14:24 16:2,7 17:9 26:6 40:1,2 40:6
majority 18:11
making 28:20,22
man 37:22
manager 8:16,19 9:2,8,11,11,12 9:15,15,21 10:3 10:4,8,20,22,24 10:24 11:5 12:20,24 20:5,7 20:20,20,21,23 28:19 29:4,8,13 29:18,20,23 30:1,5,7,10,13
managers 16:13 20:10,17,18
MARILYNN 2:7
mark 14:18
marked 2:18 14:23 17:17 18:12 27:16 28:6
mat 16:8,11,21 17:1,3,3,4
materials 6:7 12:15,21 13:1 27:6,8
mats 16:24 17:5,6 17:8
Matthews 32:12 32:15,18
mean 18:15 22:10 24:11 26:6 27:21,22 37:20 37:24
meant 27:23
meeting 31:4
member's 4:1
members 21:9,11
Menard 1:6 5:15 8:7,13 11:10,16 26:10 39:7

Menards 4:5,17 8:9 10:10,14,15 10:18,19 11:1,2 11:6,11,22,24 12:3,8 13:5,14 13:19,24 14:4,9 14:24 15:3 18:21 19:9 20:12 21:6,12 21:21,24 22:7,9 22:18 23:1,16 24:7 27:19,24 28:14,19 29:2 30:22 37:3
Menards' 20:5
metal 17:17
Michael 4:4 36:3
MIKE 1:3
military 7:11
misdemeanor 7:18
misstates 41:8
misty 35:1
money 28:23
mop 19:15
mopped 34:20
morning 26:22 29:2
multiple 4:20 16:20,20,24 19:7,8

**N**
N 2:1,12
N-e-t-t 6:23
name 3:22,22 4:3 4:6 6:20 35:19 35:19
named 4:4
names 6:16
national 3:3
nature 19:22
near 23:6,15 34:16
need 6:3 11:21 20:1 26:20

Pamela Bamman

28:22
needed 16:10
    19:15
neon 26:11,12
Nett 6:21
never 18:14
new 11:15 12:4,4
    13:4
night 34:24
North 2:7
NORTHERN 1:1
Notary 1:16 42:3
notice 1:12 4:11
    29:23 33:24
noticed 23:5,14
    23:19 24:6 30:5
    34:5
notify 20:6
number 25:7,10
    25:11 26:14

**O**

object 41:7
objection 3:7,8
    5:1,10,16 21:16
    22:2,20
obviously 6:4
occurred 21:14
    30:21 37:15
October 30:21
office 32:19,21
    36:12,16 39:12
Oh 33:18 35:20
    37:24
okay 4:22 8:18,21
    9:1,4,10 10:9,13
    10:17 11:21
    12:2,12,15,19
    13:3 14:7,13,17
    15:13 16:7,11
    16:17 17:20
    20:4 21:5,12
    22:13 23:14
    24:1 25:6 26:17
    29:13,17 32:6
    32:24 33:4,18

34:12,16 35:3
36:4,8,14,17
37:14,17 38:4
39:10,19 40:18
41:16
Oklahoma 8:3
Olivia 2:3 3:9 4:3
    40:24
once 15:7 19:24
ones 27:11
open 10:8,23
    15:18 29:2
opens 30:11,14,17
opposed 40:1
option 17:3,4
order 15:6 28:21
outcome 42:15
outs 16:14 20:22
    21:1,3,7,8 25:14
    25:23 26:3,9,14
    26:21 28:21
    37:2 39:24
    40:15 41:5,11
outside 13:19
    39:7

**P**

P 2:1,1
p.m 41:17
Page 2:13 42:7
Pamela 1:9,12
    2:14 3:12 4:8,10
    6:17,21 42:5
pandemic 3:4
park 4:5 10:10,15
    10:19 11:2,6
    13:14,24 14:11
    21:13,24 22:9
    22:24 27:19,24
    29:2 30:22
parking 14:1,3,10
    15:15 16:1
    20:22 21:6,7
    26:1,7 27:2 40:9
parties 4:11 42:14
pass 28:13

path 17:20
pavement 39:7
Payroll 8:24
PC 2:6
pending 6:5
Pennsylvania 8:3
people 18:17
    26:20 29:12
percent 21:8 35:2
    39:5,9
person 19:14,21
    25:1 35:19
personal 42:9
personally 23:5
pertaining 1:14
PEYLA 2:6
phone 4:1 35:21
photograph 13:24
physical 3:5
physically 13:11
    31:8,10
pick 21:10
picked 28:23
picture 13:19,21
    13:23 15:18
place 42:12
placed 16:12
plaintiff 1:4 2:5
    3:10 6:14
planning 14:7,8
please 4:6
plus 19:14
policies 13:4,10
    27:1
policy 20:6
pool 30:6
pooled 23:5 29:24
    35:4
pooling 23:10,12
position 8:12,22
    9:1 10:8 11:15
    11:24 12:11,17
    13:4 16:18
positions 12:1,12
Prairie 7:1
premises 21:14

30:11,14,17
presence 3:6
previous 28:14
previously 2:18
    10:14 22:6 28:6
    42:12
print 13:8
printed 13:11
prior 11:2,9,11,19
    11:22,23 21:14
    35:4 41:8
probably 19:21
    35:24
Procedure 1:13
procedures 13:4
    13:10 27:1
process 13:9
product 26:5
program 11:8
    12:13
promoted 10:23
    11:15 12:14,16
proper 4:11
property/damage
    36:2
protocol 19:16,18
    19:21
provided 12:16
    12:20,24 13:3
Public 1:16 42:4
pull 35:10
purpose 28:8
pursuant 1:12,12
pushed 25:20
put 9:19 16:15,21
    16:24 18:22
    19:11 25:16
    34:16,21
putting 19:6

**Q**

question 5:22 6:5
    6:6 11:20 12:7
    23:13 33:19
questions 38:24

**R**

R 2:1
radio 30:3
rags 19:15
rain 16:14
raining 16:9
Randolph 2:3
really 26:20
reason 10:2
recall 9:16,24
    14:14 21:20
    30:22 31:1,4,6
    32:3,9,14,17
    33:7 34:22
receiving 15:6
    18:7,8
record 3:3 4:7,9
recorded 42:7
Recross 2:16
RECROSS-EX...
    40:12
Redirect 2:15,16
    39:21 41:2
reduced 42:8
REFERENCED
    2:19
referring 21:2
    24:1,3
reflect 4:9
reflecting 26:13
regard 39:3,10
regarding 35:17
    36:9 38:14
registers 18:6
    20:22
related 42:14
relevance 5:1,10
    5:16 21:16 22:2
    22:20
remember 4:21
    5:12,18 28:14
    36:19 37:18,19
remodel 10:5
report 6:9,10
    20:12,16 35:7
    35:16 36:6,12

Pamela Bamman

36:12,15,22
37:12 39:10,17
reporter 3:1,4 6:1
  25:9
reports 20:2
  39:11
represent 4:4
require 11:18
responsible 25:24
rest 26:10
RETAINED 2:22
returns 26:6
review 6:7,13
  13:10
right 10:16 12:9
  13:13 15:9 16:8
  17:18 19:3,4,23
  25:17 26:1 28:6
  28:20 32:22
  40:9,23 41:13
roles 11:18
roll 24:12
rolls 24:9,10
roughly 10:17
route 18:2
RPR 1:15 42:3,21
rules 1:13 4:12
  5:21
running 28:20
runs 20:21,23

**S**

S 2:1
sales 26:20
saw 28:6 31:10
  38:6
saying 23:10
Schwartz 2:2,3,14
  2:15,16,22 3:9,9
  3:17 4:4,9 5:6
  5:13,19 21:19
  22:5,23 25:13
  35:20 36:1
  38:22 39:22
  40:11 41:1,3,10
  41:15

screen 13:18
seal 42:18
Seasons 26:18
second 13:20
see 13:20 14:20
  15:11 16:14
  19:10,12 20:5
  31:8 35:11,18
  35:19 36:24
seen 38:6
separate 24:5
  25:15
served 7:11
service 32:1
set 4:2 19:20
  42:17
shaking 5:24
share 13:18
shift 26:15 29:7
shirts 26:11
shopping 23:6,15
  24:15 33:22
  34:7,13 35:4
show 13:19
showed 36:13
sidewalk 14:22
sign 19:11,14
  34:16
signs 18:22 19:2,6
  34:18,20,21
situations 22:8
slip 30:20
slippery 19:1
slow 26:6,18
slush 39:6
snow 23:8 24:4,9
  24:10,13,13,18
  24:19 25:3,5
  39:6
snowed 34:14,24
snowing 16:9 35:1
snowy 23:8,10
somebody 19:17
  19:19 20:5,9
  21:23 30:3,8
  34:19,20

Sophia 1:15 42:3
  42:21
sorry 36:21
special 15:6
specific 10:2
  11:18,24 16:17
  19:5,16,18 25:7
  26:14,24 27:5
  29:7 40:20
specifically 40:8
specified 42:12
spell 6:22
spill 18:22 19:10
  19:12,13
squares 17:14
SS 42:1
start 5:20 8:9 12:7
  12:17
started 8:13,22
  10:18,19,21
  22:8
starting 11:22,23
  12:3 16:14
starts 27:4 29:5
state 1:16 4:6,12
  42:1,4
stated 33:8,15
  38:2 40:14 41:4
statement 33:2,4
  33:7
states 1:1,14 36:2
stay 19:13 20:8
  30:7
stenographically
  42:8
stipulate 3:2
stipulated 3:10
stipulates 3:11
store 5:9 10:5,7
  17:6,21 18:3,8
  19:19 20:10,17
  20:20,23,23
  23:3,6 30:11,14
  30:17 31:21,23
Street 2:3,7
strike 19:17 33:20

stuff 26:13 28:11
  30:3
suit 42:15
Suite 2:7
supposed 15:22
  16:1,3 19:11
  20:6,12,15 27:9
  39:24 41:12
sure 3:23 5:21
  19:24 28:20,22
  34:20
sustained 21:23
  38:19
swear 3:1,4
switch 14:17
sworn 3:14 42:6
system 19:9

**T**

take 6:1,3,6 8:1
  9:17 17:21 18:2
  26:6 33:4
taken 1:15 4:10
  13:24 20:1
talked 38:16
talking 22:14
  30:23
tasked 19:5
team 21:9,11
tell 20:9
ten 29:10
testified 3:15 5:14
testify 42:6
testimony 41:8
  42:11
Thank 40:23
  41:16
thereof 42:16
they'd 30:2
thing 6:1 28:10
think 27:11 35:21
thinking 10:13
  28:10,11
thought 18:14
three 9:22 29:11
  29:12

tile 17:14
time 3:7 13:13
  21:8 24:5 29:1,9
  31:13 37:14
  40:19 42:12
times 21:1 23:18
  26:19
Tinley 4:5 10:10
  10:15,19 11:2,6
  13:14,24 21:13
  21:24 22:9,24
  27:19,24 29:1
  30:22
today 6:8 22:15
told 31:15,16,24
  32:1,2,4 38:6
train 27:12,13
trained 27:14,15
  27:17 41:5,11
training 11:8,14
  11:19,22,23
  12:3,4,5,8,13,15
  12:20,24 13:9
  27:5,8
transcript 42:9,11
transferred 10:6
  10:7,21
trash 21:10
trial 5:14
true 8:16 15:23
  17:18,24 36:10
  39:17,18 42:10
truth 42:6
trying 6:1
turnstile 17:19,23
  18:13
Twenty-seven
  8:10
two 4:21 7:8,21
  7:22 9:22 17:6
  29:11,12
type 4:23 5:24
  17:17 39:6
typewriting 42:8
typically 17:21

Pamela Bamman

**U**

uh-huhs 5:24
uh-uhs 5:24
undergo 11:21,23 12:8,13
underneath 15:10
understand 4:3 11:20 12:2 23:13
understanding 8:6,15 15:21
uniform 26:9
United 1:1,13
unsure 4:2
use 16:3,5 39:24 40:20
usually 29:10

**V**

Vaguely 30:24
vehicles 26:5
vests 26:12
videoconferenci... 1:11
vinyl 17:14
vs 1:5

**W**

W 42:2
wait 5:21
walk 16:23 17:18 18:8,9,12 30:2 32:22 40:3,7
walk-off 27:20,23 28:2,8,15
walks 16:7
want 9:5 10:11 28:24 38:13 39:8 40:4,6
wanted 3:23
warning 34:16,17
water 24:6 28:11 29:24 30:6,8 33:8 34:2,5,12 34:17 35:4
way 15:8 18:3

24:17 42:14,15
we're 14:20 22:14 30:20 36:21
wear 26:11
weather 34:22 39:3
welcome 6:4
went 10:2 19:21 24:12 33:16,22
weren't 32:21 39:4
West 2:3
wet 18:21 19:1,1,6 19:14 25:16 34:7,19
wheels 23:11 24:8 24:12,19 25:5 34:2,15
WHEREOF 42:17
wipe 23:23
wiped 23:9
witness 3:2,13 5:3 35:23 36:23 41:18 42:11,17
word 15:10
work 8:5 11:9 37:7
worked 10:14 28:15
working 8:9,13 10:9,18 11:2,11 12:7 13:14 21:20 22:8 26:15,22 29:21 31:1
works 21:5 29:8 37:2
wouldn't 24:22 40:18
written 12:15,20 13:3,7 27:1,11

**X**

X 2:12

**Y**

yard 15:7
yeah 26:4 34:14 35:12
year 9:14,24
years 7:21,22 8:10 9:8,17,18,18,19 9:22,22,23 10:11,11,17 13:15
yellow 19:2 34:17

**Z**

zoom 1:9,11 2:2,6 4:11 35:13
zoomed 14:19,19

**0**

05682 1:5
084-003792 42:22

**1**

1 42:7
10 40:19
11:59 1:18
116 2:7
12:46 41:17
13 26:22 30:21 31:18 35:17 38:10,15
13th 11:6 21:15 22:18 24:2 34:23 35:18 38:20
14 2:20
15 40:19
17th 42:18
1984 8:10
1985 7:24
1994 8:10

**2**

20 1:5 9:17,19
200-A 2:7
2017 21:21,24
2019 4:6 11:6

14:15 21:15
22:19 24:2
26:22 30:21
31:18 34:23
35:17 38:10,15
2021 1:17 42:18
20505 7:1
26th 21:21,24
28 8:11

**3**

3 2:14
34 7:8
37 7:8
39 2:15,15
3rd 4:6

**4**

40 2:16
41 2:16 42:7

**5**

**6**

6 29:3,5,8,14
60 2:3
60423 7:2
60432 2:8
60601 2:4

**7**

7th 1:17

**8**

8-17-59 7:10
80 7:24
85 7:24

**9**

9 29:15 30:22 35:18
99 21:8